ROB BONTA
Attorney General of California
PAULA BLIZZARD (SBN 207920)
Senior Assistant Attorney General
LAURA ANTONINI (SBN 271658)
PAUL CHANDER (SBN 305133)
ELIZABETH CHEEVER (SBN 341421)
EMILY CURRAN (SBN 293065)
KOMAL K. PATEL (SBN 342765)
CONNIE P. SUNG (SBN 304242)
BRIAN WANG (SBN 245983)
Deputy Attorneys General
 455 Golden Gate Ave., Suite 11000
 San Francisco, CA  91402
 Telephone: (415) 510-3765
 E-mail: Paula.Blizzard@doj.ca.gov
         Laura.Antonini@doj.ca.gov
*Attorneys for Plaintiff, The State of California*

Additional counsel identified on signature page

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| **THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF ILLINOIS, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OREGON,** AND **THE COMMONWEALTH OF VIRGINIA,** | Case No. **COMPLAINT FOR A PERMANENT INJUNCTION** |
| Plaintiffs, | |
| **v.** | |
| **NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.,** | |
| Defendants. | |

The State of California, State of Colorado, State of Connecticut, State of Illinois, State of New York, State of North Carolina, State of Oregon, and Commonwealth of Virginia, by and through their respective Attorneys General (collectively, "Plaintiff States"), bring this civil action against Nexstar Media Group, Inc. ("Nexstar") and TEGNA Inc. ("TEGNA") to enjoin Nexstar's proposed merger with TEGNA.  Plaintiff States allege as follows:

## I.    NATURE OF THE CASE

1.    Nexstar, the largest local television broadcast company in the United States, proposes to acquire TEGNA, the third largest television broadcast company in the country,[1] in a $6.2 billion transaction (the "Proposed Transaction").  The Proposed Transaction would create a broadcast behemoth with the increased and substantial power to raise prices for television consumers and to control and degrade the quality and quantity of broadcast content such as local news and sports.

2.    The merged entity would own 265 television stations across 44 states and the District of Columbia, reaching ~80% of U.S. households.  The Proposed Transaction consolidates ownership of many popular local television stations that currently compete against each other, likely resulting in significant harm to competition.

3.    Specifically, the Proposed Transaction would give Nexstar control over an unprecedented 221 "Big 4" stations.  The Big 4 stations are the well-known local stations affiliated with the FOX, NBC, ABC, and CBS networks.  Big 4 broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable channels.  Big 4 stations usually are the highest ranked in terms of audience share and ratings, largely because of unique offerings such as local news, sports, and highly ranked primetime programs.  Nexstar confirms that the "Big 4 broadcast networks carry the nation's most watched programming by a significant margin (including the substantial majority of

---

[1] If only counting English-language television broadcast companies, TEGNA is the second largest by household reach.

1

COMPLAINT FOR A PERMANENT INJUNCTION

[NFL] games)."[2]  As Nexstar put it to investors: "Broadcast and news networks continue to be the most watched."[3]

4.      Thirty-one[4] Designated Market Areas ("DMAs")[5] are "Big 4 Overlap DMAs."  A Big 4 Overlap DMA is a market area in which Nexstar and TEGNA each own at least one broadcast television station that is an affiliate of one of the Big 4 television networks.  After the Proposed Transaction, Nexstar would own the TEGNA Big 4 stations in each Overlap DMA.  For example, the Sacramento–Stockton–Modesto, California DMA is an Overlap DMA: Nexstar owns the local FOX affiliate KTXL-TV, and TEGNA owns the local ABC affiliate KXTV-TV.  After the Proposed Transaction, Nexstar would own both KTXL-TV and KXTV-TV.

5.      Eleven of the Big 4 Overlap DMAs directly impact the residents of each State or Commonwealth bringing this Complaint: (i) Buffalo, New York; (ii) Charlotte, North Carolina; (iii) Davenport-Rock Island-Moline, Iowa-Illinois; (iv) Denver, Colorado; (v) Greensboro-High Point-Winston-Salem, North Carolina; (vi) Hartford-New Haven, Connecticut; (vii) Norfolk-Portsmouth-Newport News, Virginia; (viii) Portland, Oregon; (ix) Sacramento-Stockton-Modesto, California; (x) San Diego, California; and (xi) St. Louis, Missouri (which includes several Illinois counties).

6.      Many consumers get their Big 4 broadcast content through cable, satellite, and fiber optic television (referred to collectively as multichannel video programming distributors or "MVPDs") like Comcast, DirecTV, DISH, Verizon, or Charter.  Because of Big 4 stations'

---

[2] Nexstar Media Group, Inc. (Form 10-K) at 4 (Feb. 27, 2026).
[3] Nexstar Media Group, Inc. Investor Presentation at 8 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf ("Nexstar Investor Presentation").
[4] Huntsville-Decatur, Alabama; Little Rock-Pine Bluff, Arkansas; Ft. Smith-Fayetteville-Springdale-Rodgers, Arkansas; San Diego, California; Sacramento-Stockton-Modesto, California; Denver, Colorado; Hartford & New Haven, Connecticut; Tampa-St. Petersburg, Florida; Des Moines-Ames, Iowa; Davenport-Rock Island-Moline, Iowa-Illinois; Indianapolis, Indiana; New Orleans, Louisiana; Grand Rapids-Kalamazoo-Battle Creek, Michigan; St. Louis, Missouri; Charlotte, North Carolina; Greensboro, North Carolina; Buffalo, New York; Cleveland-Akron, Ohio; Columbus, Ohio; Portland, Oregon; Harrisburg-Lancaster-Lebanon-York, Pennsylvania; Wilkes Barre-Scranton-Hazleton, Pennsylvania; Knoxville, Tennessee; Memphis, Tennessee; Abilene-Sweetwater, Texas; Austin, Texas; Odessa-Midlands, Texas; San Angelo, Texas; Tyler-Longview, Texas; Waco-Temple-Bryan, Texas; and Norfolk, Virginia.
5 DMAs are geographic units which are widely accepted as the standard geographic areas to use in evaluating television audience size and demographic composition.

COMPLAINT FOR A PERMANENT INJUNCTION

popular national content and valued local coverage, MVPDs regard Big 4 programming as essential for inclusion in the packages they offer subscribers.

7.    MVPDs contract with broadcast companies like Nexstar and TEGNA for inclusion of Big 4 station content in their offerings to consumers.  MVPDs enter into a "retransmission consent agreement" with broadcast companies under which MVPDs pay "retransmission consent fees" for Big 4 station content.

8.    In each Big 4 Overlap DMA, the proposed merger would eliminate competition between Nexstar and TEGNA in the licensing of Big 4 station content to MVPDs for distribution to their subscribers.

9.    By consolidating with a major competitor, Nexstar would likely acquire the power to charge MVPDs higher retransmission consent fees for Big 4 station content.  In turn, those MVPDs would likely pass on the increased retransmission consent fees, in large measure, to their subscribers in the form of substantially higher cable and satellite bills.  The U.S. Department of Justice ("U.S. DOJ") challenged two previous Nexstar acquisitions in 2016 (Media General) and 2020 (Tribune) on such grounds.  For example, in the Nexstar/Tribune merger, the U.S. DOJ noted "the combined company would likely charge . . . higher retransmission [consent] fees … resulting in higher monthly cable and satellite bills for millions of Americans."[6]

10.    The merger would increase retransmission consent fees in Overlap DMAs as well as DMAs where Nexstar is acquiring a TEGNA station but does not own any stations itself. Retransmission consent negotiations are commonly conducted on a station-group, multi-market "footprint" basis.  Because Nexstar would own and control such a large number of stations post-acqusition, the merger would materially increase Nexstar's national footprint.  Having an outsized national footprint gives Nexstar equally outsized bargaining leverage over MVPDs in

[6] The U.S. DOJ ultimately required Nexstar to divest Big 4 stations in both mergers. Press Release, U.S. Dep't of Just., Justice Department Requires Structural Relief to Resolve Antitrust Concerns in Nexstar's Merger with Tribune (Jul. 31, 2019), https://www.justice.gov/archives/opa/pr/justice-department-requires-structural-relief-resolve-antitrust-concerns-nexstar-s-merger; *see* Press Release U.S. Dep't of Just., Justice Department Requires Divestitures in Order for Nexstar to Proceed with Media General Acquisition (Sept. 2, 2016), https://www.justice.gov/archives/opa/pr/justice-department-requires-divestitures-order-nexstar-proceed-media-general-acquisition.

COMPLAINT FOR A PERMANENT INJUNCTION

negotiations over retransmission consent agreements.  An MVPD has attested that retransmission consent fees "are higher for affiliates owned by larger groups."[7]  As a result, the merger would likely increase retransmission consent fees in both Overlap DMAs and the DMAs where Nexstar and TEGNA do not own competing stations (the "Nationwide Portfolio/Footprint Effect").

11.    The Proposed Transaction may also result in fee increases through contractual "after-acquired" clauses that move TEGNA stations to Nexstar's preexisting retransmission consent agreements.  Among all broadcasting groups, Nexstar charges the highest average monthly retransmission consent fees per subscriber.[8]

12.    Additionally, the Proposed Transaction will likely reduce competition in local news operations.  Based on Nexstar's pattern of newsroom closures and its recent statements to investors, the merged entity is likely to consolidate newsrooms of previously separate Big 4 stations, degrading the content and quality of local news broadcasts through the Big 4 stations.  A recent study found that Nexstar is the worst offender in "news duplication" in local news, meaning Nexstar stations air local news content that is identical across multiple stations in one location.[9]

13.    Eliminating independent sources of local news is a quality degradation resulting from the aggregation of market power and, as such, fits neatly within traditional antitrust concerns over the ability of firms with significant market power to lower the quality of products (even as they boost prices).  Moreover, eliminating independent news operations will diminish diversity in news coverage at a time when, with challenges to local newspapers, local broadcast news coverage is critical to the ability of an informed citizenry to participate in local governmental and community activities.  The Nexstar track record reveals that consumers and

---

[7] Decl. of Allan L. Shampine at ¶ 5, Petition to Deny of DIRECTV, LLC at E-14, *In the Matter of Applications to Transfer Control of TEGNA Inc. to Nexstar Meda Inc.,* MB Docket No. 25-331 (Dec. 31, 2025).
[8] *See* Nexstar Investor Presentation at 28.
[9] Danilo Yanich & Benjamin E. Bagozzi, *Reusing the News: Duplicating Local TV Content*, SNF Ithaca Initiative, Univ. of Del. (Aug. 2025), https://udspace.udel.edu/server/api/core/bitstreams/414834a9-fa05-4be0-a5cd-9b317fdbe02b/content, at 4.

4

COMPLAINT FOR A PERMANENT INJUNCTION

communities will have less choice in news and less access to diversity in perspectives if this merger succeeds, all while prices for paid television content continue to rise.

14.    Section 7 of the Clayton Act prohibits mergers and acquisitions in "any line of commerce . . . in any section of the country," where the effect "may be substantially to lessen competition, or tend to create a monopoly."  For all of the foregoing reasons, the proposed merger of Nexstar and TEGNA likely would substantially lessen competition in the market for Licensing of Big 4 Television Retransmission Consent in each of the Big 4 Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.    JURISDICTION AND VENUE

15.    Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  Plaintiff States, by and through their respective Offices of their Attorneys General, bring this action as *parens patriae* on behalf of and to protect the health and welfare of their residents and the general economy of each of their states.

16.    The Court has subject matter jurisdiction over this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337(a).

17.    Defendants license retransmission of Big 4 television network content to MVPDs in the flow of interstate commerce, and such activities substantially affect interstate commerce. Defendants are, and at all relevant times have been, engaged in commerce in the States of California, Colorado, Connecticut, Illinois, New York, North Carolina, Oregon, and Virginia.

18.    Both Defendants transact business in this district, including in Sacramento County. Defendant Nexstar owns the FOX affiliate KTXL-TV, or FOX40, based in Sacramento. Defendant TEGNA owns the local ABC affiliate KXTV-TV or ABC10, based in Sacramento. The Court therefore has personal jurisdiction over the Defendants, and venue is therefore proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(1) and (c).  Additionally, for the foregoing reasons, assignment to the Sacramento Division is proper.

COMPLAINT FOR A PERMANENT INJUNCTION

### III.   THE PARTIES

19.     Plaintiff State of California is a sovereign state of the United States.  This action is brought by and through its Attorney General, Rob Bonta, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of California has its principal offices at 1300 "I" Street, Sacramento, CA 95814.

20.     Plaintiff State of Colorado is a sovereign state of the United States.  This action is brought by and through its Attorney General, Phil Weiser, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of Colorado has its principal offices at 1300 N. Broadway, Denver, CO 80203.

21.     Plaintiff State of Connecticut is a sovereign state of the United States.  This action is brought by and through its Attorney General, William Tong, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of Connecticut has its principal offices at 165 Capitol Ave, Hartford, CT 06106.

22.     Plaintiff State of Illinois is a sovereign State of the United States.  This action is brought by and through its Attorney General, Kwame Raoul, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of Illinois has its principal offices at 115 S. LaSalle Street, Chicago, IL 60603.

23.     Plaintiff State of New York is a sovereign state of the United States.  This action is brought by and through its Attorney General, Letitia James, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of New York has its principal offices at The Capitol, Albany, NY 12224-0341.

24.     Plaintiff State of North Carolina is a sovereign state of the United States.  This action is brought by and through its Attorney General, Jeff Jackson, who is the chief law

COMPLAINT FOR A PERMANENT INJUNCTION

enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of North Carolina has its principal offices at 114 W. Edenton Street, Raleigh, NC 27603.

25. Plaintiff State of Oregon is a sovereign state of the United States. This action is brought by and through its Attorney General, Dan Rayfield, who is the chief law enforcement officer of the State and heads the Oregon Department of Justice ("OR DOJ"), with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Oregon is a division of the OR DOJ and has its principal offices at 1162 Court Street NE, Salem, OR 97301.

26. Plaintiff Commonwealth of Virginia is a sovereign state of the United States. This action is brought by and through its Attorney General, Jay Jones, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of Virgnia has its principal offices at 202 North 9th Street, Richmond, VA, 23219.

27. Each Plaintiff State is seeking relief pursuant to Clayton Act Section 16, 15 U.S.C. § 26.

28. Defendant Nexstar is a Delaware corporation with its headquarters in Irving, Texas. Nexstar owns America's largest local television broadcasting group comprised of top network affiliates, with more than 200 owned or partner stations in 116 U.S. markets reaching 220 million people.[10] In 2025, Nexstar reported revenues of over $4.9 billion. Nexstar is a leading affiliate of all major broadcast networks, holding dozens of Big 4 stations nationwide: 49 CBS affiliates, 51 FOX affiliates, 35 NBC affiliates, and 33 ABC affiliates:[11]

---

[10] Nexstar, *Stations,* https://www.nexstar.tv/stations/ (last visited Mar. 18, 2026); Nexstar Investor Presentation at 5 ("We are the Largest Local Television Broadcast Group"; "Nexstar Has Unmatched Local Broadcast Television Scale with Nationwide Reach via its Owned Broadcast and News Networks.").
[11] Nexstar, *Stations,* https://www.nexstar.tv/stations/ (last visited Mar. 18, 2026); While not considered Big 4 networks, as of June 2025, Nexstar also held 54 CW affiliates, 27 MyTV affiliates, and 7 independent and Telemundo affiliates. Nexstar Investor Presentation at 7.

7

Source: Nexstar Investor Presentation at 7.

29.    Defendant TEGNA is a Delaware corporation with its headquarters in Tysons, Virginia.  TEGNA owns 64 television stations in 51 DMAs.[12]  In 2025, TEGNA earned revenues of more than $2.7 billion.  TEGNA is the largest owner of Big 4 affiliates in the top 25 markets, and the location of TEGNA stations is illustrated below:

[12] TEGNA, *Trustworthy, Impactful Journalism,* https://www.tegna.com/about/trustworthy-impactful-journalism/ (last visited Mar. 18, 2026).

8



Source: TEGNA, *Trustworthy, Impactful Journalism,* https://www.tegna.com/about/trustworthy-impactful-journalism/ (last visited Mar. 18, 2026).

## IV.   THE MERGER

30.   On August 18, 2025, Nexstar announced it had reached an agreement to acquire TEGNA for $6.2 billion.  The Proposed Transaction creates the largest broadcast station group in the United States, owning 265 stations across 44 states and DC and reaching 80% of U.S. television households.  The combined company would operate broadcast stations in 132 U.S. DMAs, 9 of the top 10 DMAs, and 41 of the top 50 DMAs.  Notably, 35 of TEGNA's 51 DMAs overlap with Nexstar DMAs, meaning in those 35 DMAs both TEGNA and Nexstar own at least one broadcast station affiliated with a Big 4 network.  Consequently, the Proposed Transaction will create substantial duopolies and triopolies, and give the combined company unprecedented national and DMA-level reach.

31.   In Nexstar Chairman and CEO Perry Sook's own words, this is a merger that creates ██████████████████████

9

COMPLAINT FOR A PERMANENT INJUNCTION

## V.    RELEVANT ANTITRUST MARKET

32.    MVPDs, such as Comcast, DirecTV, DISH, and Charter, typically pay the owner of each local Big 4 broadcast station a per-subscriber retransmission consent fee for the right to retransmit the station's content to the MVPD's subscribers.  This fee and other terms under which an MVPD is permitted to distribute a station's content to its subscribers are set forth in a retransmission consent agreement.  A retransmission consent agreement is negotiated directly between a broadcast station group, such as Nexstar or TEGNA, and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or "footprint."[13]  Because MVPDs generally have a national footprint, the agreements nearly always cover all the broadcasting company's stations.

33.    Retransmission consent agreements generally provide a single price for all a broadcasting company's stations in a particular category (*e.g.*, all stations affiliated with Big 4 networks).  Retransmission consent agreements also commonly address what happens if the broadcast station group acquires additional stations during the term of the agreement, including that those newly acquired stations will be added to the agreement and will be subject to the agreement's pricing terms.[14]

34.    Each broadcast station group typically renegotiates retransmission consent agreements with the MVPDs every few years.  If an MVPD and a broadcast station company cannot agree on a retransmission consent fee at the expiration of a retransmission consent agreement, the result may be a "blackout" of the broadcast group's stations from the particular MVPD—*i.e.*, an open-ended period during which the MVPD may not distribute those stations to its subscribers until a new contract is successfully negotiated.  For example, if, post-acquisition, Nexstar and an MVPD operating in Sacramento could not agree to the terms of a retransmission consent agreement, that MVPD's customers would not have access to either KTXL-TV (FOX) or KXTV-TV (ABC) during any blackout.

---

[13] *See* Competitive Impact Statement at 4, *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-02295 (D.D.C. Aug. 1, 2019).

[14] *See* Memorandum Op. & Order at ¶ 16, *In the Matter of the Applications of Tribune Media Company and Nexstar Media Group, Inc. et al.,* FCC 19-89 (Sept. 16, 2019).

COMPLAINT FOR A PERMANENT INJUNCTION

**A. The Licensing of Big 4 Retransmission Consent Is a Relevant Product Market**

35.     The Licensing of Big 4 Television Retransmission Consent is a relevant product market in which to evaluate the competitive effects of the Proposed Transaction.  A relevant product market under Section 7 is defined by the "reasonable interchangeability of use . . . between the product itself and substitutes for it."[15]  In this market, sellers are the broadcast groups that own Big 4 stations in a given community and the buyers are the MVPDs that purchase the right to that broadcast content, for distribution alongside other programming to their local subcribers.

36.     Because of Big 4 stations' popular national content and valued local coverage, MVPDs regard Big 4 programming as essential for inclusion in the packages they offer subscribers.  Big 4 broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable channels.  Big 4 stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly ranked primetime programs.

37.     Nexstar confirms that the "Big 4 broadcast networks carry the nation's most-watched programming by a significant margin (including the substantial majority of [NFL] games)."[16]  In noting that "market shifts are benefiting broadcast," Nexstar boasts that "[b]roadcast television remains the most important medium for engaging live sports audiences."[17]  And, as Nexstar put it to investors: "Broadcast and news networks continue to be the most watched,"[18] and "broadcast continues to be the gold standard for sports and news programming."[19]

38.     Nexstar's CEO Perry Sook stated, "If we look at recent industry strategic activity, broadcast has been a consistently coveted asset because of the scale, reach and results it delivers to premium programming, especially sports.  The numbers speak for themselves. . . . The data is

---

[15] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).
[16] Nexstar Media Group, Inc. (Form 10-K) at 4 (Feb. 27, 2026).
[17] Nexstar Investor Presentation at 25.
[18] Nexstar Investor Presentation at 8.
[19] Nexstar, *Nexstar Media Group Q4 2024 Earnings Call Transcript* (Feb. 27, 2025).

COMPLAINT FOR A PERMANENT INJUNCTION

clear when it comes to delivering scaled audiences for premium live sports and events, broadcast remains unmatched."[20]  Nexstar highlights the unique benefits of broadcast television:



Source: Nexstar Investor Presentation at 30.

39.     Viewers that have chosen to subscribe to an MVPD to receive a package of content are a distinct set of consumers participating in a well-defined local market, which has been recognized repeatedly by the U.S. DOJ[21] and also by the Federal Communications Commission.[22] That is not suprising because the licensing of Big 4 restransmission consent has peculiar characteristics and uses, as it offers unique and highly watched must-have content such as local news, sports and primetime programs; has distinct prices in the form of retransmission consent fees that get passed on to consumers' cable and satellite bills; has distinct customers in the form

[20] Nexstar, *Nexstar Media Group Q4 2025 Earnings Call Transcript* (Feb. 26, 2026).
[21] The U.S. DOJ has consistently used this product market definition in previous antitrust enforcement proceedings.  *See, e.g.*, Competitive Impact Statement at 1-2, *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-02295 (D.D.C. Aug. 1, 2019); Competitive Impact Statement at 1, *United States v. Gray Television, Inc.*, No. 1:21-cv-02041 (D.D.C. Jul. 28, 2021).
[22] The Federal Communications Commission has similarly used a product market based on the Big 4 networks.  *See* FCC, *Report and Order and Further Notice of Proposed Rulemaking In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent*, MB Docket No. 10-71, FCC 14-29, March 31, 2014, ¶13.

12

of MVPDs that collect content to be provided to viewers; and uses specialized vendors, the broadcast companies.

40. Retransmission consent fees for Big 4 stations are higher than the retransmission consent fees for non-Big 4 stations, indeed, significant numbers of non-Big 4 stations charge no retransmission consent fees at all.[23] Moreover, federal law requires that Big 4 affiliates and MVPDs "shall negotiate in good faith the terms and conditions of retransmission consent agreements" and largely prohibits the ability of MVPDs to replace blacked-out content in one local market by bringing in network programming from another.[24] The only firms that acquire Big 4 station content by paying retransmission consent fees are MVPDs.

41. If an MVPD suffers a blackout of a Big 4 station in a given DMA, many of the MVPD's subscribers in that DMA are likely to turn to other Big 4 stations in the DMA to watch similar content, such as sports, primetime shows, and local news and weather. This willingness of viewers to switch between competing Big 4 broadcast stations limits an MVPD's expected losses in the case of a blackout, and thus limits (though it does not fully eliminate) a broadcaster's ability to extract higher fees from that MVPD—since an MVPD's willingness to pay higher retransmission consent fees for content rises or falls with the harm it would suffer if that content were lost. But when the same owner controls more Big 4 options in the same DMA, that "escape valve" is weakened.

42. Because the programming typically offered by non-Big 4 stations often has narrower audience appeal, viewers are much less likely to switch to a non-Big 4 station than to switch to other Big 4 stations in the event of a blackout of a Big 4 station, particularly for local news or sports programming. Stations that are affiliates of networks other than the Big 4, such as

---

[23] *See e.g.* Declaration of Linda Burakoff ¶ 11–12, *Circle City Broad. I, LLC v. AT&T Servs., Inc.*, No. 1:20-cv-02108-TWP-TAB (S.D. Ind. Jan. 1, 2022), ECF No. 132-17 (describing non-payment to non-Big 4 stations).

[24] 47 CFR § 76.65(a); Competitive Impact Statement at 6, *United States v. Gray Television, Inc.*, No. 1:21-cv-02041 (D.D.C. Jul. 28, 2021) ("In the event of a blackout of a Big Four network station, FCC rules generally prohibit an MVPD from importing the same network's content from another DMA. Thus, MVPD subscribers in one DMA cannot switch to Big Four programming in another DMA in the face of a blackout. Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA.")

COMPLAINT FOR A PERMANENT INJUNCTION

the CW Network, MyNetworkTV, or Telemundo, typically feature niche programming without local news or sports—or, in the case of Telemundo, programming aimed at a Spanish-speaking audience.  Stations that are unaffiliated with any network are similarly unlikely to carry programming with broad popular appeal.  Accordingly, competition from non-Big 4 stations does not impose a significant competitive constraint on the retransmission consent fees charged by the owners of Big 4 stations, and non-Big 4 stations are therefore not meaningful substitutes for Big 4 stations.

43.    For the same reasons, subscribers—and therefore MVPDs—generally do not view cable network programming as a close substitute for Big 4 network content.  This is primarily because cable channels offer different content.  For example, cable channels generally do not offer local news, which provides a valuable connection to the local community that is important to viewers of Big 4 stations.  The high price of retransmission consent fees also demonstrates that the market for the Licensing of Big 4 Retransmission Consent is a relevant product market.  Retransmission consent fees are higher for Big 4 stations than any retransmission consent fees for non-Big 4 stations.

44.    Streaming services are also not available substitutes for Big 4 network content.  Streaming services do not obtain content through federally governed retransmission consent; they are not, therefore, buyers of retransmission services like the MVPDs.  Rather, they focus on serving consumers directly.

45.    Some streaming services provide an on-demand library of content via an app, the Internet, or an online platform where users either pay a recurring fee (*e.g.*, Netflix, HBO Max, or Disney+)[25] or get the content free with advertisements (*e.g.*, Tubi, Pluto TV, and FreeVee).[26]  These streaming services are not close substitutes for Big 4 station broadcasts because they do not replicate the unique offerings of a Big 4 station, including the in-the-moment nature of local live news, sports, and network programming, including live events.  These types of streaming services instead provide an on-demand viewing experience from cultivated collections.

---

[25] This type of streaming service is called a Subscription Video on Demand (SVOD) service.
[26] This type of streaming service is called an Ad-based Video on Demand (AVOD) service.

14

46.     Nor are streaming services like YouTube TV, Hulu+, Sling TV or Fubo ("Virtual Multichannel Programming Distributors or "vMVPDs") an alternative source of Big 4 station content to an MVPD.  vMVPDs that contract directly with ABC, NBC, FOX, and CBS to stream network content can also provide local content if Big 4 stations give their approval.  Legal and practical realities, including the requirement that MVPDs receive Big 4 broadcast station signals through retransmission, the nature of content contracts, and the limitations on the use of intellectual property, effectively prevent an MVPD from receiving Big 4 broadcast station signals outside of retransmission consent agreements.

47.     Moreover, the live content available from vMVPDs is more limited, less consistent, and less localized than the content that is available through an MVPD subscriber's unlimited access to all Big 4 stations.

48.     The hypothetical monopolist test is a tool used to determine if a group of products is sufficiently broad to be a properly defined antitrust product market.  If a single firm (*i.e.*, a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and likely would undertake a small but significant and non-transitory increase in price ("SSNIP"), then that group of products is a properly defined antitrust product market.

49.     Here, a hypothetical monopolist of Big 4 television stations likely would undertake a SSNIP on MVPDs to increase the retransmission consent fees it charges to MVPDs for Big 4 stations.  In the event of a SSNIP for Big 4 television stations, MVPDs would not switch to other sources of programming in sufficient volumes to render the price increase unprofitable.

50.     Because of viewer preferences, legal restrictions, and marketplace realities, non-Big 4 broadcast stations, cable networks, or the streaming services described above are not close substitutes for the programming MVPDs receive from Big 4 stations; thus, these other sources of programming are not sufficient to discipline an increase in the fees charged for Big 4 television retransmission consent.  In fact, all or nearly all MVPDs in the United States have restransmission agreements for Big 4 stations with local broadcasters.  If there were cheaper, available substitutes, economic principles suggest that MVPDs would be giving up the quest for Big 4 retransmission licenses.  That they are sticking with retransmission consent agreements despite their rising

15

costs—doubling between 2018 and 2024[27]—supports the view that there are no other sellers of equivalent content to MVPDs.

51.    The Licensing of Big 4 Television Retransmission Consent therefore constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### B. Geographic Markets

52.    A DMA is a geographic unit for which A.C. Nielsen Company—a firm that surveys television viewers—furnishes broadcast television stations, MVPDs, cable and satellite television networks, advertisers, and advertising agencies in a particular area with data to aid in evaluating audience size and composition.  DMAs are widely accepted by industry participants as the standard geographic areas to use in evaluating television audience size and demographic composition.  The Federal Communications Commission ("FCC") also uses DMAs as geographic units with respect to its MVPD regulations.

53.    In the event of a blackout of a Big 4 network station, FCC rules generally prohibit an MVPD from importing the same network's content from another DMA.[28]  Thus, Big 4 viewers in one DMA cannot switch to Big 4 programming in another DMA in the face of a blackout.  Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA.  Each DMA thus constitutes a relevant geographic market for the Licensing of Big 4 Television Retransmission Consent within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### VI.    THE PROPOSED TRANSACTION IS PRESUMPTIVELY UNLAWFUL

54.    The proposed merger is presumptively unlawful.  The acquisition will lead to significant increases in concentration in multiple geographic markets in the already-consolidated

---

[27] *See* American Television Alliance, *Big Broadcast Raises Prices as Viewership Falls* (Oct. 16, 2025), ATVA-Rising-Prices-as-Viewership-Falls-6.25.pdf (2018 = $9.48; 2024 = $21.71).
[28] 47 C.F.R. 76.65(a) ("Television broadcast stations and multichannel video programming distributors shall negotiate in good faith the terms and conditions of retransmission consent agreements."); Cable Television Consumer Protection and Competition Act of 1992.

16

Licensing of Big 4 Television Retransmission Consent market that exceed the threshold for presumptive illegality.

55.     The Herfindahl-Hirschman Index ("HHI") is a well-established method for calculating concentration in a market.  The HHI is the sum of the squares of the market shares of the market participants.  For example, a market with five firms, each with 20% market share, would have an HHI of 2,000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2,000$).  The HHI is low when there are many small firms and grows higher as the market becomes more concentrated.  For example, if 100 firms each had 1% of the market, the HHI would would be 100 ($1^2$ added together 100 times).  A market with a single firm would have an HHI of 10,000 ($100^2 = 10,000$).

56.     The U.S. DOJ and the Federal Trade Commission jointly publish the Merger Guidelines.  Rooted in established caselaw and widely accepted economic thinking, the Merger Guidelines outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess whether transactions violate the antitrust laws, including measuring market shares and changes in market concentration from a merger.  The Merger Guidelines—themselves guided by numerous court decisions—support using the HHI method to calculate market concentration.

57.     The increase in market concentration caused by the Proposed Transaction is indicative of the Proposed Transaction's likely negative impact on competition.  The Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful.  Specifically:

- A merger that creates a firm with a market share of over 30 percent and that increases the HHI of the market by more than 100 points is presumed to substantially lessen competition in that market and is thus presumptively illegal.
- A merger is also likely to create or enhance market power—and, again, is presumptively illegal—when the post-merger HHI exceeds 1,800 and the merger increases the HHI by more than 100 points.

58.     The chart below summarizes Defendants' approximate Big 4 television retransmission consent market shares, based on revenue, and the effect of the Proposed

17

COMPLAINT FOR A PERMANENT INJUNCTION

Transaction on the HHI in each of the eleven Big 4 Overlap DMAs whose viewers include residents of the Plaintiff States.

| Big 4 Overlap DMA[29] | Nexstar Share | TEGNA Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Buffalo, NY | 39.3% | 20.0% | 59.3% | 2,800 | 4,371 | 1,571 |
| Charlotte, NC | 24.7% | 26.2% | 50.9% | 2,566 | 3,860 | 1,294 |
| Davenport-Rock Island-Moline, IA-IL | 44.6% | 11.2% | 55.8% | 3,111 | 4,108 | 997 |
| Denver, CO | 30.9% | 26.2% | 57.1% | 2,562 | 4,182 | 1,620 |
| Greensboro-High Point-Winston-Salem, NC | 27.2% | 26.0% | 53.2% | 2,541 | 3,957 | 1,416 |
| Hartford-New Haven, CT | 38.1% | 25.3% | 63.3% | 2,838 | 4,762 | 1,923 |
| Norfolk-Portsmouth-Newport News, VA | 62.2% | 15.7% | 77.9% | 4,607 | 6,556 | 1,949 |
| Portland, OR | 39.9% | 15.0% | 54.9% | 2,835 | 4,029 | 1,194 |
| Sacramento-Stockton-Modesto, CA | 39.7% | 22.5% | 62.2% | 2,797 | 4,581 | 1,784 |
| San Diego, CA | 41.9% | 22.7% | 64.6% | 2,911 | 4,813 | 1,902 |
| St. Louis, MO | 26.1% | 22.5% | 48.6% | 2,508 | 3,684 | 1,175 |

59.    As indicated by the preceding chart, the post-merger HHI in each Big 4 Overlap DMA is well above 1,800, and the HHI increase in each Big 4 Overlap DMA far exceeds the 100-point threshold.  In fact, the post-merger HHIs are **all** over 3,500 and the HHI increases are **all** over 900. The **lowest** merger share is over 48%.

60.    Another way to assess market shares related to the Proposed Transaction is through ratings—the measure of how many viewers are watching a station.  The chart below summarizes Defendants' approximate market shares based on ratings and the effect of the Proposed Transaction on the HHI in each of the eleven Big 4 Overlap DMAs whose viewers include residents of Plaintiff States:

---

[29] Retransmission revenue data from S&P Capital IQ, U.S. Broadcast Station Database.

18

| Big 4 Overlap DMA[30] | Nexstar Share | TEGNA Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Buffalo, NY | 37.0% | 32.7% | 69.7% | 2,905 | 5,322 | 2,417 |
| Charlotte, NC | 14.1% | 21.0% | 35.1% | 2,768 | 3,361 | 592 |
| Davenport-Rock Island-Moline, IA-IL | 16.3% | 25.2% | 41.5% | 3,262 | 4,083 | 821 |
| Denver, CO | 27.4% | 29.8% | 57.2% | 2,557 | 4,191 | 1,633 |
| Greensboro-High Point-Winston-Salem, NC | 26.2% | 29.1% | 55.3% | 2,721 | 4,245 | 1,524 |
| Hartford-New Haven, CT | 25.9% | 16.1% | 42.0% | 2,675 | 3,508 | 833 |
| Norfolk-Portsmouth-Newport News, VA | 49.1% | 26.1% | 75.1% | 3,705 | 6,261 | 2,557 |
| Portland, OR | 23.3% | 22.4% | 45.8% | 2,524 | 3,571 | 1,046 |
| Sacramento-Stockton-Modesto, CA | 16.2% | 17.3% | 33.5% | 2,943 | 3,505 | 560 |
| San Diego, CA | 22.5% | 28.7% | 51.2% | 2,539 | 3,832 | 1,293 |
| St. Louis, MO | 27.3% | 27.6% | 54.9% | 2,837 | 4,344 | 1,507 |

61. As indicated by the preceding chart, the post-merger HHI in each Big 4 Overlap DMA is well above 1,800, and the HHI increase in each Big 4 Overlap DMA far exceeds the 100-point threshold. In fact, the post-merger HHIs are **all** over 3,300 and the HHI increases are **all** well over 100. All of the merged shares are above 30%.

62. Thus, the proposed merger presumptively violates Section 7 of the Clayton Act in each Big 4 Overlap DMA.[31]

## VII.   THE PROPOSED TRANSACTION ELIMINATES DIRECT HEAD-TO-HEAD COMPETITION

63. The elimination of head-to-head competition between Defendants also makes the Proposed Transaction unlawful. A merger is unlawful if it substantially lessens competition between the parties independent of the analysis of market shares, as recognized by the Merger Guidelines.

---

[30] Ratings data from S&P Capital IQ, Comscore TV Average Ratings, Q4 2025.
[31] "Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive." *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001).

64.     Nexstar and TEGNA are close competitors.  Nexstar and TEGNA compete for viewers, and Nexstar and TEGNA compete closely in the Licensing of Big 4 Retransmission Consent market.  TEGNA acknowledged in an internal email that ████████████████ ████████████████████████  Additionally, Nexstar tracks TEGNA's ████████ ████████████████  and monitors and compares ████████████████████████ ████████

65.     The Proposed Transaction eliminates substantial head-to-head competition between Defendants in each Big 4 Overlap DMA in the Licensing of Big 4 Retransmission Consent market.  The loss of competition between Nexstar and TEGNA will give Nexstar the power to charge MVPDs higher fees to retransmit its content.  In turn, those MVPDs would likely pass on the increased retransmission consent fees, in large measure, to their subscribers in the form of substantially higher cable and satellite bills.

66.     The Proposed Transaction would increase retransmission consent fees as part of the Nationwide Portfolio/Footprint Effect in both Overlap DMAs and DMAs where Nexstar and TEGNA do not own competing stations.  Retransmission consent negotiations are commonly conducted on a station-group, multi-market "footprint" basis, and the merger would materially increase Nexstar's national footprint and bargaining leverage in those negotiations.  As a result, the merger would likely increase retransmission consent fees—and, ultimately, costs to consumers—in both Overlap DMAs and DMAs where Nexstar and TEGNA do not own competing stations.  Nexstar's Chief Financial Officer Lee Ann Gliha acknowledged that Nexstar anticipates collecting higher retransmission consent fees when she stated that "there's about $300 million of synergies [in this merger].  It breaks out very similar to how the synergies broke out on the [Nexstar/Tribune Merger], which was about 45% from net retrans[.]"[32]

67.     The Proposed Transaction would increase the bargaining power of Nexstar because, in more DMAs, it would be providing access to a bundle rather than only one of the Big 4 stations.  That increases its ability to demand higher fees and to threaten negative consequences to MVPDs and their viewers if the MVPDs resist.  The merged company would have the power to

[32] Nexstar, *Nexstar Media Group, Inc. Q3 2025 Earnings Call Transcript* (Nov. 6, 2025).

20

COMPLAINT FOR A PERMANENT INJUNCTION

threaten to black out multiple Big 4 stations simultaneously in each of the Big 4 Overlap DMAs, something Nexstar and TEGNA cannot do independently today. And the proposed merger would reduce the extent to which MVPD subscribers in a Big 4 Overlap DMA could substitute to watch an independently owned competing Big 4 station in the event of a blackout, thereby increasing an MVPD's expected losses from a blackout and increasing the retransmission consent fees that Defendants could profitably demand.

68.    By way of an example, if an MVPD serving Sacramento is negotiating with Nexstar and a blackout results from stalled negotiations, the Sacramento MVPD customer could switch from the Nexstar-owned FOX affiliate KTXL-TV (FOX10) to the TEGNA-owned ABC affiliate KXTV-TV (ABC10) to watch local news or sports programming. After this merger, in the same scenario, Nexstar would also own the local ABC affiliate, KXTV-TV, meaning: (1) a consumer who lives in Sacramento would be unable to watch either FOX or ABC during the Nexstar-related blackout; and (2) in order to avoid its customers canceling their subscriptions *en masse* due to a blackout of two of the Big 4, the bargaining MVPD will be far more incentivized to pay a higher retransmission consent fee to reach a deal with Nexstar and expeditiously end the blackout. Higher retransmission consent fees ultimately lead to higher prices borne by consumers.

69.    The Proposed Transaction may also result in increased retransmission consent fees because, as part of Nexstar's established acquisition strategy, it moves acquired stations to Nexstar's retransmission consent agreements.[33] Among all broadcasting groups, Nexstar charges the highest average monthly retransmission consent fees per subscriber.[34]

70.    The loss of competition between Nexstar and TEGNA will also likely lead to the consolidation of local television newsrooms in the Big 4 Overlap DMAs, reducing the quantity and quality of local news options available to consumers in each such DMA.

---

[33] Nexstar Media Group, Inc. (Form 10-K) at 6 (Feb. 27, 2026) ("Historically, we have been able to achieve significant improvements from acquisitions of television broadcasting assets by applying our favorable distribution contracts to newly acquired stations…"); Nexstar Investor Presentation at 22.

[34] *See* Nexstar Investor Presentation at 28.

21

COMPLAINT FOR A PERMANENT INJUNCTION

71.     Nexstar has an established track record of consolidating newsrooms when it owns more than one station in a DMA, meaning it reduces the independent news operations from two to one.[35]  As Nexstar described it to investors in June 2025, a key component of "The Nexstar Consolidation Playbook" is "[o]perat[ing] multiple stations with one infrastructure," and "[r]ationalization of station overhead costs."[36]  Among other things, a significant portion of the cost savings that Nexstar achieves from newsroom consolidation arises from eliminating jobs.  In such DMAs, formerly independent newsrooms that generated their own stories, employed separate slates of staff and talent, and made separate editorial decisions, now rely on a single talent team, share a single website, and offer essentially the same local news.  For example, Nexstar has a duopoly in the Indianapolis DMA, where it owns both the FOX and CBS affiliates.  These two Big 4 networks' local affiliate newsrooms, however, are not independent: they are under the leadership of a single news director, they share the same anchors and reporting team, and they have a single website (Fox59.com).[37]  The same is true in numerous other DMAs where Nexstar is a duopolist.[38]

---

[35] *See, e.g*., Mark. K. Miller, *WYOU Dumps Local News, Fires 14*, TVNewsCheck (Apr. 3, 2009), https://tvnewscheck.com/uncategorized/article/wyou-dumps-local-news-fires-14/?rcp_action=lostpassword; Scott D. Pierce, *New Owners Lay Off KTVX and KUCW Staffers*, The Salt Lake Tribune (Dec. 19, 2012), https://archive.sltrib.com/article.php?id=55491871&itype=CMSID; Merrill Knox, *Richard Doutree Jones Named GM at Salt Lake City's KTVX-KUCW*, AdWeek (Jan. 7, 2013), https://www.adweek.com/tvspy/richard-doutrejones-named-gm-at-salt-lake-citys-ktvx-kucw/; Kevin Eck, *Layoffs Hit Little Rock's KLRT and KARK*, AdWeek (Jan. 30, 2013), https://www.adweek.com/tvspy/layoffs-hit-little-rocks-klrt-and-kark/; Kevin Eck, *Nexstar Putting Both Fresno Stations Under One Roof*, AdWeek (May 24, 2013), https://www.adweek.com/tvspy/nexstar-putting-both-fresno-stations-under-one-roof/; Arkansas Business Staff, *Almost 30 Lose Jobs at KARK, KLRT as TV Owners Consolidate*, Arkansas Business (Jan. 29, 2013), https://archive.ph/ju9PX#selection929.0-934.0; *More Layoffs from Nexstar at NewsChannel9*, CNYRadio.com (Dec. 3, 2012), https://cnyradio.com/2012/12/03/layoffs-rumored-as-new-owners-arrive-at-newschannel-9/; Christopher Lawrence, *Layoffs Hit Las Vegas' KLAS-TV*, Las Vegas Rev. J. (June 4, 2015), https://www.reviewjournal.com/business/layoffs-hit-las-vegass-klas-tv/; Dade Hayes & Ted Johnson, *Nexstar Laying Off 2% Of Workforce, Focusing Cuts On Local Stations*; *The Hill Editor-In-Chief Bob Cusack Also Sets Exit*, Deadline (Dec. 11, 2024), https://deadline.com/2024/12/nexstarlayoffs-local-stations-the-hill-editor-in-chief-bob-cusack-exits-1236200879/.
[36] Nexstar Investor Presentation at 22.
[37] Fox59.com (last visited Mar. 18, 2026).
[38] *See, e.g.,* DirecTV February 20, 2026 Letter at 16-17, *2022 Quadrennial Regulatory Review - Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 22-459 (describing 14
(continued…)

22

COMPLAINT FOR A PERMANENT INJUNCTION

72.    If it acquires TEGNA, Nexstar will follow its historical pattern of newsroom consolidation, and viewers in the Big 4 Overlap DMAs will lose options for where to get their local TV news.  Indeed, this anticipated consolidation is central to Nexstar's plan: in its August 2025 presentation to investors regarding the planned acquisition of TEGNA, Nexstar highlighted the cost savings associated with shrinking news operations as a source of efficiencies in the deal.[39]  Nexstar's Chief Financial Officer Lee Ann Gliha told investors, "there is obviously the significant amount of 35 or 51 markets that are the overlap markets that we can really operate two stations off of one infrastructure.  [T]hat is an area where there's a significant portion of those synergies."[40]  Simply put, the loss of competition between Nexstar and TEGNA in the Big 4 Overlap DMAs means that viewers in those DMAs will have fewer options for local news.

73.    Fewer newsrooms in a Big 4 Overlap DMA will also likely result in a shift from local news to more centralized programming, and a loss of independent, diverse viewpoints.[41] Audiences rely on their local news broadcasts for reporting on community events, local elections, and local emergency coverage, among other things.[42]  Multiple stations in a DMA can compete by differentiating their news focus, with some emphasizing "breaking news" stories or crime-related

---

duopoly DMAs in which the two Nexstar Big 4 affiliate stations share a single news website, the same news director, and the same talent).

[39] Nexstar Media Group, Inc. Acquisition of TEGNA Inc. at 8 (Aug. 2025), https://www.nexstar.tv/wp-content/uploads/2025/08/August-2025-TEGNA-Acquisition-Deck.pdf; *see also* ███████████████

Nexstar, *Nexstar Media Group, Inc. Q3 2025 Earnings Call Transcript* (Nov. 6, 2025).
[41] *See, e.g.*, Thomas E. Patterson, *Can They Do Good and Still Do Well? Local TV Stations and Communities' Information Needs*, Shorenstein Center (June 4, 2025), https://shorensteincenter.org/resource/can-good-still-well-local-tv-stations-communities-information-needs/ (finding, based on a survey of television station executives and employees in 504 local news stations, a significant decrease in local news quality and increase in reliance on outside produced material particularly for stations tied to large conglomerates).
[42] Local TV stations are "one of the few trusted sources" for viewers looking for local stories. Thomas E. Patterson, *Can They Do Good and Still Do Well? Local TV Stations and Communities' Information Needs*, Shorenstein Center (June 4, 2025), https://shorensteincenter.org/resource/can-good-still-well-local-tv-stations-communities-information-needs/.

COMPLAINT FOR A PERMANENT INJUNCTION

topics, for example, and others following a more local-government/issues-focused strategy.[43] Combining newsrooms in a DMA reduces the number of independent decision-making centers that determine what is newsworthy and how to report it, potentially diminishing the depth and variety of information reported in that community.  When combining newsrooms, Nexstar has often shifted local news programs toward more regional or national programming, and the emphasis on profitability means that station managers are "incentivized to run centralized content," negatively impacting the quality of local news viewers can access.[44]  Furthermore, by eliminating competition from TEGNA in the Big 4 Overlap and by vastly expanding its footprint nationwide, Nexstar would gain significant control over editorial policy and have the power to suppress viewpoints and exclude voices that are essential to a robust political and social discourse.[45]

---

[43] Thomas E. Patterson, *Can They Do Good and Still Do Well? Local TV Stations and Communities' Information Needs* at 19, Shorenstein Center (June 4, 2025), https://shorensteincenter.org/resource/can-good-still-well-local-tv-stations-communities-information-needs/.

[44] *See* Petition to Deny of Broadband Communications Association of Pennsylvania, Broadband Communications Association of Washington, Indiana Cable and Broadband Association, Mississippi Cable Telecommunications Association, Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia at 53, *In the Matter of Applications to Transfer Control of Tegna Inc. to Nexstar Media Inc.,* MB Docket No. 25-331 (Dec. 31, 2025), https://www.fcc.gov/ecfs/document/123173493805/1; *see also* Meaghan Winter, Nexstar Nation, Columbia Journalism Review, (July 20, 2020), https://www.cjr.org/special_report/nexstar-nation.php (Even where station managers personally value accountability journalism, they are ultimately "tasked with keeping the station profitable," which requires "running more hours of news programming with a lean staff" ); Danilo Yanich & Benjamin E. Bagozzi, *Reusing the News: Duplicating Local TV Content*, Univ. Of Del. Biden Sch. Of Pub. Pol'y & Admin. (Aug. 2025), https://www.reusingthenews.org (finding Nexstar, across all major station owners, controls the highest share of stations with duplicated content across the United States; "Duplication is based on economies of scale not on the information needs of citizens"); Thomas E. Patterson, *Can They Do Good and Still Do Well? Local TV Stations and Communities' Information Needs*, Shorenstein Center (June 4, 2025), https://shorensteincenter.org/resource/can-good-still-well-local-tv-stations-communities-information-needs/ ("Ownership groups for decades have been extracting more output from fewer staff with less money. We're getting ever closer to the point of simply being unable to get newscasts on the air because we just don't have the people to do it... Our corporate ownership cares more about making money than serving our community. Local news needs investment from ownership, not just to increase content and coverage, but for staff. The current staff is spread too thin.")

[45] Nexstar has already exercised its editorial power over local news to promote views that favor its own business agenda.  *See, e.g.*, Matthew Keys, *Nexstar Orders Stations to Run News Stories about FCC Deregulation Efforts*, The Desk (Apr. 7, 2025) https://thedesk.net/2025/04/nexstar-fcc-must-runs-ownership-caps-deregulation/ ("Nexstar Media Group has ordered most of its 160-plus owned stations to air segments during local newscasts encouraging viewers to contact the FCC to support broadcast ownership deregulation").

24

74.     For these reasons, the proposed merger of Nexstar and TEGNA likely would substantially lessen competition in the Licensing of Big 4 Television Retransmission Consent in each of the Big 4 Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VIII.     THE PROPOSED ACQUSITION IS PART OF NEXSTAR'S LONGSTANDING STRATEGY OF SERIAL ACQUSITIONS

75.     "A firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section 7."[46]  Under the Merger Guidelines, "the Agencies will consider individual acquisitions in light of the cumulative effect of related patterns or business strategies."[47]

76.     Nexstar has engaged in an anticompetitive pattern and strategy of pursuing consolidation through acquisitions in the Licensing of Big 4 Retransmission Consent market.  The Proposed Transaction is Nexstar's latest transaction in Nexstar's serial acqusition strategy. Nexstar has engaged in what it describes as a "consolidation wave" of 20 acquisitions of stations and broadcast companies between 2010 and 2019, including its acquisitions of Tribune Media for $6.4 billion and Media General for $4.6 billion.[48]  And Nexstar is not stopping anytime soon, announcing, "We plan to continue to pursue television station acquisitions."[49]

77.     Nexstar's acquisitions follow its "Consolidation Playbook,"[50] in which it moves acquired entities to Nexstar's retransmission consent agreements and "[o]perate[s] multiple stations with one infrastructure."[51]  This playbook increases retransmission consent fees for

---

[46] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines, Guideline 8 at 23.
[47] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines, Guideline 8 at 23.
[48] Nexstar Investor Presentation at 20; Tribune Media Co., *Nexstar Media Group Enters Into Definitive Agreement To Acquire Tribune Media Company* (December 3, 2018), https://www.tribunemedia.com/nexstar-media-group-enters-into-definitive-agreement-to-acquire-tribune-media-company/; Nexstar Media Group, Inc., *Nexstar Broadcasting Group Enters Into Definitive Agreement To Acquire Media General For $4.6 Billion In Accretive Cash And Stock Transaction* (January 27, 2016) https://www.nexstar.tv/nexstar-broadcasting-group-enters-into-definitive-agreement-to-acquire-media-general-for-4-6-billion-in-accretive-cash-and-stock-transaction/.
[49] Nexstar Media Group, Inc. (Form 10-K) at 6 (Feb. 27, 2026).
[50] Nexstar Investor Presentation at 22.
[51] *Id.*

COMPLAINT FOR A PERMANENT INJUNCTION

MVPDs, leads to higher cable and satellite bills for consumers, and degrades the content and quality of local news broadcast through the Big 4 stations.

78. Additionally, under the Merger Guidelines, "the Agencies may evaluate the series of acquisitions as part of an industry trend [.]"[52]

79. Nexstar's acquisitions are part of an industry trend toward consolidation. For example, between 2014 and 2024, a series of broadcast television ownership deals resulted in the three largest firms controlling 40% of all local stations. In 2025, Sinclair, Inc., the second-largest broadcast television company in the United States, acquired a stake in E.W. Scripps, another large broadcast television company, "in a move to push toward a merger of the companies."[53] Over the past year, Gray Media, another large broadcast television company in the United States, acquired television stations across the country.[54] These large broadcast television companies have acknowledged that the Proposed Transaction will embolden them to pursue more conslidation themselves. Sinclair's President and CEO stated that "[T]here's no doubt that having a precedence of such a large transaction like Nexstar, Tegna go through and people seeing what the rules are on a confirmed basis is going to be exceptionally helpful for M&A going forward. . . . [I]t is going to be very helpful in terms of paving the way for future transactions."[55] Gray Media's Executive Chairman and CEO stated, "[I]f Nexstar-Tegna closes. . . it may put a little impetus on our company to get larger. … we, believe that consolidation is important for the industry[.]"[56]

---

[52] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines, Guideline 8 at 23.
[53] Lillian Rizzo, *E.W. Scripps Stock Surges 40% After Sinclair Takes Stake, Pushes for a Merger,* CNBC (Nov. 17, 2025), https://www.cnbc.com/2025/11/17/sinclair-scripps-stake-merger-push.html.
[54] Jeff Kolkey, *Gray Media to Buy 13 WREX in Rockford and 9 other TV Stations Across US for $171M,* Knox News (Aug. 8, 2025), https://www.knoxnews.com/story/news/regional/2025/08/08/gray-media-moves-to-acquire-10-new-television-stations/85574733007/.
[55] Sinclair, Inc., *Q4 2025 Earnings Call Transcript* at 11 (Feb. 25, 2026).
[56] Gray Media, Inc. *Q4 2025 Earnings Call Transcript* at 8 (Feb. 26, 2026).

COMPLAINT FOR A PERMANENT INJUNCTION

80.     Thus, the cumulative effects of Nexstar's serial acquisition include increased consolidation and substantially lessening of competition in the relevant market for the Licensing of Big 4 Retransmission Consent.

### IX.     THE PROPOSED TRANSACTION WILL LIKELY HAVE SERIOUS ANTICOMPETITIVE EFFECTS

81.     The Proposed Transaction will result in a substantial lessening of competition in the market for the Licensing of Big 4 Retransmission Consent.  The loss of competition between Nexstar and TEGNA will give Nexstar the power to charge MVPDs higher fees to retransmit its content, both through increased bargaining leverage in retransmission negotiations with MVPDs and "after-acquired" clauses.  These higher fees will, in turn, be passed on to television consumers, resulting in higher costs for a substantial portion of the citizens of the Plaintiff States.

82.     These harms are not limited to television consumers in the Big 4 Overlap DMAs. Because the Proposed Transaction materially increases Nexstar's national footprint and bargaining leverage in negotiations that are commonly conducted on a station-group, multi-market basis, the Proposed Transaction will likely result in higher retransmission consent fees—and cost to television consumers—across the nation.

83.     The Proposed Transaction furthers threatens to degrade the quality and quantity of local news programming in each impacted DMA—an additional harm to competition, to the citizens of the Plaintiff States, and to the general economies of the States.

### X.     THERE ARE NO COUNTERVAILING FACTORS TO JUSTIFY THE PROPOSED TRANSACTION

84.     The Merger Guidelines recognize that, in certain proposed transactions, there may exist "'other pertinent factors' that may 'mandate[] a conclusion that no substantial lessening of competition [is] threatened by the acquisition.'"[57]  No "other pertinent factors" mandate such a conclusion here.

85.     Entry of a new broadcast station group into a Big 4 Overlap DMA would not be timely, likely, or sufficient to prevent or remedy the proposed merger's likely anticompetitive

---

[57] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines § 3, at 30 (quoting *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974)).

COMPLAINT FOR A PERMANENT INJUNCTION

effects in the relevant markets.  The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited, and the regulatory process associated with obtaining a license is lengthy.  Even if a new signal were to become available, commercial success would come over a period of many years, if at all.

86.     Existing consolidation in the industry makes entry even less likely.  Even before the proposed Nexstar and TEGNA merger, a mere four companies—including Sinclair and Gray Media in addition to Nexstar and TEGNA—control nearly all of the licensing of Big 4 Station content, a highly consolidated market.  With the merger, that number goes to three, making it even less likely that a new competitor could successfully enter the market.

87.     Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to rebut the presumption of the Transaction's anticompetitive effects.

88.     Defendants cannot establish that TEGNA, the acquired firm, "face[s] the grave probability of a business failure," has "dim or nonexistent" prospects for reorganization, and/or that Nexstar "is the only available purchaser."[58]

## XI.     VIOLATIONS ALLEGED

89.     The proposed merger of Nexstar and TEGNA likely would substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act,  15 U.S.C. § 18.

90.     Unless enjoined, the merger likely would have the following effects in the market for the Licensing of Big 4 Retransmission Consent across the nation, among others:

a.     competition in the Licensing of Big 4 Television Retransmission Consent in each of the Big 4 Overlap DMAs likely would be substantially lessened, raising prices and harming quality, such as with the elimination of independent local news and other content;

b.     competition between Nexstar and TEGNA in the Licensing of Big 4 Television Retransmission Consent in each of the Big 4 Overlap DMAs would be eliminated; and

c.     the fees charged to MVPDs for the the Licensing of Big 4 Television

---

[58] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines, § 3 at 30 (alterations in original) (internal quotation marks omitted).

COMPLAINT FOR A PERMANENT INJUNCTION

Retransmission Consent in each of the Big 4 Overlap DMAs, as well as in DMAs beyond the Big 4 Overlap DMAs, would increase.

## XII.   REQUESTED RELIEF

91. The Plaintiff States request that:

a.      the Court adjudge the proposed merger to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.      the Court permanently enjoin and restrain Defendants from carrying out the merger, or entering into any other agreement, understanding, or plan by which Nexstar would merge with, acquire, or be acquired by TEGNA, or Nexstar and TEGNA would combine any of their respective Big 4 stations in the Big 4 Overlap DMAs;

c.      the Court award Plaintiff States the fees and costs of this action; and

d.      the Court award such other relief to Plaintiff States as the Court may deem just and proper.

29

COMPLAINT FOR A PERMANENT INJUNCTION

Dated:  March 18, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California


/s/ *Laura Antonini*
Laura Antonini (SBN 271658)
Deputy Attorney General

Paula Blizzard (SBN 207920)
Senior Assistant Attorney General
Paul Chander (SBN 305133)
Elizabeth Cheever (SBN 341421)
Emily Curran (SBN 293065)
Komal K Patel (SBN 342765)
Connie P. Sung (SBN 304242)
Brian Wang (SBN 245983)
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7014
Telephone: (415) 510-3765
Email: Paula.Blizzard@doj.ca.gov
         Laura.Antonini@doj.ca.gov

*Attorneys for Plaintiff State of California*


FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General

*/s/Bryn Williams* (as authorized on March 18, 2026)
Bryn A. Williams
First Assistant Attorney General (SBN 301699)
Jonathan B. Sallet (*Pro Hac Vice forthcoming*)
Special Assistant Attorney General
Robin Alexander (*Pro Hac Vice forthcoming*)
Assistant Attorney General
Amy Bowles (*Pro Hac Vice forthcoming*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Bryn.Williams@coag.gov
         Jon.Sallet@coag.gov
         Robin.Alexander@coag.gov
         Amy.Bowles@coag.gov

*Attorneys for the State of Colorado*

34

COMPLAINT FOR A PERMANENT INJUNCTION

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS
Deputy Associate Attorney General
(*pro hac vice* forthcoming)


/s/ *Julián A. Quiñones Reyes* (as authorized on March 18, 2026)
Julián A. Quiñones Reyes (*Pro Hac Vice forthcoming*)
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov

*Attorneys for Plaintiff State of Connecticut*


FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General of Illinois

/s/ *Paul J. Harper* (as authorized on March 18, 2026)
Elizabeth L. Maxeiner (*Pro Hac Vice forthcoming*)
Chief, Antitrust Bureau
Paul J. Harper (*Pro Hac Vice forthcoming*)
Supervising Attorney, Antitrust Bureau
John R. Milligan (*Pro Hac Vice forthcoming*)
Daniel R. Betancourt (*Pro Hac Vice forthcoming*)
Assistant Attorneys General
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (312) 814-1004
E-Mail: paul.harper@ilag.gov
*Attorneys for Plaintiff State of Illinois*

31

COMPLAINT FOR A PERMANENT INJUNCTION

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ *Elinor R. Hoffmann* (as authorized on March 18, 2026)
Elinor R. Hoffmann (*Pro Hac Vice forthcoming*)
Chief, Antitrust Bureau
Christopher D'Angelo
Chief Deputy Attorney General
Economic Justice Division
Amy McFarlane (*Pro Hac Vice forthcoming)*
Deputy Chief, Antitrust Bureau
Morgan Feder (*Pro Hac Vice forthcoming)*
Assistant Attorney General, Antitrust Bureau
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Elinor.Hoffmann@ag.ny.gov | (212) 416-8269
Christopher.D'Angelo@ag.ny.gov |
   (212) 416-6124
Amy.McFarlane@ag.ny.gov | (212) 416-6195
Morgan.Feder@ag.ny.gov | (212) 416-8288

*Attorneys for Plaintiff State of New York*


FOR PLAINTIFF STATE OF NORTH CAROLINA:

JEFF JACKSON
Attorney General of North Carolina

KUNAL CHOKSI (*Pro Hac Vice Forthcoming*)
Senior Deputy Attorney General

/s/ *Francisco Benzoni* (as authorized on March 18, 2026)
Francisco Benzoni (*Pro Hac Vice Forthcoming*)
Special Deputy Attorney General
Brian Rabinovitz (*Pro Hac Vice Forthcoming*)
Director of Major Litigation for Consumer Protection
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
fbenzoni@ncdoj.gov
brabinovitz@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

COMPLAINT FOR A PERMANENT INJUNCTION

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon


*/s/ Ian Van Loh* (as authorized on March 18, 2026)
Timothy D. Smith (*Pro Hac Vice forthcoming*)
Attorney-in-Charge
Ian Van Loh (SBN 280254)
Alex DeLorenzo (*Pro Hac Vice forthcoming*)
Senior Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St, Portland OR  97201
tim.smith@doj.oregon.gov | 503.798.3297
ian.vanloh@doj.oregon.gov | 971.239.7457
alex.delorenzo@doj.oregon.gov | 503.428.9482

*Attorneys for Plaintiff State of Oregon*



FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:

JAY JONES
Attorney General of Virginia


*/s/ Tyler T. Henry* (as authorized on March 18, 2026)
Tyler T. Henry (*Pro Hac Vice forthcoming*)
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
THenry@oag.state.va.us
(804) 692-0485

*Attorneys for the Plaintiff Commonwealth of Virginia*

33

COMPLAINT FOR A PERMANENT INJUNCTION