ROB BONTA
Attorney General of California
PAULA BLIZZARD (SBN 207920)
Senior Assistant Attorney General
LAURA ANTONINI (SBN 271658)
PAUL CHANDER (SBN 305133)
ELIZABETH CHEEVER (SBN 341421)
EMILY CURRAN (SBN 293065)
KOMAL PATEL (SBN 342765)
CONNIE P. SUNG (SBN 304242)
BRIAN WANG (SBN 284490)
Deputy Attorneys General
  455 Golden Gate Ave., Suite 11000
  San Francisco, CA  94102
  Telephone: (415) 510-3765
  E-mail: Paula.Blizzard@doj.ca.gov
          Laura.Antonini@doj.ca.gov
          Connie.Sung@doj.ca.gov
*Attorneys for Plaintiff, The State of California*

Additional counsel identified on signature page

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| **THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF ILLINOIS, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OREGON, AND THE COMMONWEALTH OF VIRGINIA** | Case No.: 2:26-cv-00978-TLN-CKD |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| **NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.,** | |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

I.   INTRODUCTION ..................................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................... 3

    A.   The Parties and the Transaction .................................................................. 3

    B.   Competition for Broadcast Programming .................................................... 4

    C.   Sacramento-Stockton-Modesto DMA ......................................................... 6

    D.   Federal Regulatory Approvals .................................................................... 6

    E.   Plaintiffs' Efforts to Avoid This Motion ..................................................... 8

III. LEGAL STANDARD ............................................................................................... 9

IV.  ARGUMENT ........................................................................................................ 10

    A.   Plaintiffs Are Likely to Establish that the Transaction is Unlawful and, at a Minimum, Present Serious Questions Going to the Merits of Plaintiffs' Claims ............. 10

        1.   Plaintiffs Are Likely to Establish a Relevant Product Market .................. 11

        2.   Plaintiffs Are Likely to Establish a Relevant Geographic Market ............ 12

        3.   Plaintiffs Are Likely to Demonstrate Substantially Lessened Competition .................................................................................................... 13

    B.   There is a Substantial Risk of Imminent, Irreparable Harm ...................... 16

    C.   The Public Interest and Balance of Equities Sharply Favor a TRO ........... 18

    D.   The Court Has Authority to Order Defendants to Hold Separate Acquired Assets. .......................................................................................................... 19

V.   CONCLUSION ...................................................................................................... 20

Plaintiffs' Mem. of Points and Authorities in Support of Mot. For TRO

# TABLE OF AUTHORITIES

**Page**

**CASES**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
901 F.3d 1166 (9th Cir. 2018)............................................................................................... 9

*Alfred L. Snapp & Son v. Puerto Rico*
458 U.S. 592 (1982) .............................................................................................................. 4

*All. for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011).............................................................................................. 15

*April in Paris v. Becerra*
494 F. Supp. 3d 756 (E.D. Cal. 2021)................................................................................... 16

*Ariz. Dream Act. Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014).............................................................................................. 17

*Boardman v. Pac. Seafood Grp.*
822 F.3d 1011 (9th Cir. 2016)..................................................................................... 9, 16, 18

*Brown Shoe Co. v. United States*
370 U.S. 294 (1962) ............................................................................................................. 10

*California v. Am. Stores, Inc.*
495 U.S. 271 (1990) ............................................................................................................... 9

*California v. Am. Stores, Inc.*
697 F. Supp. 1125 (C.D. Cal. 1988) ..................................................................................... 19

*DIRECTV, LLC v. Nexstar Media Gro., Inc.*
Case No. 2:26-00976-TLN-CKD, ECF No. 1 (E.D. Cal. Mar. 18, 2026) ............................... 2

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021)........................................................................................... 9, 17

*EIG Glob. Energy Partners, LLC v. TCW Asset Mgmt. Co.*
2012 WL 5990113 (C.D. Cal. Nov. 30, 2012)....................................................................... 19

*F.T.C. v. Whole Foods Mkt., Inc.*
548 F.3d 1028 (D.C. Cir. 2008) ........................................................................................... 10

*Fed. Trade Comm'n v. Sysco Corp.*
113 F. Supp. 3d 1 (D.D.C. 2015) ......................................................................................... 18

*Friends of the Wild Swan v. Weber*
767 F.3d 936 (9th Cir. 2014)................................................................................................ 18

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*FTC v. Exxon Corp.*
  636 F.2d 1336 (D.C. Cir. 1980) ...................................................................... 19

*FTC v. H.J. Heinz Co.*
  246 F.3d 708 (D.C. Cir. 2001) .......................................................... 10, 13, 14

*FTC v. Hackensack Meridian Health, Inc.*
  30 F.4th 160 (3d Cir. 2022).......................................................................... 14

*FTC v. IQVIA Hldg's, Inc.*
  No. 1:23-cv-06188, ECF No. 6 (S.D.N.Y. July 19, 2023)........................... 8

*FTC v. Kroger Co.*
  2024 WL 5053016 (D. Or. Dec. 10, 2024) ................................................. 10

*FTC v. Microsoft Corp.*
  No. 3:23-cv-02880, ECF No. 7 (N.D. Cal. June 12, 2023)........................... 8

*FTC v. Penn State Hershey Med. Ctr.*
  838 F.3d 327 (3d Cir. 2016)..................................................................... 10, 15

*FTC v. Qualcomm Inc.*
  969 F.3d 974 (9th Cir. 2020)....................................................................... 10

*FTC v. Warner Commc'ns Inc.*
  742 F.2d 1156 (9th Cir. 1984)................................................................. 18, 19

*FTC v. Weyerhaeuser Co.*
  665 F.2d 1072 (D.C. Cir. 1981) .................................................................. 19

*Georgia v. Pennsylvania R.R. Co.*
  324 U.S. 439 (1945)....................................................................................... 4

*Hawaii v. Standard Oil Co. of California*
  405 U.S. 251 (1972)....................................................................................... 4

*Hecht Co. v. Bowles*
  321 U.S. 321 (1944)..................................................................................... 19

*In the Matter of 2018 Quadrennial Regulatory Review*
  MB Docket No. 18-349, FCC 23-117 (Dec. 26, 2023)................................. 5

*In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent*
  MB Docket No. 10-71 (Mar. 31, 2014) ...................................................... 11

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*
4 F.3d 819 (9th Cir. 1993) ............................................................................................... 17

*Knevelbaard Dairies v. Kraft Foods, Inc.*
232 F.3d 979 (9th Cir. 2000) ............................................................................................ 18

*Northeast Utils. Serv. Co. v. FERC*
993 F.2d 937 (1st Cir. 1993) .............................................................................................. 8

*Porter v. Warner Holding Co.*
328 U.S. 395 (1946) ........................................................................................................... 19

*ProMedica Health Sys., Inc. v. FTC*
749 F.3d 559 (6th Cir. 2014) ............................................................................................ 14

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*
778 F.3d 775 (9th Cir. 2015) ..................................................................................... *passim*

*State of New York v. Deutsche Telekom AG*
No. 1:19-cv-05434, ECF No. 201 (S.D.N.Y. Aug. 20, 2019) .......................................... 8

*Ex Parte Status for the Proceeding*
MB Docket No. 25-331, Public Notice, DA 25-1000 (F.C.C. Media Bureau
Dec. 1, 2025) ............................................................................................................ 7, 14, 16

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
240 F.3d 832 (9th Cir. 2001) .............................................................................................. 9

*Trump v. Int'l Refugee Assistance Project*
582 U.S. 571 (2017) ....................................................................................................... 9, 18

*U.S. v. Baker Hughes Inc.*
908 F.2d 981 (D.C. Cir. 1990) .......................................................................................... 10

*U.S. v. Phila. Nat'l Bank*
374 U.S. 321 (1963) .......................................................................................................... 10

*United States v. Acorn Eng'g Co.*
1981 WL 2112 (N.D. Cal. June 18, 1981) ........................................................................ 19

*United States v. Bazaarvoice, Inc.*
2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ....................................................................... 15

*United States v. BNS Inc. et al*
858 F.2d 456 (9th Cir. 1988) ............................................................................................ 16

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Gray Television, Inc. and Quincy Media, Inc.*
No. 1:21-cv-02041 (D.D.C. July 28, 2021) .......................................................*passim*

*United States v. Rice Growers Ass'n of California*
1986 WL 12561 (E.D. Cal. Jan. 31, 1986).............................................................. 13

*United States v. Trib. Publ'g Co.*
2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ...................................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008)........................................................................... 9, 16, 17, 18

**STATUTES**

15 U.S.C.
§ 18.............................................................................................................*passim*
§ 18a................................................................................................................. 6
§ 26............................................................................................................... 3, 4

47 U.S.C. § 310(d) ............................................................................................... 6

Clayton Act § 7 ..................................................................................................*passim*

Communications Act § 310(d) .............................................................................. 6

**COURT RULES**

Federal Rule of Civil Procedure 65.................................................................. 3, 19

**OTHER AUTHORITIES**

47 C.F.R.
§ 1.3.................................................................................................................. 7
§ 73.3555(e)(1)–(2).......................................................................................... 7

David Shepardson, *Federal Communications Commission chair backs Nexstar,*
*Tegna merger*, Reuters (Feb. 18, 2026)
https://www.reuters.com/business/federal-communications-commission-chair-
backs-nexstar-tegna-merger-2026-02-18/ .................................................... 7

Josh Sisco, *Bloomberg*, "Nexstar's $3.5 Billion Tegna Deal Cleared by Justice
Department" (March 19, 2026),
https://www.bloomberg.com/news/articles/2026-03-19/nexstar-s-3-5-billion-
tegna-deal-cleared-by-justice-department........................................................... 4, 6

Justice & Fed. Trade Comm'n, *Merger Guidelines* (2023), § 2.1 ............................. 13

v

**TABLE OF AUTHORITIES**
(continued)

**Page**

"KTLA Anchors, Meteorologists Hit By Nexstar Layoffs In Multiple Cities As TV Giant Seeks Merger," https://deadline.com/2026/02/ktla-mark-kriski-nexstar-layoffs-1236736389/ (Feb. 25, 2026).................................................................. 17

Mckinley Franklin, *Trump Says Nexstar–Tegna Merger Will "Knock Out the Fake News," FCC Chair Says "Let's Get It Done"* Hollywood Reporter (Feb. 7, 2026) https://www.hollywoodreporter.com/business/business-news/trump-nexstar-tegna-merger-support-fcc-chair-get-it-done-1236498115/ ........................................ 7

Memorandum Op. and Order, *In the Matter of Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc.,* MB Docket No. 25-331, DA 26-267, (F.C.C. Media Bureau Mar. 19, 2026).
............................................................................................................... 8

News Release, TEGNA Inc., *TEGNA Inc. Reports Fourth Quarter and Full-Year 2025 Results* (Mar. 2, 2026)................................................................................ 4

Nexstar Media Group, Inc., *TEGNA Acquisition Deck* (Aug. 2025) ............................................ 15

Nexstar Media Group, *Nexstar Media Group, Inc. Enters into Definitive Agreement to Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction* (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/ (last visited Mar. 19, 2026).................................................................. 7

Press Release, *Nexstar Media Group, Inc., Closes Acquisition of TEGNA Inc.* (Mar. 19, 2026), https://www.nexstar.tv/nexstar-media-group-inc-closes-acquisition-of-tegna-inc/ ..................................................................................... 4

Press Release, Nexstar Media Group, Inc., "Nexstar Media Group, Inc. Enters into Definitive Agreement To Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction" (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/ ..................................................................................... 18

Samantha-Jo Roth, *Bipartisan Unease Surfaces at Senate Hearing on Nexstar-Tegna Merger,* Wash. Examiner (Feb. 10, 2026, 4:36pm) https://www.washingtonexaminer.com/news/senate/4453108/bipartisan-unease-nexstar-tegna-merger-senate-hearing/.......................................................... 8

Ted Johnson, *Deadline*, "Nexstar Says It Has Closed Merger With Tegna After Greenlight From FCC And Justice Department" (March 19, 2026), https://deadline.com/2026/03/fcc-approves-nexstar-tegna-merger-1236760998/
............................................................................................................... 4

vi

Plaintiffs' Mem. of Points and Authorities in Support of Mot. For TRO

## TABLE OF AUTHORITIES
### (continued)

**Page**

Tom Tapp, *Deadline*, "KTLA Anchors, Meteorologists Hit By Nexstar Layoffs In Multiple Cities As TV Giant Seeks Merger," https://deadline.com/2026/02/ktla-mark-kriski-nexstar-layoffs-1236736389/ (Feb. 25, 2026) .................................................................................................................. 17

*Trump backs Nexstar-Tegna merger, says big TV networks need more competition*, Reuters (Feb. 9, 2026) https://www.reuters.com/business/trump-backs-merger-between-nexstar-tegna-2026-02-07/ ........................................................................... 7

Plaintiffs' Mem. of Points and Authorities in Support of Mot. For TRO

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

### I.   INTRODUCTION

The State of California, State of Colorado, State of Connecticut, State of Illinois, State of New York, State of North Carolina, State of Oregon, and Commonwealth of Virginia (collectively, "Plaintiffs" or "Plaintiff States") move for an order temporarily enjoining the nation's largest broadcasting company, Nexstar Media Group, Inc. ("Nexstar") from integrating or commingling the assets and operations it has acquired from what was, yesterday, a substantial competitor, TEGNA Inc. ("TEGNA"), and requiring Nexstar to hold separate the acquired TEGNA assets pending further proceedings.

A temporary restraining order is necessary to avoid irreparable harm to the public interest and Plaintiff States' ability to effectively enforce the nation's antitrust laws.  Plaintiff States filed this suit two days ago, on Wednesday, March 18, seeking to block Nexstar's proposed acquisition of TEGNA (the "Transaction") on the grounds that the Transaction will substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  At the time the case was filed, Nexstar and TEGNA (together, "Defendants") had not yet received the necessary federal regulatory approvals to close the Transaction.  Minutes after filing, Plaintiffs sent Defendants' counsel a copy of the Complaint[1] and asked Defendants to enter into a Stipulated Timing Agreement under which Nexstar and TEGNA would agree not to consummate the challenged Transaction until after a final judgment was issued in this case.  Sung Decl., ¶ 4.

Defendants failed to even acknowledge Plaintiffs' request.  Instead, in the late afternoon yesterday, March 19, Nexstar closed its acquisition of TEGNA, immediately following announcements of regulatory approval from the Federal Communications Commission ("FCC") and the U.S. Department of Justice's ("U.S. DOJ") decision to close its investigation into the Transaction early.

---

[1] *See* Complaint for a Permanent Injunction, ECF No. 1 ("Compl.").

1

Defendants' decision to close despite multiple pending lawsuits,[2] their non-responsiveness to counsel's inquiries, and their rush to consummate the Transaction raise the troubling specter that Defendants may be barreling forward with this transaction to frustrate effective judicial review.  Plaintiff States seek emergency relief to prevent integration of Nexstar and TEGNA and to preserve the Court's ability to grant effective relief.

If the requested relief is not granted, the harm to the public and to competition in the market for broadcast television licensing would commence immediately.  The Transaction is set to create a broadcasting behemoth with control over an unprecedented share of broadcast television content, including local news and sports, from the nation's most-watched "Big 4" stations (those affiliated with FOX, ABC, NBC or CBS).  A post-merger Nexstar has more substantial power to raise prices for cable, satellite, and fiber-optic television consumers, and to control and degrade the quality and variety of broadcast television content.

The Plaintiff States are likely to prevail on the merits.  Section 7 of the Clayton Act prohibits mergers that "substantially lessen competition, or tend to create a monopoly."  15 U.S.C. § 18.  If allowed to proceed to full consummation, the Transaction will severely lessen competition in the market for the licensing of Big 4 television retransmission consent, leading to higher prices and lower quality for television consumers.  Millions of customers access Big 4 television content through the cable, satellite, and fiber-optic television services provided by Multichannel Video Programming Distributors ("MVPDs") such as Comcast, DirecTV, DISH, and Charter.  The MVPDs pay "retransmission consent fees" to license Big 4 television programming from broadcast companies like Nexstar and TEGNA, enabling their subscribers to access content from stations affiliated with FOX, ABC, NBC, or CBS.  MVPDs must negotiate for the right to carry Big 4 content, and the fees that MVPDs pay to do so are a significant component of cable, satellite, and fiber-optic television bills.

As of yesterday, Nexstar and TEGNA competed head-to-head in negotiations with MVPDs over the terms by which MVPDs are able to carry local broadcast station content in markets

---

[2] On March 18, DIRECTV, LLC filed a case in this Court also seeking to block the Transaction under Section 7 of the Clayton Act.  *See* Compl., *DIRECTV, LLC v. Nexstar Media Gro., Inc.*, Case No. 2:26-00976-TLN-CKD, ECF No. 1 (E.D. Cal. Mar. 18, 2026).

2

throughout the country.  Post-Transaction, that competition will vanish absent judicial intervention.  As described in the Complaint, Nexstar and TEGNA overlap—in that both Nexstar and TEGNA each own at least one local "Big 4" broadcast station—in 31 Nielsen-designated market areas ("DMAs")[3] across the country, including the Sacramento-Stockton-Modesto DMA.  Compl. ¶ 4.  The Transaction will place those previously competing stations under common control, eliminating competition and strengthening the merged entity's bargaining leverage to extract higher retransmission consent fees from MVPDs, ultimately raising cable and satellite bills for consumers.

Integration of Nexstar's and the acquired TEGNA assets would trigger immediate and irreparable harm, including (1) loss of independent rivalry, through Nexstar's common ownership of at least half of Big 4 affiliates in the overlapping DMAs; (2) retransmission consent fee increases for MVPDs, with predictable pass-through to consumers; and (3) degradation in the quality and variety of local news and other local programming.  Compl. ¶ 90.  Plaintiffs will address the full merits of their claims in due course and after reasonable discovery.  To preserve the status quo of separability and the Court's ability to award effective relief pending adjudication, Plaintiffs apply to this Court, pursuant to 15 U.S.C. § 26 and Federal Rule of Civil Procedure 65, for a temporary restraining order requiring Defendants to cease all actions relating to integration and consolidation of Nexstar and TEGNA.

## II.   FACTUAL BACKGROUND

### A.  The Parties and the Transaction

Nexstar is a Delaware corporation with its headquarters in Irving, Texas.  Compl. ¶ 28.  Nexstar owns America's largest local television broadcasting group comprised of top network affiliates, with more than 200 owned or partner stations in 116 U.S. markets reaching 220 million people.  *Id.*  In 2025, Nexstar reported net revenues of over $4.9 billion.  *Id.*  As of yesterday, TEGNA was a Delaware corporation headquartered in Tysons, Virginia. Compl. ¶ 29.  TEGNA

---

[3] DMAs are geographic units which are "widely accepted by industry participants as the standard geographic areas to use in evaluating television audience size and demographic composition."  Sung Decl., Ex. 8 (Competitive Impact Statement 2 n.1, *United States v. Gray Television, Inc. and Quincy Media, Inc.*, No. 1:21-cv-02041 (D.D.C. July 28, 2021) [hereinafter, "*Gray* Competitive Impact Statement"]).

3

owned 64 television stations in 51 DMAs, reaching over 100 million people monthly.[4] TEGNA reported revenues over $2.7 billion last year. Compl. ¶ 29.

On August 19, 2025, Nexstar announced it had entered into a definitive agreement to acquire TEGNA in a $6.2 billion transaction that will create the largest broadcast station group in the country, reaching 80% of U.S. television households. Compl. ¶ 2. Plaintiffs filed suit challenging the Transaction on March 18, 2026. Bringing this action by and through their respective Attorneys General, Plaintiffs are sovereign States who qualify as persons authorized to sue for injunctive relief under the Clayton Act. *See* 15 U.S.C. §§ 18, 26. Plaintiff States may sue in their *parens patriae* capacity for injunctive relief against any threatened loss or damage to the health and welfare of their residents or their general economies. *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982); *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 257–61 (1972); *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 447 (1945).

Yesterday, one day after this lawsuit's filing, U.S. DOJ terminated its antitrust investigation into the Transaction; nearly simultaneously, the FCC announced that it had granted the necessary clearance for the Transaction.[5] Within two hours, Nexstar declared that the Transaction had closed.[6] With TEGNA's stations and retransmission consent rights now combined with Nexstar's, the merged firm controls an unmatched portfolio of "must-have" Big 4 stations.

**B. Competition for Broadcast Programming**

Big 4 television stations are local stations affiliated with the FOX, NBC, ABC, and CBS networks, which produce popular content such as local news, sports, and primetime programs. Big 4 stations typically have the highest audience share and ratings. Compl. ¶ 3. The challenged

---

[4] Sung Decl., Ex. 5 (News Release, TEGNA Inc., *TEGNA Inc. Reports Fourth Quarter and Full-Year 2025 Results*, at 4 (Mar. 2, 2026))

[5] *See* Josh Sisco, *Bloomberg*, "Nexstar's $3.5 Billion Tegna Deal Cleared by Justice Department" (March 19, 2026), https://www.bloomberg.com/news/articles/2026-03-19/nexstar-s-3-5-billion-tegna-deal-cleared-by-justice-department.

[6] I*d*.; *See also* Ted Johnson, *Deadline*, "Nexstar Says It Has Closed Merger With Tegna After Greenlight From FCC And Justice Department" (March 19, 2026), https://deadline.com/2026/03/fcc-approves-nexstar-tegna-merger-1236760998/; Press Release, *Nexstar Media Group, Inc., Closes Acquisition of TEGNA Inc.* (Mar. 19, 2026), https://www.nexstar.tv/nexstar-media-group-inc-closes-acquisition-of-tegna-inc/.

merger gives Nexstar control over an unprecedented 221 Big 4 television stations and their "must-have" programming. *Id.*

Millions of consumers nationwide access Big 4 broadcast content through MVPDs like Comcast, DirecTV, DISH, or Charter. *See* Compl. ¶ 6. MVPDs contract with broadcasting companies like Nexstar and TEGNA for inclusion of Big 4 station content in their offerings to consumers. MVPDs enter into retransmission consent agreements with broadcasting companies by which MVPDs pay consent fees for this Big 4 station content. Based on not only Big 4 stations' popular national content but also their unique local programming, such as local news, MVPDs regard programming from each and every Big 4 station as essential for inclusion in the packages they offer subscribers.[7]

The more Big 4 television stations a broadcaster controls, the greater its bargaining power. If an MVPD and a broadcast station company cannot agree on a retransmission consent fee at the expiration of an agreement, the result is a "blackout" of the broadcast group's stations from the particular MVPD—*i.e.*, an open-ended period during which the MVPD may not distribute content from those stations to its subscribers until a new contract is successfully negotiated.[8] A company that controls an outsized number of Big 4 stations thus wields the ability to threaten more severe blackouts for an MVPD, such that an MVPD will be compelled to pay higher fees to avoid an impasse that would leave its customers without access to Big 4 station content. Compl. ¶¶ 67–68. MVPDs report that retransmission consent fees "are higher for affiliates owned by larger groups." Compl. ¶ 10.

Retransmission consent agreements and fees are affected by both local consolidation (*e.g.*, duopolies that solidify a station owner's dominance within a particular DMA) and national consolidation (*e.g.*, larger station portfolios that put more markets at risk in a dispute and

---

[7] Sung Decl., Ex. 7 (*Tribune* Competitive Impact Statement) at 5 ("MVPDs regard Big 4 programming as highly desirable for inclusion in the packages they offer subscribers."); Compl. ¶ 36.
[8] Sung Decl., Ex. 7 (*Tribune* Competitive Impact Statement) at 4 ("the result may be a 'blackout' … an open-ended period during which the MVPD may not distribute those stations to its subscribers ...").

5

strengthen the broadcaster's negotiating position in nationwide negotiations), each of which tends to push fees upward and worsen terms for consumers.[9]

## C.  Sacramento-Stockton-Modesto DMA

As alleged in the Complaint, the Transaction would create overlaps in approximately 30 DMAs that raise the same core competitive concerns.  As an illustrative example, one of these impacted DMAs is the Sacramento-Stockton-Modesto DMA, which comprises 16 California counties.[10]  Within the Sacramento-Stockton-Modesto DMA, each of the "Big 4" broadcast stations is carried by a local affiliate station.  As of yesterday morning, each of these Big 4 stations had different owners: KCRA-TV, the NBC affiliate, is owned by Hearst Television; KXTV-TV, the ABC affiliate, was owned by TEGNA; KOVR-TV, the CBS affiliate, is owned by CBS, and  KTXL-TV, the FOX affiliate, is owned by Nexstar.  With closure of the Transaction, Nexstar now owns both the ABC affiliate (KXTV-TV) and the FOX affiliate (KTXL-TV) in the Sacramento-Stockton-Modesto DMA, placing two of the Big 4 affiliates that previously competed in this area under common ownership.  Compl. ¶ 68.

## D.  Federal Regulatory Approvals

Regulatory oversight did not curb the manifest anticompetitive effects of this acquisition.  Because this Transaction was a large merger involving the transfer of FCC licenses, it was subject to federal review by both U.S. DOJ and the FCC.  The U.S. DOJ is tasked to conduct antitrust review of proposed mergers under Section 7 of the Clayton Act, 15 U.S.C. § 18a, through the Hart-Scott-Rodino ("HSR") process.  15 U.S.C. § 18a.  On October 30, 2025, the U.S. DOJ issued to the Defendants an HSR Second Request, a compulsory demand for documents and data.[11]  Yesterday, March 19, U.S. DOJ announced that it was closing its investigation of the deal

---

[9] Report and Order, *In the Matter of 2018 Quadrennial Regulatory Review,* MB Docket No. 18-349, FCC 23-117, at ¶ 77 (Dec. 26, 2023) (local competition prevents higher retransmission fees); Competitive Impact Statement at 2, Sung Dec., Ex. 8 (*Gray* Competitive Impact Statement) (loss of DMA-level competition likely increases retransmission fees); Sung Decl., Ex. 7 (*Tribune* Competitive Impact Statement) at 8.

[10] Amador, Calaveras, Colusa, El Dorado West, Nevada, Placer, Plumas, Sacramento, San Joaquin, Sierra, the eastern portion of Solano, Stanislaus, Sutter, Tuolumne, Yolo, and Yuba.

[11] *See* Sung Decl., Ex. 2 (Nexstar Media Group, Inc., Current Report (Form 8-K) at 1 (Oct. 31, 2025)).

6

through "early termination," clearing the way for Defendants to close before the end of what would otherwise be a standard statutory waiting period.[12]

Since Nexstar's acquisition of TEGNA involved transfers of FCC licenses, it also required FCC approval under Section 310(d) of the Communications Act, 47 U.S.C. § 310(d). The FCC initiated a proceeding reviewing the Transaction on December 1, 2025.[13] In this agency proceeding, Nexstar sought multiple waivers from otherwise applicable ownership limits. *See* 47 C.F.R. § 1.3. Notably, Nexstar sought a waiver from the FCC's National Television Multiple Ownership Rule (the "national audience reach cap"), which generally prohibits a single entity from owning television stations that, in the aggregate, reach more than 39% of U.S. television households.[14] Because Nexstar would serve 54.5% of the national audience[15] through this Transaction, it sought a waiver of the 39% cap to permit consummation of the Transaction.[16] In unusual circumstances—with the FCC's quasi-adjudicatory licensing proceeding still pending—the President himself weighed in publicly in February and urged federal regulators to approve the deal to "knock out the Fake News."[17] FCC Chairman Brendan Carr publicly signaled his acknowledgement of, and agreement with, the President's endorsement.[18] At a press

---

[12] Josh Sisco, *Bloomberg*, "Nexstar's $3.5 Billion Tegna Deal Cleared by Justice Department" (March 19, 2026), https://www.bloomberg.com/news/articles/2026-03-19/nexstar-s-3-5-billion-tegna-deal-cleared-by-justice-department.

[13] *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc. and Permit-But-Disclose Ex Parte Status for the Proceeding*, MB Docket No. 25-331, Public Notice, DA 25-1000, at 1–3 (F.C.C. Media Bureau Dec. 1, 2025) [hereinafter "DA 25-1000"].

[14] DA 25-1000, at 1; 47 C.F.R. § 73.3555(e)(1)–(2).

[15] Nexstar has stated that the merged entity would "cover[], in total, 80% of U.S. television households." Nexstar Media Group, *Nexstar Media Group, Inc. Enters into Definitive Agreement to Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction* (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/ (last visited Mar. 19, 2026).
 The FCC calculates national audience reach by including a 50% discount for Ultra High Frequency (UHF) stations (47 CFR § 73.3555(e)(1)-(2)). For purposes of the FCC's review, taking into account the UHF discount, Nexstar's national audience reach post-acquisition would be 54.5%. DA 25-1000 at 1. For market share calculations set forth in the Complaint, Plaintiff States rely on retransmission consent revenue numbers and ratings, not national audience share. *See* Compl. ¶¶ 58, 60.

[16] DA 25-1000, at 1.

[17] *Trump backs Nexstar-Tegna merger, says big TV networks need more competition*, Reuters (Feb. 9, 2026), https://www.reuters.com/business/trump-backs-merger-between-nexstar-tegna-2026-02-07/.

[18] Mckinley Franklin, *Trump Says Nexstar–Tegna Merger Will "Knock Out the Fake News," FCC Chair Says "Let's Get It Done"*, The Hollywood Reporter (Feb. 7, 2026), https://www.hollywoodreporter.com/business/business-news/trump-nexstar-tegna-merger-support-fcc-chair-get-it-done-1236498115/.

7

conference on February 18, 2026, Chairman Carr reiterated, "I support that [Nexstar/TEGNA] transaction. We're going to be moving forward."[19]

Yesterday, the same day U.S. DOJ announced its early termination, the FCC issued a ruling granting Nexstar's requested waivers and green-lighting the acquisition. In doing so, the FCC held it had the authority to revise the national audience reach cap.[20] Questions about whether the FCC has legal authority to change or waive that cap have been the subject of recent public debate and congressional oversight.[21] The FCC's decision is likely subject to legal challenge in the immediate future.[22]

**E. Plaintiffs' Efforts to Avoid This Motion**

Seeking to avoid burdening the Court with this motion for emergency relief, the Plaintiff States attempted multiple times to reach a timing agreement with Defendants. On March 10 and 11, 2026, counsel for the Plaintiff State of California asked Defendants to consider a timing agreement—a waiting period following Defendant's compliance with California's investigative subpoenas, during which the Parties would agree not to close their transaction while California completed its investigation of the Transaction. Sung Decl., ¶ 3. Defendants' counsel claimed they would follow up with a response, but never did. *Id.*

Making another attempt, the Plaintiff States e-mailed Defendants' counsel the evening of March 18, within an hour of filing this lawsuit and before the Transaction closed, to ask whether Defendants would agree not to consummate or otherwise complete the challenged Transaction until after a final judgment is issued in this case, or to propose any alternative that would obviate

---

[19] David Shepardson, *Federal Communications Commission chair backs Nexstar, Tegna merger*, Reuters (Feb. 18, 2026), https://www.reuters.com/business/federal-communications-commission-chair-backs-nexstar-tegna-merger-2026-02-18/.

[20] Memorandum Op. and Order, *In the Matter of Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc.,* MB Docket No. 25-331, DA 26-267, at 2 ¶ 3 (F.C.C. Media Bureau Mar. 19, 2026).

[21] Samantha-Jo Roth, *Bipartisan Unease Surfaces at Senate Hearing on Nexstar-Tegna Merger*, Wash. Examiner (Feb. 10, 2026, 4:36 PM), https://www.washingtonexaminer.com/news/senate/4453108/bipartisan-unease-nexstar-tegna-merger-senate-hearing/.

[22] Importantly, the FCC's analysis concerns a different legal standard than what is used in Clayton Act cases such as this one. The FCC acknowledges that its public interest evaluation is "informed by, but not limited to, traditional antitrust principles." DA 26-267, at 9 ¶ 18. The public interest standard does not require agencies "to analyze proposed mergers under the same standards" that are used in Clayton Act cases. *Northeast Utils. Serv. Co. v. FERC*, 993 F.2d 937, 947 (1st Cir. 1993). Thus, the FCC's conclusions are not binding on this Court.

8

the need for a TRO.  Sung Decl., ¶ 4.  Such timing agreements are common in merger proceedings, and they allow for an orderly, expedited review of the merger on its merits.[23] Defendants did not respond to that proposal, not even to acknowledge receipt or consideration. Sung Decl., ¶ 4.

In response to Plaintiffs' notice that they would file this Motion, Defendants finally e-mailed Plaintiffs at 7:45am this morning.  Sung Decl., ¶ 5.  In that e-mail, Defendants told Plaintiffs, "[T]he relief sought in your Complaint is no longer available" because the Transaction had closed.  *Id.*

## III.    LEGAL STANDARD

The purpose of interim injunctive relief is "not to conclusively determine the rights of the parties," but instead to "balance the equities as litigation moves forward."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017).  The standard for a temporary restraining order is generally the same as for a preliminary injunction.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  This Court has the authority to issue a temporary restraining order and preliminary injunction prohibiting Nexstar from integrating TEGNA in a case where a State is seeking additional relief, despite a federal agency clearing a merger.  *See, e.g.*, *California v. Am. Stores, Inc.*, 495 U.S. 271 (1990).

To be entitled to a preliminary injunction or a temporary restraining order, a plaintiff must demonstrate that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest."  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1020 (9th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach if it raises "serious questions" going to the merits of the plaintiff's claims while

---

[23] *See, e.g.*, See Compl. for TRO & Prelim. Inj., *FTC v. IQVIA Hldg's, Inc.*, No. 1:23-cv-06188, ECF No. 6, at 7 n.19 (S.D.N.Y. July 19, 2023) ("[M]erging parties commonly stipulate to a TRO to provide time for adequate development of the evidentiary record.") (citing cases); Mem. Law Supp. TRO, *FTC v. Microsoft Corp.*, No. 3:23-cv-02880, ECF No. 7, at 6 n.3 (N.D. Cal. June 12, 2023) (same); Joint Civil Case Mgmt Plan & Scheduling Or. ¶ 4, *State of New York v. Deutsche Telekom AG*, No. 1:19-cv-05434, ECF No. 201 (S.D.N.Y. Aug. 20, 2019).

showing that the balance of hardships tips "sharply" in the plaintiff's favor.  *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

## IV.    ARGUMENT

### A. Plaintiffs Are Likely to Establish that the Transaction is Unlawful and, at a Minimum, Present Serious Questions Going to the Merits of Plaintiffs' Claims

Plaintiffs are likely to succeed on the merits of their claims.  Section 7 of the Clayton Act prohibits mergers where the effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  "The first step of antitrust analysis is to define the relevant market."  *FTC v. Kroger Co.*, 2024 WL 5053016, at *6 (D. Or. Dec. 10, 2024) (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)).  "The relevant market has two components: the product market and the geographic market."  *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)).  Once the relevant market is defined, courts consider "whether the proposed merger or acquisition would lead to anticompetitive effects in that market."  *Id.* at *15 (citing *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 785-86 (9th Cir. 2015) ).  Showing that a merger would result in "'a significant increase in the concentration of firms in that market' establishes a presumption that the merger will substantially lessen competition."  *Id.* (quoting *U.S. v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)); *U.S. v. Baker Hughes Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990).  As alleged in the Complaint, the Transaction substantially lessens competition in the market for the licensing of Big 4 television retransmission consent and is presumptively unlawful under the U.S. DOJ and Federal Trade Commission's 2023 Merger Guidelines ("Merger Guidelines").[24]

---

[24] Courts evaluating challenged mergers routinely look to the Merger Guidelines as persuasive authority. *See, e.g.*, *Saint Alphonsus*, 778 F.3d at 784 & n. 9; *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 & n. 2 (3d Cir. 2016); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 & n. 9 (D.C. Cir. 2001).

**1. Plaintiffs Are Likely to Establish a Relevant Product Market[25]**

A relevant product market "consists of what customers consider to be reasonable substitutes for a company's products." *FTC v. Kroger Co.*, 2024 WL 5053016, at *6; *Brown Shoe*, 370 U.S at 325 (a relevant product market under Section 7 is defined by "reasonable interchangeability of use . . . between the product itself and substitutes for it").  The Transaction harms competition in the relevant product market for the licensing of Big 4 television retransmission consent.  The existence of this product market is well established.  Indeed, the U.S. DOJ pleaded exactly this market in its court filings regarding Nexstar's acquisition of Tribune Media's television stations in 2019 and in a similar broadcast-station merger in 2021.[26]  As U.S. DOJ has repeatedly explained, there is no close substitute for the programming MVPDs receive from Big 4 affiliates.[27]

Consistent with prior federal enforcement actions, Plaintiffs are likely to establish the existence of the product market in the licensing for retransmission of Big 4 content by broadcasting companies to MVPDs.  Big 4 stations provide "unique offerings such as local news, sports, and highly-ranked primetime programs."[28]  Local news "provides a valuable connection to the local community that is important to viewers of Big Four stations."[29]  To Sacramento residents, for example, news coverage about a teacher's strike in Natomas or the ascension of Sacramento State's football team to the Mid-American Conference holds importance and relevance that cannot be replaced by local news reports from Los Angeles or Boston, or by national news reporting.  MVPD subscribers—and therefore the MVPDs themselves—continue to

---

[25]  In seeking this TRO, Plaintiffs need not settle on specific product or geographic market definitions that will govern the rest of this case, and an assessment of Plaintiffs' likelihood of success does not hinge on a threshold question of market definition.  *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036–37 (D.C. Cir. 2008).  At this preliminary phase, Plaintiffs need only "raise doubts about a transaction."  *Id.*

[26] The U.S. DOJ has consistently used this product market definition in previous antitrust enforcement proceedings.  *See, e.g.,* Sung Decl., Ex. 7, at 1–2 (*Tribune* Competitive Impact Statement); Sung Decl., Ex. 8, at 1 (*Gray* Competitive Impact Statement). The Federal Communications Commission has similarly used a product market based on the Big 4 networks.  *See* Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent*, MB Docket No. 10-71 (Mar. 31, 2014), ¶ 13.

[27] Sung Decl., Ex. 7, at 6 (*Tribune* Competitive Impact Statement) (discussion other broadcast and cable programming); Sung Decl., Ex. 8, at 5 (*Gray* Competitive Impact Statement) (same).

[28] Sung Decl., Ex. 8 (*Gray* Competitive Impact Statement) at 4.

[29] Sung Decl., Ex. 7 (*Tribune* Competitive Statement) at 5.

11

rely on consistent access to local content despite the rise of retransmission fees that lead to higher consumer costs.[30]  The live television content available from streaming services like YouTube TV, Hulu+, Sling TV or Fubo is more limited, less consistent, and less localized than the content that is available through an MVPD subscriber's unlimited access to all Big 4 stations.  Compl. ¶ 46.

Nexstar itself says that "Big 4 broadcast networks carry the nation's most-watched programming by a significant margin (including the substantial majority of [NFL] games)."[31]  Not surprisingly, the Big 4 stations are usually the highest-ranked stations in a local market.[32]  By contrast, non-Big 4 stations carry less popular appeal.[33]

Because of viewer preferences, legal restrictions, and marketplace realities, non-Big 4 broadcast stations, cable networks, or streaming services are not close substitutes for the programming MVPDs receive from Big 4 stations.  Compl. ¶ 50.  Thus, in the event of a price increase for Big 4 television stations, viewers would be unlikely to switch to other sources of programming in sufficient volumes to render the price increase unprofitable.[34]  Because viewers do not regard non-Big 4 broadcast stations, cable networks, or various streaming services as close substitutes for the programming they receive from Big 4 stations, these other programming sources are not sufficient to discipline an increase in the fees charged for Big 4 television retransmission consent.  Compl. ¶ 50.  Thus, Plaintiffs are likely to establish that the licensing of Big 4 television retransmission consent constitutes a properly defined product market.

### 2.  Plaintiffs Are Likely to Establish a Relevant Geographic Market

"The relevant geographic market is the area of effective competition where buyers can turn for alternate sources of supply."  *Saint Alphonsus*, 778 F.3d at 784 (internal quotation marks omitted).  In the event of a blackout of a Big 4 network station, FCC rules generally prohibit an

---

[30] Sung Decl., Ex. 7 (*Tribune* Competitive Impact Statement) at 6 ("subscribers—and therefore MVPDs—generally do not view cable network programming as a close substitute for Big 4 network content."); Sung Decl., Ex. 8 (*Gray* Competitive Impact Statement) at 5 ("Due to the limited programming typically offered by non-Big Four stations, viewers are much less likely to switch to a non-Big Four station than to switch to other Big Four stations in the event of a blackout of a Big Four station.").
[31] Sung Decl., Ex. 6 (Nexstar Media Group, Inc., Annual Report (Form 10-K) (Feb. 27, 2026)) at 4.
[32] Sung Decl., Ex. 8 (*Gray* Competitive Impact Statement) at 4.
[33] *See* Compl. ¶ 42; Sung Decl., Ex. 8 (*Gray* Competitive Impact Statement) at 5.
[34] Sung Decl., Ex. 8 (*Gray* Competitive Impact Statement) at 5.

12

MVPD from importing the same network's content from another DMA.  Compl. ¶ 53.  Thus, Big 4 viewers in one DMA cannot switch to Big 4 programming in another DMA in the face of a blackout.  *Id.*  Therefore, substitution using a station outside the DMA is not a viable option in response to an increase in the retransmission consent fees for broadcast stations within the DMA.  Each DMA thus constitutes a relevant geographic market for the licensing of Big 4 television retransmission consent within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### 3.  Plaintiffs Are Likely to Demonstrate Substantially Lessened Competition

Plaintiffs are likely to prevail in proving that the Transaction substantially lessens competition in violation of the Clayton Act.  The Transaction dramatically raises Nexstar's market share.  Structural measurements of market concentration show that the post-Transaction level of concentration and the increase in concentration caused by the Transaction each independently support a presumption of illegality under the 2023 federal Merger Guidelines.  A commonly used metric for determining market concentration is the Herfindahl–Hirschman Index ("HHI"), which is the sum of the squares of individual firms' market shares.[35]  *Saint Alphonsus*, 778 F.3d at 786; *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001); *United States v. Rice Growers Ass'n of California*, 1986 WL 12561, at *2, n.4 (E.D. Cal. Jan. 31, 1986).  Per the Merger Guidelines, a transaction that creates a firm with a market share of over 30 percent and that increases the HHI of the market by more than 100 points is presumed to substantially lessen competition in that market and is thus presumptively illegal.[36]  A merger is also likely to create or enhance market power—and, again, is presumptively illegal—when the post-merger HHI exceeds 1,800 and the merger increases the HHI by more than 100 points.[37]

As alleged in the Complaint, in each "Big 4 Overlap DMA" directly impacting residents of the Plaintiff States, the merged firm now has well over 30 percent market share based on retransmission revenues, the post-merger HHI is well above 1,800, and the HHI increases well exceed 100 points:

---

[35] U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2023), § 2.1, at 5.
[36] U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2023), § 2.1, at 5–6.
[37] *Id.*

13

| Big 4 Overlap DMA | Nexstar Share | TEGNA Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Buffalo, NY | 39.3% | 20.0% | 59.3% | 2,800 | 4,371 | 1,571 |
| Charlotte, NC | 24.7% | 26.2% | 50.9% | 2,566 | 3,860 | 1,294 |
| Cleveland-Akron (Canton), OH | 28.0% | 24.5% | 52.4% | 2,562 | 3,930 | 1,368 |
| Columbus, OH | 46.1% | 23.8% | 69.9% | 3,597 | 5,793 | 2,196 |
| Davenport-Rock Island-Moline, IA-IL | 44.6% | 11.2% | 55.8% | 3,111 | 4,108 | 997 |
| Denver, CO | 30.9% | 26.2% | 57.1% | 2,562 | 4,182 | 1,620 |
| Greensboro-High Point-Winston-Salem, NC | 27.2% | 26.0% | 53.2% | 2,541 | 3,957 | 1,416 |
| Hartford-New Haven, CT | 38.1% | 25.3% | 63.3% | 2,838 | 4,762 | 1,923 |
| Norfolk-Portsmouth-Newport News, VA | 62.2% | 15.7% | 77.9% | 4,607 | 6,556 | 1,949 |
| Portland, OR | 39.9% | 15.0% | 54.9% | 2,835 | 4,029 | 1,194 |
| Sacramento-Stockton-Modesto, CA | 39.7% | 22.5% | 62.2% | 2,797 | 4,581 | 1,784 |
| San Diego, CA | 41.9% | 22.7% | 64.6% | 2,911 | 4,813 | 1,902 |
| St. Louis, MO | 26.1% | 22.5% | 48.6% | 2,508 | 3,684 | 1,175 |

Compl. ¶¶ 58–59; Decl. of Olga Haislip ISO TRO ("Haislip Decl.") ¶ 5.

Another potential way to assess market shares related to the Transaction is through ratings, a metric of how many viewers are watching a station.  Using ratings to calculate HHIs, the post-merger HHI in each Big 4 Overlap DMA is also well above 1,800, and the HHI increase in each Big 4 Overlap DMA also far exceeds the 100-point threshold.  In a post-Transaction world, the merged market shares are higher than 30%.  Compl. ¶ 61; Haislip Decl. ¶ 6.

As reflected in the chart above, such substantial structural consolidation is poised to occur in DMAs across the country, which are already highly concentrated, reinforcing that the Transaction presumptively violates Section 7 of the Clayton Act in each Big 4 Overlap DMA. *See Saint Alphonsus*, 778 F.3d at 786 (merger found presumptively unlawful where HHI numbers were "well above the thresholds for a presumptively anticompetitive merger"); *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172–73 (3d Cir. 2022) (same); *ProMedica*

Plaintiffs' Mem. of Points and Authorities in Support of Mot. For TRO

*Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014) (same); *Heinz*, 246 F.3d at 716 (D.C. Cir. 2001) (same).[38]

But there is more than just the structural presumption of illegality to indicate the Transaction will have likely anticompetitive effects. One reaches the same conclusion observing how the market for the licensing of Big 4 retransmission consent operates in practice. In overlapping DMAs, where Nexstar stations previously competed head-to-head with TEGNA's, Nexstar's increased negotiating leverage is most acute. Now, after consolidating a significant competitor, Nexstar owns at least two of the Big 4 stations in these DMAs, widening control over the "must-have" local programming that MVPDs seek to include in their subscriber packages. Because retransmission agreements generally provide a single price for all of a broadcasting company's stations of a certain category,[39] enlargement of Nexstar's national footprint would impact all geographic markets in the company's portfolio of Big 4 "must-have" affiliate--not just overlapping DMAs

For an MVPD, there is a strong incentive to acquiesce to the demands of a broadcast station owner who carries a substantial nationwide station portfolio. Bargaining impasses between MVPDs and broadcast television companies lead to blackouts, which lead to customer dissatisfaction and reputational harm if an MVPD loses access to the Big 4's popular broadcast programming (including local news and live sports). A larger station portfolio contains more local markets—and therefore more subscribers—at risk of a blackout in any dispute between a broadcast television company and an MVPD, thus raising the downside risk to the MVPDs of not reaching agreement and rendering them more likely to submit to higher retransmission consent fees across the board.

Where, as here, a plaintiff establishes a *prima facie* case that a merger is anticompetitive, the burden shifts to the defendants to rebut the presumption of illegality by "cast[ing] doubt on

---

[38] The Ninth Circuit in *Saint Alphonsus*, 778 F.3d at 786, applied the HHI requirements from then-applicable 2010 Horizontal Merger Guidelines, which are not identical to the current requirements, but this merger establishes the structural presumption under the 2010 guidelines as well.

[39] Sung Decl., Ex. 1 (Decl. of Rob Thun ¶ 7, Petition to Deny of DIRECTV, LLC at B-48, *In the Matter of Applications to Transfer Control of TEGNA Inc. to Nexstar Meda Inc.,* MB Docket No. 25-331 (Dec. 17, 2025)).

15

the accuracy of [plaintiff's] evidence as predictive of future anticompetitive effects" and presenting "evidence that the proposed merger will create a more efficient combined entity and thus increase competition." *Saint Alphonsus*, 778 F.3d at 788, 790; *see also FTC v. Penn Hershey Med. Ctr.*, 838 F.3d 327, 347 (3d Cir. 2016); *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *70 (N.D. Cal. Jan. 8, 2014). Defendants are unlikely to be able to make this showing. While Defendants have made vague, unsupported assertions of efficiencies from the merger,[40] they do not identify purported procompetitive benefits that would offset the Transaction's likely anticompetitive effects.

In short, the States are likely to succeed in proving the Transaction violates the Clayton Act. At a minimum, Plaintiffs have presented serious questions going to the merits of the Transaction's legality. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### B. There is a Substantial Risk of Imminent, Irreparable Harm

Plaintiffs, consumers, and competition itself are likely to suffer immediate, irreparable injuries in the absence of an injunction. *Winter*, 555 U.S. at 20. First, there will be an immediate loss of independent rivalry among stations that previously competed against each other in retransmission consent bargaining in the overlap DMAs. If allowed to integrate, Nexstar will increase its negotiating leverage against MVPDs across its nationwide portfolio, impacting geographic areas beyond just the overlap DMAs. It is well-established in the Ninth Circuit that the lessening of competition, in and of itself, constitutes an irreparable injury warranting preliminary injunctive relief. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016); *United States v. BNS Inc. et al*, 858 F.2d 456, 464–66 (9th Cir. 1988). The Transaction eliminates competition between Nexstar and TEGNA in the licensing of Big 4 station content to MVPDs for distribution to their subscribers, creating substantial duopolies in DMAs across the

---

[40] *See, e.g.*, Sung Decl., Ex. 4 (Nexstar Media Group, Inc., *TEGNA Acquisition Deck* (Aug. 2025)) at 5 (Nexstar expects "a combination of revenue synergies and net operating expense reductions" from the Transaction).

country and giving the combined company unprecedented national and DMA-level reach. *See* Compl. ¶ 30.

Second, as alleged in the Complaint, the Transaction will likely lead to retransmission consent fee increases that will be passed onto consumers. *See, e.g.*, Compl. ¶ 81. Nexstar now controls TEGNA stations' retransmission consent rights and negotiations. Without competitive discipline, Nexstar will be positioned to extract increased retransmission consent fees from MVPDs, including costs that are ultimately borne by subscribers in the form of higher cable and satellite bills.[41] Even if Plaintiffs later prevail on the merits, the economic injury will be diffuse and difficult to reverse. *See, e.g.*, *April in Paris v. Becerra*, 494 F. Supp. 3d 756, 770 (E.D. Cal. 2021) (irreparable harm found where economic harm alleged was "diffuse, industry-wide and difficult to quantify as damages"). Nexstar's limited commitment to the FCC not to raise some retransmission rates until November 30, 2026 does little to ameliorate this concern. The consolidation in the market and harm to competition will remain, rates will rise on December 1, 2026 and consumers will forever after be paying them.

Finally, the Transaction spells consolidation of local news operations in Big 4 Overlap DMAs—impacting both news content and jobs.[42] In local news, common ownership predictably reduces the incentive to compete by investing in differentiated reporting, investigative content, and other forms of news output, the effects of which have been borne out by Nexstar's track record of news duplication across different local stations.[43] Thus, the quality and content of local news and other local programming will likely be degraded as a result of this merger. The public interest concerns are magnified "where the consumer access to local news is at stake" in a merger case. *See United States v. Trib. Publ'g Co.*, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016). Nexstar has already been slashing newsroom jobs across the country in the weeks leading up to the Transaction.[44] Once newsrooms are consolidated, staff terminated, and operations integrated,

---

[41] Sung Decl., Ex. 10 (Decl. of Vince Torres ¶ 2, Petition to Deny of DIRECTV, LLC at B-51, *In the Matter of Applications to Transfer Control of TEGNA Inc. to Nexstar Meda Inc.,* MB Docket No. 25-331 (Dec. 31, 2025)).

[42] *See* Sung Decl., Ex. 9 (Nexstar Investor Presentation - June 2025) at 22.

[43] Compl. ¶ 12.

[44] *See , e.g.,* Tom Tapp, *Deadline*, "KTLA Anchors, Meteorologists Hit By Nexstar Layoffs In Multiple

17                                                                                      (continued…)

the lost independent rivalry and locally cultivated content cannot realistically be reconstructed later, even if the Court ultimately rules for Plaintiffs on the merits. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (irreparable harm found both where "parties cannot typically recover monetary damages flowing from their injury," and where injury is "intangible").

### C. The Public Interest and Balance of Equities Sharply Favor a TRO

A preliminary injunction is appropriate where: (1) the balance of equities tips in favor of the applicants; and (2) an injunction is in the public interest. *Winter*, 555. U.S. at 20. When evaluating the balance of hardships, "a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993). Among other things, "by establishing a likelihood of success on the merits," a plaintiff "establish[es] that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act. Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Even if a plaintiff "can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014). The purpose of interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward. *Int'l Refugee Assistance Project*, 582 U.S. at 580.

Here, the balance of equities tips sharply in Plaintiffs' favor. The primary public equities here include (i) the public interest in enforcing the antitrust laws, and (ii) the public interest in ensuring effective relief remains available if Plaintiffs succeed in adjudication on the merits. *See Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1, 86 (D.D.C. 2015). The Ninth Circuit has long recognized that the preservation of competition is "vital to the public interest." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000); *Boardman v. Pac. Seafood Grp.*,

Cities As TV Giant Seeks Merger," https://deadline.com/2026/02/ktla-mark-kriski-nexstar-layoffs-1236736389/ (Feb. 25, 2026).

18

822 F.3d 1011, 1024 (9th Cir. 2016). As sovereign enforcers of federal antitrust laws, Plaintiff States challenge an acquisition that threatens to eviscerate competition and harm consumers through supracompetitive retransmission-driven price increases as well as diminished quality and variety of independent local news. Moreover, in requesting temporary relief, Plaintiffs seek to maintain the status quo of separability and, thus, maintain the Court's ability to order effective relief. Without the Court's intervention, Defendants would be free to proceed with—and even accelerate—integration that gives Nexstar outsized power in retransmission fee negotiations and operational consolidation, including the abolition of separate news operations in overlap DMAs. Such changes would be difficult to undo and would irreversibly alter competitive conditions before the Court has a meaningful opportunity to rule on further injunctive relief. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) (difficulty of unwinding a consummated merger was a "public equity" that favored injunctive relief).

The requested TRO would cause minimal burden to Defendants, who told their investors—even as recently as February 27, 2026, that they anticipated a much later consummation date "by the second half of 2026."[45] Maintaining separability preserves the Court's ability to order effective remedies going forward, and imposes upon Defendants, at most, the limited and temporary burden of continuing to operate Nexstar and TEGNA independently pending further adjudication by the Court. "Although private equities may be considered [in balancing the equities], public equities receive far greater weight," *Warner Commc'ns*, 742 F.2d at 1165, and the public equities here heavily favor interim relief.

**D. The Court Has Authority to Order Defendants to Hold Separate Acquired Assets.**

The Court has authority to issue a hold separate order, which is "a form of preliminary relief that requires the acquiring company to preserve the acquired company (or certain of the acquired assets) as a separate and independent entity during the course of antitrust proceedings." *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1075 n.7 (D.C. Cir. 1981). The goal of such an order

---

[45] Sung Decl., Ex. 6 (Nexstar Media Group, Inc., Annual Report (Form 10-K) at 4 (Feb. 27, 2026) ("The Merger is anticipated to close by the second half of 2026."); Press Release, Nexstar Media Group, Inc., "Nexstar Media Group, Inc. Enters into Definitive Agreement To Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction" (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/.

19

is to "safeguard 'unscrambled' the assets acquired so that they may be divested effectively" in the event a plaintiff prevails in challenging the acquisition. *Id.*

Federal Rule of Civil Procedure 65 empowers this Court to tailor interim injunctive relief to meet the circumstances. The "essence of equity jurisdiction" is the Court's power "to mould each decree to the necessities of the particular case," *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), and where Congress has authorized injunctive relief, "all the inherent equitable powers of the District Court are available" to exercise that jurisdiction unless expressly limited, *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). Consistent with those principles, courts have exercised their equitable authority in Section 7 merger cases by ordering parties to hold separate the acquired assets to prevent interim harm and preserve the availability of effective relief. *See, e.g., FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1090 (D.C. Cir. 1981); *FTC v. Exxon Corp.*, 636 F.2d 1336, 1340 (D.C. Cir. 1980); *EIG Glob. Energy Partners, LLC v. TCW Asset Mgmt. Co.*, 2012 WL 5990113, at *11 (C.D. Cal. Nov. 30, 2012) (hold separate orders are "commonly issued in antitrust cases involving mergers"); *United States v. Acorn Eng'g Co.*, 1981 WL 2112, at *1 (N.D. Cal. June 18, 1981); *California v. Am. Stores, Inc.*, 697 F. Supp. 1125, 1133-34 (C.D. Cal. 1988), *aff'd in part and rev'd in part on other grounds*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990).

To preserve the availability of effective relief here, a hold separate order must cover the acquired TEGNA assets across the merged company's national portfolio. Plaintiffs' sought TRO would not force Defendants to unwind the Transaction or divest assets on an emergency basis; it is instead narrowly tailored to keep the status quo and prevent Defendants from taking steps that would irreversibly alter competitive conditions and frustrate remedial abilities before the Court can rule on preliminary injunctive relief.

## V.   **CONCLUSION**

Plaintiffs respectfully request that the Court enter a TRO temporarily enjoining Defendants from integrating and consolidating Nexstar and TEGNA; promptly calendar a hearing on preliminary injunctive relief; and grant such other and further relief as the Court deems just and proper.

Dated: March 20, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

/s/ Connie P. Sung
Connie P. Sung (SBN 304242)
Deputy Attorney General

Paula Blizzard (SBN 207920)
Senior Assistant Attorney General
Laura Antonini (SBN 271658)
Paul Chander (SBN 305133)
Elizabeth Cheever (SBN 341421)
Emily Curran (SBN 293065)
Komal K Patel (SBN 342765)
Connie P. Sung (SBN 304242)
Brian Wang (SBN 284490)
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7014
Telephone: (415) 510-3765
Email: Paula.Blizzard@doj.ca.gov
        Laura.Antonini@doj.ca.gov
        Connie.Sung@doj.ca.gov

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General

/s/Bryn Williams (as authorized on March 20, 2026)
Bryn A. Williams
First Assistant Attorney General (SBN 301699)
Jonathan B. Sallet (*Pro Hac Vice forthcoming*)
Special Assistant Attorney General
Robin Alexander (*Pro Hac Vice forthcoming*)
Assistant Attorney General
Amy Bowles (*Pro Hac Vice forthcoming*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Bryn.Williams@coag.gov
        Jon.Sallet@coag.gov
        Robin.Alexander@coag.gov
        Amy.Bowles@coag.gov

21

*Attorneys for the State of Colorado*
FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS
Deputy Associate Attorney General
(*pro hac vice* forthcoming)

/s/ *Julián A. Quiñones Reyes* (as authorized on March 20, 2026)
Julián A. Quiñones Reyes (*Pro Hac Vice forthcoming*)
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General of Illinois

/s/ *Paul J. Harper* (as authorized on March 20, 2026)
Elizabeth L. Maxeiner (*Pro Hac Vice forthcoming*)
Chief, Antitrust Bureau
Paul J. Harper (*Pro Hac Vice forthcoming*)
Supervising Attorney, Antitrust Bureau
John R. Milligan (*Pro Hac Vice forthcoming*)
Daniel R. Betancourt (*Pro Hac Vice forthcoming*)
Assistant Attorneys General
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (312) 814-1004
E-Mail: paul.harper@ilag.gov

*Attorneys for Plaintiff State of Illinois*

22

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ *Elinor R. Hoffmann* (as authorized on March 20, 2026)
Elinor R. Hoffmann (*Pro Hac Vice forthcoming*)
Chief, Antitrust Bureau
Christopher D'Angelo (*Pro Hac Vice forthcoming)*
Chief Deputy Attorney General
Economic Justice Division
Amy McFarlane (*Pro Hac Vice forthcoming*)
Deputy Chief, Antitrust Bureau
Morgan Feder (*Pro Hac Vice forthcoming)*
Assistant Attorney General, Antitrust Bureau
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Elinor.Hoffmann@ag.ny.gov | (212) 416-8269
Christopher.D'Angelo@ag.ny.gov |
(212) 416-6124
Amy.McFarlane@ag.ny.gov | (212) 416-6195
Morgan.Feder@ag.ny.gov | (212) 416-8288

*Attorneys for Plaintiff State of New York*


FOR PLAINTIFF STATE OF NORTH CAROLINA:

JEFF JACKSON
Attorney General of North Carolina

KUNAL CHOKSI (*Pro Hac Vice Forthcoming*)
Senior Deputy Attorney General

/s/ *Francisco Benzoni* (as authorized on March 20, 2026)
Francisco Benzoni (*Pro Hac Vice Forthcoming*)
Special Deputy Attorney General
Brian Rabinovitz (*Pro Hac Vice Forthcoming*)
Director of Major Litigation, Consumer Protection
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
fbenzoni@ncdoj.gov
brabinovitz@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

Plaintiffs' Mem. of Points and Authorities in Support of Mot. For TRO

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

*/s/ Ian Van Loh* (as authorized on March 20, 2026)
Timothy D. Smith (*Pro Hac Vice forthcoming*)
Attorney-in-Charge
Ian Van Loh (SBN 280254)
Alex DeLorenzo (*Pro Hac Vice forthcoming*)
Senior Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St, Portland OR  97201
tim.smith@doj.oregon.gov | 503.798.3297
ian.vanloh@doj.oregon.gov | 971.239.7457
alex.delorenzo@doj.oregon.gov | 503.428.9482

*Attorneys for Plaintiff State of Oregon*


FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:

JAY JONES
Attorney General of Virginia

*/s/ Tyler T. Henry* (as authorized on March 20, 2026)
Tyler T. Henry (*Pro Hac Vice forthcoming*)
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
THenry@oag.state.va.us
(804) 692-0485

*Attorneys for Plaintiff Commonwealth of Virginia*

Plaintiffs' Mem. of Points and Authorities in Support of Mot. For TRO