# EXHIBIT 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

 **for the fiscal year ended December 31, 2025**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

 **for the transition period from          to          .**

**Commission File Number: 000-50478**

# NEXSTAR MEDIA GROUP, INC.

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **23-3083125** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **545 E. John Carpenter Freeway, Suite 700, Irving, Texas** | **75062** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(972) 373-8800**

**(Registrant's Telephone Number, Including Area Code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | NXST | NASDAQ Global Select Market |

Securities registered pursuant to section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that it was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by checkmark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of June 30, 2025, the aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant was $4,901,766,022.

As of February 26, 2026, the Registrant had 30,327,997 shares of Common Stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Proxy Statement for the Registrant's 2026 Annual Meeting of Stockholders will be filed with the Commission within 120 days after the close of the Registrant's fiscal year and incorporated by reference in Part III of this Annual Report on Form 10-K.

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **PART I** | | |
| ITEM 1. | Business | 4 |
| ITEM 1A. | Risk Factors | 18 |
| ITEM 1B. | Unresolved Staff Comments | 28 |
| ITEM 1C. | Cybersecurity | 28 |
| ITEM 2. | Properties | 28 |
| ITEM 3. | Legal Proceedings | 29 |
| ITEM 4. | Mine Safety Disclosures | 29 |
| **PART II** | | |
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 30 |
| ITEM 6. | Reserved | 31 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| ITEM 7A. | Quantitative and Qualitative Disclosures About Market Risk | 44 |
| ITEM 8. | Financial Statements and Supplementary Data | 44 |
| ITEM 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 44 |
| ITEM 9A. | Controls and Procedures | 44 |
| ITEM 9B. | Other Information | 45 |
| ITEM 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 45 |
| **PART III** | | |
| ITEM 10. | Directors, Executive Officers and Corporate Governance | 46 |
| | Information about our Executive Officers | 46 |
| ITEM 11. | Executive Compensation | 48 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management, and Related Stockholder Matters | 48 |
| ITEM 13. | Certain Relationships and Related Transactions, and Director Independence | 48 |
| ITEM 14. | Principal Accountant Fees and Services | 48 |
| **PART IV** | | |
| ITEM 15. | Exhibits and Financial Statement Schedules | 49 |
| ITEM 16. | Form 10-K Summary | 49 |
| Index to Exhibits | | 50 |
| Index to Financial Statements | | F-1 |

**General**

As used in this Annual Report on Form 10-K and unless the context indicates otherwise, "Nexstar" refers to Nexstar Media Group, Inc., a Delaware corporation, and its consolidated wholly owned and majority-owned subsidiaries, "Nexstar Media" refers to Nexstar Media Inc., a Delaware corporation and Nexstar's wholly owned subsidiary; the "Company" refers to Nexstar and the variable interest entities ("VIEs") required to be consolidated in our financial statements; and all references to "we," "our," "ours," and "us" refer to Nexstar.

Nexstar Media has time brokerage agreements ("TBAs"), shared services agreements ("SSAs"), joint sales agreements ("JSAs"), local marketing agreements ("LMAs") and outsourcing agreements (which we generally and collectively refer to as "local service agreements") relating to the television stations owned by VIEs but does not own any of the equity interests in these entities. For a description of the relationship between Nexstar and these VIEs, see Item 1, "Business."

The information in this Annual Report on Form 10-K includes information related to Nexstar and the VIEs with which Nexstar has relationships. In accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and as discussed in Note 2 to our Consolidated Financial Statements in Part IV, Item 15(a) of this Annual Report on Form 10-K, the financial results of the consolidated VIEs are included in the Consolidated Financial Statements contained herein.

In the context of describing ownership of television stations in a particular market, the term "duopoly" refers to owning or deriving the majority of the economic benefit, through ownership or local service agreements, from two or more stations in a particular market. For more information on how we derive economic benefit from a duopoly, see Item 1, "Business."

There are 210 generally recognized television markets, known as Designated Market Areas ("DMAs"), in the United States. DMAs are ranked in size according to various factors based upon actual or potential audience. DMA rankings contained in this Annual Report on Form 10-K are from the *2025-2026 Nielsen Local Television Market Universe Estimates* as published by The Nielsen Company ("Nielsen").

**Cautionary Note Regarding Forward-Looking Statements**

This Annual Report on Form 10-K contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended ("Exchange Act"). All statements other than statements of historical fact are "forward-looking statements" for purposes of federal and state securities laws, including but not limited to: the ultimate outcome, benefits and synergies of the proposed merger between Nexstar and TEGNA Inc., a Delaware corporation ("TEGNA") and the timing thereof; the risks and uncertainties of current economic factors that are beyond our control, such as tariffs and other trade barriers, capital markets volatility, sustained inflation, high interest rates and supply chain disruptions; any projections or expectations of earnings, revenue, financial performance, liquidity and capital resources or other financial items; any assumptions or projections about the television broadcasting industry; any statements of our plans, strategies and objectives for our future operations, performance, liquidity and capital resources or other financial items; any statements concerning proposed new products, services or developments; any statements regarding future economic conditions or performance; any statements of belief; and any statements of assumptions underlying any of the foregoing. Forward-looking statements may include the words "may," "will," "should," "could," "would," "predicts," "potential," "continue," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates" and other similar words.

Although we believe that the expectations reflected in any of our forward-looking statements are reasonable, actual results could differ from a projection or assumption in any of our forward-looking statements. Our future financial position and results of operations, as well as any forward-looking statements, are subject to change and inherent risks and uncertainties discussed under Item 1A, "Risk Factors" located elsewhere in this Annual Report on Form 10-K and in our other filings with the United States Securities and Exchange Commission ("SEC"). The forward-looking statements made in this Annual Report on Form 10-K are made only as of the date hereof, and we do not have or undertake any obligation to update any forward-looking statements to reflect subsequent events or circumstances.

## Item 1. Business

### Company Overview

We are a leading diversified media company that produces and distributes engaging local and national news, sports and entertainment content across our television and digital platforms, including more than 317,000 hours of programming produced annually by our business units. Nexstar owns America's largest local television broadcasting group comprised of top network affiliates, with over 200 owned or partner stations in 116 U.S. markets in 40 states and the District of Columbia reaching over 225 million people. Nexstar's national television properties include an 80.8% interest in The CW Network, LLC ("The CW"), the fifth major broadcast network in the U.S., NewsNation, a national news network providing "News for All Americans," two popular entertainment multicast networks, Antenna TV and REWIND TV, and a 31.3% ownership stake in Television Food Network, G.P. ("TV Food Network"). The Company's portfolio of digital assets, including its local TV station apps and websites, The Hill and NewsNationNow.com, is collectively a Top 10 U.S. digital news and information property, attracting over 90 million monthly unique users on average during 2025 according to Comscore.

On August 18, 2025, we entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") to acquire the outstanding equity of TEGNA (such transaction, the "Merger"). TEGNA owns and operates 64 television stations and two radio stations in 51 DMAs in the U.S. The Merger is anticipated to close by the second half of 2026. For more information see the "Merger Agreement with TEGNA" paragraph later in this Item 1.

We are a Delaware corporation formed in 1996. Our principal offices are at 545 E. John Carpenter Freeway, Suite 700, Irving, TX 75062. Our telephone number is (972) 373-8800 and our website is *http://www.nexstar.tv*. The information contained on, or accessible through, our website is not part of this Annual Report on Form 10-K and is not incorporated herein by reference.

### Competitive Strengths

***Focus on Broadcast Television.*** The substantial majority of our assets, including our television stations, The CW and our multicast networks, are broadcast television assets. Our television stations are affiliates of CBS, FOX, NBC and ABC (together, the "Big 4"), as well as The CW and MyNetworkTV ("MNTV"). We are the first, second or third largest affiliate group for each broadcast network. According to Nielsen, the Big 4 broadcast networks carry the nation's most-watched programming by a significant margin (including the substantial majority of National Football League ("NFL") games). The broadcast television model has several inherent advantages: (i) it reaches more viewers than any other distribution model, including multichannel and other select pay television subscribers as well as the 18% of the population that only receives their television programming over the air, (ii) it is the preferred distribution platform for most professional sports organizations delivering the widest reach to their fanbases, thereby enhancing franchise value, and (iii) it remains under-monetized as broadcast stations receive a lower percentage of total programming fees paid to content providers by distributors (e.g., cable companies, satellite companies and multichannel streaming platform providers) than the aggregate viewership they generate.

***Unique Combination of Scaled Local Audiences and Powerful National Reach.*** We are the largest local television broadcasting company in the United States, generating $4.9 billion of revenue for the year ended December 31, 2025. Our and our partners' over 200 broadcast stations in 116 local markets reach approximately 70% of U.S. television households (without applying the Federal Communications Commission's ("FCC") ultra-high-frequency ("UHF") discount). This local reach is augmented by the national reach we have via our broadcast network, The CW, and our national news network, NewsNation. According to Nielsen, The CW reaches over 128 million television households, equal to the reach of the ABC, CBS, FOX and NBC broadcast networks, and NewsNation reaches approximately 58 million television households, virtually equivalent to the reach of Fox News, MS NOW and CNN. Together, Nexstar can provide both national reach and activation of local audiences at scale, representing a differentiated and attractive value proposition for advertisers and brands in an increasingly fragmented marketplace.

***Leading Local Franchises.*** We are focused on building and maintaining leading local franchises in the 116 local markets we serve. In total, we employ approximately 6,000 journalists and 1,600 salespeople, produce over 317,000 hours of programming, and have relationships with over 50,000 advertisers. For the year ended December 31, 2025, excluding our owned network assets, the Company earned approximately 68% of its advertising revenue from local (non-network) programming.

•*Recognizable Local Brands*. Our television stations have typically been established in our markets for decades. Our long-term, track record of reliable local news and community outreach initiatives, provides us with strong local brand recognition and affinity which helps generate viewership and advertising sales.

•*High Quality, Independent Local Programming*. Our strong local brands are primarily attributable to our high-quality local programming, including news, lifestyle, sports and syndicated programming. All of the news programming produced by Nexstar stations rated by a third-party watchdog group, Ad Fontes, is judged to be politically neutral. In

addition, according to Ad Fontes, virtually all of the news programming has a reliability rating of "reliable; analysis/fact reporting." In 2025, journalists at our stations won 531 awards for their reporting, including 56 Edward R. Murrow awards and 121 Emmy awards.

- *Local Sales Force*. We employ a local sales force in each of our markets which capitalize on our investment in local programming, websites and connected television ("CTV") or over-the-top ("OTT") applications by selling advertising on these platforms as well as selling third-party digital advertising inventory to enhance advertiser campaigns.

- *Presence in Contested Election Markets*. In even-numbered years, when most elections are held, we have historically generated substantial revenue from locally driven political advertising. Given our expansive geographic reach, our station footprint typically overlaps with over 80% of contested election markets, enabling us to capture a relatively consistent share of total television broadcasting political advertising spending in election years.

- *Duopolies*. We own or provide services to more than one station in more than half of our markets which enhances our service to local communities, broadens our audience share, increases our revenue share, and enables significant operating efficiencies.

**Strong National Brands.** We have a portfolio of scaled, strong national brands that enables us to meaningfully engage with national advertisers. Our primary national brands include The CW, NewsNation and The Hill. The CW is America's fifth national broadcast network. NewsNation is our news network providing fact-based, unbiased "News for All Americans." The Hill is the nation's leading, independent political digital media platform.

**Diversified Revenue Streams.** Our revenue streams are diversified by geography, affiliation and source. In 2025, we generated 59% of our revenue from distribution, 40% from advertising (approximately 39% from commercial sources and 1% from political sources), and 1% from other sources. No single customer generated more than 13% of our revenue; no single market generated more than 3% of our revenue; and our affiliations are diverse with no network affiliate group representing more than 25% of our 2025 combined core and political advertising net revenue.

**Intense Operational Focus**. We emphasize strict controls on operating and programming costs in order to increase net income, Adjusted EBITDA and Adjusted Free Cash Flow. We continually seek to identify and implement cost savings at each of our stations, the stations we provide services to, and other business units. For example, during the fourth quarter of 2024, we implemented a strategic, operational restructuring which enabled us to reduce overall operating expenses before one-time and transaction-related expenses, from 2024 to 2025. We achieved these cost reductions by reducing middle management in our ad sales division, streamlining work processes at our local markets to improve productivity, and improving integration of The CW and The Hill into the broader organization, among other initiatives. In addition, we are able to achieve economies of scale by leveraging our size and corporate management expertise by providing programming, financial, sales and marketing support to our owned stations, the stations to which we provide services and to other business units. Our operational execution expertise is the direct result of our talented management team. We seek to attract and retain corporate, business unit and station general managers with proven track records by providing equity incentives.

**Attractive Financial Profile.** In 2025 and 2024, we generated total net revenue of $4.9 billion and $5.4 billion, respectively, generated net cash flow from operating activities of $891 million and $1.25 billion, respectively, and returned a significant percentage of that cash flow to shareholders in the form of share repurchases and dividends—$351 million in 2025 and $820 million in 2024—while maintaining a corporate credit rating of Ba3 / BB+ as rated by Moody's / S&P. We believe we have the financial flexibility to invest in both organic and inorganic growth initiatives while continuing to return capital to our shareholders. In 2026, we anticipate we will use some of our financial capacity to execute on the acquisition of TEGNA.

**Growth Strategies**

We continually seek to generate revenue, net income, Adjusted EBITDA and Adjusted Free Cash Flow growth through the following strategies:

**Leverage Our Scale.** As the largest local television broadcaster with significant and scaled national media properties, we believe we are an important partner for the major broadcast networks as we are one of the largest affiliate groups for each network, multichannel video programming distributors ("MVPDs") and virtual multichannel video programming distributors ("vMVPDs") who include our programming in their consumer offerings, and advertisers. For national advertisers, we have a collection of national networks/properties including The CW, NewsNation, Antenna TV and The Hill as well as television stations covering 70% of the country (without applying the FCC UHF discount) including eight of the top 10 and 18 of the top 25 DMAs. Our digital assets attract an audience that makes us a top ten digital news and information property, according to Comscore. Our scale provides us with beneficial operating advantages in the form of services we can provide to our advertisers, audience and employees, a platform for growth and operating expense synergies and access to capital. As part of this strategy, in 2023, we centralized our national

5

advertising sales in house in order to drive advertising sales across our diversified media portfolio by further emphasizing our client-first approach, combined with a new data-driven, multi-platform focus.

**Continue to Grow Distribution and Advertising Revenues.** We believe our core business of distribution and advertising revenue has the potential to continue to grow. We believe that the share of audience that our programming generates for MVPDs and vMVPDs is greater than the share of fees those platforms pay us and that broadcast advertising continues to provide commercial and political advertisers with access to the broadest television audience available. In addition, we are focused on better monetizing our digital content and audience and growing our portfolio of digital products, services and content and associated revenue streams, including apps for NewsNation, The Hill and other local television station programming.

**Improve and Expand National Broadcast and Cable Networks.** We seek to continue to increase the viewership, revenues and profitability of our national television network assets, The CW and NewsNation.

*The CW.* As the largest affiliate of The CW, we acquired the network in September 2022 (for no consideration) in order to sustain and grow our CW-related revenue streams and to improve this underexploited national broadcast network asset. Our growth strategy for The CW has been to cost-efficiently improve and diversify the programming to better align with broadcast audiences with the intention of improving ratings and revenue (both distribution and advertising) while reducing programming and other operating costs. Since we made the acquisition, we have (i) increased the hours of programming provided by the network by almost 60%, (ii) introduced sports and sports-related programming through the creation of CW Sports with the acquisition of exclusive broadcast rights to NASCAR O'Reilly Auto Parts Series (formerly known as the NASCAR Xfinity Series), WWE NXT, ACC college football and basketball, Pac-12 football games, AVP beach volleyball, PBR Team Series, and Professional Bowlers Association events, among other events, and (iii) increased the percentage of total programming hours offered by the network in 2025 related to sports and sports-related programming to over 40% from 0% at acquisition, all while reducing programming costs by more than 50% and improving operating cash flows of the network. In addition, we have been able to grow The CW's distribution revenue while increasing the number of CW affiliations held by us and our partners to 58, representing 48.2% of total U.S. TV households. We and our partners together own the largest group of CW affiliates, larger than any of the Big 4 networks' ownership of their respective network-affiliated stations. We believe there is potential for The CW to further improve its profitability and, together with Nexstar's CW station affiliates, the overall net profit contribution to Nexstar.

*NewsNation.* NewsNation is our national news network providing "News for All Americans," which has been recognized by independent watchdog groups such as Ad Fontes Media, NewsGuard and AllSides for its independent, unbiased reporting of national and local news. In 2024, NewsNation successfully expanded to 24 hours of news programming seven days a week. NewsNation was launched in 2020, when we initiated the conversion of WGN America to NewsNation, leveraging our core competency in news and profitable foundation to build a network focused on providing unbiased, fact-based news. We believe there is significant growth potential for NewsNation as news networks are among the most watched and most profitable cable networks.

**Develop New Revenue Streams.** We seek to generate new revenue streams leveraging the platform and assets of our company. Given our extensive station portfolio and geographic coverage, we have converted the technology used by our stations reaching 50% of U.S. television households to a new standard, ATSC 3.0, which will enable us to provide new high speed data transmission services to businesses and consumers. We anticipate that this conversion will enable us to develop a new business and generate additional revenue in the future.

**Acquire and Invest in New and Complementary Businesses.** We selectively pursue acquisitions where we believe we can improve revenue, net income, Adjusted EBITDA and cash flow. Historically, we have been able to achieve significant improvements from acquisitions of television broadcasting assets by applying our favorable distribution contracts to newly acquired stations, reducing costs by creating duopolies or operating stations together in selected markets and executing on other overhead and cost-based synergies. We plan to continue to pursue television station acquisitions. In addition, we may selectively pursue acquisitions of businesses that leverage our platform, scale and capabilities and are complementary to our vision of providing local news, entertainment, and sports content through broadcast and digital platforms as well as serving the local advertiser.

### Merger Agreement with TEGNA

Pursuant to the Merger Agreement, we will acquire TEGNA's outstanding equity for a cash payment of $22 per share (the "Merger Consideration"). The transaction is valued at an estimated $6.2 billion, which includes the estimated purchase price of $5.8 billion (comprising the Merger Consideration and the refinancing of certain existing TEGNA debt), financing fees and transaction costs and expenses. On August 18, 2025, we entered into a debt commitment letter, which was subsequently amended and restated on September 11, 2025, pursuant to which a syndicate of financial institutions committed to provide debt financing up to a maximum of $5.725 billion to consummate the Merger, the refinancing of certain of TEGNA's existing debt and related transactions.

The Merger has been approved by the boards of directors of both companies and by the stockholders of TEGNA and is anticipated to close by the second half of 2026, subject to (i) FCC consent, (ii) receipt of other regulatory approvals including

expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and (iii) satisfaction of other customary closing conditions. The Merger does not require approval of Nexstar stockholders and is not subject to any financing condition.

The Merger Agreement contains certain termination rights for both parties. Either party may terminate the Merger Agreement if the Merger is not consummated at or before 5:00 p.m. Eastern Time on August 18, 2026, which may be extended to November 18, 2026 at the election of either TEGNA or Nexstar if all conditions other than certain regulatory conditions have been satisfied or waived. If the Merger Agreement is terminated by either party under certain circumstances, including because certain required regulatory clearances are not obtained on or before November 18, 2026, Nexstar will be required to pay TEGNA a termination fee of $125 million.

Proposed Merger highlights:

•*Preserves high-quality local journalism and diversity of opinion*.  Combines two best-in-class television broadcast companies which share an unwavering commitment to localism, innovation, and superior, trustworthy programming.

•*Increases operational and geographic diversity and scale*.  Upon closing, Nexstar, together with its partners, will have 265 full-power television stations in 44 states and the District of Columbia and 132 of the country's 210 television DMAs. The combined company will have stations in 9 of the top 10 DMAs, 41 of the top 50 DMAs, 62 of the top 75 DMAs and 82 of the top 100 DMAs, covering, in total, 80% of U.S. television households. The enhanced scale of the Company will enable us to compete better with the much larger technology and media companies in our industry.

•*Enhances presence in local DMA*s.  Nexstar's station footprint overlaps with TEGNA in 35 of TEGNA's 51 DMAs, providing improved synergy potential in these markets.

•*Extends footprint to additional contested election DMAs*.  The addition of strong Big-4 affiliates in key contested election DMAs, such as Phoenix, AZ, Atlanta, GA, Toledo, OH, and Portland, ME, will enhance the political advertising outlook for Nexstar in even-numbered years.

•*Expected to drive increased profitability through identified synergies*.  We have identified contractual revenue, station-level, and corporate overhead cost savings that can be achieved through the combination.

**Stations**

As of February 26, 2026, we owned, operated, programmed or provided sales and other services to 201 full power television stations in 116 markets in 40 states and the District of Columbia, reaching approximately 39% of all U.S. television households reflecting our owned stations only and after applying the FCC UHF discount and approximately 70% of all U.S. television households reflecting our and our partners' stations and excluding the FCC UHF discount. The stations are affiliates of CBS, FOX, NBC, ABC, The CW, MNTV and other broadcast television networks and provide television programming to consumers in our markets, including network programming, content that the stations produce, including local news, and syndicated programs that the stations acquire. We also own and operate one AM radio station in Chicago, IL.

Of the 201 full power television stations, 37 are 100% independently owned by VIEs. We consolidate 35 of these VIEs (the "consolidated VIEs") in our financial statements. In compliance with FCC regulations for all the parties, all VIEs maintain responsibility for and control over programming, finances, personnel and operations of their stations. For the consolidated VIEs, we are deemed under U.S. GAAP to have controlling financial interests in these entities because of Nexstar's (i) local service agreements with the consolidated VIEs' stations, (ii) guarantee (excluding The CW) of the obligations incurred under the senior secured credit facility of Mission Broadcasting, Inc. ("Mission"), a consolidated VIE, (iii) power over significant activities affecting the consolidated VIEs' economic performance, including budgeting for advertising revenue, certain advertising sales and, in some cases, hiring and firing of sales force personnel, and (iv) renewable, exercisable and assignable purchase options granted by each consolidated VIE which permit Nexstar to acquire the assets and assume the liabilities of all of the consolidated VIEs' stations at any time, subject to FCC consent. For additional information on VIEs, see Note 2 to our Consolidated Financial Statements in Part IV, Item 15(a) of this Annual Report on Form 10-K.

The following table sets forth general information about the television stations (full power, low power, and multicast channels) we own, operate, program or provide sales and other services to as of February 2026. **Bold denotes networks owned by Nexstar.**

| Market Rank[1] | Market | Status[2] | Full Power Stations | Primary Affiliation | Low Power Stations / Multicast Channels | Other Affiliations | FCC License Expiration Date |
|---|---|---|---|---|---|---|---|
| 1 | New York, NY | LSA | WPIX | **The CW** | WPIX-D2, D4 | **Antenna TV**, **REWIND TV** | [4] |
| 2 | Los Angeles, CA | O&O | KTLA | **The CW** | KTLA-D2, D3, D4, D5 | **Antenna TV**, GRIT, ShopLC, **REWIND TV** | |
| 3 | Chicago, IL | O&O | WGN | **The CW** | WGN-D2, D3, D4, D5 | **Antenna TV**, GRIT, **REWIND TV**, The Nest | 4/1/2030 |
| 4 | Dallas, TX | O&O | KDAF | **The CW** | KDAF-D2, D3, D4, D5 | **Antenna TV**, GRIT, Charge!, **REWIND TV** | 8/1/2030 |
| 5 | Philadelphia, PA | O&O | WPHL | **The CW** | WPHL-D2, D3, D4 | **Antenna TV**/MNTV, GRIT, Comet | 8/1/2031 |
| 6 | Houston, TX | O&O | KIAH | **The CW** | KIAH-D2, D3, D4, D5 | **Antenna TV**, The Nest, HSN2, **REWIND TV** | [4] |
| 8 | Washington DC/Hagerstown, MD | O&O | WDCW | **The CW** | WDCW-D2, D3, D4 | **Antenna TV**, **WDVM**, Univision | 10/1/2028 |
| | | O&O | WDVM | Independent | WDVM-D2, D3, D4 | ION Mystery, **REWIND TV**, ShopLC | 10/1/2028 |
| 9 | San Francisco, CA | O&O | KRON | **The CW** | KRON-D2, D3, D4, D5 | **Antenna TV**, **REWIND TV**, ROAR, Defy | [4] |
| 11 | Tampa, FL | O&O | WFLA | NBC | WFLA-D2, D3 | Charge!, **Antenna TV** | 2/1/2029 |
| | | O&O | WTTA[3] | **The CW** | WTTA-D2 | Cozi TV | 2/1/2029 |
| | | O&O | | | WSNN-LD, D2, D3, D4 | MNTV, GRIT, Laff, Court TV | 2/1/2029 |
| 12 | Phoenix, AZ | LSA | KAZT | **The CW** | KAZT-D2, D3, D4, D5 | Independent, Merit Street, Charge!, **REWIND TV** | 10/1/2030 |
| 17 | Denver, CO | O&O | KDVR | FOX | KDVR-D2, D3 | | [4] |
| | | O&O | KFCT | FOX | | **Antenna TV**, ROAR | |
| | | O&O | KWGN | **The CW** | KWGN-D2, D3, D4 | Charge!, Comet, HSN2 | 4/1/2030 |
| 19 | Cleveland, OH | O&O | WJW | FOX | WJW-D2, D3, D4 | **Antenna TV**, Comet, Charge! | 10/1/2029 |
| | | O&O | WBNX | **The CW** | WBNX-D2, D3, D4, D5 | BUZZR, **REWIND TV**, H&I, Start | 10/1/2029 |
| 20 | Sacramento, CA | O&O | KTXL | FOX | KTXL-D2, D3, D4 | **Antenna TV**, GRIT, ROAR | [4] |
| 21 | Charlotte, NC | O&O | WJZY | FOX | WJZY-D3, D4, D5, D6, D7, D8 | Charge!, GRIT, ShopLC, ION, **Antenna TV**, **REWIND TV**/MNTV | 12/1/2028 |
| | | O&O | WMYT | **The CW** | | | 12/1/2028 |
| 22 | Raleigh, NC | O&O | WNCN | CBS | WNCN-D2, D3, D4 | **REWIND TV**, GRIT, **Antenna TV** | 12/1/2028 |
| 23 | Portland, OR | O&O | KOIN | CBS | KOIN-D2, D3 | getTV, **REWIND TV** | [4] |
| | | O&O | KRCW | **The CW** | KRCW-D2, D3, D4 | **Antenna TV**, GRIT, ShopLC | |
| 24 | St. Louis, MO | O&O | KTVI | FOX | KTVI-D2, D3, D4 | **Antenna TV**, GRIT, ShopLC | 2/1/2030 |
| | | O&O | KPLR | **The CW** | KPLR-D2, D3, D4 | Court TV, Comet, 365 Black | 2/1/2030 |
| 25 | Nashville, TN | O&O | WKRN | ABC | WKRN-D2, D3, D4 | ION Mystery, Defy, 365 Black | 8/1/2029 |
| 26 | Indianapolis, IN | O&O | WTTV | CBS | WTTV-D2, D3, D4, D5 | Independent, Comet, ROAR, **REWIND TV** | 8/1/2029 |
| | | O&O | WTTK | CBS | WTTK-D2, D3 | Independent, Cozi TV | 8/1/2029 |
| | | O&O | WXIN | FOX | WXIN-D2, D3, D4 | **Antenna TV**, Defy, Charge! | 8/1/2029 |
| 27 | Salt Lake City, UT | O&O | KTVX | ABC | KTVX-D2, D3, D4 | **Antenna TV**, **REWIND TV**, Outlaw | 10/1/2030 |
| | | O&O | KUCW | **The CW** | KUCW-D2, D3, D4 | ION Mystery, Defy, ShopLC | [4] |
| 30 | San Diego, CA | O&O | KSWB | FOX | KSWB-D2, D3, D4 | **Antenna TV**, Court TV, ION | |
| | | O&O | KUSI | Independent | KUSI-D2 | **REWIND TV** | 12/1/2028 |
| 32 | Austin, TX | O&O | KXAN | NBC | KXAN-D2, D3, D4, D5 | Cozi TV, ION, **REWIND TV**, ION Plus | 8/1/2030 |
| | | O&O | KBVO | MNTV | KBVO-D2, D3, D4 | Bounce, **Antenna TV**, Defy | 8/1/2030 |
| | | LSA | KNVA | **The CW** | KNVA-D2, D3, D4 | GRIT, Laff, Court TV | 8/1/2030 |
| 33 | New Haven, CT | O&O | WTNH | ABC | WTNH-D2 | **REWIND TV** | [4] |
| | | O&O | WCTX[3] | MNTV | WCTX-D2 | Charge! | 4/1/2031 |
| 34 | Columbus, OH | O&O | WCMH | NBC | WCMH-D2, D3, D4 | GRIT, ION, Laff | 10/1/2029 |
| 35 | Kansas City, MO | O&O | WDAF | FOX | WDAF-D2, D3, D4 | **Antenna TV**, **REWIND TV**, ROAR | [4] |
| 36 | Spartanburg, SC | O&O | WSPA | CBS | WSPA-D3 | ION | 12/1/2028 |
| | | O&O | WYCW[3] | **The CW** | WYCW-D3 | **REWIND TV** | 12/1/2028 |
| 40 | Las Vegas, NV | O&O | KLAS | CBS | KLAS-D2, D3, D4 | **Antenna TV**, **REWIND TV**, ShopLC | 10/1/2030 |
| 42 | Harrisburg, PA | O&O | WHTM | ABC | WHTM-D2, D3, D4, D5 | ION, GRIT, Laff, WLYH | [4] |
| 43 | Grand Rapids, MI | O&O | WOOD | NBC | WOOD-D2, D3 | **REWIND TV**, Defy | 10/1/2029 |
| | | O&O | WOTV | ABC | WOTV-D2, D3, D4 | **The CW**, Charge!, ShopLC | 10/1/2029 |
| | | O&O | | | WXSP-CD, D2, D3 | MNTV, The Nest, Comet | 10/1/2029 |
| 44 | Portsmouth, VA | O&O | WAVY | NBC | WAVY-D2, D3, D4 | The Nest, getTV, Defy | 10/1/2028 |
| | | O&O | WVBT | FOX | WVBT-D2, D3, D4 | **The CW**, **REWIND TV**, Cozi TV | 10/1/2028 |
| 45 | Oklahoma City, OK | O&O | KFOR | NBC | KFOR-D2, D3, D4 | **Antenna TV**, True Crime, Defy | [4] |
| | | O&O | KAUT | **The CW** | KAUT-D2, D3, D4 | **REWIND TV**, ION Mystery, Cozi TV | |
| 46 | Birmingham, AL | O&O | WIAT | CBS | WIAT-D2, D3, D4 | ION Mystery, GRIT, ION Plus | 4/1/2029 |
| 47 | Greensboro, NC | O&O | WGHP | FOX | WGHP-D2, D3, D4 | **Antenna TV**, GRIT, Defy | 12/1/2028 |
| 49 | Albuquerque, NM | O&O | KRQE | CBS | KRQE-D2, D3 | FOX, Bounce | 10/1/2030 |
| | | O&O | KREZ | CBS | KREZ-D2 | FOX | 4/1/2030 |
| | | O&O | KBIM | CBS | KBIM-D2 | FOX | 10/1/2030 |
| | | LSA | KRWB | **The CW** | KRWB-D2 | MNTV | 10/1/2030 |
| | | LSA | KWBQ | **The CW** | KWBQ-D2, D3, D4, D5 | GRIT, Laff, ION, **REWIND TV** | 10/1/2030 |
| | | LSA | KASY | MNTV | KASY-D2, D3, D4, D5 | ION Mystery, getTV, Court TV, **Antenna TV** | 10/3/2030 |
| 50 | New Orleans, LA | O&O | WGNO | ABC | WGNO-D2, D3, D4 | **Antenna TV**, **REWIND TV**, ROAR | 6/1/2029 |
| | | O&O | WNOL | **The CW** | WNOL-D2, D3, D4 | GRIT, Charge!, Comet | |
| 51 | Memphis, TN | O&O | WREG | CBS | WREG-D2, D3 | News3, **Antenna TV** | 8/1/2029 |
| 53 | Providence, RI | O&O | WPRI | CBS | WPRI-D2, D3, D4 | MNTV, True Crime, Defy | [4] |
| | | LSA | WNAC | FOX | WNAC-D2, D3, D4 | **The CW**, **REWIND TV**, **Antenna TV** | |

| Market Rank[1] | Market | Status[2] | Full Power Stations | Primary Affiliation | Low Power Stations / Multicast Channels | Other Affiliations | FCC License Expiration Date |
|---|---|---|---|---|---|---|---|
| 54 | Richmond, VA | O&O | WRIC | ABC | WRIC-D2, D3, D4 | **REWIND TV**, Cozi TV, Laff | 10/1/2028 |
| 55 | Buffalo, NY | O&O | WIVB[3] | CBS | WIVB-D2 | QVC | [4] |
| | | O&O | WNLO | **The CW** | WNLO-D2 | **REWIND TV** | |
| 56 | Fresno, CA | O&O | KSEE | NBC | KSEE-D2, D3, D4 | Bounce, GRIT, **REWIND TV** | [4] |
| | | O&O | KGPE | CBS | KGPE-D2, D3, D4 | ION Mystery, **Antenna TV**, Court TV | |
| 57 | Mobile, AL | O&O | WKRG | CBS | WKRG-D2, D3, D4 | ION, **Antenna TV**, Court TV | 4/1/2029 |
| | | O&O | WFNA | **The CW** | WFNA-D2, D3, D4 | Bounce, Busted, GRIT | 4/1/2029 |
| 58 | Wilkes Barre, PA | O&O | WBRE | NBC | WBRE-D2, D3, D4 | Laff, **REWIND TV**, Defy | [4] |
| | | LSA | WYOU | CBS | WYOU-D2, D3, D4 | ION Mystery, getTV, Cozi TV | 8/1/2031 |
| 59 | Little Rock, AR | O&O | KARK | NBC | KARK-D2, D3, D4 | Laff, GRIT, **Antenna TV** | 6/1/2029 |
| | | O&O | KARZ | MNTV | KARZ-D2 | Bounce | 6/1/2029 |
| | | LSA | KLRT | FOX | KLRT-D2 | ION Mystery | 6/1/2029 |
| | | LSA | KASN | **The CW** | KASN-D2, D3, D4, D5 | **REWIND TV**, ION, ION Plus, GRIT | 6/1/2029 |
| 60 | Albany, NY | O&O | WTEN | ABC | WTEN-D2, D3, D4 | Cozi TV, **Antenna TV**, ION Mystery | [4] |
| | | LSA | WXXA | FOX | WXXA-D2, D3, D4, D5 | OTB-TV, GRIT, ShopLC, True Crime | 6/1/2031 |
| 61 | Knoxville, TN | O&O | WATE | ABC | WATE-D2, D3, D4 | **Antenna TV**, **REWIND TV**, Cozi TV | 8/1/2029 |
| 63 | Lexington, KY | O&O | WDKY | FOX | WDKY-D2, D3, D4 | **REWIND TV**, Charge!, Comet | 8/1/2029 |
| 65 | Dayton, OH | O&O | WDTN | NBC | WDTN-D2, D3 | ION Mystery, ION | 10/1/2029 |
| | | LSA | WBDT[3] | **The CW** | WBDT-D2 | Bounce | 10/1/2029 |
| 67 | Des Moines, IA | O&O | WHO | NBC | | **REWIND TV**, **Antenna TV**/ACC Network, Iowa's Weather Channel | 2/1/2030 |
| 68 | Green Bay, WI | O&O | WFRV | CBS | WFRV-D2, D3, D4 | Bounce, True Crime, **REWIND TV** | 12/1/2029 |
| 69 | Honolulu, HI | O&O | KHON | FOX | KHON-D2, D3, D4 | **The CW**, GRIT, **REWIND TV** | [4] |
| | | O&O | KHAW | FOX | KHAW-D2, D3, D4 | **The CW**, GRIT, **REWIND TV** | [4] |
| | | O&O | KAII | FOX | KAII-D2, D3, D4 | **The CW**, GRIT, **REWIND TV** | [4] |
| | | O&O | KGMD | MNTV | | | [4] |
| | | O&O | KGMV | MNTV | | | 2/1/2031 |
| | | O&O | KHII | MNTV | | | |
| 70 | Roanoke, VA | O&O | WFXR | FOX | WFXR-D2, D3, D4 | **The CW**, Bounce, **Antenna TV** | 10/1/2028 |
| | | O&O | WWCW | **The CW** | WWCW-D2, D3, D4 | FOX, **REWIND TV**, GRIT | 10/1/2028 |
| 72 | Wichita, KS | O&O | KSNW | NBC | KSNW-D2, D3, D4 | Telemundo, ION, Busted | 6/1/2030 |
| | | O&O | KSNC | NBC | | | [4] |
| | | O&O | KSNG | NBC | KSNG-D2 | Telemundo | [4] |
| | | O&O | KSNK | NBC | | | 6/1/2030 |
| | | O&O | | | KSNL-LD | NBC | |
| 73 | Huntsville, AL | O&O | WHNT | CBS | WHNT-D2, D3 | **The CW**, **Antenna TV** | 4/1/2029 |
| | | O&O | WHDF | **The CW** | WHDF-D2, D3, D4 | Court TV, **REWIND TV**, Charge! | 4/1/2029 |
| 74 | Springfield, MO | O&O | KRBK | FOX | KRBK-D2, D3, D4 | **Antenna TV**, Charge!, ION | 2/1/2030 |
| | | O&O | KOZL | MNTV | KOZL-D2, D3, D4 | ION Mystery, Bounce, **REWIND TV** | 2/1/2030 |
| | | LSA | KOLR | CBS | KOLR-D2, D3, D4 | Laff, GRIT, Defy | 2/1/2030 |
| 77 | Rochester, NY | O&O | WROC | CBS | WROC-D2, D3, D4 | Bounce, GRIT, ION Mystery | 6/1/2031 |
| 80 | Brownsville, TX | O&O | KVEO | NBC | KVEO-D2 | CBS | 8/1/2030 |
| | | O&O | KGBT | MNTV | KGBT-D2, D3, D4, D5, D6 | **REWIND TV**, Charge!, Estrella, ION Mystery, GRIT | 8/1/2030 |
| 82 | Charleston, WV | O&O | WOWK | CBS | WOWK-D2, D3, D4 | ION Mystery, GRIT, ShopLC | 10/1/2028 |
| 83 | Waco-Bryan, TX | O&O | KWKT | FOX | KWKT-D2, D3, D4 | MNTV, **Antenna TV**, Bounce | [4] |
| | | O&O | KYLE | MNTV | KYLE-D2, D3, D4 | FOX, **Antenna TV**, Laff | |
| 84 | Savannah, GA | O&O | WSAV | NBC | WSAV-D2, D3, D4 | **The CW**, Court TV/MNTV, Laff | [4] |
| 85 | Charleston, SC | O&O | WCBD | NBC | WCBD-D2, D3, D4 | **The CW**, ION, Laff | 12/1/2028 |
| 87 | Syracuse, NY | O&O | WSYR | ABC | WSYR-D2, D3, D4 | **Antenna TV**, Bounce, Laff | 6/1/2031 |
| 88 | El Paso, TX | O&O | KTSM | NBC | KTSM-D2, D3, D4 | Estrella, ION Mystery, Laff | 8/1/2030 |
| 89 | Colorado Springs, CO | O&O | KXRM | FOX | KXRM-D2, D3, D4 | **The CW**, ION, ION Mystery | 4/1/2030 |
| | | O&O | | | KXTU-LD, D2, D3, D4 | **The CW**, Bounce, Laff, **Antenna TV** | 4/1/2030 |
| 90 | Champaign, IL | O&O | WCIA | CBS | WCIA-D2, D3, D4 | MNTV, Bounce, GRIT | [4] |
| | | O&O | WCIX | MNTV | WCIX-D2, D3, D4 | CBS, ION Mystery, Laff | 12/1/2029 |
| 91 | Shreveport, LA | O&O | KTAL | NBC | KTAL-D2, D3, D4 | Laff, Cozi TV, Busted | 8/1/2030 |
| | | O&O | KSHV | MNTV | KSHV-D2, D3, D4 | ION Mystery, ION, Quest | 6/1/2029 |
| | | LSA | KMSS | FOX | KMSS-D2 | **REWIND TV** | 6/1/2029 |
| 94 | Burlington, VT | O&O | WFFF | FOX | WFFF-D2, D3,D4 | ION Mystery, Bounce, **Antenna TV** | 4/1/2031 |
| | | LSA | WVNY | ABC | WVNY-D2, D3, D4 | Laff, GRIT, Quest | 4/1/2031 |
| 95 | Fayetteville, AR | O&O | KFTA | FOX | KFTA-D2, D3, D4, D5 | NBC, ION Mystery, Court TV, MNTV | 6/1/2029 |
| | | O&O | KNWA | NBC | KNWA-D2, D3, D4 | FOX, Laff, GRIT | 6/1/2029 |
| | | O&O | KXNW | MNTV | KXNW-D2, D3, D4 | **REWIND TV**, Charge!, Bounce | 6/1/2029 |
| 96 | Baton Rouge, LA | O&O | WGMB | FOX | WGMB-D2, D3, D4 | **The CW**, Cozi TV, 365 Black | 6/1/2029 |
| | | O&O | | | WBRL-CD | **The CW** | [4] |
| | | O&O | | | KZUP-CD | Independent | 6/1/2029 |
| | | LSA | WVLA | NBC | WVLA-D2, D3, D4 | Laff, ION, **Antenna TV** | 6/1/2029 |

| Market Rank[1] | Market | Status[2] | Full Power Stations | Primary Affiliation | Low Power Stations / Multicast Channels | Other Affiliations | FCC License Expiration Date |
|---|---|---|---|---|---|---|---|
| 98 | Myrtle Beach-Florence, SC | O&O | WBTW | CBS | WBTW-D2, D3, D4 | MNTV/**Antenna TV**, ION, ION Mystery | 12/1/2028 |
| | | | | | WMBE-LD | Independent | 12/1/2028 |
| 100 | Jackson, MS | O&O | WJTV | CBS | WJTV-D2, D3, D4 | **The CW**, ION, Court TV | 6/1/2029 |
| 101 | Tri-Cities, TN-VA | O&O | WJHL | CBS | WJHL-D2, D3 | ABC, **Antenna TV** | 8/1/2029 |
| 102 | Greenville, NC | O&O | WNCT | CBS | WNCT-D2, D3, D4 | **The CW**, **Antenna TV**, ION Mystery | 12/1/2028 |
| 105 | Quad Cities, IL | O&O | WHBF | CBS | WHBF-D2, D3, D4 | Court TV, GRIT, ION Mystery | 12/1/2029 |
| | | O&O | KGCW | **The CW** | KGCW-D2, D3, D4 | **REWIND TV**, Laff, CBS | 2/1/2030 |
| | | LSA | KLJB | FOX | KLJB-D2, D3, D4 | MeTV, Defy, Bounce | 2/1/2030 |
| 107 | Tyler-Longview, TX | O&O | KETK | NBC | KETK-D2, D3, D4 | GRIT, ION, **Antenna TV** | 8/1/2030 |
| | | O&O | | | KTPN-LD | MNTV | 8/1/2030 |
| | | LSA | KFXK | FOX | KFXK-D2, D3, D4 | MNTV, ION Mystery, Laff | 8/1/2030 |
| 108 | Ft. Wayne, IN | O&O | WANE | CBS | WANE-D2, D3, D4 | ION, Laff, ION Mystery | 8/1/2029 |
| 109 | Evansville, IN | O&O | WEHT | ABC | WEHT-D2, D3, D4 | Laff, Cozi TV, ShopLC | 8/1/2029 |
| | | LSA | WTVW | **The CW** | WTVW-D2, D3, D4 | Bounce, ION Mystery, ION | 8/1/2029 |
| 110 | Augusta, GA | O&O | WJBF | ABC | WJBF-D2, D3, D4 | **The CW**, **Antenna TV**, ION | 4/1/2029 |
| 111 | Altoona, PA | O&O | WTAJ | CBS | WTAJ-D2, D3, D4 | ION Mystery, GRIT | 8/1/2031 |
| 112 | Sioux Falls, SD | O&O | KELO | CBS | KELO-D2, D3, D4 | MNTV, ION, **The CW** | 4/1/2030 |
| | | O&O | KDLO | CBS | KDLO-D2, D4 | MNTV, **The CW** | |
| | | O&O | KPLO | CBS | KPLO-D2 | MNTV | 4/1/2030 |
| 113 | Lansing, MI | O&O | WLNS[3] | CBS | WLAJ-D2 | **The CW** | 10/1/2029 |
| | | LSA | WLAJ | ABC | | | 10/1/2029 [4] |
| 115 | Springfield, MA | O&O | WWLP | NBC | WWLP-D2, D3, D4 | **The CW**, ION, ION Mystery | |
| 117 | Youngstown, OH | O&O | WKBN[3] | CBS | WKBN-D2 | FOX | 10/1/2029 |
| | | O&O | | | WYFX-LD, D2, D3, D4, D5, D6 | FOX, MNTV, ION, Bounce, Laff, **Antenna TV** | 10/1/2029 |
| | | LSA | WYTV | ABC | WYTV- D2 | MNTV | 10/1/2029 [4] |
| 121 | Bakersfield, CA | O&O | KGET | NBC | KGET-D2, D3, D4 | **The CW**, Telemundo, Laff | |
| | | O&O | | | KKEY-LP, D2 | Telemundo, **Antenna TV** | |
| 122 | Peoria, IL | O&O | WMBD | CBS | WMBD-D2, D3, D4 | Bounce, Laff, ION Mystery | 12/1/2029 |
| | | LSA | WYZZ | FOX | WYZZ-D2, D3 | Merit TV, getTV | 12/1/2029 |
| 124 | Lafayette, LA | O&O | KLFY | CBS | KLFY-D2, D3, D4 | **The CW**, ION, ION Mystery | 6/1/2029 |
| 126 | Columbus, GA | O&O | WRBL | CBS | WRBL-D2, D3, D4 | Busted, ION, Laff | 4/1/2029 |
| 129 | La Crosse, WI | O&O | WLAX | FOX | WLAX-D2, D3, D4 | **Antenna TV**, Laff, GRIT | 12/1/2029 |
| | | O&O | WEUX | FOX | WEUX-D2, D3, D4 | Antenna TV, ION Mystery, Bounce | 12/1/2029 |
| 132 | Amarillo, TX | O&O | KAMR | NBC | KAMR-D2, D3, D4 | MNTV, Laff, **Antenna TV** | 8/1/2030 |
| | | O&O | | | KCPN-LP, D2 | MNTV, **REWIND TV** | 8/1/2030 |
| | | LSA | KCIT | FOX | KCIT-D2, D3, D4 | GRIT, ION Mystery, Bounce | 8/1/2030 |
| 137 | Rockford, IL | O&O | WQRF | FOX | WQRF-D2, D3, D4 | Bounce, ION Mystery, **REWIND TV** | 12/1/2029 |
| | | LSA | WTVO | ABC | WTVO-D2, D3, D4 | MNTV, Laff, GRIT | 12/1/2029 |
| 140 | Lubbock, TX | O&O | KLBK | CBS | KLBK-D2, D3, D4 | Court TV, **Antenna TV**, **REWIND TV** | 8/1/2030 |
| | | LSA | KAMC | ABC | KAMC-D2, D3, D4 | ION Mystery, Bounce, QVC2 | 8/1/2030 |
| 141 | Topeka, KS | O&O | KSNT | NBC | KSNT-D2, D3, D4 | FOX, ION, Bounce | 6/1/2030 [4] |
| | | O&O | | | KTMJ-CD, D2, D3, D4 | FOX, ION Mystery, GRIT, Laff | |
| | | LSA | KTKA | ABC | KTKA-D2, D3, D4 | **REWIND TV**, **The CW**, **Antenna TV** | 6/1/2030 |
| 143 | Panama City, FL | O&O | WMBB | ABC | WMBB-D2, D3, D4 | **The CW**, Laff, ION Mystery | 2/1/2029 |
| 144 | Monroe, LA | O&O | KARD | FOX | KARD-D2, D3, D4 | **The CW**, GRIT, **Antenna TV** | 6/1/2029 |
| | | LSA | KTVE | NBC | KTVE-D2, D3, D4 | FOX, Laff, ION Mystery | 6/1/2029 |
| 146 | Midland, TX | O&O | KMID | ABC | KMID-D2, D3, D4 | Laff, ION Mystery, **Antenna TV** | 8/1/2030 |
| | | LSA | KPEJ | FOX | KPEJ-D2, D3, D4 | Estrella, **REWIND TV**, **Antenna TV** | 8/1/2030 |
| 148 | Minot-Bismarck, ND | O&O | KXMB | CBS | KXMB-D2, D3, D4 | **The CW**, Laff, ION Mystery | 4/1/2030 |
| | | O&O | KXMC | CBS | KXMC-D2, D3, D4 | **The CW**, Laff, ION Mystery | 4/1/2030 |
| | | O&O | KXMD | CBS | KXMD-D2, D3, D4 | **The CW**, Laff, ION Mystery | 4/1/2030 [4] |
| | | O&O | KXMA | **The CW** | KXMA-D2, D3, D4 | CBS, Laff, ION Mystery | |
| 149 | Wichita Falls, TX | O&O | KFDX | NBC | KFDX-D2, D3, D4 | MNTV, **The CW**, **Antenna TV** | [4] |
| | | O&O | | | KJBO-LP | MNTV | |
| | | LSA | KJTL | FOX | KJTL-D2, D3, D4 | GRIT, Bounce, ION Mystery | |
| 150 | Sioux City, IA | O&O | KCAU | ABC | KCAU-D2, D3, D4 | ION Mystery, Laff, Bounce | 2/1/2030 |
| 151 | Joplin, MO | O&O | KSNF | NBC | KSNF-D2, D3, D4 | Laff, ION Mystery, **Antenna TV** | 2/1/2030 |
| | | LSA | KODE | ABC | KODE-D2, D3, D4 | GRIT, Bounce, ION | 2/1/2030 |
| 153 | Erie, PA | O&O | WJET | ABC | WJET-D2, D3, D4 | **The CW**, ION Mystery, Cozi TV | 8/1/2031 |
| | | LSA | WFXP | FOX | WFXP-D2, D3, D4 | GRIT, Bounce, **Antenna TV** | 8/1/2031 |
| 160 | Terre Haute, IN | O&O | WTWO | NBC | WTWO-D2, D3, D4 | **The CW**, Laff, **Antenna TV** | 8/1/2029 |
| | | LSA | WAWV | ABC | WAWV-D2, D3, D4 | GRIT, Bounce, **REWIND TV** | 8/1/2029 [4] |
| 162 | Binghamton, NY | O&O | WIVT | ABC | WIVT-D2, D3, D4 | NBC, Laff, ION Mystery | |
| | | O&O | | | WBGH-CD, D2 | NBC, ABC | |
| 164 | Wheeling, WV | O&O | WTRF | CBS | WTRF-D2, D3, D4 | MNTV, ABC, ION Mystery | 10/1/2028 |
| 165 | Dothan, AL | O&O | WDHN | ABC | WDHN-D2, D3, D4 | ION Mystery, Laff, **Antenna TV** | 4/1/2029 |

10

| Market Rank[1] | Market | Status[2] | Full Power Stations | Primary Affiliation | Low Power Stations / Multicast Channels | Other Affiliations | FCC License Expiration Date |
|---|---|---|---|---|---|---|---|
| 166 | Billings, MT | O&O | KSVI | ABC | KSVI-D2, D3, D4 | **The CW**, ION Mystery, **Antenna TV** | 4/1/2030 |
| | | LSA | KHMT | FOX | KHMT-D2, D3, D4 | Court TV, Laff, ION | 4/1/2030 |
| 167 | Abilene, TX | O&O | KTAB | CBS | KTAB-D2, D3, D4 | Telemundo, ION Mystery, ION | 8/1/2030 |
| | | LSA | KRBC | NBC | KRBC-D2, D3, D4 | GRIT, Laff, Bounce | 8/1/2030 |
| 168 | Beckley, WV | O&O | WVNS | CBS | WVNS-D2 | FOX | 10/1/2028 |
| 169 | Hattiesburg, MS | O&O | WHLT | CBS | WHLT-D2, D3, D4 | **The CW**, ION, ION Mystery | 6/1/2029 |
| 170 | Rapid City, SD | O&O | KCLO | CBS | KCLO-D2, D3, D4 | **The CW**, ION, ION Mystery | 4/1/2030 |
| 171 | Utica, NY | O&O | WFXV | FOX | WFXV-D2, D3, D4 | **The CW**, ION Mystery, Laff | 6/1/2031 |
| | | O&O | | | WPNY-LP | MNTV | 6/1/2031 |
| | | LSA | WUTR | ABC | WUTR-D2, D3, D4 | MNTV, GRIT, Bounce | 6/1/2031 |
| 173 | Clarksburg, WV | O&O | WBOY | NBC | WBOY-D2, D3, D4 | ABC, ION Mystery, Laff | 10/1/2028 |
| 175 | Jackson, TN | O&O | WJKT | FOX | WJKT-D2, D3, D4 | ION Mystery, Laff, GRIT | 8/1/2029 [4] |
| 179 | Elmira, NY | O&O | WETM | NBC | WETM-D2, D3, D4 | **The CW**, **Antenna TV**, ION Mystery | |
| 180 | Watertown, NY | O&O | WWTI | ABC | WWTI-D2, D3, D4 | **The CW**, Laff, ION Mystery | 6/1/2031 |
| 183 | Alexandria, LA | O&O | WNTZ | FOX | WNTZ-D2, D3, D4 | Bounce, ION Mystery, Laff | 6/1/2029 |
| 186 | Grand Junction, CO | O&O | KREX | CBS | KREX-D2, D3, D4 | Laff, MNTV, Bounce | 4/1/2030 |
| | | O&O | KREY | CBS | KREY-D2, D3, D4 | FOX, ION Mystery, GRIT | 4/1/2030 |
| | | O&O | | | KGJT-CD | MNTV | 4/1/2030 |
| | | LSA | KFQX | FOX | KFQX-D2, D3, D4 | CBS, ION Mystery, GRIT | 4/1/2030 |
| 197 | San Angelo, TX | O&O | KLST | CBS | KLST-D2, D3, D4 | ION Mystery, GRIT, **Antenna TV** | [4] |
| | | LSA | KSAN | NBC | KSAN-D2, D3, D4 | Laff, Bounce, ION | |

[1]Market rank refers to ranking the size of the DMA in which the station is located in relation to other DMAs. Source: *2025-2026 Nielsen Local Television Market Universe Estimates*, as published by The Nielsen Company.

[2]O&O refers to stations that we own and operate. LSA, or local service agreement, is the general term we use to refer to a contract under which we provide services utilizing our employees to a station owned and operated by an independent third-party. Local service agreements include TBAs, SSAs, JSAs, LMAs and outsourcing agreements. For further information regarding the LSAs to which we are a party, see Note 2 to our Consolidated Financial Statements in Part IV, Item 15(a) of this Annual Report on Form 10-K.

[3]These stations are operating under channel sharing arrangements with another Company station in the same market.

[4]Application for renewal of license was submitted timely to the FCC. Under the FCC's rules, the license expiration date is automatically extended pending FCC review of and action on the renewal application.

*Network Affiliations*

All, except two, of the full power television stations that we own and operate, program or provide sales and other services to are currently affiliated with a network pursuant to an affiliation agreement. The agreements with CBS, FOX, NBC, ABC, and The CW are the most significant to our operations. The current terms of these agreements expire as discussed below:

| Network Affiliation | Expiration Date |
|---|---|
| The CW | Of the 31 agreements, 30 expire in August 2026 and one[1]expires in December 2026. |
| CBS | 49 agreements expire in July 2026. |
| MNTV | 13 agreements expire in August 2027. |
| ABC | 29 agreements expire in December 2027. |
| NBC | 35 agreements expire in December 2027. |
| FOX | Of the 42 agreements, 41 expire in August 2026 and one[1]expires in December 2027. |

[1]These affiliation agreements are owned by stations to which we provide sales and other services. We do not consolidate these stations in our financial statements due to lack of a deemed controlling financial interest under U.S. GAAP.

Each affiliation agreement provides the affiliated station with the right to broadcast all programs transmitted by the network with which it is affiliated. In exchange, the network receives affiliation fees from us and has the right to sell a substantial majority of the advertising time during these broadcasts. We expect the network affiliation agreements listed above to be renewed upon expiration.

**Networks**

We own, operate or have an ownership interest in the following:

| Network / Entity | Network Type | Description | % Owned by Nexstar | U.S. TV Households Reached [1] (in millions) | % of U.S. TV Households [1] (Broadcast) | % of Multi-channel Households [1] (Pay TV) |
|---|---|---|---|---|---|---|
| The CW Network | Broadcast | Fifth major broadcast network in the U.S. | 80.8% | 128 | 100% | -- |
| NewsNation | Pay TV | National cable news network | 100% | 58 | -- | 93% |
| Antenna TV | Broadcast | Multicast entertainment network | 100% | 128 | 100% | -- |
| REWIND TV | Broadcast | Multicast entertainment network | 100% | 70[2] | 54%[2] | -- |
| TV Food Network | Pay TV | Food Network and Cooking Channel | 31.3% | 58 and 22 | -- | 93% and 36% |

[1]Source: Nielsen, January 2026

[2]Source: Internal estimates

*The CW.* The CW is America's fifth major broadcast network and is available to 100% of U.S. television households. The CW delivers 15 hours of primetime entertainment programming and three hours of children's programming per week in addition to almost 690 hours of sports programming in 2026 as the broadcast home to NASCAR O'Reilly Auto Parts Series; WWE NXT; college football and men's and women's basketball from the ACC, Pac-12 and Mountain West conferences; AVP beach volleyball, PBR Team Series; and Professional Bowlers Association ("PBA") events. For its smaller market affiliates, CWPlus supplements The CW programming with additional syndicated content to provide 24 hours of programming, seven days per week. The fully ad-supported CW App, with more than 100 million downloads to date, is available for free to consumers on all major platforms and is home to the latest episodes and seasons of The CW's primetime programming and a library of entertaining film and television content for on-demand viewing.

*NewsNation.* NewsNation is a national news network reaching approximately 58 million television households across the United States providing "News for All Americans." Validated by independent watchdog groups, the network delivers engaging and unbiased news, reflecting the full range of perspectives across the country. NewsNation draws upon the expertise of approximately 6,000 journalists from 109 newsrooms across the country and its own dedicated national staff. NewsNation is fully distributed on every pay television platform in the United States, online at www.newsnationnow.com, and on the NewsNationNow mobile app, available on Android and iOS.

*Antenna TV and REWIND TV.* Antenna TV and REWIND TV are multicast networks reaching 100% and over 50% of U.S. television households, respectively. The networks primarily air sitcom hits from the 1950s through the 1990s.

*TV Food Network.* We hold a 31.3% interest in TV Food Network, which annually distributes significant cash flow to us. TV Food Network operates two 24-hour television networks, Food Network and Cooking Channel, offering quality television, video, internet and mobile entertainment and information focusing on food and entertaining. During 2025, we received cash distributions from TV Food Network totaling $137 million. Our partner in TV Food Network is Warner Bros. Discovery, Inc., which owns a 68.7% interest in TV Food Network and operates the networks on behalf of the partnership.

**Digital Assets**

Our digital businesses include video and display advertising platforms that are delivered locally or nationally through our own and various third-party websites, mobile and OTT applications, other digital media solutions to media publishers and advertisers and a consumer product reviews platform. Our digital assets include 125 websites and 229 mobile applications across our local stations, NewsNation and The Hill. The portfolio also includes 110 connected television applications and three free ad-supported television ("FAST") channels from The CW and The Hill.

*The Hill.* The Hill is the nation's leading digital-first political news brand and the definitive source for non-partisan political news and information. Inside the Beltway, The Hill is known as an essential, agenda-setting read for lawmakers and influencers. Beyond the Capitol, millions of Americans turn to The Hill to decode how events in Washington will impact their communities and lives.

*BestReviews.* BestReviews is a leading consumer product recommendations company which simplifies the way consumers buy products and services across thousands of categories by independently researching, analyzing, and testing products and recommending the best picks. BestReviews monetizes its content through a revenue share model with its retail partners against all sales generated by BestReviews, as well as advertising.

**Operating Model**

Our primary business is the production and/or acquisition of video and digital content which we air on our television stations, digital assets and/or television networks. Our content attracts millions of viewers which we primarily monetize through distribution and advertising revenue. Our primary operating expenses include programming, cost of digital inventory, production, promotion, sales and other administrative expenses.

We seek to grow our revenue, net income, Adjusted EBITDA and free cash flow by continuing to provide high quality programming that attracts and engages audiences, as our reach and consumer engagement are important to our distribution partners and advertisers. We use our industry-leading scale to assist us in securing distribution revenue streams, to provide advertisers with solutions across geographies and media types to engage both local and national audiences at scale and to leverage costs against a broader platform. In addition, we plan to continue to acquire or invest in businesses that can benefit from our scale, asset mix and record of management and cost discipline.

*Distribution Revenue*

Our distribution revenue primarily relates to the retransmission of our stations' signals and the carriage of our cable and broadcast networks by cable, satellite and other MVPDs, vMVPDs, and other direct-to-consumer OTT services. Distributors generally pay for retransmission and carriage rights on a per subscriber basis. Distribution revenue is affected positively or negatively by the rate of growth or decline of subscribers and the rate of growth or decline in the fee per subscriber due to contract renegotiations or annual escalators in existing contracts. Over the past several years, the number of MVPD subscribers has been declining but we have been able to increase our distribution revenue, excluding certain one-time items, as vMVPD and other direct-to-consumer OTT subscribers have been increasing, and the rates per subscriber paid by MVPDs for our programming have increased at a faster pace than subscribers have declined. If subscriber losses exceed our contractual rate increases in the future, our distribution revenue could be adversely affected.

We also generate distribution revenues from the affiliation fees paid by local broadcast stations affiliated with The CW and from programmers who use our broadcast spectrum in selected local markets to air their programming on our multicast streams.

*Advertising Revenue*

Our advertising revenue is primarily derived from the sale of local and national advertising on our stations, networks, websites, apps and other digital platforms or via third party media primarily to local and national businesses. In even-numbered years, we generate substantial advertising revenue from the political advertising we sell to candidates, political action committees, political parties, and interest groups.

Advertisers typically pay for advertising on our television and digital assets based on the number of impressions our programming or digital content delivers. As a result, our advertising is affected by a number of factors, including the size and demographics of the audience viewing our programming and digital content, economic conditions, demand for advertising and our sales effort. We also generate digital advertising revenue from the sale of advertising on third-party sites and other local and national services. In addition, digital advertising that is not directly sold to advertisers is sold via programmatic exchanges.

Advertising revenue exhibits seasonal patterns, with the fourth quarter typically generating the highest level of activity reflecting elevated retail spending during the holiday season and NFL and college football programming. Major events such as the Olympic Games and the Super Bowl also contribute to periodic increases in advertising demand. Additionally, our advertising revenue varies significantly across annual periods due to the cyclical nature of political advertising. In even-numbered years, we generate substantial revenue from advertising purchased by candidates, political action committees, political parties, and other political organizations. Political advertising levels are influenced by the number and competitiveness of races, the presence of our stations in key political markets, fundraising activity, the availability and pricing of television inventory, and the use of alternative media channels. Given our scale and broad market footprint, we typically operate in most major markets with competitive political races. During these even-year cycles, heightened political demand can consume a significant portion of our available inventory, creating a "crowd-out" effect that typically reduces the amount of non-political advertising we are able to accommodate.

*Other Revenue*

Our other revenue primarily includes licensing, tower space rental, production, and sale of advertising spots in exchange for products or services.

*Operating Expenses*

Our primary operating expenses include third-party programming, news programming, production and promotion, sales, digital cost of goods sold and content creation costs, and other administrative and corporate expenses. Third-party programming costs are primarily related to fees paid to networks with which our and our partners' stations are affiliated, license fees for original

13

and local sports programming, and syndicated programming in the case of the stations and our networks. The largest contributor to news programming and other expenses is employee-related expenses. A large percentage of the costs involved in our operations is relatively fixed.

**Competition**

Competition in the television industry takes place on several levels: competition for audience, competition for programming and competition for advertising.

*Audience*.  We compete for audience primarily based on program popularity and exclusivity of programming to our platforms. The size of our audience has an effect on the rates we can secure from our distributors and a direct effect on the advertising rates we can charge our advertisers. We compete against other broadcast television programming, cable and satellite television programming and direct-to-consumer programming provided via a variety of streaming services, including some of the broadcast television networks with which our stations are affiliated. Other sources of competition for audience include the internet, gaming devices, home entertainment systems and video-on-demand. The CW, our broadcast television network, competes with other broadcast networks and other video programming for viewers and NewsNation, our national news network, competes with other national news networks such as FOX News, MS NOW, CNN, and Newsmax for viewers.

*Programming*.  Our local television stations compete for syndicated programming from national program distributors or syndicators and compete to secure broadcast rights for regional and local sporting events. We compete against in-market broadcast station operators, cable networks and streaming services for exclusive access to this programming in our markets. In a different way, our local stations also compete with other stations in their markets to provide exclusive news stories and unique features such as investigative reporting and coverage of community events to their local audiences. The CW competes against other broadcast television and cable networks as well as other video providers, such as direct-to-consumer streaming platforms for television content. NewsNation competes against other cable news networks for talent and stories.

*Advertising*.  Our stations compete for advertising revenue with other television stations in their respective markets and other advertising media such as streaming video services (e.g. Netflix, Amazon Prime Video, Roku, YouTube, etc.), online media (e.g., Google, Meta, Tiktok, Snapchat, etc.), vMVPDs, MVPDs, radio stations, newspapers, outdoor advertising, and direct mail, among others. Competition for local advertising dollars occurs primarily within individual markets. The CW also competes for advertising revenue with other broadcast networks and other advertising-supported national programming. NewsNation also competes for advertising revenue with other national news networks such as FOX News, MS NOW, CNN and Newsmax and other advertising-supported national programming.

**Federal Regulation**

Television broadcasting is subject to the jurisdiction of the FCC under the Communications Act of 1934, as amended (the "Communications Act"). The following is a brief discussion of certain provisions of the Communications Act and the FCC's regulations and policies that affect our operations. These rules are subject to change, which may affect our operations.

### FCC Licenses, Renewals and Transfers

*License Grant and Renewal.* The Communications Act requires broadcast stations to operate under licenses issued by the FCC. Television broadcast licenses are granted for a maximum term of eight years and may be renewed upon application to the FCC. The FCC grants an application for license renewal if the station served the public interest, the licensee did not commit any serious violations of the Communications Act or the FCC's rules and the licensee committed no other violations which, taken together, would constitute a pattern of abuse. A majority of renewal applications are routinely granted under this standard. We consistently have received license renewal approvals in the past and are permitted to continue operations when renewal is delayed; however, there are no assurances that this will be the case in the future.

*Station Transfer*.  The Communications Act prohibits the assignment or the transfer of control of a broadcast station's FCC license without prior FCC approval.

### Foreign Ownership Restrictions

The Communications Act limits the extent of non-U.S. ownership of companies that own U.S. broadcast stations, generally prohibiting more than 20% non-U.S. ownership (by vote and by equity) in a U.S. broadcast licensee and more than 25% indirect foreign ownership or control of such licensee through a parent company. The FCC will entertain and may authorize, on a case-by-case basis, proposals to exceed the 25% indirect foreign ownership limit in broadcast licensees.

14

### Multiple Ownership Rules

The FCC's multiple ownership rules restrict the number of television stations in which a single person or entity may have an "attributable interest."

*Ownership Attribution.* For purposes of determining compliance with the multiple ownership rules, the FCC considers the "attributable interests" in a broadcast station licensee held by an individual or entity. The following are considered "attributable interests": (i) for corporations, officership, directorship and voting stock interests of 5% or more (20% or more in the case of certain passive investors), (ii) for partnerships and limited liability companies, any general partnership interest, and any limited partnership interest or limited liability company interest that is not properly "insulated" from involvement in the partnership's media activities and (iii) more than 33% of a licensee's total assets (defined as total debt plus total equity), if the holder of such interest also provides over 15% of the station's total weekly broadcast programming or has an attributable interest in another media entity in the same market which is subject to the FCC's ownership rules. If a shareholder of Nexstar holds a voting stock interest of 5% or more (20% or more in the case of certain passive investors), we must report that shareholder, its parent entities, and attributable individuals and entities of both, as attributable interest holders in Nexstar.

*Local Television Multiple Ownership (Duopoly) Rule.* Under the local television multiple ownership, or "duopoly," rule, a single entity is allowed to own or have attributable interests in two television stations in a DMA if (i) the two stations do not have overlapping service areas, or (ii) at least one of the two stations is not ranked among the top four stations in the DMA in terms of audience share (subject to certain exceptions based on a case-by-case determination). The duopoly rule also allows the FCC to consider waivers to permit the ownership of a second station, where otherwise prohibited, where the second station has failed or is failing or unbuilt. In 2023, the FCC extended the duopoly rule to prohibit, in certain circumstances, the acquisition of a network affiliation that would establish a "top four" combination involving a network-affiliated LPTV station or digital multicast stream. In October 2025, the Eighth Circuit vacated the top four prohibition, finding that the FCC had not justified its retention. In addition, the FCC is considering the Duopoly Rule in its open ownership rulemaking proceeding. We anticipate the FCC will issue its decision in this proceeding later this year. In certain markets, the Company owns and operates both full-power and low-power television ("LPTV") broadcast stations. (See Regulatory Developments.)

*National Television Multiple Ownership Rule.* The FCC's rules limit the percentage of U.S. television households which a party may reach through its attributable interests in television stations to 39%. When calculating a party's nationwide aggregate audience coverage, the ownership of a UHF station is counted as 50% of a market's percentage of total national audience. In December 2017, the FCC initiated a proceeding to broadly reexamine its national television ownership rule. In June 2025, the FCC issued a public notice soliciting comment to refresh the record of this proceeding in the comment period in the proceeding closed in August 2025, and the proceeding remains pending.

*Local Service Agreements.* The FCC applies the local television ownership limits to a non-owned station when the owner of a station in the same market provides more than 15% of the second station's weekly broadcast programming. However, local marketing agreements entered into prior to November 5, 1996 ("grandfathered LMAs") are exempt from this attribution rule until the FCC determines otherwise. This "grandfathering" is subject to possible extension or termination in a future FCC review. Nexstar is currently a party to certain grandfathered LMAs. Under current FCC rules, JSAs and SSAs between independently owned television stations that do not involve the provision of programming exceeding the 15% threshold noted above are non-attributable but must be publicly disclosed, and the FCC may in the future consider regulations with respect to such agreements. Nexstar is currently a party to certain JSA and SSA agreements whereby it provides services to independently owned stations.

*Quadrennial Review of Media Ownership Rules.* The FCC is required to review its media ownership rules every four years and to eliminate those rules it finds are no longer "necessary in the public interest as a result of competition." In December 2023, the FCC issued an order concluding its 2018 quadrennial review. The order retained the local television ownership rule without deregulatory changes while extending the rule to prohibit, in certain circumstances, the acquisition of a network affiliation that would establish a "top four" combination involving a network affiliated LPTV station or digital multicast stream. In a July 2025 decision on appeal of the FCC's 2018 quadrennial review order, the United States Court of Appeals for the Eighth Circuit vacated the "top four" portion of the local television ownership rule, which had generally prohibited common ownership of two of the top four highest-rated stations in a DMA. The court also vacated the December 2023 rule prohibiting certain "top four" combinations involving LPTV stations or digital multicast streams. The FCC has not yet issued an order repealing either of these prongs of the "top four" rule, although it has said it will not enforce it. Meanwhile, the comment period for the FCC's 2022 quadrennial review closed in January 2026 and it is currently pending. Thus, the media ownership rules may be subject to change in response to current or future quadrennial reviews or other proceedings.

### Distribution by MVPDs and vMVPDs

*MVPD Carriage of Local Television Signals*.  Broadcasters may obtain carriage of their television stations' signals on cable, satellite and other MVPDs through either mandatory carriage or through "retransmission consent." Every three years all stations must formally elect either mandatory carriage ("must-carry" for cable distributors and "carry one-carry all" for satellite television providers) or retransmission consent. The next election must be made by October 1, 2026, and will be effective January 1, 2027. Mandatory carriage elections require that the MVPD carry one station programming stream and related data in the station's local market, subject to limited exceptions. MVPDs do not pay a fee to stations that elect mandatory carriage. We and our partners have elected "retransmission consent" for all of our stations.

A broadcaster, like Nexstar, that elects retransmission consent waives its mandatory carriage rights, and the broadcaster and the MVPD must negotiate terms for carriage of the station's signal. If a broadcaster elects to negotiate retransmission terms, it is possible that the broadcaster and the MVPD will not reach agreement and that the MVPD will not carry the station's signal. Pursuant to FCC rules and federal statutory law, all broadcasters and MVPDs must conduct retransmission consent negotiations in "good faith," and a broadcaster may not undertake such negotiations for third parties including VIEs in markets where that broadcaster also owns a television station. MVPDs and broadcasters may file FCC complaints against each other for violations of the good faith negotiation rules, and such complaints have been filed against Nexstar in the past. We cannot predict the impact that any such complaints may have on our operations.

MVPDs have actively sought to change the regulations under which retransmission consent is negotiated before both the U.S. Congress and the FCC in order to increase their bargaining leverage with television stations, and there are still-open FCC proceedings to review these regulations.

Certain vMVPDs stream broadcast programming over the internet. In December 2014, the FCC issued a Notice of Proposed Rulemaking proposing to interpret the term "MVPD" to encompass vMVPDs that make available for purchase multiple streams of video programming distributed at a prescheduled time and seeking comment on the effects of applying MVPD rules to such vMVPDs. The proceeding remains open.

### Broadcast Transmission Standard (ATSC 3.0)

In November 2017, the FCC adopted rules to permit television broadcasters to voluntarily broadcast using a new broadcast television transmission standard developed by the Advanced Television Systems Committee, Inc., also referred to as "ATSC 3.0" or "NEXTGEN TV." The ATSC 3.0 standard provides for a more efficient use of spectrum, which could enable us to provide additional services to consumers and businesses, including additional content, interactive television, signal encryption and data transmission services. We and our partners have adopted the ATSC 3.0 technology in stations covering over 50% of U.S. television households.

Because ATSC 3.0 is not compatible with existing television equipment, the FCC currently requires the stations which have adopted the ATSC 3.0 technology to continue broadcasting a signal in the existing standard with programming that is "substantially similar" to the programming broadcast on the ATSC 3.0 signal. Pursuant to a Third Report and Order and Fourth Further Notice of Proposed Rulemaking issued in June 2023, the "substantially similar" programming requirement is scheduled to sunset in July 2027. In October 2025, the FCC issued a Fifth Further Notice of Proposed Rulemaking, which proposes to eliminate the requirements that stations adopting ATSC 3.0 continue to broadcast a signal in the existing standard and that such signal (if the broadcaster chooses to air it) include substantially similar content. In addition, in June 2020, the FCC adopted a Declaratory Ruling and Notice of Proposed Rulemaking declaring that local and national ownership restrictions do not apply to non-video services provided on a broadcaster's ATSC 3.0 spectrum.

In October 2025, the FCC released for public comment a Fifth Notice of Proposed Rulemaking (NPRM) proposing significant revisions to the ATSC 3.0 regulatory framework to accelerate the transition to ATSC 3.0. The NPRM tentatively proposes the elimination of the requirements that broadcasters (i) simulcast their legacy ATSC 1.0 signal when deploying ATSC 3.0, (ii) broadcast "substantially similar" programming via ATSC 3.0 to what was broadcast via ATSC 1.0, and (iii) ensure that the ATSC 3.0 signal covers at least 95% of the ATSC 1.0 coverage area. In addition, it sought comment on allowing more efficient MPEG-4 encoding which could ease the transition by allowing more program streams in the same amount of spectrum, requiring an ATSC 3.0 tuner mandate, establishing a firm deadline for the sunset of ATSC 1.0 service, and extending existing MVPD carriage rules to television stations operating only in ATSC 3.0. The comment period in this rulemaking proceeding closed in February 2026 and it remains pending.

### Other FCC Broadcast Regulations and Enforcement

The FCC continues to enforce its regulations concerning indecency, sponsorship identification, political advertising, good faith retransmission consent negotiation, unauthorized assignments and transfers of control, multiple ownership, children's television, environmental concerns, emergency alerting and information, equal employment opportunity, technical operating matters, antenna

16

tower maintenance, and other matters. The FCC may impose substantial forfeitures or, in extreme cases, revoke licenses if it determines that its rules have been violated.

## Human Capital Management

*Values*.  Our key human capital management objectives are to attract, develop, and retain top industry talent that reflects the communities in which we operate. We encourage every individual's contribution and personal growth and foster work environments that provide personal pride through job satisfaction. We embrace the communities in which we operate and promote open communications, innovation and creativity.

*Engagement and Opportunities*.  With markets ranging from small to large to national, we offer a broad range of employment opportunities for every experience level, including for those who are just starting their broadcasting career or those who are ready to move to a larger market or onto the national stage. Our varied markets allow us to give our employees room to grow and progress in their careers. Our management team supports a culture of developing future leaders from our existing workforce, enabling us to promote from within for many leadership positions. As of December 31, 2025, our voluntary retention rate for employees was approximately 83%.

*Compensation and Benefits*.  We offer our employees a broad range of company-paid benefits and we believe our compensation package and benefits are competitive with others in our industry. Our employee wages are competitive and consistent with employee positions, experience, knowledge and location. Annual wage increases and incentive payments are based on merit and are communicated to employees as a part of the annual review process.

*Equal Employment Opportunity*.  We believe in equal employment opportunities for all. As such, we are committed to complying with local state and federal anti-discrimination laws. We encourage a culture of respect, equal opportunity and non-discrimination.

*Training*.  We are committed to developing the talents of our employees and provide our employees workplace training. Our catalog of courses includes harassment prevention, ethics, supervisor/manager skills, and health-related safety. Selected Nexstar employees also participate in annual training to ensure understanding of antitrust laws and how they apply to Nexstar, as well as a media sales training program provided by a third-party vendor.

*Safety and Health*.  We are committed to providing a safe and healthy workplace for our employees. All employees are required to comply with our safety rules and are expected to actively contribute to making our company a safer place to work. Employees must immediately report accidents, injuries, and unsafe equipment, practices or conditions to a supervisor or other designated person. Threats or acts of violence or physical intimidation are prohibited and subject to disciplinary action up to and including termination of employment.

*Employees*.  As of December 31, 2025, we had a total of 12,832 employees, comprised of 11,693 full-time and 1,139 part-time employees. As of December 31, 2025, 1,869 of our employees were covered by collective bargaining agreements. We believe that our employee relations are satisfactory, and we have not experienced any work stoppages at any of our facilities. However, we cannot assure you that our collective bargaining agreements will be renewed in the future, or that we will not experience a prolonged labor dispute, which could have a material adverse effect on our business, financial condition, or results of operations.

*Community Outreach*.  We pride ourselves on the opportunities we provide for our employees to give back to their communities. At the local level, our stations were actively involved in over 2,000 community outreach initiatives in 2025. Nexstar and its partner stations work with local community groups to increase awareness, raise money and otherwise assist these local groups with their missions. Stations run promotions and air content related to the initiatives and station employees participate in local events. On a companywide basis, annually Nexstar engages in a variety of initiatives as well, including, among others, Founder's Day of Caring, an annual celebration of the founding of the Company by providing one day of service by our employees across the country to local non-profits and charities; Project Roadblock, a national multiplatform program aimed at preventing drunk driving, by donating airtime and news coverage to the issue; and Remarkable Women, Nexstar's own initiative to celebrate local women to inspire, lead and pave the way for other women to succeed, by airing content and contributing to the winners' charitable organizations of their choice.

## Legal Proceedings

From time to time, we are involved in litigation that arises from the ordinary operations of business, such as contractual or employment disputes or other actions. In the event of an adverse outcome of these proceedings, we believe the resulting liabilities would not have a material adverse effect on our financial condition or results of operations. See Note 11 to our Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K, which is incorporated herein by reference.

**Available Information**

We file annual, quarterly and current reports, proxy statements and other information with the SEC. The SEC maintains a website that contains reports, proxy and information statements and other information regarding issuers, including us, that file electronically with the SEC. The address for the SEC's website is http://www.sec.gov. Due to the availability of our filings on the SEC website, we do not currently make available our filings on our internet website. Upon request, we will provide free copies of our annual reports on Form 10-K, quarterly reports on Form 10-Q and any other filings with the SEC. Requests can be sent to Nexstar Media Group, Inc., Attn: Investor Relations, 545 E. John Carpenter Freeway, Suite 700, Irving, TX 75062.

**Item 1A.  Risk Factors**

You should carefully consider the risks described below and all of the information contained in this document. The risks and uncertainties described below are not the only risks and uncertainties that the Company faces. Additional risks and uncertainties not presently known to the Company or that the Company currently deems immaterial may also impair the Company's business operations. If any of those risks occur, the Company's business, financial condition and results of operations could suffer. The risks discussed below also include forward-looking statements, and the Company's actual results may differ substantially from those discussed in these forward-looking statements. See "Cautionary Note Regarding Forward-Looking Statements" for further information.

**Summary Risk Factors**

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, results of operations, cash flows, and prospects. These risks are discussed more fully below and include, but are not limited to:

***Risks Related to the Proposed Merger with TEGNA***

- The proposed Merger with TEGNA is subject to conditions, some or all of which may not be satisfied, on a timely basis or at all; and

- We may fail to realize all of the anticipated benefits of the Merger with TEGNA, or those benefits may take longer to realize than expected. The combined company may also encounter difficulties in integrating the two businesses.

***Risks Related to Our Operations***

- Our distribution revenues and operating results may be adversely affected by, among other factors, declining MVPD subscribers, our inability to renew expiring distribution agreements on favorable terms, or at all, and our network partners inability to renew expiring distribution agreements on favorable terms with vMPVDs, or at all;

- Our station revenues and operating results may be adversely affected if we are unable to renew our network affiliation agreements on favorable terms, or at all;

- Our revenue and operating results may be adversely affected if we are unable to retain our largest customers, which account for a significant percentage of our total revenue, on favorable terms, or at all;

- Our advertising revenue and operating results may be affected by big tech and other media and technology competitors, economic downturns, geopolitical events and other factors outside of our control;

- Because a significant percentage of our operating expenses are fixed, a relatively small decrease in revenue could have a significant negative impact on our operating results;

- Our growth may be limited if we are unable to implement an acquisition strategy and our operating results may be adversely affected if we are unable to successfully integrate any future acquisition;

- Our substantial debt and related interest expense could limit our ability to reinvest in the business, make acquisitions and/or return capital to shareholders;

- We may not be able to generate sufficient cash flow to meet our debt service requirements;

- We may be required to cease certain station operations if the FCC denies renewal of any of our station licenses;

- The loss of the services of our chief executive officer could disrupt management of our business and impair the execution of our business strategies;

18

- Our operating results could be adversely affected if the owners of the VIEs make decisions regarding the operation of their respective stations that adversely impact their operating results and reduce payments due to us under our local service agreements;

- We have recognized, and could continue to recognize, asset impairment charges for our equity method investments; the financial performance of our equity method investments could adversely impact our results of operations;

- Future impairment charges to goodwill and intangible assets could adversely affect our operating results;

- Changes in deferred tax asset assets or valuation allowances as a result of tax law changes could affect our operating results;

- We may face additional tax liabilities stemming from proposed and ongoing tax audits;

- Our pension and postretirement benefit plan obligations may be increased by a declining stock market and lower interest rates;

- Adverse results from litigation or governmental investigations involving us could impact our business practices and operating results;

- Any decrease in our dividend payments or suspension of our dividend payments or stock repurchases could cause our stock price to decline;

- We may face challenges in protecting our intellectual property and defending against infringement claims;

- We rely on a number of third-party service providers to operate certain significant aspects of our business and any disruption could have an adverse effect on our financial condition and results of operations; and

- Cybersecurity risks could adversely affect our operating effectiveness and operating results.

### Risks Related to Our Industry

- Intense competition in the television industry and alternative forms of media could limit our growth and profitability;

- New or changed federal statutes, legislation and regulations or changes in the application of existing regulations could significantly impact our operations or the television broadcasting industry as a whole; and

- We are subject to foreign ownership limitations which limit foreign investments in us.

**Risks Related to the Proposed Merger with TEGNA**

**The proposed Merger with TEGNA is subject to conditions, some or all of which may not be satisfied, on a timely basis or at all.**

The completion of the Merger is subject to the satisfaction (or waiver by all parties, to the extent permissible) of a number of conditions as specified in the Merger Agreement. These closing conditions include, among other things, (i) the absence of any order, writ, injunction, judgment, decree or ruling by a court of competent jurisdiction in the United States or law in the United States having been adopted prohibiting the consummation of the Merger, (ii)(x) the expiration or termination of the waiting period applicable to the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and under any agreement with a governmental entity not to consummate the transactions contemplated by the Merger Agreement that was entered into with the prior written consent of each of Nexstar and TEGNA and (y) the grant by the FCC of applications required to be filed with the FCC to obtain the approvals of the FCC pursuant to the Communications Act and FCC rules necessary to consummate the transactions contemplated by the Merger Agreement, (iii) the accuracy of the representations and warranties contained in the Merger Agreement (subject to certain materiality qualifiers), (iv) the performance and compliance in all material respects by the parties of their respective covenants required by the Merger Agreement to be performed or complied with by such party prior to the Effective Time (as defined in the Merger Agreement) and (v) the absence, since June 30, 2025, of any effect, change, event, occurrence or development that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect (as defined in the Merger Agreement) that is continuing.

The failure to satisfy all of the required conditions could delay the completion of the Merger for a significant period of time or prevent it from occurring at all. There can be no assurance that the conditions to the completion of the Merger will be satisfied or waived or that the Merger will be completed. If the Merger is not completed, we may be materially adversely affected and, without realizing any of the benefits of having completed the Merger, will be subject to a number of risks. Upon termination of the Merger Agreement under certain circumstances, including the termination by either party because certain required regulatory clearances are not obtained before the outside date of August 18, 2026 (subject to one three-month extension), Nexstar will be required to pay TEGNA a termination fee of $125 million. We may also experience negative reactions from the financial markets, and our stock price could decline to the extent that the current market price reflects an assumption that the Merger will be completed.

Delays in the completion of the Merger could cause the combined company not to realize, or to be delayed in realizing, some or all of the benefits that we expect to achieve if the Merger is successfully completed within its expected timeframe and, among other things, result in additional transaction costs, loss of revenue, additional expense or other negative effects associated with delay and uncertainty about completion of the Merger. If we or TEGNA are required to divest assets or businesses as a condition to the Merger, there can be no assurance that we will be able to negotiate such divestitures expeditiously or on favorable terms or that the governmental authorities will approve the terms of such divestitures. Such divestitures could also reduce the benefits that may be realized by the combined company from the Merger.

**We may fail to realize all of the anticipated benefits of the Merger with TEGNA, or those benefits may take longer to realize than expected. The combined company may also encounter difficulties in integrating the two businesses.**

Our ability to realize the anticipated benefits of the Merger will depend on our ability to successfully integrate TEGNA into our business. The integration of a business is a complex, costly and time-consuming process. As a result, we will be required to devote significant management attention and resources to integrating our business practices and operations with the business practices and operations of TEGNA. The integration process may disrupt our business and, if implemented ineffectively, would restrict the full realization of the anticipated benefits from the Merger. The failure to meet the challenges involved in integrating the acquired business and to realize the anticipated benefits of the transaction could adversely impact the carrying value of the goodwill, could cause an interruption of, or a loss of momentum in, our business activities, and could adversely impact our business, financial condition and results of operations. In addition, the overall integration of TEGNA may result in material unanticipated problems, expenses, liabilities, loss of customers and diversion of the attention of our management and employees. The challenges of integrating the operations of acquired businesses include, among others:

- difficulties in achieving anticipated cost savings, synergies, business opportunities and growth prospects from the combination;
- challenges in keeping key business relationships in place;
- difficulties in the integration of operations and systems, including information technology systems;
- difficulties in establishing effective uniform controls, standards, systems, procedures, business cultures, compensation structures and accounting and other policies;
- difficulties in managing the expanded operations of a larger and more complex company; and

20

- challenges in attracting and retaining key personnel, including personnel that are considered key to the future success of the combined company.

Many of these factors are outside of our control, and any one of them could result in increased costs and liabilities, decreases in the amount of expected revenue and earnings and diversion of management's time and energy, each of which could have a material adverse effect on our business, financial condition and results of operations. In addition, even if the operations of our business and TEGNA are integrated successfully, the full benefits of the Merger may not be realized, including the synergies, cost savings, growth opportunities, or cash flows that are expected, and we will also be subject to additional risks that could impact future earnings. These benefits may not be achieved within the anticipated time frame, or at all. Further, additional unanticipated costs may be incurred in the integration of TEGNA. In addition, it is possible that the integration process could result in the loss of key employees and/or inconsistencies in standards, controls, procedures and policies, which may adversely affect our ability to maintain relationships with customers, other providers and employees or to achieve the anticipated benefits of the Merger. These integration matters and our significant amount of indebtedness may hinder our ability to make further acquisitions and could have an adverse effect on us for an undetermined period after consummation of the Merger. All of these factors could decrease or delay the expected accretive effect of the Merger or have a material adverse effect on our business, financial condition and results of operations.

## Risks Related to Our Operations

**Our distribution revenues and operating results may be adversely affected by, among other factors, declining MVPD subscribers, our inability to renew expiring distribution agreements on favorable terms, or at all, and our network partners inability to renew expiring distribution agreements on favorable terms with vMPVDs, or at all.**

A significant portion of our revenue comes from our retransmission consent and carriage agreements with MVPDs (mainly cable and satellite television providers) and vMVPDs. These agreements permit the distributors to retransmit our stations' and our cable and broadcast networks' signals to their subscribers in exchange for the payment of compensation to us. If we are unable to renegotiate these agreements on favorable terms, or at all, the failure to do so could have an adverse effect on our business, financial condition, and results of operations. In addition, occasionally these negotiations result in a temporary removal of our stations from the distributor's service, which disruption could have an adverse effect on our operating results.

Though we are typically able to renegotiate our retransmission consent agreements on favorable terms, the payments due to us under these agreements are customarily based on a price per subscriber of the applicable distributor. In the past several years, the number of subscribers to MVPDs has declined as the growth of direct internet streaming of video programming to televisions and mobile devices has led consumers to discontinue their cable or satellite service subscriptions. As our retransmission consent agreements include payment terms by subscriber numbers, if the rate of reductions in the number of MVPD subscribers increases, this could have an adverse effect on our business revenues, financial condition and results of operations. Also, refer to "Risks Related to Our Industry—Intense competition in the television industry and alternative forms of media could limit our growth and profitability."

Our affiliation agreements with the Big 4 broadcast networks (ABC, CBS, NBC and FOX) include terms that limit our ability to grant retransmission consent rights to vMVPDs and other service providers that provide video streaming to consumers. As a result, the Big 4 networks generally negotiate directly with vMVPDs for carriage of their local affiliate stations, including certain of our stations. If a network is unable to renegotiate these agreements and the failure to do so could have an adverse effect on our business, financial condition, and results of operations. In addition, occasionally these negotiations result in a temporary removal of our stations from the distributor's service, which disruption could have an adverse effect on our operating results. In addition, the terms the networks negotiate may be unfavorable or unacceptable to us, as a result of which we may receive reduced revenue from our stations' carriage on vMVPDs or may choose not to permit a vMVPD's carriage of our stations at all, which could materially reduce this revenue source to the Company if we cannot reduce network affiliation fees or generate additional revenue streams from other relationships we have with the Big 4 networks and vMVPDs, and could have an adverse effect on our business, financial condition and results of operations.

**Our station revenues and operating results may be adversely affected if we are unable to renew our network affiliation agreements on favorable terms, or at all.**

Due to the quality of the programming provided by the networks, stations that are affiliated with a network generally have higher ratings than unaffiliated independent stations in the same market. As a result, it is important for stations to maintain their network affiliations. All but two of the stations that we operate or provide services to have network affiliation agreements which have expiration/renewal dates at various times through December 2027. In order to renew certain of our affiliation agreements, we may be required to make increased payments to the networks and to accept other modifications of existing affiliation agreements. If any of our stations cease to maintain affiliation agreements with their networks for any reason, we would need to find alternative

21

sources of programming, which may be less attractive to our audiences and more expensive to obtain. In addition, a loss of a specific network affiliation for a station may affect our retransmission consent payments, resulting in us receiving less retransmission consent fees. Further, some of our network affiliation agreements are subject to earlier termination by the networks under specified circumstances. For more information regarding these network affiliation agreements, see Item 1, "Business—Stations—Network Affiliations."

**Our revenue and operating results may be adversely affected if we are unable to retain our largest customers, which account for a significant percentage of our total revenue, on favorable terms, or at all.**

During the years ended December 31, 2025, 2024 and 2023, the Company's revenues from two customers exceeded 10%. Each of these customers represented approximately 13% for 2025, 12% for 2024, and 12% and 14% for 2023, of our consolidated net revenues. The loss of or disruption in our relationship with one or more of our major customers could have a material adverse effect on our business, operating results, or financial condition. In addition, any consolidation of our customers could reduce the number of customers to whom our services could be sold and increase our revenue concentration.

**Our advertising revenue and operating results may be affected by big tech and other media and technology competitors, economic downturns, geopolitical events and other factors outside of our control.**

We derive a significant amount of our revenue from the sale of television and digital advertising. Our ability to sell advertising time depends on numerous factors that may be beyond our control, including: the health of the economy; the popularity of our programming, including trust in news organizations; fluctuations in pricing for advertising (including numerous large technology and media companies); the activities of our competitors; and the amount of demand for political advertising in election years. Because businesses generally reduce their advertising budgets during economic recessions or downturns, our reliance upon advertising revenue makes our operating results susceptible to prevailing economic conditions. In addition, our programming may not attract sufficient targeted viewership, and we may not achieve favorable ratings. Our ratings depend partly upon unpredictable and volatile factors beyond our control, such as viewer preferences, competing programming and the availability of other entertainment activities. A shift in viewer preferences could cause our programming not to gain popularity or to decline in popularity, which could cause our advertising revenue to decline. Further, we and the programming providers upon which we rely may not be able to anticipate, and effectively react to, shifts in viewer tastes and interests in our markets.

In addition, we may experience a loss of advertising revenue and incur additional broadcasting expenses due to preemption of our regularly scheduled programming by network coverage of a major global news event such as a war or terrorist attack or by coverage of local disasters such as tornados and hurricanes.

**Because a significant percentage of our operating expenses are fixed, a relatively small decrease in revenue could have a significant negative impact on our operating results.**

Our business is characterized generally by high fixed costs, primarily for debt service, broadcast rights and personnel. Other than commissions paid to our sales staff and outside sales agencies, our expenses do not vary significantly with an increase or decrease in advertising revenue. Accordingly, a minor shortfall in expected revenue could have a significant negative impact on our financial results.

**Our growth may be limited if we are unable to implement an acquisition strategy and our operating results may be adversely affected if we are unable to successfully integrate any future acquisition.**

Historically, we achieved much of our growth through acquisitions. We intend to continue our growth by selectively pursuing acquisitions of businesses that leverage our platform, scale and capabilities. Some of our competitors may have greater financial or management resources with which to pursue acquisition targets. Therefore, even if we are successful in identifying attractive acquisition targets, we may face considerable competition and our acquisition strategy may not be successful.

Current and future changes to federal statutes and rules and policies of the FCC and other regulatory authorities which limit the ownership of television stations may also make it more difficult for us to acquire additional television stations. Additionally, our major television station acquisitions over the past years have significantly increased our national audience reach to a level that is at the national television ownership limit imposed by the Communications Act and FCC rules. This may restrict our future television station acquisitions and may require us to divest current stations in connection with any acquisition in order to comply with the national television ownership limit. For more information see "Federal Regulation."

There are a number of risks associated with growing our business through acquisitions. For example, with any past or future acquisition, there is the possibility that: we may not be able to manage the increased reporting and administrative demands; we may not be able to successfully reduce costs, increase revenue or audience or realize anticipated synergies and economies of scale with respect to any acquired business; we may not be able to generate adequate returns on our acquisitions or investments; we may encounter and fail to address risks or other problems associated with or arising from our reliance on the representations and

warranties and related indemnities, if any, provided to us by the sellers of acquired companies; an acquisition may increase our leverage and debt service requirements or may result in our assuming unexpected liabilities; our management may be reassigned from overseeing existing operations by the need to integrate the acquired business; we may experience difficulties integrating operations and systems, as well as company policies and cultures;  we may be unable to retain and grow relationships with the acquired company's key customers; we may fail to retain and assimilate employees of the acquired business; and problems may arise in entering new markets in which we have little or no experience. The occurrence of any of these events could have a material adverse effect on our operating results, particularly during the period immediately following any acquisition.

**Our substantial debt and related interest expense could limit our ability to reinvest in the business, make acquisitions and/or return capital to shareholders.**

As of December 31, 2025, we had $6.3 billion of debt, which represented 75.4% of total capitalization. Of our $6.3 billion of debt, $3.6 billion is floating rate debt for which we pay interest based on a spread to current Secured Overnight Financing Rate ("SOFR"). An increase in SOFR will increase our interest expense, reducing the amount of cash flow from operations we have available to reinvest in our operations, make acquisitions or return to shareholders. Our high level of debt could have other important consequences for our business, including: limiting our ability to borrow additional funds or obtain additional financing in the future; using cash from operations to reduce indebtedness instead of reinvesting in the business, making acquisitions or returning capital to shareholders; limiting our flexibility to plan for and react to changes in its business and our industry; and impairing our ability to withstand a general downturn in our business and placing us at a disadvantage compared to our competitors that are less leveraged. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Material Cash Requirements" for disclosure of the approximate aggregate amount of principal indebtedness scheduled to mature.

The terms of our debt instruments contain various maintenance or other restrictive covenants customary for arrangements of these types. The restrictive covenants restrict our ability to, among other things: incur additional debt and issue preferred stock; pay dividends and make other distributions; make investments and other restricted payments; make acquisitions; merge, consolidate or transfer all or substantially all of our assets; enter into sale and leaseback transactions; create liens; sell assets or stock of our subsidiaries; and enter into transactions with affiliates. Our senior secured credit facility requires us to maintain or meet certain financial ratios, including a maximum consolidated first lien net leverage ratio of 4.25 to 1.00. Pursuant to the Nexstar credit agreement, this covenant ratio, at Nexstar's election, will increase to 4.75:1.00 with respect to the last day of the fiscal quarter during which a Material Transaction (as defined therein) shall have been consummated and the last day of each of the immediately following three consecutive fiscal quarters; provided that no more than two such elections will be made over the life of the facility. Future financing agreements may contain similar, or even more restrictive, provisions and covenants. Because of these restrictions and covenants, management's ability to operate our business at its discretion is limited, and we may be unable to compete effectively, pursue acquisitions or take advantage of new business opportunities, any of which could harm our business.

If we fail to comply with the restrictions in present or future financing agreements, a default may occur. A default could allow creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. A default could also allow creditors to foreclose on any collateral securing such debt.

We could also incur additional debt in the future. The terms of our senior secured credit facilities, as well as the indentures governing our senior unsecured notes, limit, but do not prohibit us from incurring substantial amounts of additional debt. To the extent we incur additional debt, it would become even more susceptible to the leverage-related risks described above.

**We may not be able to generate sufficient cash flow to meet our debt service requirements.**

Our ability to service our debt depends on our ability to generate the necessary cash flow. Generation of the necessary cash flow is partially subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. We cannot assure you that our business will generate cash flow from operations, that future borrowings will be available to us under our current or any replacement credit facilities, or that we will be able to complete any necessary financings, in amounts sufficient to enable us to fund our operations or pay our debts and other obligations, or to fund our liquidity needs. If we are not able to generate sufficient cash flow to service our debt obligations, we may need to refinance or restructure our debt, sell assets, reduce or delay capital investments, or seek to raise additional capital. Additional financing may not be available in sufficient amounts, at times or on terms acceptable to us, or at all. If we are unable to meet our debt service obligations, our lenders may determine to stop making loans to us, and/or our lenders or other holders of our debt could accelerate and declare due all outstanding obligations under the respective agreements, all of which could have a material adverse effect on us.

**We may be required to cease certain station operations if the FCC denies renewal of any of our station licenses.**

Our television stations operate pursuant to FCC licenses that are ordinarily issued for eight-year terms and are renewable upon application. The FCC generally grants an application for license renewal if, during the preceding term, the station served the public interest, the licensee did not commit any serious violations of the Communications Act or the FCC's rules, and the licensee

committed no other violations of the Communications Act or the FCC's rules which, taken together, would constitute a pattern of abuse. While a majority of renewal applications are routinely granted under this standard, if we fail to meet this standard the FCC may condition or shorten renewal or, in a worst case, deny a station's license renewal application, resulting in termination of the station's authority to broadcast. The Company expects the FCC to grant pending and future renewal applications for its stations in due course but cannot provide any assurances that the FCC will do so. See Item 1, "Business—Federal Regulation."

**The loss of the services of our chief executive officer could disrupt management of our business and impair the execution of our business strategies.**

We believe that our success depends upon our ability to retain the services of Perry A. Sook, our founder and Chief Executive Officer. Mr. Sook has been instrumental in determining our strategic direction and focus. The loss of Mr. Sook's services could adversely affect our ability to manage effectively our overall operations and successfully execute current or future business strategies. On October 28, 2025, we extended Mr. Sook's appointment as our Chief Executive Officer effective April 1, 2026, through March 31, 2029, followed by automatic renewal for successive one-year periods.

**Our operating results could be adversely affected if the owners of the VIEs make decisions regarding the operation of their respective stations that adversely impact their operating results and reduce payments due to us under our local service agreements.**

The VIEs are each 100% owned by independent third parties. We have entered into local service agreements with the VIEs, pursuant to which we provide services to their stations. In return for the services we provide, we receive substantially all of the consolidated VIEs' available cash, after satisfaction of their operating costs and any debt obligations. In addition, Nexstar (excluding The CW) guarantees the full payment of all of the obligations incurred under one of our VIEs' (Mission) senior secured credit facility in the event of default. See Item 1, "Business—Stations."

In compliance with FCC regulations, the VIEs maintain responsibility for and control over programming, finances and personnel for their respective stations. As a result, the VIEs' boards of directors and officers can make decisions with which we disagree and which could reduce the cash flow generated by these stations and, as a consequence, the amounts we receive under our local service agreements with the VIEs.

**We have recognized, and could continue to recognize, asset impairment charges for our equity method investments; the financial performance of our equity method investments could adversely impact our results of operations.**

We hold significant investments in businesses accounted for under the equity method, primarily our 31.3% interest in TV Food Network. During the fourth quarter of 2025, we recognized an other-than-temporary non-cash impairment charge of $381 million related to this investment, driven primarily by continued softness in the U.S. linear advertising market for entertainment cable networks, declining MVPD subscribers and demand for entertainment cable networks by viewers and distributors, ongoing shifts in consumer preferences toward streaming services and other digital products, and additional market data from recent spin-offs involving cable networks. Future changes in events or circumstances, such as a continuation or worsening of the current negative industry and economic trends and other events, could cause the value of our investment in TV Food Network to decline further, requiring us to record additional impairment charges that could adversely affect our net income in the periods recognized. As of December 31, 2025, the book value of our ownership interest in TV Food Network was $372 million.

During the year ended December 31, 2025, our share in TV Food Network's net income was $102 million and we received cash distributions of $137 million. If future changes to our share in earnings and distributions from our equity investment in TV Food Network are material in any year, those changes could have a material effect on our net income, cash flow, financial condition and liquidity. We do not control the day-to-day operations or strategic decisions of TV Food Network, nor do we have the ability to require the payment of dividends, advances or other distributions to its stockholders, including us. In addition, we cannot compel TV Food Network to provide us with long-term financial projections. As a result, the performance and management decisions of TV Food Network could materially affect our operating results, cash flows and the carrying value of our investment.

**Future impairment charges to goodwill and intangible assets could adversely affect our operating results.**

As of December 31, 2025, $7.4 billion, or 68.7%, of our combined total assets consisted of goodwill, indefinite-lived intangible assets (FCC licenses) and definite-lived intangible assets (network affiliation agreements and other). We regularly test our goodwill and other intangible assets for impairment. If the carrying amount of goodwill and intangible assets is revised downward due to impairment, such non-cash charge could materially affect our financial position and results of operations.

**Changes in deferred tax assets or valuation allowances as a result of tax law changes could affect our operating results.**

We currently have significant net deferred tax assets resulting from tax credit carryforwards, net operating losses and other deductible temporary differences that are available to reduce taxable income in future periods. Based on our assessment of the

24

Company's deferred tax assets, we determined that as of December 31, 2025, based on projected future income, approximately $140 million of the Company's deferred tax assets, net of valuation allowance, will more likely than not be realized in the future. Should we determine in the future that these assets will not be realized, the Company will be required to record a valuation allowance in connection with these deferred tax assets and the Company's operating results would be adversely affected in the period such determination is made. In addition, tax law changes could negatively impact the Company's deferred tax assets. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates."

**We may face additional tax liabilities stemming from proposed and ongoing tax audits.**

While we believe our tax positions and reserves are reasonable, the resolutions of certain tax issues related to a past transaction of Tribune are unpredictable and could negatively impact our effective tax rate, net income or cash flows for the period or periods in question. Specifically, we may be faced with additional tax liabilities as a result of our acquisition of Tribune for the transactions contemplated by an agreement, dated August 21, 2009, between Tribune and Chicago Entertainment Ventures, LLC (f/k/a Chicago Baseball Holdings, LLC) ("CEV LLC"), and its subsidiaries (collectively, "New Cubs LLC"), governing the contribution of certain assets and liabilities related to the business of the Chicago Cubs Major League Baseball franchise then owned by Tribune and its subsidiaries to New Cubs LLC, and related agreements thereto (the "Chicago Cubs Transactions"). We may also be faced with tax liabilities as a result of the federal income tax audits of Tribune for taxable years 2014 and 2015.

On June 28, 2016, the Internal Revenue Service ("IRS") issued Tribune a Notice of Deficiency which presented the IRS's position that the gain with respect to the Chicago Cubs Transactions should have been included in Tribune's 2009 taxable income. Accordingly, the IRS proposed a $182 million tax and a $73 million gross valuation misstatement penalty. During the third quarter of 2016, Tribune filed a petition in U.S. Tax Court to contest the IRS's determination. After-tax interest on the aforementioned proposed tax and penalty through December 31, 2025 would be approximately $271 million. In addition, if the IRS prevails in its position, under the tax rules for determining tax basis upon emergence from bankruptcy, the Company would be required to reduce its tax basis in certain assets. The reduction in tax basis would be required to reflect the reduction in the amount of the Company's guarantee of the New Cubs LLC debt which was included in the reported tax basis previously determined upon emergence from bankruptcy and subject to Tribune's 2014 and 2015 federal income tax audits (described below).

On September 19, 2019, Tribune became a wholly owned subsidiary of Nexstar following Nexstar's merger with Tribune. Nexstar disagrees with the IRS's position that the Chicago Cubs Transactions generated taxable gain in 2009, the proposed penalty and the IRS's calculation of the gain. If the IRS prevails in its position, the gain on the Chicago Cubs Transactions would be deemed to be taxable in 2009. We estimate that the federal and state income taxes would be approximately $225 million before interest and penalties. Any tax, interest and penalty due will be offset by tax payments made relating to this transaction subsequent to 2009. Tribune made approximately $154 million of tax payments prior to its merger with Nexstar.

A bench trial in the U.S. Tax Court took place between October 28, 2019 and November 8, 2019, and closing arguments took place on December 11, 2019. The Tax Court issued a separate opinion on January 6, 2020 holding that the IRS satisfied the procedural requirements for the imposition of the gross valuation misstatement penalty. The judge deferred any litigation of the penalty until a final determination was reached by the Tax Court or Court of Appeals.

On October 26, 2021, the Tax Court issued an opinion related to the Chicago Cubs Transactions, which held that Tribune's structure was, in substantial part, in compliance with partnership provisions of the Code and, as a result, did not trigger the entire 2009 taxable gain proposed by the IRS. On October 19, 2022, the Tax Court entered the decision that there is no tax deficiency or penalty due in the 2009 tax year. On January 13, 2023, the IRS filed a notice of appeal to the U.S. Court of Appeals for the Seventh Circuit. On February 3, 2023, the Company filed a notice of cross-appeal. On February 15, 2024, the case was argued before the U.S. Court of Appeals for the Seventh Circuit. The Company expects a ruling from the Court of Appeals in the first half of 2026.

As of December 31, 2025, we believe the tax impact of applying the Tax Court opinion to 2009 and its impact on subsequent years is not material to the Company's accounting for uncertain tax positions or to its Consolidated Financial Statements. Although management believes its estimates and judgments are reasonable, the timing and ultimate resolution are unpredictable and could materially change.

Prior to Nexstar's merger with Tribune in September 2019, Tribune was undergoing a federal income tax audit for taxable years 2014 and 2015. In the third quarter of 2020, the IRS completed its audit of Tribune and issued a Revenue Agent's Report which disallowed the reporting of certain assets and liabilities related to Tribune's emergence from Chapter 11 bankruptcy on December 31, 2012. We disagree with the IRS's proposed adjustments to the tax basis of certain assets and the related taxable income impact, and we are contesting the adjustments through the IRS administrative appeal procedures. If the IRS prevails in its position and after taking into account the impact of the Tax Court opinion, Nexstar would be required to reduce its tax basis in certain assets resulting in a $17 million increase in its federal and state taxes payable and a $69 million increase in deferred income tax liability as of

25

December 31, 2025. In accordance with Accounting Standards Codification ("ASC") Topic 740, the Company has reflected $11 million for certain contested issues in its liability for uncertain tax positions at December 31, 2025 and December 31, 2024.

**Our pension and postretirement benefit plan obligations may be increased by a declining stock market and lower interest rates.**

We have various funded, qualified non-contributory defined benefit retirement plans which cover certain employees and former employees. As of December 31, 2025, the pension benefit obligations for these qualified retirement plans were $1.5 billion. The qualified retirement plans also had $1.4 billion in total net assets available, or underfunded by approximately $117 million, to pay benefits to participants enrolled in the plans as of December 31, 2025. Nexstar contributed $15 million to its qualified pension benefit plans in 2025.

We also have non-contributory unfunded supplemental executive retirement and ERISA excess plans which supplement the coverage of the defined benefit retirement plans to certain employees and former employees. During 2025, Nexstar contributed $4 million to these plans. As of December 31, 2025, the total liability was $37 million. We also have various retiree medical savings account plans which reimburse eligible retired employees for certain medical expenses and unfunded plans that provide certain health and life insurance benefits to certain retired employees. Although we have frozen participation and benefits under all plans, two significant elements in determining the pension expense or credit are the expected return on plan assets and the discount rate used in projecting obligations. Large declines in the stock market and lower discount rates increase the expense and may necessitate higher cash contributions to the qualified retirement plans.

**Adverse results from litigation or governmental investigations involving us can impact our business practices and operating results.**

We are party to various litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations may result in significant monetary damages or injunctive relief that may adversely affect our operating results or financial condition as well as our ability to conduct our businesses as they are presently being conducted.

**Any decrease in our dividend payments or suspension of our dividend payments or stock repurchases could cause our stock price to decline.**

Our common stockholders are only entitled to receive the dividends declared by our board of directors. Our board of directors declared in 2025 total cash dividends of $7.44 per share to the outstanding shares of our common stock (installments of $1.86 per share were paid each quarter to the applicable record date outstanding shares of common stock). We expect to continue to pay quarterly cash dividends at the rate set forth in our current dividend policy. However, future cash dividends, if any, will be at the discretion of our board of directors and can be changed or discontinued at any time. Dividend determinations (including the amount of cash dividend, the record date and date of payment) will depend upon, among other things, our future operations and earnings, targeted future acquisitions, capital requirements and surplus, general financial condition, contractual restrictions and other factors as our board of directors may deem relevant. In addition, the Company's senior secured credit facilities and the indentures governing our existing notes limit our ability to pay dividends. Given these considerations, our board of directors may increase or decrease the amount of the dividend at any time and may also decide to suspend or discontinue the payment of cash dividends in the future.

We engage in share repurchases of our common stock from time to time in accordance with authorizations from our board of directors. Our repurchase program does not have an expiration date and does not obligate us to repurchase any specific dollar amount or to acquire any specific number of shares. Further, our share repurchases could affect our share trading prices or increase their volatility and may be suspended or terminated at any time, which may result in a decrease in the trading prices of our common stock.

**We may face challenges in protecting our intellectual property (IP) and defending against infringement claims.**

Our business relies on patents, trademarks, copyrights, and licenses to protect our technology and brand. Any damage to these assets could impact our success and financial performance.

Enforcing IP rights is difficult, especially as technology makes piracy easier. Current protections may not be sufficient, and litigation could be necessary. Changes in laws could also affect our ability to generate revenue or increase costs. Any IP-related litigation or claims—valid or not—could be costly, divert resources, and require us to pay substantial amounts or stop using certain IP. Licensing may not be available on reasonable terms, negatively affecting our business.

**We rely on a number of third-party service providers to operate certain significant aspects of our business and any disruption could have an adverse effect on our financial condition and results of operations.**

Our business depends upon services provided by third parties to provide software platforms for certain of our business operations. Such third-party services are vulnerable to damage or interruption from infrastructure changes, natural disasters, cybersecurity attacks, power outages, terrorist attacks, human or software errors, website hosting disruptions, capacity constraints and other events. Because we cannot easily switch our operations to other third-party providers without significant costs, any disruption of or interference with our use of third-party service providers could have a material negative impact on our business and the results of our operations.

**Cybersecurity risks could adversely affect our operating effectiveness and operating results.**

We use computers in substantially all aspects of our business operations. Such use exposes us to potential cyber incidents resulting from deliberate attacks or unintentional events. While we have not experienced cybersecurity incidents that materially impacted our operating results and financial condition, it is not uncommon for a company such as ours to be subjected to continuous attempted cyber-attacks or other malicious efforts to cause a cyber incident. These incidents can include, but are not limited to, gaining unauthorized access to digital systems for purposes of misappropriating assets or sensitive information, corrupting data or causing operational disruption. Increased remote work and the use of third-party services to enable remote work also impact the security of our systems, as well as our ability to protect against attacks and detect and respond to them quickly. The results of these incidents could include, but are not limited to, business interruption, disclosure of nonpublic information, decreased advertising revenues, misstated financial data, liability for stolen assets or information, increased cybersecurity protection costs, and litigation and reputational damage adversely affecting customer or investor confidence.

**Risks Related to Our Industry**

**Intense competition in the television industry and alternative forms of media could limit our growth and profitability.**

As a television broadcasting company, we face a significant level of competition, both directly and indirectly. We compete for our audience against other video services in addition to all the other leisure activities in which one could choose to engage rather than watch television. Many of our current and potential competitors have greater financial, marketing, programming and distribution resources than we do. The markets in which we operate are also in a constant state of change arising from, among other things, technological improvements and economic and regulatory developments. Technological innovation and the resulting proliferation of television entertainment, such as streaming video, cable television, wireless cable, satellite-to-home distribution services, home video and entertainment systems, social media, and the internet have fractionalized television viewing audiences and have subjected television broadcast networks, cable networks and television stations to increased competition and declining viewership. In recent years, demand for television advertising has been declining and demand for advertising in alternative media has been increasing, and we expect this trend to continue. We may not be able to compete effectively or adjust our business plans to meet changing market conditions.

**New or changed federal statutes, legislation and regulations or changes in the application of existing regulations could significantly impact our operations or the television broadcasting industry as a whole.**

The FCC has open proceedings to determine whether to standardize TV stations' reporting of programming responsive to local needs and interests; whether to modify its network non-duplication and syndicated exclusivity rules; whether to modify its standards for "good faith" retransmission consent negotiations; and whether to broaden the definition of "MVPD" to include online video programming distributors; and the FCC has initiated reviews of the broadcast ownership rules. In addition, changes in FCC and Department of Justice/Federal Trade Commission rules and guidelines around owning or providing services to multiple stations in a local market, or other rules, could adversely impact us. The FCC also may decide to initiate other new rule-making proceedings on its own or in response to requests from outside parties, any of which might impact our business or operations. The U.S. Congress may also act to amend the Communications Act in a manner that could impact our stations and the stations we provide services to or the television broadcast industry in general. For more information about the regulations that we are subject to, see Item 1, "Business— Federal Regulation."

**We are subject to foreign ownership limitations which limit foreign investments in us.**

The Communications Act limits the extent of non-U.S. ownership of companies that own U.S. broadcast stations. Under these restrictions, the holder of a U.S. broadcast license may have no more than 20% non-U.S. ownership (by vote and by equity). The Communications Act prohibits more than 25% indirect foreign ownership or control of a licensee through a parent company if the FCC determines the public interest will be served by enforcement of such restriction. The FCC has interpreted this provision to require an affirmative public interest showing before indirect foreign ownership of a broadcast licensee may exceed 25%. Therefore, certain investors may be prevented from investing in us if our foreign ownership is at or near the FCC limits.

**Item 1B. Unresolved Staff Comments**

None.

**Item 1C. Cybersecurity**

**Cybersecurity Governance, Risk Management and Strategy**

In the current digital environment, companies like ours may be the target of cyber-attacks or other malicious efforts to cause a cyber incident. These cyber incidents can include, but are not limited to, gaining unauthorized access to digital systems for purposes of misappropriating assets or sensitive information, corrupting data or causing operational disruption. The possible consequences of such an attack include but are not limited to loss of data, damage to our reputation, interruptions to our operations, and/or the need to pay ransom. Historically, we have not experienced cybersecurity incidents that materially impacted our business strategy, operating results and financial condition but we cannot guarantee a future cybersecurity incident would not materially impact us.

We recognize the importance of maintaining the confidence and trust of our customers, suppliers, employees, audience, and communities by maintaining our data and information security. In managing our cyber risk, we utilize the National Institute of Standards and Technology Framework for Improving Critical Infrastructure Cybersecurity (the "NIST Framework") issued by the U.S. government as a guideline to manage our cybersecurity-related risk. In addition, we have established security control requirements for our third-party vendors based on global standards.

Our day-to-day cybersecurity efforts are led operationally by our Chief Technology and Digital Officer and Senior Vice President, Technology who have over 15 and 30 years, respectively, of networking and information technology management or executive experience, and oversee a team of in-house cybersecurity specialists. Our Cybersecurity Committee, comprised of representatives from key management groups including accounting, finance, legal, internal audit, and information technology, also supports our cybersecurity efforts. The Cybersecurity Committee consults with representatives from senior management and retains third-party contractors as needed. The role of the Cybersecurity Committee is to oversee cyber risk assessments, monitor applicable key risk indicators, review cybersecurity training procedures, establish cybersecurity policies and procedures, and implement enhancements to our cybersecurity infrastructure. The Cybersecurity Committee meets monthly, or more regularly as necessary, and ensures that senior management, and ultimately, the Board, is given the information required to manage and exercise proper oversight over cybersecurity risks and ensure that escalation procedures are followed in the event of a cybersecurity incident.

As part of its role as independent oversight of the key risks facing Nexstar, the Board itself and through its Audit Committee devotes regular and thorough attention to our cybersecurity risk. The Audit Committee receives quarterly (or more frequent as necessary) reports from senior financial executives and Nexstar's Chief Technology and Digital Officer to evaluate cybersecurity and data risks. Such reporting includes updates on the Company's cybersecurity program, the external threat environment, and the Company's programs to address and mitigate the risks associated with the evolving cybersecurity threat landscape. In accordance with our Cyber Incident Response Plan, the Audit Committee is promptly informed of any cybersecurity incidents that could potentially materially adversely affect the Company or its information systems and is regularly updated about incidents with lesser impact potential. The Audit Committee and management regularly brief the full Board on these matters as well.

For additional discussion of certain risks associated with cybersecurity, see Item 1A, "Risk Factors" under the heading "Cybersecurity risks could adversely affect our operating effectiveness and operating results."

**Item 2. Properties**

We have office space for our corporate headquarters in Irving, TX, which is leased through 2033. Each of our markets has facilities consisting of offices, studios, sales offices and tower and transmitter sites. We own approximately 56% of our office and studio locations and approximately 55% of our tower and transmitter locations. The remaining properties that we utilize in our operations are leased. We consider all of our properties, together with equipment contained therein, to be adequate for our present needs. We continually evaluate our future needs and from time to time will undertake significant projects to replace or upgrade facilities.

While none of our owned or leased properties is individually material to our operations, if we were required to relocate any towers, the cost could be significant. This is because the number of sites in any geographic area that permit a tower of reasonable height to provide good coverage of the market is limited, and zoning and other land use restrictions, as well as Federal Aviation Administration and FCC regulations, limit the number of alternative locations or increase the cost of acquiring them for tower sites. See Item 1, "Business—The Stations" for a complete list of stations by market.

**Item 3.  Legal Proceedings**

The information set forth under Note 11 to our Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K is incorporated herein by reference. For additional discussion of certain risks associated with legal proceedings, see Item 1A, "Risk Factors" above.

**Item 4.  Mine Safety Disclosures**

None.

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Prices; Record Holders and Dividends**

Our common stock trades on The NASDAQ Global Select Market ("NASDAQ") under the symbol "NXST."

As of February 26, 2026, there were 256 shareholders of record of our common stock. This number does not include beneficial owners whose shares are held in street name by banks, brokers or other nominee holders.

Pursuant to our current dividend policy, our board of directors declared in 2025, 2024 and 2023 total annual cash dividends of $7.44 per share, $6.76 per share and $5.40 per share, respectively, with respect to outstanding shares of our common stock. The dividends were paid in equal quarterly installments.

On January 30, 2026, our board of directors declared a quarterly cash dividend of $1.86 per share on our outstanding common stock payable on February 27, 2026 to stockholders of record on February 13, 2026. Dividend determinations will depend upon, among other things, our future operations and earnings, targeted future acquisitions, capital requirements and surplus, general financial condition, contractual restrictions and other factors as our board of directors may deem relevant. Additionally, the Company's senior secured credit facilities and the indentures governing Nexstar's existing notes limit our ability to pay dividends. Given these considerations, our board of directors may increase or decrease the amount of dividends at any time and may also decide to suspend or discontinue the payment of cash dividends in the future.

**Recent Sales of Unregistered Securities**

None.

**Issuer Purchases of Equity Securities**

There was no common stock repurchased during the quarter ended December 31, 2025. As of December 31, 2025, the remaining available amount under the share repurchase authorization was $1.4 billion.

Share repurchases are executed from time to time in open market transactions, block trades or in private transactions, including through Rule 10b5-1 and 10b-18 plans. There is no minimum number of shares that Nexstar is required to repurchase. The repurchase program does not have an expiration date and may be suspended or discontinued at any time without prior notice.

**Securities Authorized for Issuance Under Equity Compensation Plans as of December 31, 2025**

| Plan Category | Number of securities to be issued upon exercise of outstanding options and vesting of restricted stock units (a) | Weighted average exercise price of outstanding options (b) | Number of securities remaining available for future issuance excluding securities reflected in column (a) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders[1] | 950,297 | $ - | 664,860 |
| Equity compensation plans not approved by security holders | - | - | - |
| | 950,297 | | 664,860 |

[1]The 950,297 securities to be issued consist of time-based and performance-based restricted stock units.

For a more detailed description of our equity plans and grants, we refer you to Note 13 to the Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

**Comparative Stock Performance Graph**

The following graph compares the total return of our common stock based on closing prices for the period from December 31, 2020 through December 31, 2025 with the total return of the NASDAQ Composite Index and our peer index of comparable television companies. Our peer group index consists of the following publicly traded companies: Gray Media, Inc., TEGNA Inc., Sinclair, Inc., The E.W. Scripps Company, Fox Corporation and Paramount Skydance Corporation. The graph assumes the investment of $100 in our common stock and in both of the indices on December 31, 2020, with the reinvestment of dividends into shares of our common stock or the indices, as applicable. The performance shown is not necessarily indicative of future performance.



|  | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 12/31/2024 | 12/31/2025 |
|---|---|---|---|---|---|---|
| Nexstar Media Group, Inc. (NXST) | $ 100.00 | $ 140.94 | $ 166.73 | $ 154.28 | $ 161.95 | $ 217.02 |
| NASDAQ Composite Index | $ 100.00 | $ 122.18 | $ 82.43 | $ 119.22 | $ 154.48 | $ 187.14 |
| Peer Group | $ 100.00 | $ 101.70 | $ 75.12 | $ 67.92 | $ 82.94 | $ 113.15 |

**Item 6. Reserved**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis should be read in conjunction with our Consolidated Financial Statements and related Notes included in Part IV, Item 15(a) of this Annual Report on Form 10-K.*

*As a result of our deemed controlling financial interests in the consolidated VIEs in accordance with U.S. GAAP, we consolidate the financial position, results of operations and cash flows of these VIEs as if they were wholly owned entities. We believe this presentation is meaningful for understanding our financial performance. Refer to Note 2 to our Consolidated Financial Statements for a discussion of our determinations of VIE consolidation under the related authoritative guidance. The following discussion of our financial position and results of operations includes the consolidated VIEs' financial position and results of operations.*

## Executive Summary

### *2025 Highlights*

- •Entered into a definitive agreement to acquire TEGNA Inc. for $6.2 billion in a transaction expected to be accretive to Nexstar's standalone Adjusted Free Cash Flow. The transaction is subject to regulatory approvals and is anticipated to close by the second half of 2026.

- •Returned approximately $351 million of capital to shareholders through repurchases of common stock and dividends.

- •Renewed distribution agreements in the fourth quarter, covering more than 60% of our subscriber base.

- •Acquired the assets of WBNX-TV, an independent full power television station serving the Cleveland, OH market for a $22 million cash purchase price. On September 1, 2025, the station became affiliated with The CW.

- •Completed the refinancing of senior secured credit facilities on June 27, 2025, reducing the interest margin, increasing capacity under our revolver, and extending the maturities. During 2025, the Company repaid $185 million of its debt.

### *Overview of Operations*

As of February 26, 2026, we owned, operated, programmed or provided sales and other services to 201 full power television stations and one AM radio station, including those owned by VIEs, in 116 markets in 40 states and the District of Columbia. The stations are affiliates of ABC, NBC, FOX, CBS, The CW, MNTV and other broadcast television networks.

Through various local service agreements, we provided sales, programming and other services to 37 full power television stations owned by independent third parties, of which 35 full power television stations are VIEs that are consolidated into our financial statements. See Note 2 to our Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for a discussion of the local service agreements we have with these independent third parties. We do not own the consolidated VIEs or their television stations. However, we are deemed under U.S. GAAP to have controlling financial interests for financial reporting purposes in these entities because of (i) the local service agreements we have with their stations, (ii) our (excluding The CW) guarantee of the obligations incurred under Mission's senior secured credit facility, (iii) our power over significant activities affecting the consolidated VIEs' economic performance, including budgeting for advertising revenue, advertising sales and, in some cases, hiring and firing of sales force personnel and (iv) purchase options granted by each consolidated VIE which permit us to acquire the assets and assume the liabilities of each of these VIEs' stations, subject to FCC consent. In compliance with FCC regulations for all the parties, each of the consolidated VIEs maintains complete responsibility for and control over programming, finances and personnel for its stations.

As of December 31, 2025, we also own an 80.8% ownership interest in The CW, the fifth major broadcast network in the U.S., NewsNation, a national news network, two multicast networks, Antenna TV and REWIND TV, multicast network services provided to third parties, and a 31.3% ownership stake in TV Food Network. Our digital assets include 125 local websites and 229 mobile applications across local stations, NewsNation and The Hill. The portfolio also includes 110 CTV applications and three FAST channels from The CW and The Hill.

The Company generates revenue primarily from distribution and advertising. Distribution revenue consists of fees received for the retransmission of our stations' signals and for the carriage of our cable and broadcast networks by cable, satellite, and other MVPDs, vMVPDs, and direct-to-consumer OTT services. Advertising revenue is derived from the sale of local and national advertising across our stations, networks, websites, apps, and other digital platforms, including through third-party media partners. In even-numbered years, we also earn significant political advertising revenue from candidates, political action committees, political parties, and interest groups.

Our principal operating expenses include third-party programming, news production, promotion, sales, digital cost of goods sold, content creation, and other administrative and corporate costs.

For additional information, see Item 1. "Business" and Item 1A. "Risk Factors."

### *Merger Agreement with TEGNA*

On August 18, 2025, we entered into a definitive Merger Agreement to acquire the outstanding equity of TEGNA. TEGNA owns and operates 64 television stations and two radio stations in 51 DMAs in the U.S. The Merger is anticipated to close by the second half of 2026. Upon closing, the Merger is expected to increase our operational and geographic diversity and scale, enhance our presence in various localities and extend our footprint to additional areas experiencing contested elections. Pursuant to the Merger Agreement, we will acquire TEGNA's outstanding equity for a cash payment of $22 per share. The transaction is valued at an estimated $6.2 billion, which includes the estimated purchase price of $5.8 billion (comprising the Merger Consideration and the refinancing of certain existing TEGNA debt), financing fees and transaction costs and expenses. On August 18, 2025, we entered into a debt commitment letter, which was subsequently amended and restated on September 11, 2025, pursuant to which a syndicate of financial institutions committed to provide debt financing up to a maximum of $5.725 billion to consummate the Merger, the refinancing of certain of TEGNA's existing debt and related transactions.

The Merger Agreement has been approved by the boards of directors of both companies and by the stockholders of TEGNA. The consummation of the Merger is subject to the satisfaction of certain customary conditions, including receipt of regulatory approvals.

See Note 1 to our Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information.

### *Regulatory Developments*

As a television broadcaster, the Company is highly regulated, and its operations require that it retain or renew a variety of government approvals and comply with changing federal regulations. In December 2023, the FCC issued an order concluding its 2018 quadrennial review of certain media ownership rules. The order retained the local television ownership rule in its then-existing form without deregulatory changes while extending the rule to prohibit, in certain circumstances, the acquisition of a network affiliation that would establish a "top four" combination involving a network affiliated LPTV station or digital multicast stream. In a July 2025 decision on appeal of the FCC's 2018 quadrennial review order, a federal court of appeals vacated the "top four" portion of the local television ownership rule, which had generally prohibited common ownership of two of the top four highest-rated stations in a DMA. The court also vacated the December 2023 rule prohibiting certain "top four" combinations involving LPTV stations or digital multicast streams.

The FCC has not yet issued an order repealing the "top four" portion of the duopoly rule and the "top four" rule concerning LPTV stations and digital multicasts. Moreover, the FCC's 2022 quadrennial media ownership review and an FCC proceeding to review the current national limit on television ownership are currently pending. The FCC could reinstitute earlier television ownership restrictions or impose other limitations in these or any future reviews.

**Historical Performance**

*Results of Operations*

The following table sets forth the Company's operating results:

| | Years Ended December 31, | | | % Change | |
|---|---|---|---|---|---|
| | **2025** | **2024** | **2023** | **2025 vs 2024** | **2024 vs 2023** |
| Net revenue: | | | | | |
| Distribution | $ 2,924 | $ 2,928 | $ 2,727 | (0.1) | 7.4 |
| Advertising | 1,959 | 2,415 | 2,121 | (18.9) | 13.9 |
| Other | 66 | 64 | 85 | 3.1 | (24.7) |
| Net revenue | 4,949 | 5,407 | 4,933 | (8.5) | 9.6 |
| Operating expenses: | | | | | |
| Direct operating | 2,235 | 2,221 | 2,153 | 0.6 | 3.2 |
| Selling, general and administrative | 1,063 | 1,088 | 1,098 | (2.3) | (0.9) |
| Amortization of broadcast rights | 314 | 324 | 453 | (3.1) | (28.5) |
| Depreciation and amortization of intangible assets | 471 | 484 | 488 | (2.7) | (0.8) |
| Goodwill and long-lived asset impairments | 14 | 24 | 35 | (41.7) | (31.4) |
| Other | 3 | (2) | (2) | NM | NM |
| Total operating expenses | 4,100 | 4,139 | 4,225 | (0.9) | (2.0) |
| Income from operations | 849 | 1,268 | 708 | (33.0) | 79.1 |
| Income from equity method investments, net (excluding impairment) | 30 | 70 | 104 | | |
| Impairment of an equity method investment | (381) | - | - | | |
| Interest expense, net | (379) | (444) | (447) | | |
| Pension and other postretirement plans credit, net | 31 | 27 | 36 | | |
| Gain on disposal of an investment | - | 40 | - | | |
| Other expenses, net | - | (2) | - | | |
| Income before income taxes | 150 | 959 | 401 | | |
| Income tax expense | (67) | (276) | (131) | | |
| Net income | 83 | 683 | 270 | | |
| Net loss attributable to noncontrolling interests | 26 | 39 | 76 | | |
| Net income attributable to Nexstar Media Group, Inc. | $ 109 | $ 722 | $ 346 | | |

NM = Not Meaningful

***Year Ended December 31, 2025 Compared to Year Ended December 31, 2024***

The Company's revenues decreased 8.5% for the year ended December 31, 2025, compared to the same period in 2024, primarily due to lower revenues from advertising.

Distribution revenue decreased by $4 million primarily due to the impact of MVPD subscriber attrition and the nonrecurring resolution of a disputed customer claim, offset in part by annual rate escalators, growth in vMVPD subscribers, and the addition of CW affiliations on certain of our stations.

Advertising revenue decreased by $456 million, due to a decrease in political advertising by $446 million, as 2025 is not an election year, and a decrease in non-political revenue of $10 million due to ongoing advertising market softness.

Direct operating expenses, consisting primarily of programming, news and technical expenses, and selling, general and administrative expenses decreased by $11 million primarily due to recent restructuring initiatives to streamline key lines of business, offset in part by legal and professional fees related to the proposed merger with TEGNA, nonrecurring costs related to a disputed customer claim, and costs associated with the debt refinancing completed in June 2025.

Amortization of broadcast rights decreased by $10 million, primarily due to lower amortization of broadcast rights at The CW of $6 million to $253 million in 2025 from $259 million in 2024.

Depreciation and amortization of intangible assets decreased by $13 million, primarily driven by a decrease in depreciation expense associated with certain fully depreciated assets.

In 2025 and 2024, we recognized goodwill impairment charges of $14 million and $24 million, respectively, related to a digital business unit. These charges resulted from our annual impairment review of assets in the fourth quarter of each year.

Income from equity method investments, net (excluding impairment) decreased by $40 million, primarily due to decline in TV Food Network's net income resulting from lower revenue. Additional information regarding our investment in TV Food Network is provided in Note 6 to Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

In 2025, we recognized a non-cash impairment charge of $381 million pertaining to other-than-temporary impairment on our investment in TV Food Network, driven by ongoing pressures in the cable network industry and recent market data.

Interest expense, net decreased by $65 million, or 14.6%, primarily due to lower interest rates and a reduction in outstanding debt.

During the first quarter of 2024, Nexstar received $40 million in cash proceeds, and recorded a gain on disposal of an investment for the same amount, in connection with BMI's sale to New Mountain Capital.

The Company's effective tax rates during the years ended December 31, 2025 and 2024 were 44.7% and 28.8%, respectively. In 2025, nondeductible permanent differences accounted for a 12% increase to the effective tax rate, primarily driven by the impact of the other-than-temporary impairment included in pre-tax book income. Additionally, changes in the valuation allowance resulted in a 3.5% increase in the effective tax rate.

***Year Ended December 31, 2024 Compared to Year Ended December 31, 2023***

The Company's revenues increased 9.6% for the year ended December 31, 2024, compared to the same period in 2023, primarily due to higher revenues from political advertising and distribution, partially offset by lower revenue from non-political advertising.

Distribution revenue increased by $201 million primarily due to a dispute with an MVPD which caused Nexstar stations to be dark for 76 days during the third quarter in 2023, the benefit of distribution contract renewals in 2023 on terms favorable to the Company, annual rate escalators, growth in vMVPDs subscribers, the addition of CW affiliations on certain of our stations, and the return of partner stations on one MVPD in January 2024, which more than offset MVPD subscriber attrition.

Advertising revenue increased by $294 million primarily due to an increase of $426 million in political advertising as 2024 was an election year, offset in part by a decrease in non-political revenue of $132 million due to ongoing advertising market softness and political crowd-out.

Direct operating expenses, consisting primarily of programming, news and technical expenses, and selling, general and administrative expenses increased by $58 million primarily due to increased news expenses related to expansion of news programming, programming expenses primarily due to lower variable programming expenses in 2023 as a result of the period when Nexstar stations were dark, stock-based compensation expense from new restricted stock grants and the timing of restricted stock grants, and direct digital operating expenses, partially offset by lower expense from various administrative expenses.

Amortization of broadcast rights decreased by $129 million, primarily due to lower amortization of broadcast rights at The CW of $117 million to $259 million in 2024 from $376 million in 2023.

Depreciation and amortization of intangible assets decreased by $4 million, primarily due to lower amortization of intangible assets resulting from impairment recorded in 2023, partially offset by higher depreciation from asset purchases.

In 2024, we recorded a $24 million goodwill impairment related to a digital business unit. In 2023, we recorded $35 million of goodwill and intangible assets impairment attributable to a separate digital business unit. These charges resulted from our annual impairment review of assets in the fourth quarter of each year.

Income from equity method investments, net decreased by $34 million primarily due to a decrease in net income of TV Food Network, our largest equity method investment. TV Food Network's net income decreased primarily due to a decrease in its advertising revenue. For additional information on our investment in TV Food Network, refer to Note 6 to Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

In February 2024, Nexstar received $40 million in cash proceeds, and recorded a gain on disposal of an investment for the same amount, in connection with BMI's sale to New Mountain Capital.

The effective tax rates during the years ended December 31, 2024 and 2023 were 28.8% and 32.7%, respectively. Changes in the valuation allowance resulted in a 2.3% decrease to the effective tax rate. Other permanent differences, including a reduction in losses related to the minority interest in The CW, resulted in a 3.1% decrease to the effective tax rate. This was partially offset by provision to return and other reserve adjustments which resulted in a 1.6% increase in the effective tax rate.

**Liquidity and Capital Resources**

The Company is leveraged, which makes it vulnerable to changes in general economic conditions. The Company's ability to repay or refinance its debt will depend on, among other things, financial, business, market, competitive and other conditions, many of which are beyond the Company's control. The Company's primary sources of liquidity include cash on hand, borrowing capacity under its revolving credit facilities (with a maturity date of June 2030) and cash generated from operations. The Company believes these sources of liquidity are sufficient to meet its business operating requirements, its capital expenditures and to continue to service its debt for at least the next 12 months as of the filing date of this Annual Report on Form 10-K. As of December 31, 2025, the Company was in compliance with the financial covenants contained in the amended credit agreements governing its senior secured credit facilities.

Any future adverse economic conditions, including those resulting from sustained inflation, high interest rates and supply chain disruptions, could adversely affect the Company's future operating results, cash flows and financial condition.

*Cash Flow Summary*

The following tables present the Company's total operating, investing and financing activity cash flows for the three years ended December 31 (in millions):

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Net cash provided by operating activities | $ 891 | $ 1,250 | $ 999 |
| Net cash used in investing activities[1] | (173) | (102) | (173) |
| Net cash used in financing activities | (582) | (1,151) | (899) |
| Net increase (decrease) in cash, cash equivalents and restricted cash | $ 136 | $ (3) | $ (73) |
| Cash paid for interest | $ 372 | $ 431 | $ 437 |
| Income taxes paid, net of refunds[2] | $ 208 | $ 254 | $ 169 |

[1]In 2025, 2024 and 2023, the investing activities included total capital expenditures of $148 million, $145 million and $149 million.

[2]In 2024, income taxes paid, net of refunds, includes $11 million in tax payments related to a gain from disposal of an investment.

| | As of December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Cash, cash equivalents and restricted cash | $ 280 | $ 144 |

*Cash Flows—Operating Activities*

Net cash provided by operating activities decreased by $359 million in 2025 compared to 2024, primarily due to lower net income and changes in operating assets and liabilities primarily reflecting timing of receipts and payments. In 2024, net cash

36

provided by operating activities increased by $251 million compared to 2023, mainly due to higher net income and changes in operating assets and liabilities primarily reflecting timing of receipts and payments.

### Cash Flows—Investing Activities

Net cash flows used in investing activities increased by $71 million in 2025 compared to 2024, primarily due to a $22 million acquisition, a decrease in proceeds received from disposal of an investment of $40 million, and a $3 million increase in capital expenditures.

Net cash flows used in investing activities decreased by $71 million in 2024 compared to 2023, mainly due to $40 million proceeds received from the disposal of an investment in connection with BMI's sale to New Mountain Capital and a $38 million decrease in cash used for acquisitions.

### Cash Flows—Financing Activities

Net cash flows used in financing activities decreased by $569 million in 2025 compared to 2024, primarily due to a $476 million decrease in stock repurchases and a $125 million decrease in debt repayments, partially offset by a $19 million decrease in contributions received from noncontrolling interests.

Net cash flows used in financing activities increased by $252 million in 2024 compared to 2023, mainly due to the $203 million prepayment of Term Loan B, a $43 million decrease in contributions from noncontrolling interests, and a $28 million increase in common stock dividends paid, offset in part by $16 million lower cash paid for shares withheld for taxes.

### Material Cash Requirements

The Company is a party to many contractual obligations involving commitments to make payments to third parties. Certain contractual obligations are recorded on the Consolidated Balance Sheet as of December 31, 2025, while others are considered future commitments. The following summarizes the Company's contractual obligations as of December 31, 2025, and the effect such obligations are expected to have on the Company's short-term and long-term liquidity and capital resource needs (in millions):

| | Total | | 2026 | | Payments Due by Period 2027 - 2028 | | 2029 - 2030 | | Thereafter |
|---|---|---|---|---|---|---|---|---|---|
| **Recorded contractual obligations:** | | | | | | | | | |
| Nexstar senior secured credit facility | $ | 3,298 | $ | 108 | $ | 217 | $ | 1,741 | $ | 1,232 |
| Mission senior secured credit facility | | 349 | | 3 | | 284 | | 62 | | - |
| 5.625% senior unsecured notes due 2027 | | 1,714 | | - | | 1,714 | | - | | - |
| 4.75% senior unsecured notes due 2028 | | 1,000 | | - | | 1,000 | | - | | - |
| Operating lease obligations | | 345 | | 53 | | 93 | | 79 | | 120 |
| Broadcast rights current cash commitments[1] | | 68 | | 48 | | 17 | | 3 | | - |
| Other[2][3] | | 42 | | 13 | | 17 | | 4 | | 8 |
| **Unrecorded contractual obligations:** | | | | | | | | | |
| Network affiliation agreements[4] | | 806 | | 662 | | 144 | | - | | - |
| Cash interest on debt[5] | | 1,325 | | 360 | | 542 | | 305 | | 118 |
| Executive employee contracts[6] | | 100 | | 54 | | 45 | | 1 | | - |
| Broadcast rights future cash commitments[7] | | 1,008 | | 237 | | 341 | | 299 | | 131 |
| Other | | 113 | | 68 | | 44 | | 1 | | - |
| | $ | 10,168 | $ | 1,606 | $ | 4,458 | $ | 2,495 | $ | 1,609 |

[1]Future minimum payments for license agreements for which the license period has begun and liabilities have been recorded.

[2]As of December 31, 2025, we had $33 million of unrecognized tax benefits, inclusive of interest and certain deduction benefits. This liability represents an estimate of tax positions that the Company has taken in its tax returns, which may ultimately not be sustained upon examination by the tax authorities. The resolution of these tax positions may not require cash settlement due to the existence of federal and state NOLs. As such, our contractual obligations table above excludes this liability.

[3]As of December 31, 2025, we had $154 million and $16 million of funding obligations with respect to our pension benefit plans and other postretirement benefit plans, respectively, which are not included in the table above. See Note 10 to our Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for further information regarding our funding obligations for these benefit plans.

[4]Future minimum payments for network affiliation agreements during the contract period. Excludes network affiliation agreements between the Company's stations and The CW as the related fees are eliminated in consolidation.

(5)Estimated interest payments due as if all debt outstanding as of December 31, 2025 remained outstanding until maturity, based on interest rates in effect at December 31, 2025.

(6)Includes the employment contracts for all corporate executive employees and general managers of our stations and entities. We expect our contracts will be renewed or replaced with similar agreements upon their expiration. Amounts included in the table above assume that contracts are not terminated prior to their expiration.

(7)Future minimum payments for license agreements for which the license period has not commenced and no liability has been recorded.

On August 18, 2025, Nexstar entered into the Merger Agreement with TEGNA. The transaction is anticipated to close by the second half of 2026, subject to the satisfaction of certain customary conditions, including receipt of regulatory approvals. The transaction is valued at an estimated $6.2 billion, which includes the estimated purchase price of $5.8 billion (comprising the Merger Consideration and the refinancing of certain existing TEGNA debt), financing fees and transaction costs and expenses. The agreement contains certain termination rights for both parties, including termination fees under certain circumstances. Nexstar also received committed financing from a group of commercial banks to fund the Merger with TEGNA and related transactions. See Note 1 to our Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information.

As of December 31, 2025, the remaining available amount under the share repurchase authorization was $1.4 billion. No shares were repurchased from that date through the filing of this Annual Report on Form 10-K.

On January 30, 2026, our board of directors declared a quarterly cash dividend of $1.86 per share of its common stock. The dividend is payable on February 27, 2026 to stockholders of record on February 13, 2026.

### Long-term debt

As of December 31, 2025, the Company had total outstanding debt of $6.3 billion, net of unamortized financing costs, discounts and premium, which represented 75.4% of the Company's combined capitalization. The Company's high level of debt requires that a substantial portion of cash flow be dedicated to pay principal and interest on debt, which reduces the funds available for working capital, capital expenditures, acquisitions and other general corporate purposes.

| ($ in millions) | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2025 | | 2024 | |
| Nexstar senior secured credit facility | $ | 3,298 | $ | 3,479 |
| Mission senior secured credit facility | | 349 | | 352 |
| 5.625% Notes, due July 2027 | | 1,714 | | 1,714 |
| 4.75% Notes, due November 2028 | | 1,000 | | 1,000 |
| Total outstanding principal | | 6,361 | | 6,545 |
| Less: Unamortized financing costs, discounts and premium, net | | (28) | | (22) |
| Total outstanding debt | $ | 6,333 | $ | 6,523 |
| | | | | |
| Unused revolving loan commitments under senior secured credit facilities (1) | $ | 600 | $ | 545 |

(1)Based on the covenant calculations as of December 31, 2025, all of the $586 million (net of outstanding standby letters of credit of $20 million) and $14 million unused revolving loan commitments under the respective Nexstar and Mission senior secured credit facilities were available for borrowing.

We (excluding The CW) guarantee full payment of all obligations incurred under Mission's senior secured credit facility in the event of its default. Mission is a guarantor of our senior secured credit facility, our 5.625% Notes, due July 2027 and our 4.75% Notes, due November 2028. In consideration of our guarantee of Mission's senior secured credit facility, Mission has granted us purchase options to acquire the assets and assume the liabilities of each Mission station, subject to FCC consent. These option agreements (which expire on various dates between 2026 and 2034) are freely exercisable or assignable by us without consent or approval by Mission or its shareholders. We expect these option agreements to be renewed upon expiration.

We make semiannual interest payments on the 5.625% Notes, due July 2027 on January 15 and July 15 of each year. We make semiannual interest payments on our 4.75% Notes, due November 2028 on May 1 and November 1 of each year. Interest payments on our and Mission's senior secured credit facilities are generally paid every one to three months and are payable based on the type of interest rate selected.

The terms of our and Mission's senior secured credit facilities, as well as the indentures governing our 5.625% Notes, due July 2027 and 4.75% Notes, due November 2028, limit, but do not prohibit us or Mission from incurring substantial amounts of additional

debt in the future. Our senior secured credit facilities and the indentures governing our existing notes may limit the amount of dividends we may pay to stockholders and share repurchases we may make.

The Company does not have any rating downgrade triggers that would accelerate the maturity dates of its debt. However, a downgrade in the Company's credit rating could adversely affect its ability to renew the existing credit facilities, obtain access to new credit facilities or otherwise issue debt in the future and could increase the cost of such debt.

The Company's ability to access funds under its senior secured credit facilities depends, in part, on its compliance with certain financial covenants. Any additional drawings under the senior secured credit facilities will reduce the Company's future borrowing capacity and the amount of total unused revolving loan commitments. Any future adverse economic conditions, including those resulting from sustained inflation and high interest rates, could adversely affect our future operating results and cash flows and may cause us to seek alternative sources of funding, including accessing capital markets, subject to market conditions. Such alternative sources of funding may not be available on commercially reasonable terms or at all.

The Nexstar credit agreement contains a covenant which requires us to comply with a maximum consolidated first lien net leverage ratio of 4.25 to 1.00. Pursuant to the Nexstar credit agreement, this covenant ratio at Nexstar's election will increase to 4.75:1.00 with respect to the last day of the fiscal quarter during which a Material Transaction (as defined therein) shall have been consummated and the last day of each of the immediately following three consecutive fiscal quarters; provided that no more than two such elections will be made during the life of the facility. The financial covenant, which is formally calculated on a quarterly basis, is based on the Company's combined results, excluding the operating results of The CW, which Nexstar designated as an unrestricted subsidiary under its credit agreements and indentures. The Mission credit agreement does not contain financial covenant ratio requirements but does provide for default in the event we do not comply with all covenants contained in our credit agreement. As of December 31, 2025, we were in compliance with our financial covenants. We believe the Company will be able to maintain compliance with all covenants contained in the credit agreements governing its senior secured facilities and the indentures governing Nexstar's 5.625% Notes, due July 2027 and Nexstar's 4.75% Notes, due November 2028 for a period of at least the next 12 months as of the filing date of this Annual Report on Form 10-K.

### Off-Balance Sheet Arrangements

As of December 31, 2025, we did not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or VIEs, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. All of our arrangements with our VIEs in which we are the primary beneficiary are on-balance sheet arrangements. Our variable interests in other entities are obtained through local service agreements, which have valid business purposes and transfer certain station activities from the station owners to us. We are, therefore, not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

As of December 31, 2025, we have outstanding standby letters of credit with various financial institutions amounting to $20 million. The outstanding balance of standby letters of credit is deducted against our unused revolving loan commitment under our senior secured credit facility and would not be available for withdrawal.

### Issuer and Guarantor Summarized Financial Information

Nexstar Media Inc. (the "Issuer") is the issuer of 5.625% Notes, due July 2027 and 4.75% Notes, due November 2028. These notes are fully and unconditionally guaranteed, jointly and severally, by Nexstar Media Group, Inc. ("Parent"), Mission (a consolidated VIE) and the Subsidiary Guarantors (as defined below). The Issuer, Subsidiary Guarantors, Parent and Mission are collectively referred to as the "Obligor Group" for the 5.625% Notes, due July 2027 and 4.75% Notes, due November 2028. "Subsidiary Guarantors" refers to certain of the Issuer's restricted subsidiaries (excluding The CW) that guarantee these notes. The guarantees of the notes are subject to release in limited circumstances upon the occurrence of certain customary conditions set forth in the indentures governing the 5.625% Notes, due July 2027 and the 4.75% Notes, due November 2028. The 5.625% Notes, due July 2027 and 4.75% Notes, due November 2028 are not registered with the SEC.

The following combined summarized financial information is presented for the Obligor Group after elimination of intercompany transactions between Parent, Issuer, Subsidiary Guarantors and Mission in the Obligor Group and amounts related to investments in any subsidiary that is a non-guarantor. This information is not intended to present the financial position or results of operations of the consolidated group of companies in accordance with U.S. GAAP.

### Summarized Balance Sheet Information for the Obligor Group as of December 31 (in millions):

| | 2025 | | 2024 | |
|---|---|---|---|---|
| Current assets – external[1] | $ | 1,337 | $ | 1,149 |
| Current assets – due from consolidated entities outside of Obligor Group | | 10 | | 11 |
| Total current assets | $ | 1,347 | $ | 1,160 |
| Noncurrent assets – external[1][2] | | 8,759 | | 9,066 |
| Noncurrent assets – due from consolidated entities outside of Obligor Group | | 72 | | 74 |
| Total noncurrent assets | $ | 8,831 | $ | 9,140 |
| Total current liabilities[1] | $ | 652 | $ | 685 |
| Total noncurrent liabilities[1] | $ | 8,039 | $ | 8,387 |
| Noncontrolling interests | $ | - | $ | - |

[1]Excludes the assets and liabilities of The CW as it is not a guarantor of the 4.75% Notes, due November 2028 and 5.625% Notes, due July 2027.

[2]Excludes Issuer's equity investments of $396 million and $877 million as of December 31, 2025 and 2024, respectively, in unconsolidated investees. These unconsolidated investees do not guarantee the 4.75% Notes, due November 2028 and 5.625% Notes, due July 2027. For additional information on equity investments, refer to Note 6 to our Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information.

### *Summarized Statements of Operations Information for the Obligor Group (in millions):*

| | Year Ended December 31, 2025 | |
|---|---|---|
| Net revenue – external | $ | 4,741 |
| Net revenue – from consolidated entities outside of Obligor Group | | 16 |
| Total net revenue | | 4,757 |
| Costs and expenses – external | | 3,734 |
| Costs and expenses – to consolidated entities outside of Obligor Group | | 72 |
| Total costs and expenses | | 3,806 |
| Income from operations | $ | 951 |
| Net income | $ | 534 |
| Net income attributable to Obligor Group | $ | 534 |
| Income from equity method investments, net (excluding impairment) | $ | 30 |

## Critical Accounting Estimates

Our Consolidated Financial Statements have been prepared in accordance with U.S. GAAP, which requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, revenue and expenses and related disclosures. On an ongoing basis, we base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ from those estimates, and any such differences could be material to our Consolidated Financial Statements.

For a summary of our significant accounting policies, we refer you to Note 2 to our Consolidated Financial Statements in Part IV, Item 15(a) of this Annual Report on Form 10-K.

We believe the following critical accounting estimates are those that are the most important to the presentation of our Consolidated Financial Statements, affect our more significant estimates and assumptions, and require the most subjective or complex judgments by management.

### *Consolidation of Variable Interest Entities*

We regularly evaluate our local service agreements and other arrangements where we may have variable interests to determine whether we are the primary beneficiary of a VIE. Under U.S. GAAP, a company must consolidate an entity when it has a "controlling financial interest" resulting from ownership of a majority of the entity's voting rights. Accounting rules expanded the definition of controlling financial interest to include factors other than equity ownership and voting rights.

In applying accounting and disclosure requirements, we must base our decision to consolidate an entity on quantitative and qualitative factors that indicate whether or not we have the power to direct the activities of the entity that most significantly affect its economic performance and whether or not we have the obligation to absorb losses of the entity or the right to receive benefits from the entity that could potentially be significant to the VIE. Our evaluation of the "power" and "economics" model must be an ongoing process and may alter as facts and circumstances change.

Mission and the other consolidated VIEs are included in our Consolidated Financial Statements because we are deemed to have controlling financial interests in these entities as VIEs for financial reporting purposes as a result of (i) local service agreements we have with the stations they own, (ii) Nexstar's (excluding The CW) guarantee of the obligations incurred under Mission's senior secured credit facility, (iii) our power over significant activities affecting these entities' economic performance, including budgeting for advertising revenue, advertising sales and, in some cases, hiring and firing of sales force personnel and (iv) purchase options granted by each consolidated VIE which permit Nexstar to acquire the assets and assume the liabilities of all of these VIEs' stations at any time, subject to FCC consent. These purchase options are freely exercisable or assignable by Nexstar without consent or approval by the VIEs. These option agreements expire on various dates between 2026 and 2034. We expect to renew these option agreements upon expiration. Therefore, these VIEs are consolidated into these financial statements.

### *Valuation of Goodwill and Intangible Assets*

Intangible assets represented $7.4 billion, or 68.7%, of our total assets as of December 31, 2025. Intangible assets consist primarily of goodwill, indefinite-lived intangible assets (such as FCC licenses), and definite-lived intangible assets (such as network affiliation agreements).

The purchase prices of acquired businesses are allocated to the assets and liabilities acquired at estimated fair values at the date of acquisition using various valuation techniques, including discounted projected cash flows, the replacement cost approach and other income, market or cost approaches.

The estimated fair value of an FCC license acquired in a business combination is calculated using a discounted projected cash flow model referred to as the Greenfield Method. The Greenfield Method attempts to isolate the income that is attributable to the license alone. This approach is based upon modeling a hypothetical start-up station and building it up to a normalized operation that, by design, lacks an affiliation with a network (commonly known as an independent station), lacks inherent goodwill and whose other assets have essentially been added as part of the build-up process. The Greenfield Method assumes annual cash flows over a projection period model. Inputs to this model include, but are not limited to, (i) a four-year build-up period for a start-up station to reach a normalized state of operations, (ii) television market long-term revenue growth rate over a projection period, (iii) estimated market revenue share for a typical market participant without a network affiliation, (iv) estimated profit margins based on industry data, (v) capital expenditures based on the size of market and the type of station being constructed, (vi) estimated tax rates in the appropriate jurisdiction, and (vii) an estimated discount rate using a weighted average cost of capital analysis. The Greenfield Method also includes an estimated terminal value by discounting an estimated annual cash flow with an estimated long-term growth rate.

The assumptions used in estimating the fair value of a network affiliation agreement acquired in a business combination are similar to those used in the valuation of an FCC license. The Greenfield Method is also utilized in the valuation of network affiliation agreements except that the estimated market revenue share, estimated profit margins, capital expenditures and other assumptions reflect a market participant premium based on the programming of a network affiliate relative to an independent station. This approach would result in an estimated collective fair value of the FCC license and a network affiliation agreement. The excess of the estimated fair value in this model over the estimated value of an FCC license of an independent station under the Greenfield Method represents the estimated fair value of a network affiliation agreement.

Goodwill represents the excess of the purchase price of a business over the fair value of the net assets acquired.

Subsequent to acquisition, goodwill and FCC licenses are tested for impairment in the fourth quarter each year, or more frequently whenever events or changes in circumstances indicate that such assets might be impaired. For purposes of goodwill impairment tests, the Company has one aggregated television stations reporting unit, because of the stations' similar economic characteristics, one cable network reporting unit and two digital business reporting units. The Company's impairment review for FCC licenses is performed at the television station market level.

The Company first assesses the qualitative factors to determine the likelihood of goodwill and FCC licenses being impaired. The qualitative impairment test includes, but is not limited to, assessing the changes in macroeconomic conditions, regulatory environment, industry and market conditions, and the financial performance versus budget of the reporting units, as well as any other events or circumstances specific to the reporting unit or the FCC licenses. If it is more likely than not that the fair value of a reporting unit or an FCC license is greater than its respective carrying amount, no further testing will be required. Otherwise, the quantitative impairment test method is applied.

The quantitative impairment test for goodwill is performed by comparing the fair value of a reporting unit with its carrying amount. If the fair value of the reporting unit exceeds its carrying value, goodwill is not impaired and no further testing is required. If the fair value of the reporting unit is less than the carrying value, an impairment charge is recognized for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. The quantitative impairment test for FCC licenses consists of a market-by-market

41

comparison of the carrying amounts of FCC licenses with their fair values, using the Greenfield Method of discounted cash flow analysis. An impairment is recorded when the carrying value of an FCC license exceeds its fair value.

We test our definite-lived intangible assets and other long-lived assets to be held and used for impairment whenever events or circumstances indicate that their carrying amount may not be recoverable, relying on certain factors including operating results, business plans, economic projections and anticipated future cash flows. The carrying value of a long-lived asset or asset group is considered impaired when the projected future undiscounted cash flows to be generated from the asset or asset group over its remaining life, or primary asset's life, plus any proceeds from the eventual disposition are less than its carrying value. The Company measures impairment based on the amount by which the carrying value exceeds the estimated fair value of the long-lived asset or asset group. The fair value is determined primarily by using the projected future cash flows discounted at a rate commensurate with the risk involved as well as market valuations.

In the fourth quarter of 2025, using the qualitative impairment test, the Company performed its annual impairment assessment on goodwill attributable to its aggregated television stations reporting unit and cable reporting unit. Based on the results of such qualitative impairment tests, the Company concluded that it was more likely than not that the reporting unit's fair value would sufficiently exceed the related carrying amount.

With respect to goodwill allocated to a digital reporting unit, the Company elected to perform quantitative impairment tests due to recent performance and uncertain economic conditions. The Company's assessment indicated that its fair value was less than its carrying amount, therefore the Company recorded a goodwill impairment of $14 million. We estimated the reporting unit's fair value based on a valuation report prepared by a third-party valuation firm who used a combination of an income approach, which employs a discounted cash flow model, and a market approach, which based the valuation on earnings multiples of comparable publicly traded digital media businesses and market net revenue multiples of comparable digital media transactions. As of December 31, 2025, the remaining goodwill of this reporting unit was $31 million. The likelihood of a material impairment is mitigated by the reduced book value of remaining goodwill.

Our quantitative goodwill impairment tests are sensitive to changes in key assumptions used in our analysis. In our income approach models, if our projections of revenue growth rates and margins are not realized, if market factors outside of our control, such as increases in discount rates, occur, or if management's expectations or plans change, including changes to a reporting unit's long-term operating plans, the Company's goodwill and other key assets could be impaired in the future. With respect to net revenue and earnings multiples, the key uncertainties are determining the reporting unit's comparable public companies, comparable transactions and the selection of the market multiples.

The Company performed its annual impairment assessment on FCC licenses for each television station market using the qualitative impairment test. Based on the results of such qualitative impairment tests, the Company concluded that it was more likely than not that their fair values would sufficiently exceed the related carrying amount.

The Company also evaluated its definite-lived intangible assets and other long-lived assets as to whether events or changes in circumstances indicate that such assets may be impaired. Based on our estimate of undiscounted future pre-tax cash flows expected to result from the use and eventual disposition of these assets, the Company determined that the carrying amounts are recoverable. No other events or circumstances were noted in 2025 that would indicate impairment.

### *Valuation of Investments*

We account for investments in which we own at least 20% of an investee's voting securities or we have significant influence over an investee under the equity method of accounting. We record equity method investments at cost. For investments acquired in a business combination, the cost is the estimated fair value allocated to the investment. We evaluate our equity method investments for other-than-temporary impairment ("OTTI") on at least a quarterly basis, and more frequently when economic or market conditions warrant such an evaluation. If the fair value of the investment is below the carrying value, an impairment charge is recorded.

During the fourth quarter of 2025, we identified indicators of OTTI related to our 31.3% equity investment in TV Food Network, including continued softness in the U.S. linear advertising market for entertainment cable networks, declining MVPD subscribers and demand for entertainment cable networks by viewers and distributors, ongoing shifts in consumer preferences toward streaming services and other digital products and additional market data from recent spin-offs involving cable networks. We estimated the fair value of the investment using a valuation prepared by an independent third-party firm applying both income and market approaches. The income approach utilized a discounted cash flow model based on a five-year projection period, a 9.25% discount rate, and a terminal value incorporating a long-term cash flow growth rate of -3%. The market approach considered earnings multiples of comparable publicly traded businesses. Based on this analysis, we concluded that the fair value of our investment was below its carrying amount. As a result, we recorded a pre-tax, non-cash impairment charge of $381 million. The OTTI

42

was recorded in "Impairment of an equity method investment" in the Consolidated Statements of Operations in Part IV, Item 15(a) of this Annual Report on Form 10-K.

Fair value estimates related to our investment in TV Food Network are sensitive to changes in the key assumptions used. Under the income approach, our lack of control over TV Food Network introduces significant uncertainty in the projected operating results. If projected revenue or cash flows are not achieved due to changes in TV Food Network's strategic or operational plans, if the projected long-term decline rate increases, or if external market forces such as increases in discount rates occur, the estimated fair value of our investment could decline further, potentially resulting in additional impairment charges. When applying market approaches, key uncertainties include the identification of appropriate comparable public companies, the lack of recent comparable market transactions, and the selection of market multiples.

### *Pension plans and other postretirement benefits*

A determination of the liabilities and cost of Nexstar's pension and other postretirement plans ("OPEB") requires the use of assumptions. The actuarial assumptions used in the pension and postretirement reporting are reviewed annually with independent actuaries and are compared with external benchmarks, historical trends and Nexstar's own experience to determine that its assumptions are reasonable. The assumptions used in developing the required estimates include the following key factors:

- discount rates

- expected return on plan assets

- mortality rates

- retirement rates

- expected contributions

As of December 31, 2025, the effective discount rate used for determining pension benefit obligations was 5.13%. During 2025, the assumptions utilized in determining net periodic benefit credit on our pension plans were (i) 5.82% to 6.59% expected rate of return on plan assets and (ii) 5.44% effective discount rates. As of December 31, 2025, our pension plans' benefit obligations were $1.6 billion. For the year ended December 31, 2025, our pension plans' net periodic benefit credit was $30 million. As of December 31, 2025, a 1% change in the discount rates would have the following effects (in millions):

|  | 1% Increase | 1% Decrease |
|---|---|---|
| Projected impact on net periodic benefit credit | $ 2 | $ (4) |
| Projected impact on pension benefit obligations | (111) | 127 |

For additional information on our pension and OPEB, see Note 10 to our Consolidated Financial Statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

### *Distribution Revenue*

We earn revenues from MVPDs and vMVPDs for the retransmission of our broadcasts and the carriage of NewsNation. These revenues are generally earned based on a price per subscriber of the distributor within the retransmission or carriage area. The distributors report their subscriber numbers to us generally on a 30- to 60-day lag, generally upon payment of the fees due to us. Prior to receiving the reports, we record revenue based on management's estimate of the number of subscribers, utilizing historical levels and trends of subscribers for each distributor. Adjustments associated with the resolution of such estimates have, historically, been inconsequential.

### *Income Taxes*

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the carrying amounts and tax basis of assets and liabilities. A valuation allowance is applied against net deferred tax assets if, based on the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. While we have considered future taxable income in assessing the need for a valuation allowance, in the event that we were to determine that we would not be able to realize all or part of our deferred tax assets in the future, an adjustment to the valuation allowance would be charged to income in the period such a determination was made.

We recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities. The determination is based on the technical merits of the position and presumes that each uncertain tax position will be examined by the relevant taxing authority that has full knowledge of all relevant information.

The estimate of the Company's tax liabilities relating to uncertain tax positions requires management to assess uncertainties and to make judgments about the application of complex tax laws and regulations. We recognize interest and penalties relating to income taxes as components of income tax expense.

**Recent Accounting Pronouncements**

Refer to Note 2 of our Consolidated Financial Statements in Part IV, Item 15(a) of this Annual Report on Form 10-K for a discussion of recently issued accounting pronouncements, including our expected date of adoption and effects on results of operations and financial position.

## Item 7A.  Quantitative and Qualitative Disclosures About Market Risk

### Interest Rate Risk

The Company's exposure to market risk for changes in interest rates relates primarily to its long-term debt obligations.

The term loan borrowings under the Company's senior secured credit facilities bear interest at rates ranging from 5.20% to 6.20% as of December 31, 2025, which represent (i) the base rate, the SOFR plus (ii) a credit spread adjustment, and (iii) the applicable margin, as defined. Interest is payable in accordance with the credit agreements.

Based on the outstanding balances of the Company's senior secured credit facilities (term loans and revolving loans) as of December 31, 2025, an increase in each of SOFR by 100 basis points would increase our annual interest expense and decrease our cash flow from operations by $36 million (excluding tax effects). A decrease in each of SOFR by 100 basis points would decrease our annual interest expense and increase our cash flow from operations by $36 million (excluding tax effects). Our 5.625% Notes due July 2027 and 4.75% Notes due November 2028 are fixed rate debt obligations and therefore are not exposed to market interest rate changes. As of December 31, 2025, the Company has no financial instruments in place to hedge against changes in the benchmark interest rates on its senior secured credit facilities.

## Item 8.  Financial Statements and Supplementary Data

Our Consolidated Financial Statements are filed with this report. The Consolidated Financial Statements and Supplementary Data are included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

## Item 9.  Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A.  Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Nexstar's management, with the participation of its Chairman and Chief Executive Officer along with its Chief Financial Officer, conducted an evaluation as of the end of the period covered by this Annual Report of the effectiveness of the design and operation of Nexstar's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act.

Based upon that evaluation, Nexstar's Chairman and Chief Executive Officer and its Chief Financial Officer concluded that as of December 31, 2025, Nexstar's disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed in the reports that it files or submits under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) is accumulated and communicated to Nexstar's management, including its Chairman and Chief Executive Officer and its Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

### Changes in Internal Control over Financial Reporting

During the quarterly period as of the end of the period covered by this report, there have been no changes in Nexstar's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

### Management's Report on Internal Control over Financial Reporting

Nexstar's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. Management assessed the effectiveness of our internal control over financial reporting as of

December 31, 2025 based upon the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control—Integrated Framework (2013)*.

Based on management's assessment, we have concluded that our internal control over financial reporting was effective as of December 31, 2025.

PricewaterhouseCoopers LLP, an independent registered public accounting firm, has audited the effectiveness of our internal control over financial reporting as of December 31, 2025 as stated in their report which appears herein.

**Item 9B.  Other Information**

(a) None.

(b) None of the Company's directors or officers adopted, modified, or terminated a Rule 10b5-1 trading arrangement or a non-Rule 10b5-1 trading arrangement during the Company's fiscal quarter ended December 31, 2025.

**Item 9C.  Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

**PART III**

**Item 10.  Directors, Executive Officers and Corporate Governance**

Information concerning directors that is required by this Item 10 will be set forth in and is incorporated herein by reference from the Proxy Statement to be provided to stockholders in connection with our 2026 Annual Meeting of Stockholders (the "Proxy Statement").

**Information about our Executive Officers**

The current executive officers of the Company are:

| Name | Age | Nexstar Position |
|---|---|---|
| Perry A. Sook | 68 | Chairman and Chief Executive Officer |
| Michael Biard | 57 | President and Chief Operating Officer |
| Lee Ann Gliha | 51 | Executive Vice President and Chief Financial Officer |
| Andrew Alford | 64 | President, Broadcasting |
| Sean Compton | 52 | President, Networks |
| Dan Lanzano | 40 | President, National Advertising Sales |
| Dana Zimmer | 55 | President, Distribution and Strategy |
| Brett Jenkins | 55 | Executive Vice President and Chief Technology and Digital Officer |
| Rachel Morgan | 54 | Executive Vice President and General Counsel |
| Blake Russell | 55 | Executive Vice President, Operations |
| Gary Weitman | 69 | Executive Vice President and Chief Communications Officer |
| Scott Weaver | 46 | Executive Vice President, Government Relations |

**Perry A. Sook** has served as the Chairman and Chief Executive Officer of Nexstar since its inception in 1996. Mr. Sook founded Nexstar with one local television station in Scranton, PA and led its growth into the leading diversified media company and the largest local television broadcaster in the United States it is today. Mr. Sook has over 45 years of professional experience in broadcasting covering all facets of the business, including ownership and M&A, management, sales, on-air talent and news. Mr. Sook is a member of the board of directors of the Broadcasters Foundation of America.

**Michael Biard** was appointed President and Chief Operating Officer in August 2023. Mr. Biard is responsible for oversight of divisional operations, long-term strategy, and various corporate and administrative functions, including broadcasting, networks, distribution, and advertising sales. Prior to joining Nexstar, Mr. Biard served as President, Operations and Distribution, for Fox Corporation, overseeing Fox's studio operations and corporate real estate; serving as a member of the senior team responsible for sports rights strategy and acquisition; and leading multi-platform content distribution, including distribution strategy, affiliate marketing and affiliate-related business affairs and operations for all of its media brands from November 2018 to August 2023. From November 2013 to October 2018, Mr. Biard served as President, Distribution for Fox Networks Group, a division of 21st Century Fox. Mr. Biard is a member of the board of directors of the National Association of Broadcasters and EdgeBeam Wireless, LLC.

**Lee Ann Gliha** was appointed Executive Vice President and Chief Financial Officer in August 2021. Ms. Gliha oversees all financial aspects of the Company's business, including internal and external financial reporting, internal audit, investor relations, and treasury and capital markets functions, and has a prominent role in strategic planning, business development, and mergers and acquisitions. From April 2016 to July 2021, Ms. Gliha served as a Managing Director at Jefferies LLC ("Jefferies"). Prior to joining Jefferies, Ms. Gliha worked as an investment banker at Houlihan Lokey focused on the media and out-of-home entertainment sectors from 2008 to 2016 most recently as Managing Director. Before joining Houlihan Lokey, Ms. Gliha held a variety of positions of increasing responsibility in the banking and finance industry at companies such as UBS Investment Bank and Banc of America Securities. She also previously worked at Live Nation, Inc., where she served as Executive Vice President of Corporate Finance from 2006 to 2008 and was responsible for the company's mergers and acquisitions, financing, and investor relations functions. Ms. Gliha is a member of the board of directors of the National Hot Rod Association and the management committee of Television Food Network, G.P., the owner of the Food Network and the Cooking Channel.

**Andrew Alford** was appointed President, Broadcasting in June 2021. He is responsible for the Company's local television and digital operations including content and sales. From August 2017 until his current appointment, Mr. Alford served as a Senior Vice President and Regional Manager at Nexstar. Between 2014-2017, Mr. Alford was Vice President and General Manager of WFLA-TV and WTTA-TV, Tampa's NBC and MyNet affiliates. Before moving to Tampa, he served as Vice President of Sales for Media General,

Vice President and General Manager of WTEN-TV, an ABC affiliate, in Albany, NY and WXXA-TV, a Fox affiliate, under a shared services and joint sales agreement. Prior to Albany, Mr. Alford spent a total of seven years at WGCL-TV in Atlanta, most recently as Vice President and General Manager. He has also served in broadcast management roles in the Orlando, FL, Syracuse, NY and Rochester, NY markets. Mr. Alford currently serves as President of Television Bureau of Advertising and is a member of the board of directors of the NBC Affiliate Board.

***Sean Compton*** was appointed President, Networks in November 2020. He is responsible for the long-term strategy and day-to-day operations of The CW Network, NewsNation, Antenna TV, REWIND TV, Nexstar programming acquisitions, The Hill and WGN Radio. Prior to joining Nexstar, Mr. Compton was President of Strategic Programming and Acquisitions for Tribune Company from 2008 to 2019 where he oversaw programming for 42 Tribune television stations and nationally distributed digital network Antenna TV. He also spent 16 years in radio at Clear Channel Radio & Premiere Radio Networks of which, he served as Vice President of programming for 10 years before joining Tribune.

***Dan Lanzano*** was appointed President, National Advertising Sales in July 2025. Mr. Lanzano is responsible for leading Nexstar's national and political advertising sales organization across its linear and digital platforms. From January 2024 until his current appointment, Mr. Lanzano served as Senior Vice President, National Advertising Sales at Nexstar. Between 2018 and 2024, Mr. Lanzano was Vice President, Sales Manager at Warner Bros. Discovery where he managed multi-platform advertising sales efforts across the entire Warner Bros. Discovery portfolio. Prior to that time, he worked in advertising sales at Turner Broadcasting System, Inc. and CNN. Mr. Lanzano currently serves on the board of directors of The Ad Council.

***Dana Zimmer*** was appointed President, Distribution and Strategy in September 2023 and prior to that she served as Executive Vice President & Chief Distribution and Strategy Officer since September 2019 when she joined Nexstar. She oversees all distribution for the Company's broadcast and television content portfolio to the cable, satellite, telco and digital media industries, network affiliation agreement with third-party partners, including CBS, Fox, NBC and ABC, MyNetwork and Telemundo, and distribution and affiliation relations for The CW. Prior to joining Nexstar, Ms. Zimmer was President of Distribution and Marketing for Tribune Media Company from 2013 to 2019 where she served a similar role. She was a former Executive Vice President of TV Networks Distribution for NBCUniversal from 2011 to 2013. Ms. Zimmer also served as Executive Vice President, Affiliate Sales and Marketing for Comcast Networks from 2005 through January 2011. Prior to joining Comcast, Ms. Zimmer played an integral role on the launch teams that spearheaded successful distribution efforts of YES Network and SportsNet New York. Ms. Zimmer is on the Board of the T. Howard Foundation and Vice Chair of the CBS Affiliate Board.

***Brett Jenkins*** was appointed Executive Vice President and Chief Technology and Digital Officer in April 2023. Mr. Jenkins is responsible for the Company's technology, data and digital operations as well as the development and deployment of ATSC 3.0. From 2017 to 2023, he served as Nexstar's Chief Technology Officer. Prior to that role, Mr. Jenkins served as Vice President and Chief Technology Officer at Media General, overseeing the company's information technology and engineering functions. Before joining Media General in 2014, he was Vice President Chief Technology Officer of LIN Media. He also held technology positions at ION Media Networks and executive positions for Thales Broadcast & Multimedia and Thomson.

***Rachel Morgan*** was appointed Executive Vice President and General Counsel in June 2022. Ms. Morgan is responsible for the management of Nexstar's legal affairs including overseeing the Company's business transactions, regulatory filings, privacy and data security-related legal concerns, labor and employment issues, as well as intellectual property, and litigation matters. She also serves on the Nexstar Media Charitable Foundation Board. Prior to joining Nexstar, Ms. Morgan served as Vice President and Associate General Counsel for AT&T Services, Inc. Between 2012 and 2022, Ms. Morgan served in a variety of roles of increasing responsibility in the corporate legal department of AT&T. Before joining AT&T, Ms. Morgan spent almost fifteen years in private practice at two international law firms. Ms. Morgan is a member of The Dallas Bar Association's Community Service Fund Board of Directors and serves as a trustee on the Dallas Bar Foundation Board.

***Blake Russell*** was appointed Executive Vice President, Operations in February 2018. Mr. Russell is responsible for the Company's technical and physical operations, including capital deployment. Prior to that, he served as Nexstar's Senior Vice President, Station Operations from November 2008 to January 2018 and has served as Nexstar's Vice President Marketing and Operations from October 2007 to October 2008. Before that, Mr. Russell served as Vice President and General Manager at KNWA (NBC) and KFTA (FOX) stations in Ft. Smith/Fayetteville, Arkansas from January 2004 to September 2007 and as Nexstar's Director of Marketing/Operations at KTAL-TV (NBC) in Shreveport, Louisiana from 2000 to 2003.

***Gary Weitman*** was appointed Executive Vice President and Chief Communications Officer in September 2019. Mr. Weitman is responsible for all of the Company's internal and external communications. He also serves as the Chief Operating Officer for the Nexstar Media Charitable Foundation. Prior to this, Mr. Weitman was a Senior Vice President, Corporate Relations at Tribune Media Company from 2008 to 2019 and was Vice President, Corporate Communications from 2000 to 2008. Prior to his work with Tribune, Mr. Weitman was Executive Director, Corporate Communications at Allied Riser Communications Corp., Senior Vice President,

Media Relations at Hill and Knowlton, Inc., and earlier in his career, Mr. Weitman spent 15 years in broadcast journalism, holding positions of increasing responsibility at the CBS- and FOX-owned television stations in Chicago, IL.

***Scott Weaver*** has served as Executive Vice President, Government Relations since January 2026 and joined Nexstar in August 2024. Mr. Weaver assists in overseeing the Company's legislative and regulatory priorities and represents Nexstar's interests to the executive branch of the federal government, Congress and a variety of regulatory bodies. Prior to joining Nexstar, Mr. Weaver was the founding partner of HSA Strategies, an advocacy and consulting firm specializing in the representation of clients in the telecommunications, healthcare and defense industry in matters before Congress and the executive branch of the federal government, from 2022 to 2024. From 2009 to 2022, Mr. Weaver was chairman of the public policy practice at the law firm of Wiley Rein LLP, managing all related staff and budget, political giving, client growth and new business generation in this area. Earlier in his career, Mr. Weaver has been engaged in a number of political campaigns, was Vice President of Government and Political Affairs for the Airports Council International/North America and was Chief of Staff in the Office of U.S. Representative Katherine Harris.

## Item 11.  Executive Compensation

Information required by this Item 11 will be set forth in and is incorporated herein by reference from the Proxy Statement.

## Item 12.  Security Ownership of Certain Beneficial Owners and Management, and Related Stockholder Matters

Information required by this Item 12 will be set forth in and is incorporated herein by reference from the Proxy Statement.

## Item 13.  Certain Relationships and Related Transactions, and Director Independence

Information required by this Item 13 will be set forth in and is incorporated herein by reference from the Proxy Statement.

## Item 14.  Principal Accountant Fees and Services

Information required by this Item 14 will be set forth in and is incorporated herein by reference from the Proxy Statement.

**PART IV**

**Item 15.  Exhibits and Financial Statement Schedules**

**(a)  Documents filed as part of this report:**

(1)*Consolidated Financial Statements.* The Consolidated Financial Statements of Nexstar Media Group, Inc. listed on the index on page F-1 have been included beginning on page F-4 of this Annual Report on Form 10-K.

(2)*Financial Statement Schedules*. The schedule of Valuation and Qualifying Accounts appears in Note 18 to the Consolidated Financial Statements filed as part of this report.

(3)*Exhibits*. The exhibits listed on the accompanying Index to Exhibits on this Annual Report on Form 10-K are filed, furnished or incorporated into this Annual Report on Form 10-K by reference, as applicable.

**Item 16.  Form 10-K Summary**

Not applicable.

## Exhibit Index

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date |
| 2.1 | Agreement and Plan of Merger, dated as of August 18, 2025, by and among Nexstar Media Group, Inc., Teton Merger Sub, Inc. and TEGNA Inc. + | 8-K | 000-50478 | 2.1 | August 19, 2025 |
| 3.1 | Certificate of Amended and Restated Certificate of Incorporation of Nexstar Media Group, Inc. | 8-K | 000-50478 | 3.1 | June 21, 2023 |
| 3.2 | Second Amended and Restated Bylaws of Nexstar Media Group, Inc. | 8-K | 000-50478 | 3.1 | January 30, 2023 |
| 4.1 | Specimen Class A Common Stock Certificate. | S-1/A | 333-86994 | 4.1 | November 18, 2003 |
| 4.2 | Indenture, dated as of July 3, 2019, between Nexstar Escrow, Inc., as issuer, and Citibank, N.A., as trustee. | 8-K | 000-50478 | 4.1 | July 3, 2019 |
| 4.3 | Form of 5.625% Senior Note due 2027. | 8-K | 000-50478 | 4.1 | July 3, 2019 |
| 4.4 | First Supplemental Indenture, dated as of September 19, 2019, by and among Nexstar Broadcasting, Inc., as issuer, the guarantors party thereto, and Citibank, N.A. as trustee. | 8-K | 000-50478 | 4.3 | September 20, 2019 |
| 4.5 | Second Supplemental Indenture, dated as of November 22, 2019, by and among Nexstar Broadcasting, Inc., as issuer, the guarantors party thereto, and Citibank, N.A. as trustee. | 8-K | 000-50478 | 4.3 | November 22, 2019 |
| 4.6 | Indenture, dated as of September 25, 2020, by and among Nexstar Broadcasting, Inc., as issuer, the guarantors party thereto, and Citibank, N.A., as trustee. | 8-K | 000-50478 | 4.1 | September 25, 2020 |
| 4.7 | Form of 4.750% Senior Notes due 2028. | 8-K | 000-50478 | 4.1 | September 25, 2020 |
| 4.8 | Description of the Registrant's Securities registered under Section 12 of the Securities Exchange Act of 1934.* | | | | |
| 10.1 | Stock Option Agreement, dated as of November 29, 2011, by and among Mission Broadcasting, Inc., Nancie J. Smith, Dennis Thatcher and Nexstar Broadcasting, Inc. | 10-K | 000-50478 | 10.44 | March 15, 2012 |
| 10.2 | Amendment, dated as of November 15, 2019, to Stock Option Agreement, dated as of November 29, 2011, by and between Mission Broadcasting, Inc., Dennis Thatcher, Nancie J. Smith, and Nexstar Broadcasting, Inc. | 10-Q | 000-50478 | 10.87 | May 8, 2020 |
| 10.3 | Amendment, dated as of November 30, 2020, to Stock Option Agreement, dated as of November 29, 2011, as amended November 15, 2019, by and between Mission Broadcasting, Inc., Dennis Thatcher, Nancie J. Smith, and Nexstar Broadcasting, Inc. | 10-K | 000-50478 | 10.4 | March 1, 2021 |
| 10.4 | Credit Agreement, dated as of January 17, 2017, by and among Nexstar Media Group, Inc., as a holding company, Nexstar Broadcasting, Inc., as the borrower, Bank of America, N.A., as the administrative agent, the collateral agent, a letter of credit issuer and a swing line lender and other financial institutions from time to time party thereto. | 8-K | 000-50478 | 10.2 | January 17, 2017 |
| 10.5 | Amendment No. 1, dated as of July 19, 2017, to Credit Agreement, dated as of January 17, 2017, by and among Nexstar Broadcasting, Inc., Nexstar Media Group, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K | 000-50478 | 10.1 | July 25, 2017 |
| 10.6 | Amendment No. 2, dated as of October 26, 2018, to Credit Agreement, dated as of January 17, 2017, by and among Nexstar Broadcasting, Inc., Nexstar Media Group, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K | 000-50478 | 10.1 | November 1, 2018 |

| | | | | | |
|---|---|---|---|---|---|
| 10.7 | Amendment No. 3, dated as of September 19, 2019, to Credit Agreement, dated as of January 17, 2017, by and among Nexstar Broadcasting, Inc., Nexstar Media Group, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K | 000-50478 | 10.1 | September 20, 2019 |
| 10.8 | Amendment No. 4, dated as of September 3, 2020, to Credit Agreement, dated as of January 17, 2017, by and among Nexstar Broadcasting, Inc., Nexstar Media Group, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K/A | 000-50478 | 10.1 | September 9, 2020 |
| 10.9 | Amendment No. 5, dated as of June 21, 2022, to Credit Agreement, dated as of January 17, 2017, by and among Nexstar Media Inc. (f/k/a Nexstar Broadcasting, Inc.), Nexstar Media Group, Inc., Bank of America, N.A. and the several lenders party thereto. | 10-Q | 000-50478 | 10.1 | August 5, 2022 |
| 10.10 | Amendment No. 6 dated as of June 6, 2023, to Credit Agreement, dated as of January 17, 2017, by and among Nexstar Media Inc. (f/k/a Nexstar Broadcasting, Inc.), Nexstar Media Group, Inc., Bank of America, N.A. and the several lenders party thereto. | 10-Q | 000-50478 | 10.1 | August 8, 2023 |
| 10.11 | Amendment No.7 dated as of June 27, 2025, to Credit Agreement, dated as of January 17, 2017, by and among Nexstar Media Inc. (f/k/a Nexstar Broadcasting, Inc.), Nexstar Media Group, Inc. Bank of America, N.A. and the several lenders party thereto. | 8-K | 000-50478 | 10.1 | June 30, 2025 |
| 10.12 | Credit Agreement, dated as of January 17, 2017, by and among Mission Broadcasting, Inc., as the borrower and Bank of America, N.A., as the administrative agent and the collateral agent and other financial institutions from time to time party thereto. | 10-K | 333-62916-02 | 10.8 | March 29, 2017 |
| 10.13 | Amendment No. 1, dated as of July 19, 2017, to Credit Agreement, dated as of January 17, 2017, by and among Mission Broadcasting, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K | 333-62916-02 | 10.1 | July 25, 2017 |
| 10.14 | Amendment No. 2, dated as of October 26, 2018, to Credit Agreement, dated as of January 17, 2017, by and among Mission Broadcasting, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K | 333-62916-02 | 10.1 | November 1, 2018 |
| 10.15 | Amendment No. 3, dated as of September 3, 2020, to Credit Agreement, dated as of January 17, 2017, by and among Mission Broadcasting, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K/A | 000-50478 | 10.2 | September 9, 2020 |
| 10.16 | Amendment No. 4, dated as of June 3, 2021, to Credit Agreement, dated as of January 17, 2017, by and among Mission Broadcasting, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K | 000-50478 | 10.1 | June 4, 2021 |
| 10.17 | Amendment No. 5, dated as of June 3, 2021, to Credit Agreement, dated as of January 17, 2017, by and among Mission Broadcasting, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K | 000-50478 | 10.2 | June 4, 2021 |
| 10.18 | Amendment No. 6, dated as of June 21, 2022, to Credit Agreement, dated as of January 17, 2017, by among Mission Broadcasting, Inc., Bank of America, N.A. and the several lenders party thereto. | 10-Q | 000-50478 | 10.2 | August 5, 2022 |
| 10.19 | Amendment No. 7 dated as of June 6, 2023, to Credit Agreement, dated as of January 17, 2017, by among Mission Broadcasting, Inc., Bank of America, N.A. and the several lenders party thereto. | 10-Q | 000-50478 | 10.2 | August 8, 2023 |
| 10.20 | Amendment No.8 dated as of June 27, 2025, to Credit Agreement, dated as of January 17, 2017, by and among Mission Broadcasting, Inc., Bank of America, N.A. and the several lenders party thereto. | 8-K | 000-50478 | 10.2 | June 30, 2025 |

| | | | | | |
|---|---|---|---|---|---|
| 10.21 | Amended Executive Employment Agreement, dated as of January 15, 2019 between Perry A. Sook and Nexstar Broadcasting, Inc. | 8-K | 000-50478 | 10.1 | January 22, 2019 |
| 10.22 | Amendment to Executive Employment Agreement, dated as of August 1, 2022 between Perry A. Sook and Nexstar Media Group, Inc. | 8-K | 000-50478 | 10.1 | August 4, 2022 |
| 10.23 | Amended Executive Employment Agreement between Perry A. Sook and Nexstar Media Group, Inc. | 8-K | 000-50478 | 10.1 | October 30, 2025 |
| 10.24 | Executive Employment Agreement, effective as of August 21, 2023, between Michael Biard and Nexstar Media Group, Inc. | 8-K | 000-50478 | 10.1 | July 28, 2023 |
| 10.25 | Executive Employment Agreement, dated July 26, 2021 between Lee Ann Gliha and Nexstar Media Group, Inc. | 10-Q | 000-50478 | 10.3 | August 5, 2021 |
| 10.26 | Amendment to Executive Employment Agreement, effective January 1, 2024, by and between Lee Ann Gliha and Nexstar Media Group, Inc. | 8-K | 000-50478 | 10.1 | December 20, 2023 |
| 10.27 | Executive Employment Agreement, effective as of September 19, 2023, between Dana Zimmer and Nexstar Media Group, Inc. | 8-K | 000-50478 | 10.2 | July 17, 2023 |
| 10.28 | Executive Employment Agreement, effective as of September 19, 2023, between Sean Compton and Nexstar Media Group, Inc. | 8-K | 000-50478 | 10.1 | July 17, 2023 |
| 10.29 | Amended and Restated Executive Employment Agreement, effective as of September 19, 2023 between Sean Compton and Nexstar Media Group, Inc. | 10-Q | 000-50478 | 10.3 | November 8, 2023 |
| 10.30 | Amendment to Executive Employment Agreement, dated as of May 2, 2025 between Sean Compton and Nexstar Media Group, Inc. | 10-Q | 000-50478 | 10.1 | May 8, 2025 |
| 10.31 | Nexstar Media Group, Inc. 2019 Long-Term Equity Incentive Plan. | DEF14A | 000-50478 | | April 26, 2019 |
| 10.32 | Nexstar Media Group, Inc.'s Restricted Stock Unit Agreement Form. | 10-Q | 000-50478 | 10.88 | May 8, 2020 |
| 14.1 | Nexstar Media Group, Inc. Code of Ethics. | 10-K | 000-50478 | 14.1 | March 31, 2004 |
| 19.1 | Nexstar Media Group, Inc. Insider Trading and Anti-Hedging/Pledging Policy. | 10-K | 000-50478 | 19.1 | February 27, 2025 |
| 21.1 | Subsidiaries of the Registrant.* | | | | |
| 23.1 | Consent issued by PricewaterhouseCoopers LLP.* | | | | |
| 31.1 | Certification of Perry A. Sook pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* | | | | |
| 31.2 | Certification of Lee Ann Gliha pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* | | | | |
| 32.1 | Certification of Perry A. Sook pursuant to 18 U.S.C. ss. 1350.* | | | | |
| 32.2 | Certification of Lee Ann Gliha pursuant to 18 U.S.C. ss. 1350.* | | | | |
| 97.1 | Clawback Policy, Nexstar Media Group, Inc. | 10-K | 000-50478 | 97.1 | February 28, 2024 |
| 101.INS | Inline XBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema With Embedded Linkbases Document. | | | | |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). | | | | |

+ Schedules have been omitted from this filing pursuant to Item 601(b)(2) of Regulation S-K. A copy of any omitted schedule will be furnished to the Securities and Exchange Commission upon request.
* Filed herewith.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

NEXSTAR MEDIA GROUP, INC.

By:         /s/ PERRY A. SOOK
**Perry A. Sook**
**Chairman and Chief Executive Officer**

By:         /s/ LEE ANN GLIHA
**Lee Ann Gliha**
**Chief Financial Officer (Principal Accounting and Financial Officer)**

Dated: February 26, 2026

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities indicated on February 26, 2026.

| Name | Title |
|---|---|
| /s/ PERRY A. SOOK<br>**Perry A. Sook** | Chairman and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ LEE ANN GLIHA<br>**Lee Ann Gliha** | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ GEOFF ARMSTRONG<br>**Geoff Armstrong** | Director |
| /s/ BERNADETTE AULESTIA<br>**Bernadette Aulestia** | Director |
| /s/ JAY M. GROSSMAN<br>**Jay M. Grossman** | Director |
| /s/ ELLEN JOHNSON<br>**Ellen Johnson** | Director |
| /s/ C. THOMAS MCMILLEN<br>**C. Thomas McMillen** | Director |
| /s/ LISBETH MCNABB<br>**Lisbeth McNabb** | Director |
| /s/ JOHN R. MUSE<br>**John R. Muse** | Director |
| /s/ ROYCE A. WELLS<br>**Royce A. Wells** | Director |

**NEXSTAR MEDIA GROUP, INC.**
**INDEX TO FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID Number 238) | F-2 |
| Consolidated Balance Sheets as of December 31, 2025 and 2024 | F-4 |
| Consolidated Statements of Operations for the years ended December 31, 2025, 2024 and 2023 | F-5 |
| Consolidated Statements of Comprehensive Income for the years ended December 31, 2025, 2024 and 2023 | F-6 |
| Consolidated Statements of Changes in Stockholders' Equity and Redeemable Noncontrolling Interests for the years ended December 31, 2025, 2024 and 2023 | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2025, 2024 and 2023 | F-8 |
| Notes to Consolidated Financial Statements | |
| Note 1: Organization and Business Operations | F-9 |
| Note 2: Summary of Significant Accounting Policies | F-10 |
| Note 3: Acquisitions | F-18 |
| Note 4: Property and Equipment | F-18 |
| Note 5: Intangible Assets and Goodwill | F-19 |
| Note 6: Investments | F-20 |
| Note 7: Accrued Expenses | F-22 |
| Note 8: Debt | F-22 |
| Note 9: Leases | F-25 |
| Note 10: Retirement and Postretirement Plans | F-26 |
| Note 11: Commitments and Contingencies | F-30 |
| Note 12: Equity | F-32 |
| Note 13: Stock-Based Compensation | F-33 |
| Note 14: Income Taxes | F-34 |
| Note 15: Income Per Share | F-36 |
| Note 16: Fair Value Measurements | F-36 |
| Note 17: Segment Data | F-37 |
| Note 18: Valuation and Qualifying Accounts | F-39 |
| Note 19: Subsequent Events | F-39 |

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Nexstar Media Group, Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Nexstar Media Group, Inc. and its subsidiaries (the "Company") as of December 31, 2025 and 2024, and the related consolidated statements of operations, of comprehensive income, of changes in stockholders' equity and redeemable noncontrolling interests and of cash flows for each of the three years in the period ended December 31, 2025, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2025, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2025 and 2024, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2025 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2025, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matters***

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Equity Method Investment Impairment Assessment - TV Food Network*

As described in Notes 2 and 6 to the consolidated financial statements, the Company's equity method investments balance was $390 million as of December 31, 2025, $372 million of which related to a 31.3% ownership stake in TV Food Network. Management evaluates equity method investments for impairment whenever events or changes in circumstances indicate that the carrying amounts of such investments may be impaired. Management assesses these investments for other-than-temporary impairment ("OTTI") on at least a quarterly basis, and more frequently when economic or market conditions warrant. If the fair value of the investment is below the carrying value, an impairment charge is recorded. During the fourth quarter of 2025, management identified indicators of OTTI related to its investment in TV Food Network, and estimated the fair value of the investment using both an income approach and a market approach. Fair value estimates related to the Company's investment in TV Food Network are sensitive to changes in the key assumptions used. Under the market approach, assumptions used include earnings multiples of comparable public companies. Based on the impairment assessment, management concluded that the fair value of the investment was below the carrying amount and recorded an impairment charge of $381 million.

The principal considerations for our determination that performing procedures relating to the equity method investment impairment assessment of the TV Food Network is a critical audit matter are (i) the significant judgment by management when developing the fair value estimate of the TV Food Network investment; (ii) a high degree of auditor judgment, subjectivity and effort in performing procedures and evaluating management's significant assumption related to earnings multiples of comparable public companies; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's equity method investment impairment assessment, including controls over the valuation of the TV Food Network investment. These procedures also included, among others (i) testing management's process for developing the fair value of the TV Food Network investment; (ii) evaluating the appropriateness of the market approach used by management; (iii) testing the completeness and accuracy of underlying data used in the market approach; and (iv) evaluating the reasonableness of the significant assumption used by management related to earnings multiples of comparable public companies. Professionals with specialized skill and knowledge were used to assist in evaluating (i) the appropriateness of the market approach; and (ii) the reasonableness of earnings multiples of comparable public companies.

/s/ PricewaterhouseCoopers LLP
Dallas, Texas
February 26, 2026

We have served as the Company's auditor since 1997.

# NEXSTAR MEDIA GROUP, INC.
## CONSOLIDATED BALANCE SHEETS
### (in millions, except for share and per share information)

| | December 31, | | |
|---|---|---|---|
| | 2025 | | 2024 |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 280 | $ | 144 |
| Accounts receivable, net of allowance for credit losses of $18 and $16, respectively | 1,075 | | 1,028 |
| Broadcast rights | 61 | | 84 |
| Prepaid expenses and other current assets | 57 | | 41 |
| Total current assets | 1,473 | | 1,297 |
| Property and equipment, net | 1,158 | | 1,207 |
| Goodwill | 2,910 | | 2,922 |
| FCC licenses | 2,949 | | 2,929 |
| Network affiliation agreements, net | 1,305 | | 1,494 |
| Other intangible assets, net | 282 | | 353 |
| Investments | 396 | | 877 |
| Other noncurrent assets, net | 373 | | 389 |
| Total assets[(1)] | $ 10,846 | $ | 11,468 |
| **LIABILITIES, REDEEMABLE NONCONTROLLING INTERESTS AND STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Current portion of debt | $ 111 | $ | 124 |
| Accounts payable | 133 | | 133 |
| Broadcast rights payable | 48 | | 97 |
| Accrued expenses | 314 | | 314 |
| Operating lease liabilities | 41 | | 37 |
| Other current liabilities | 64 | | 78 |
| Total current liabilities | 711 | | 783 |
| Debt | 6,222 | | 6,399 |
| Deferred tax liabilities | 1,354 | | 1,487 |
| Other noncurrent liabilities | 497 | | 531 |
| Total liabilities[(1)] | 8,784 | | 9,200 |
| Commitments and contingencies (Note 11) | | | |
| Redeemable noncontrolling interests (Note 2) | 19 | | 26 |
| Stockholders' equity: | | | |
| Preferred stock - $0.01 par value, 200,000 shares authorized; none issued and outstanding at each of December 31, 2025 and December 31, 2024 | - | | - |
| Common stock - $0.01 par value, 100,000,000 shares authorized; 47,282,823 shares issued, 30,327,669 shares outstanding as of December 31, 2025 and 47,282,823 shares issued, 30,621,241 shares outstanding as of December 31, 2024 | - | | - |
| Additional paid-in capital | 1,331 | | 1,304 |
| Accumulated other comprehensive loss | (15) | | (1) |
| Retained earnings | 3,537 | | 3,671 |
| Treasury stock - at cost; 16,955,154 and 16,661,582 shares as of December 31, 2025 and December 31, 2024, respectively | (2,789) | | (2,717) |
| Total Nexstar Media Group, Inc. stockholders' equity | 2,064 | | 2,257 |
| Noncontrolling interests | (21) | | (15) |
| Total stockholders' equity | 2,043 | | 2,242 |
| Total liabilities, redeemable noncontrolling interests and stockholders' equity | $ 10,846 | $ | 11,468 |

The accompanying Notes are an integral part of these Consolidated Financial Statements.

(1)The consolidated total assets as of December 31, 2025 and 2024 include certain assets held by consolidated VIEs of $292 million and $297 million, respectively, which are not available to be used to settle the obligations of Nexstar. The consolidated total liabilities as of December 31, 2025 and 2024 include certain liabilities of consolidated VIEs of $139 million and $148 million, respectively, for which the creditors of the VIEs have no recourse to the general credit of Nexstar. See Note 2 for additional information.

**NEXSTAR MEDIA GROUP, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in millions, except for share and per share information)**

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2025** | | **2024** | | **2023** |
| Net revenue | $ | 4,949 | $ | 5,407 | $ | 4,933 |
| Operating expenses (income): | | | | | | |
| Direct operating, excluding depreciation and amortization | | 2,235 | | 2,221 | | 2,153 |
| Selling, general and administrative, excluding depreciation and amortization | | 1,063 | | 1,088 | | 1,098 |
| Amortization of broadcast rights | | 314 | | 324 | | 453 |
| Depreciation and amortization of intangible assets | | 471 | | 484 | | 488 |
| Goodwill and long-lived asset impairments | | 14 | | 24 | | 35 |
| Other | | 3 | | (2) | | (2) |
| Total operating expenses | | 4,100 | | 4,139 | | 4,225 |
| Income from operations | | 849 | | 1,268 | | 708 |
| Income from equity method investments, net (excluding impairment) | | 30 | | 70 | | 104 |
| Impairment of an equity method investment | | (381) | | - | | - |
| Interest expense, net | | (379) | | (444) | | (447) |
| Pension and other postretirement plans credit, net | | 31 | | 27 | | 36 |
| Gain on disposal of an investment | | - | | 40 | | - |
| Other expenses, net | | - | | (2) | | - |
| Income before income taxes | | 150 | | 959 | | 401 |
| Income tax expense | | (67) | | (276) | | (131) |
| Net income | | 83 | | 683 | | 270 |
| Net loss attributable to noncontrolling interests | | 26 | | 39 | | 76 |
| Net income attributable to Nexstar Media Group, Inc. | $ | 109 | $ | 722 | $ | 346 |
| | | | | | | |
| Net income per share available to common stockholders: | | | | | | |
| Basic | $ | 3.04 | $ | 21.73 | $ | 9.78 |
| Diluted | $ | 3.00 | $ | 21.41 | $ | 9.64 |
| | | | | | | |
| Weighted average number of common shares outstanding: | | | | | | |
| Basic (in thousands) | | 30,349 | | 32,311 | | 35,317 |
| Diluted (in thousands) | | 30,707 | | 32,796 | | 35,834 |

The accompanying Notes are an integral part of these Consolidated Financial Statements.

F-5

**NEXSTAR MEDIA GROUP, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(in millions)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2025** | **2024** | **2023** |
| Net income | $ 83 | $ 683 | $ 270 |
| Other comprehensive loss: | | | |
| Change in unrecognized amounts included in pension and other postretirement benefit obligations, net of tax benefit of $4 in 2025, $1 in 2024 and $9 in 2023 | (14) | (2) | (26) |
| Total comprehensive income | 69 | 681 | 244 |
| Total comprehensive loss attributable to noncontrolling interests | 26 | 39 | 76 |
| Total comprehensive income attributable to Nexstar Media Group, Inc. | $ 95 | $ 720 | $ 320 |

The accompanying Notes are an integral part of these Consolidated Financial Statements.

# NEXSTAR MEDIA GROUP, INC.
## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY AND REDEEMABLE NONCONTROLLING INTERESTS
### For the Three Years Ended December 31, 2025
### (in millions, except for share and per share information)

| | Redeemable Noncontrolling Interests | Common Stock Shares | Common Stock Amount | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Treasury Stock Shares | Treasury Stock Amount | Noncontrolling interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balances as of December 31, 2022** | $ - | 47,282,823 | $ - | $ 1,288 | $ 3,033 | $ 27 | (10,472,637) | $ (1,607) | $ 28 | $ 2,769 |
| Purchase of treasury stock | - | - | - | - | - | - | (3,782,104) | (611) | - | (611) |
| Stock-based compensation expense | - | - | - | 60 | - | - | - | - | - | 60 |
| Vesting of restricted stock units and exercise of stock options | - | - | - | (65) | - | - | 572,844 | 45 | - | (20) |
| Dividends declared on common stock ($5.40 per share) | - | - | - | - | (191) | - | - | - | - | (191) |
| Contribution from noncontrolling interests | - | - | - | - | - | - | - | - | 62 | 62 |
| Change in pension and other postretirement benefit obligations, net of tax | - | - | - | - | - | (26) | - | - | - | (26) |
| Net income (loss) | - | - | - | - | 346 | - | - | - | (76) | 270 |
| **Balances as of December 31, 2023** | - | 47,282,823 | - | 1,283 | 3,188 | 1 | (13,681,897) | (2,173) | 14 | 2,313 |
| Purchase of treasury stock | - | - | - | - | - | - | (3,637,192) | (606) | - | (606) |
| Stock-based compensation expense | - | - | - | 78 | - | - | - | - | - | 78 |
| Vesting of restricted stock units and exercise of stock options | - | - | - | (60) | - | - | 657,507 | 62 | - | 2 |
| Dividends declared on common stock ($6.76 per share) | - | - | - | - | (219) | - | - | - | - | (219) |
| Adjustment to redeemable noncontrolling interests (Note 2) | 27 | - | - | - | - | - | - | - | (27) | (27) |
| Contribution from noncontrolling interests | - | - | - | - | - | - | - | - | 19 | 19 |
| Accretion of redeemable noncontrolling interests | 20 | - | - | - | (20) | - | - | - | - | (20) |
| Change in pension and other postretirement benefit obligations, net of tax | - | - | - | - | - | (2) | - | - | - | (2) |
| Other | (3) | - | - | 3 | - | - | - | - | - | 3 |
| Net income (loss) | (18) | - | - | - | 722 | - | - | - | (21) | 701 |
| **Balances as of December 31, 2024** | 26 | 47,282,823 | - | 1,304 | 3,671 | (1) | (16,661,582) | (2,717) | (15) | 2,242 |
| Purchase of treasury stock | - | - | - | - | - | - | (753,162) | (126) | - | (126) |
| Stock-based compensation expense | - | - | - | 78 | - | - | - | - | - | 78 |
| Vesting of restricted stock units and exercise of stock options | - | - | - | (55) | - | - | 459,590 | 54 | - | (1) |
| Dividends declared on common stock ($7.44 per share) | - | - | - | - | (226) | - | - | - | - | (226) |
| Accretion of redeemable noncontrolling interests | 17 | - | - | - | (17) | - | - | - | - | (17) |
| Change in pension and other postretirement benefit obligations, net of tax | - | - | - | - | - | (14) | - | - | - | (14) |
| Other | (4) | - | - | 4 | - | - | - | - | - | 4 |
| Net income (loss) | (20) | - | - | - | 109 | - | - | - | (6) | 103 |
| **Balances as of December 31, 2025** | $ 19 | 47,282,823 | $ - | $ 1,331 | $ 3,537 | $ (15) | (16,955,154) | $ (2,789) | $ (21) | $ 2,043 |

The accompanying Notes are an integral part of these Consolidated Financial Statements.

F-7

**NEXSTAR MEDIA GROUP, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in millions)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2025** | **2024** | **2023** |
| **Cash flows from operating activities:** | | | |
| Net income | $ 83 | $ 683 | $ 270 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Amortization of broadcast rights | 314 | 324 | 453 |
| Depreciation and amortization of intangible assets | 471 | 484 | 488 |
| Goodwill and long-lived asset impairments | 14 | 24 | 35 |
| Stock-based compensation expense | 78 | 78 | 60 |
| Amortization of debt financing costs, debt discounts and premium | 8 | 12 | 11 |
| Gain on disposal of an investment | - | (40) | - |
| Deferred income taxes | (129) | (33) | (77) |
| Payments for broadcast rights | (343) | (325) | (417) |
| Income from equity method investments, net (excluding impairment) | (30) | (70) | (104) |
| Impairment of an equity method investment | 381 | - | - |
| Distribution from equity method investments—return on capital | 137 | 154 | 270 |
| Changes in operating assets and liabilities, net of acquisitions and dispositions: | | | |
| Accounts receivable | (47) | 68 | (13) |
| Prepaid expenses and other current assets | (1) | (1) | (4) |
| Other noncurrent assets | 6 | (10) | (24) |
| Accounts payable | 4 | (98) | 32 |
| Accrued expenses and other current liabilities | - | (26) | 29 |
| Income tax payable | (14) | 52 | 37 |
| Other noncurrent liabilities | (54) | (36) | (48) |
| Other | 13 | 10 | 1 |
| Net cash provided by operating activities | 891 | 1,250 | 999 |
| **Cash flows from investing activities:** | | | |
| Purchases of property and equipment | (148) | (145) | (149) |
| Payments for acquisitions, net of cash acquired | (22) | - | (38) |
| Deposits received associated with the sale of real estate assets | - | - | 10 |
| Proceeds from disposal of an investment | - | 40 | - |
| Other investing activities, net | (3) | 3 | 4 |
| Net cash used in investing activities | (173) | (102) | (173) |
| **Cash flows from financing activities:** | | | |
| Proceeds from debt issuance, net of debt discounts | 3,393 | 55 | 20 |
| Repayments of long-term debt | (3,595) | (382) | (145) |
| Purchase of treasury stock | (125) | (601) | (605) |
| Common stock dividends paid | (226) | (219) | (191) |
| Contribution from noncontrolling interests | - | 19 | 62 |
| Payments for capitalized software obligations | (20) | (19) | (19) |
| Cash paid for shares withheld for taxes | (1) | (8) | (24) |
| Proceeds from exercise of stock options | - | 10 | 4 |
| Other financing activities, net | (8) | (6) | (1) |
| Net cash used in financing activities | (582) | (1,151) | (899) |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 136 | (3) | (73) |
| Cash, cash equivalents and restricted cash at beginning of period | 144 | 147 | 220 |
| Cash, cash equivalents and restricted cash at end of period | $ 280 | $ 144 | $ 147 |
| **Supplemental information:** | | | |
| Interest paid | $ 372 | $ 431 | $ 437 |
| Income taxes paid, net of refunds | $ 208 | $ 254 | $ 169 |
| **Non-cash investing and financing activities:** | | | |
| Purchases of property and equipment in accounts payable and accruals | $ 3 | $ 7 | $ 13 |
| Capitalized software in other current and noncurrent liabilities | $ 24 | $ 11 | $ 29 |
| Right-of-use assets obtained in exchange for operating lease obligations | $ 52 | $ 39 | $ 54 |

The accompanying Notes are an integral part of these Consolidated Financial Statements.

## Note 1: Organization and Business Operations

As used in these Consolidated Financial Statements and unless the context indicates otherwise, "Nexstar" refers to Nexstar Media Group, Inc., a Delaware corporation, and its consolidated wholly owned and majority-owned subsidiaries; the "Company" refers to Nexstar and the variable interest entities ("VIEs") required to be consolidated in its financial statements under authoritative guidance related to the consolidation of VIEs; and all references to "we," "our," "ours," and "us" refer to Nexstar.

Nexstar is a leading diversified media company with television broadcasting, television network and digital media assets operating in the United States. As of December 31, 2025, we owned, operated, programmed or provided sales and other services to 201 full power television stations and one AM radio station, including those television stations owned by VIEs, in 116 markets in 40 states and the District of Columbia. The stations are affiliates of CBS, FOX, NBC, ABC, The CW, MyNetworkTV ("MNTV"), and other broadcast television networks. As of December 31, 2025, Nexstar's stations reached approximately 39% of all U.S. television households (after applying the Federal Communications Commission's ("FCC") ultra-high frequency discount). Through various local service agreements, we provided sales, programming, and other services to 35 television stations owned by consolidated VIEs and two television stations owned by unconsolidated VIEs. As of December 31, 2025, Nexstar also owns an 80.8% ownership interest in The CW Network, LLC, the fifth major broadcast network in the U.S. ("The CW"); NewsNation, a national cable news network; two digital multicast networks, Antenna TV and REWIND TV; multicast network services provided to third parties; and a 31.3% ownership stake in Television Food Network, G.P. ("TV Food Network"). Our digital assets include 125 local websites and 229 mobile applications across local stations, NewsNation and The Hill. The portfolio also includes 110 connected television applications and three free ad-supported television channels from The CW and The Hill.

### Merger Agreement with TEGNA

On August 18, 2025, Nexstar entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") to acquire the outstanding equity of TEGNA Inc., a Delaware corporation ("TEGNA") (such transaction, the "Merger"). TEGNA owns and operates 64 television stations and two radio stations in 51 designated market areas ("DMAs") in the U.S. Upon closing, the Merger is expected to increase Nexstar's operational and geographic diversity and scale, enhance its presence in various localities and extend its footprint to additional areas experiencing contested elections.

The Merger has been approved by the boards of directors of both companies and by the stockholders of TEGNA and is anticipated to close by the second half of 2026, subject to (i) FCC consent, (ii) receipt of other regulatory approvals including expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and (iii) satisfaction of other customary closing conditions. The Merger does not require approval of Nexstar stockholders and is not subject to any financing condition.

Pursuant to the Merger Agreement, Nexstar will acquire TEGNA's outstanding equity for $22 per share in a cash transaction (the "Merger Consideration"). All vested and unvested time-based and performance-based equity-based awards of TEGNA that are granted prior to August 18, 2025 and outstanding immediately prior to the effective time of the Merger will vest in full and will be converted into the right to receive the Merger Consideration. Each TEGNA time-based and performance-based restricted stock unit granted on or after August 18, 2025 will convert into a time-based restricted stock unit award based on the Merger Consideration and the terms of the Merger Agreement, with total grant date value capped at $35.1 million. The estimated total purchase price, calculated in accordance with the authoritative accounting guidance, is valued at $5.8 billion. This preliminary estimate includes the Merger Consideration and the refinancing of certain existing TEGNA debt. The final purchase price at closing may differ materially from this estimate. On August 18, 2025, Nexstar entered into a debt commitment letter, which was subsequently amended and restated on September 11, 2025. Under this agreement, a syndicate of financial institutions committed to provide up to $5.725 billion in debt financing to support the Merger, the refinancing of certain TEGNA obligations, and related transactions.

The Merger Agreement contains certain termination rights for both parties. Either party may terminate the Merger Agreement if the Merger is not consummated at or before 5:00 p.m. Eastern Time on August 18, 2026, which may be extended to November 18, 2026 at the election of either TEGNA or Nexstar if all conditions other than certain regulatory conditions have been satisfied or waived. If the Merger Agreement is terminated by either party under certain circumstances, including because certain required regulatory clearances are not obtained on or before November 18, 2026, Nexstar will be required to pay TEGNA a termination fee of $125 million.

Transaction costs relating to this proposed merger, including legal and professional fees, of $22 million were expensed as incurred during the year ended December 31, 2025.

**Note 2:  Summary of Significant Accounting Policies**

### *Principles of Consolidation*

The Consolidated Financial Statements include the accounts of Nexstar, subsidiaries consolidated through voting interests and VIEs for which we are the primary beneficiary (See "Variable Interest Entities" section below). All intercompany account balances and transactions have been eliminated in consolidation. Nexstar management evaluates each arrangement that may include variable interests and determines the need to consolidate an entity where it determines Nexstar is the primary beneficiary of a VIE in accordance with related authoritative literature and interpretive guidance.

### *Variable Interest Entities*

Nexstar may determine that an entity is a VIE as a result of local service agreements entered into with that entity. The term local service agreement generally refers to a contract whereby the owner-operator of a television station contracts with a third party (typically another television station owner-operator) to provide it with administrative, sales and other services required for the operation of its station. Nevertheless, the owner-operator of each station retains control of and responsibility for the operation of its station, including ultimate responsibility over all programming broadcast on its station. A local service agreement can be (i) a time brokerage agreement ("TBA") or a local marketing agreement ("LMA") which allows Nexstar to program most of a station's broadcast time, sell the station's advertising time and retain the advertising revenue generated in exchange for monthly payments, frequently based on the station's monthly operating expenses, (ii) a shared services agreement ("SSA") which allows Nexstar to provide services to a station including news production, technical maintenance and security, in exchange for Nexstar's right to receive certain payments as described in the SSA, or (iii) a joint sales agreement ("JSA") which permits Nexstar to sell certain of a station's advertising time and retain a percentage of the related revenue, as described in the JSA.

### *Consolidated VIEs*

Nexstar consolidates entities in which it is deemed under accounting principles generally accepted in the United States ("U.S. GAAP") to have controlling financial interests for financial reporting purposes as a result of (i) local service agreements Nexstar has with the stations owned by these entities, (ii) Nexstar's (excluding The CW) guarantee of the obligations incurred under Mission Broadcasting, Inc.'s ("Mission") senior secured credit facility (see Note 8), (iii) Nexstar having power over significant activities affecting these VIEs' economic performance, including budgeting for advertising revenue, certain advertising sales and, in some cases, hiring and firing of sales force personnel and (iv) purchase options granted by each consolidated VIE which permit Nexstar to acquire the assets and assume the liabilities of each of these VIEs' stations, subject to FCC consent.

The following table summarizes the various local service agreements Nexstar had in effect as of December 31, 2025 with its consolidated VIEs:

| Owner | Service Agreements | Full Power Stations |
|---|---|---|
| Mission | TBA | WFXP, KHMT and KFQX |
| | SSA & JSA | KJTL, KLRT, KASN, KOLR, KCIT, KAMC, KRBC, KSAN, WUTR, WAWV, WYOU, KODE, WTVO, KTVE, WTVW, WVNY, WXXA, WLAJ, KMSS, KPEJ, KLJB, KASY, KWBQ and KRWB |
| | LMA | WNAC and WPIX |
| White Knight Broadcasting ("White Knight") | SSA & JSA | WVLA and KFXK |
| Vaughan Media, LLC ("Vaughan") | SSA & JSA | WBDT, WYTV and KTKA |
| | LMA | KNVA |

Nexstar's ability to receive cash from the consolidated VIEs is governed by the local service agreements. Under these agreements, Nexstar has received substantially all of the consolidated VIEs' available cash, after satisfaction of operating costs and debt obligations. Nexstar anticipates it will continue to receive substantially all of the consolidated VIEs' available cash, after satisfaction of operating costs and debt obligations. In compliance with FCC regulations for all the parties, each VIE maintains complete responsibility for and control over programming, finances, personnel and operations of its stations.

As of December 31, the carrying amounts and classification of the assets and liabilities, excluding intercompany amounts, of the VIEs which have been included in the Consolidated Balance Sheets were as follows (in millions):

|  | 2025 | 2024 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 5 | $ 7 |
| Accounts receivable, net | 23 | 26 |
| Prepaid expenses and other current assets | 4 | 4 |
| Total current assets | 32 | 37 |
| Property and equipment, net | 48 | 52 |
| Goodwill | 151 | 151 |
| FCC licenses | 200 | 200 |
| Network affiliation agreements, net | 51 | 59 |
| Other noncurrent assets, net | 56 | 63 |
| Total assets | $ 538 | $ 562 |
| | | |
| Current liabilities: | | |
| Current portion of debt | $ 3 | $ 3 |
| Other current liabilities | 36 | 37 |
| Total current liabilities | 39 | 40 |
| Debt | 345 | 348 |
| Deferred tax liabilities | 41 | 41 |
| Other noncurrent liabilities | 64 | 72 |
| Total liabilities | $ 489 | $ 501 |

As of December 31, the following are assets of consolidated VIEs, excluding intercompany amounts, that are not available to settle the obligations of Nexstar and the liabilities of consolidated VIEs, excluding intercompany amounts, for which their creditors do not have recourse to the general credit of Nexstar (in millions):

|  | 2025 | 2024 |
|---|---|---|
| Current assets | $ 3 | $ 3 |
| Property and equipment, net | 9 | 10 |
| Goodwill | 62 | 62 |
| FCC licenses | 200 | 200 |
| Network affiliation agreements, net | 16 | 19 |
| Other noncurrent assets, net | 2 | 3 |
| Total assets | $ 292 | $ 297 |
| | | |
| Current liabilities | $ 34 | $ 35 |
| Noncurrent liabilities | 105 | 113 |
| Total liabilities | $ 139 | $ 148 |

### Non-Consolidated VIEs

Nexstar has an outsourcing agreement with Cunningham Broadcasting Corporation ("Cunningham") which continues through December 31, 2027. Under the outsourcing agreement, Nexstar provides certain engineering, production, sales and administrative services for WYZZ, the FOX affiliate in the Peoria, Illinois market, through WMBD, the Nexstar television station in that market. During the term of the outsourcing agreement, Nexstar retains the broadcasting revenue and related expenses of WYZZ and is obligated to pay a monthly fee to Cunningham based on the combined operating cash flow of WMBD and WYZZ, as defined in the agreement.

Nexstar has a multi-year TBA with KAZT, L.L.C., the owner of television station KAZT-TV, an affiliate of The CW in Phoenix, Arizona. Nexstar was also granted an option to purchase the station from KAZT, L.L.C., subject to FCC consent.

Nexstar has determined that it has variable interests in WYZZ and KAZT-TV. Nexstar has also evaluated its arrangements with Cunningham and KAZT, L.L.C. and has determined that it is not the primary beneficiary of the variable interests because it does not have the ultimate power to direct the activities that most significantly impact the stations' economic performance. Therefore, Nexstar has not consolidated WYZZ and KAZT-TV under authoritative guidance related to the consolidation of VIEs. There were no

significant transactions arising from Nexstar's outsourcing agreement with Cunningham or TBA with KAZT, L.L.C. Neither Cunningham nor KAZT, L.L.C. guarantees Nexstar's debt.

### Basis of Presentation

Certain prior year financial statement amounts have been reclassified to conform to the current year presentation. These reclassifications had no effect on net income or stockholders' equity as previously reported.

### Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and use assumptions that affect the reported amounts of assets and liabilities and the disclosure for contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. The more significant estimates made by management include, but are not limited to, those relating to valuation of assets acquired and liabilities assumed in business combinations, distribution revenue recognized, income taxes, the recoverability of goodwill, indefinite-lived intangible assets (FCC licenses), long-lived assets (property and equipment, definite-lived intangible assets and right-of-use assets), investments and broadcast rights, the useful lives of long-lived assets, valuation of pension and postretirement obligations, fair value of stock-based compensation, accretion of redeemable noncontrolling interests and allowance for credit losses. As of December 31, 2025, the Company is not aware of any specific event or circumstance that would require an update to its estimates or judgments or revision of the carrying value of its assets or liabilities. However, these estimates and judgments may change as new events occur and additional information is obtained, which may result in changes being recognized in the Company's consolidated financial statements in future periods. Such judgments and assumptions could result in a meaningful impact on the Company's consolidated financial statements in future periods. Actual results could differ from those estimates and any such differences may have a material impact on the Company's consolidated financial statements.

### Cash and Cash Equivalents

The Company considers all highly liquid investments purchased with an original maturity of 90 days or less to be cash equivalents.

### Accounts Receivable and Allowance for Credit Losses

The Company's accounts receivable consist primarily of billings to its customers for advertising broadcast on its stations or placed on its websites, for retransmission consent or network carriage by cable or satellite operators, and for digital publishing and content management, digital video advertising, social media advertising and related services. Trade receivables normally have terms of 30 days and the Company has no interest provision for customer accounts that are past due. The Company maintains an allowance for estimated losses resulting from the inability of customers to make required payments. Management periodically evaluates the collectability of accounts receivable based on a combination of factors, including customer payment history, known customer circumstances, the overall aging of customer balances and trends. In circumstances where management is aware of a specific customer's inability to meet its financial obligations, an allowance is recorded to reduce the receivable amount to an amount estimated to be collectable.

### Concentration of Credit Risk

Financial instruments which potentially expose the Company to a concentration of credit risk consist principally of cash and cash equivalents and accounts receivable. Cash deposits are maintained with several financial institutions. Deposits held with banks may exceed the amount of insurance provided on such deposits; however, the Company believes these deposits are maintained with financial institutions of reputable credit and are not subject to any unusual credit risk. A significant portion of the Company's accounts receivable is due from cable, satellite and other multichannel video programming distributors ("MVPDs"), virtual multichannel video programming distributors ("vMVPDs") via our affiliation agreements with Big 4 networks, and local and national advertising agencies. The Company does not require collateral from its customers but maintains reserves for potential credit losses. Management believes that the allowance for credit losses is adequate, but if the financial condition of the Company's customers were to deteriorate, additional allowances may be required. The Company has not experienced significant losses related to receivables from individual customers or by geographical area.

### Property and Equipment, Net

Property and equipment is stated at cost or at estimated fair value if acquired through a business combination. The cost and related accumulated depreciation applicable to assets sold or retired are removed from the accounts and the gain or loss on disposition is recognized. Major renewals and betterments are capitalized, and ordinary repairs and maintenance are charged to expense in the period incurred. Depreciation is computed on a straight-line basis over the estimated useful lives of the assets (see Note 4).

### *Intangible Assets, Net*

Intangible assets consist primarily of goodwill, FCC licenses, network affiliation agreements, developed technology, brand value and customer relationships arising from acquisitions.

The Company accounts for acquired businesses using the acquisition method of accounting, which requires that purchase prices, including any contingent consideration, are measured at acquisition date fair values. These purchase prices are allocated to the assets acquired and liabilities assumed at estimated fair values at the date of acquisition using various valuation techniques, including the income approach, such as discounted projected cash flows, and other income, market or cost approaches.

The estimated fair value of an FCC license acquired in a business combination is calculated using a discounted projected cash flow model referred to as the Greenfield Method. The Greenfield Method attempts to isolate the income that is attributable to the license alone. This approach is based upon modeling a hypothetical start-up station and building it up to a normalized operation that, by design, lacks an affiliation with a network (commonly known as an independent station), lacks inherent goodwill and whose other assets have essentially been added as part of the build-up process. The Greenfield Method assumes annual cash flows over a projection period model. Inputs to this model include, but are not limited to, (i) a four-year build-up period for a start-up station to reach a normalized state of operations, (ii) television market long-term growth rate over a projection period, (iii) estimated market revenue share for a typical market participant without a network affiliation, (iv) estimated profit margins based on industry data, (v) capital expenditures based on the size of market and the type of station being constructed, (vi) estimated tax rates in the appropriate jurisdiction, and (vii) an estimated discount rate using a weighted average cost of capital analysis. The Greenfield Method also includes an estimated terminal value by discounting an estimated annual cash flow with an estimated long-term growth rate.

The assumptions used in estimating the fair value of a network affiliation agreement acquired in a business combination are similar to those used in the valuation of an FCC license. The Greenfield Method is also utilized in the valuation of network affiliation agreements except that the estimated market revenue share, estimated profit margins, capital expenditures and other assumptions reflect a market participant premium based on the programming of a network affiliate relative to an independent station. This approach would result in an estimated collective fair value of the FCC license and a network affiliation agreement. The excess of the estimated fair value in this model over the estimated value of an FCC license of an independent station under the Greenfield Method represents the estimated fair value of a network affiliation agreement.

Goodwill represents the excess of the purchase price over the fair value of the identifiable net assets acquired. During the measurement period, which may be up to one year from the acquisition date of a business, the Company records adjustments related to the assets acquired and liabilities assumed with the corresponding offset to goodwill. Upon the conclusion of the measurement period or final determination of the values of assets acquired and liabilities assumed, whichever comes first, any subsequent adjustments are recognized in the Company's Consolidated Statements of Operations.

The Company's goodwill and FCC licenses are considered to be indefinite-lived intangible assets. Subsequent to acquisition, these assets are not amortized but are tested for impairment annually in the Company's fourth quarter, or more frequently if events or changes in circumstances indicate that such assets might be impaired. The use of an indefinite life for FCC licenses contemplates the Company's historical ability to renew its licenses such that renewals generally may be obtained indefinitely and at little cost. Therefore, cash flows derived from the FCC licenses are expected to continue indefinitely. Network affiliation agreements are subject to amortization computed on a straight-line basis over the estimated useful life of 15 years. The 15-year life assumes affiliation contracts will be renewed upon expiration. Changes in the likelihood of renewal could require a change in the useful life of such assets and cause an acceleration of amortization. The Company evaluates the remaining lives of its network affiliations whenever changes occur in the likelihood of affiliation contract renewals, and at least on an annual basis.

For purposes of goodwill impairment tests, the Company has one aggregated television stations reporting unit because of the stations' similar economic characteristics, one cable network reporting unit, and one digital business reporting unit. The Company's impairment review for FCC licenses is performed at the television station market level.

The Company first assesses the qualitative factors to determine the likelihood of the goodwill and FCC licenses being impaired. The qualitative analysis includes, but is not limited to, assessing the changes in macroeconomic conditions, regulatory environment, industry and market conditions, and the financial performance versus budget of the reporting units, as well as any other events or circumstances specific to the reporting units or the FCC licenses. If it is more likely than not that the fair value of a reporting unit's goodwill or a station's FCC license is greater than its carrying amount, no further testing will be required. Otherwise, the Company will apply the quantitative impairment test method.

The quantitative impairment test for goodwill is performed by comparing the fair value of a reporting unit with its carrying amount. If the fair value of the reporting unit exceeds its carrying value, goodwill is not impaired and no further testing is required. If the fair value of the reporting unit is less than the carrying value, an impairment charge is recognized for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. The quantitative impairment test for FCC licenses consists of a market-by-market comparison of the carrying amounts of FCC licenses with their fair values, using the Greenfield Method of discounted cash flow analysis. An impairment is recorded when the carrying value of an FCC license exceeds its fair value.

Determining the fair value of reporting units and FCC licenses requires management to make judgments about assumptions and estimates that are highly subjective and that are based on unobservable inputs. The actual results may differ from these assumptions and estimates, and it is possible that such differences could have a material impact on the Company's Consolidated Financial Statements. In addition to the various inputs (e.g. revenue growth, operating profit margins, capital expenditures, discount rates) used to calculate the fair value of reporting units, the Company evaluates the reasonableness of its assumptions by comparing the total fair value of all its reporting units to its total market capitalization and by comparing the fair values of its reporting units to recent market sale transactions.

The Company tests definite-lived intangible assets and other long-lived assets to be held and used for impairment whenever events or changes in circumstances indicate that their carrying amount may not be recoverable, relying on certain factors, including operating results, business plans, economic projections and anticipated future cash flows. The carrying value of a long-lived asset or asset group is considered impaired when the projected future undiscounted cash flows to be generated from the asset or asset group over its remaining life, or primary asset's life, plus any proceeds from the eventual disposition are less than its carrying value. The Company measures impairment based on the amount by which the carrying value exceeds the estimated fair value of the long-lived asset or asset group. The fair value is determined primarily by using the projected future cash flows discounted at a rate commensurate with the risk involved as well as market valuations.

### Investments

The Company accounts for investments in which it owns at least 20% of an investee's voting securities or has significant influence over an investee under the equity method of accounting.

The Company records equity method investments at cost. For investments acquired in a business combination, the cost is the estimated fair value allocated to the investment. At acquisition date, the Company measures its estimated share of the differences between the estimated fair values and carrying values (the "basis difference") of the investees' tangible assets, amortizable intangible assets and goodwill had the fair value of the investments been allocated to the identifiable assets of the investees in accordance with ASC Topic 805, "Business Combinations." The Company amortizes its share of the basis differences attributable to the investee's tangible assets and amortizable intangible assets over the estimated useful life of each asset.

The amounts initially recognized as investment are increased by cash contributions made to and decreased by cash distributions from the investee. The investment is also adjusted for the Company's appropriate share of the net earnings or losses of the investee and its share in the amortization of basis differences attributable to the investee's tangible assets and amortizable intangible assets. The Company's share in earnings and losses of the investee, along with its share in the amortization of basis differences is reported within "Income from equity method investments, net (excluding impairment)" in the accompanying Consolidated Statements of Operations. Cash distributions received from investments are classified in the Consolidated Statements of Cash Flows based on the nature of the investee activities that generated the distribution. Returns on capital distributions are presented as cash flow from operating activities whereas returns of capital distributions are presented as cash flow from investing activities.

The Company evaluates its equity method investments for impairment whenever events or changes in circumstances indicate that the carrying amounts of such investments may be impaired. The Company assesses these investments for other-than-temporary impairment ("OTTI") on at least a quarterly basis, and more frequently when economic or market conditions warrant. If the fair value of the investment is below the carrying value, an impairment charge is recorded.

See Note 6 for additional information on the Company's investments.

### Broadcast Rights and Broadcast Rights Payable

The Company acquires licenses to broadcast programs from national program syndicators and from certain production companies. The Company records these contracts as an asset and a liability when the following criteria are met: (i) the license period has begun, (ii) the cost of each program is known or reasonably determinable, (iii) the program material has been accepted in accordance with the license agreement, and (iv) the program is produced and available for broadcast. Broadcast rights are initially recorded at the contract cost and are amortized on a straight-line basis over the period the programming airs. The current portion of broadcast rights represents those rights available for broadcast which will be amortized in the succeeding year. The Company

periodically evaluates the net realizable value, calculated using the average historical rates for the programs or the time periods the programming will air, of broadcast rights and adjusts the amortization for any deficiency calculated. As of December 31, 2025 and 2024, programming costs included $28 million and $33 million, respectively, that were contractually due related to episodes that had been completed by certain production companies but not yet delivered to the Company. Such episodes are typically delivered within a few weeks of completion.

The Company also acquired exclusive rights to broadcast various live sports games in exchange for rights fees paid over the season associated with the live sports games. The Company amortizes these programming rights as an expense over each season based upon contractually stated rates which align with the projected revenue over the contractual term. Amortization is evaluated periodically, based on revenue projections, and adjusted as necessary.

### *Leases*

The Company determines if a contract is a lease at inception. We determine that a contract contains a lease if we obtain substantially all of the economic benefits of, and the right to direct the use of, an asset identified in the contract. For leases with terms greater than 12 months, we record right-of-use ("ROU") asset and lease liability which are both measured at the present value of the future lease payments over the lease term. The lease payments exclude any executory costs as they are not significant. The lease term may include options to extend or terminate the lease when it is reasonably certain that the Company will exercise that option. When determining if a renewal option is reasonably certain of being exercised, the Company considers several factors, including but not limited to the significance of leasehold improvements incurred on the property, whether the asset is difficult to replace, and specific characteristics unique to the particular lease that would make it reasonably certain that the Company would exercise such option. As most of the Company's leases do not provide an implicit rate, the incremental borrowing rate was used in determining the present value of future lease payments. The discount rate represents a risk-adjusted rate on a secured basis and is the rate at which the Company would borrow funds to satisfy the scheduled lease liability payment streams commensurate with the lease term. ROU assets and lease liabilities arising from operating leases are included in other noncurrent assets, other current liabilities and other noncurrent liabilities in the accompanying Consolidated Balance Sheets. Lease expense for lease payments is recognized on a straight-line basis over the lease term. See Note 9 for additional disclosures on the Company's leases.

### *Pension plans and postretirement benefits*

A determination of the liabilities and cost of Nexstar's pension and other postretirement plans requires the use of assumptions. The actuarial assumptions used in the pension and postretirement reporting are reviewed annually with independent actuaries and are compared with external benchmarks, historical trends and Nexstar's own experience to determine that its assumptions are reasonable. The assumptions used in developing the required estimates include the following key factors: discount rates, expected return on plan assets, mortality rates, retirement rates and expected contributions. The amount by which the projected benefit obligation exceeds the fair value of the pension plan assets is recorded in other noncurrent liabilities in the accompanying Consolidated Balance Sheets.

The net periodic benefit credit, which consists of expected return on plan assets and interest costs, is disclosed on a separate line item below income from operations in the accompanying Consolidated Statements of Operations.

### *Redeemable Noncontrolling Interests*

On September 30, 2022, Nexstar acquired a 75.0% ownership interest in The CW. Since that time, Nexstar acquired additional ownership interest in the network increasing its ownership to 80.8% as of December 31, 2025. Pursuant to the operating agreement governing The CW, Nexstar has a call right to acquire the noncontrolling ownership interests in The CW that is exercisable during a certain period each year, and each noncontrolling owner has a put right to sell its ownership interest in The CW to Nexstar beginning in June 2026, subject to Nexstar's one year deferral right, for cash. The amount at which the noncontrolling interests can be redeemed under either the call right or the put rights is the greater of the capital contributed by the minority owners or a multiple of The CW's earnings.

Redeemable noncontrolling interests are presented as mezzanine equity (outside of liability and stockholders' equity) in the accompanying Consolidated Balance Sheets as they are redeemable by the holders through their put rights and the redemption is outside Nexstar's control. We accrete the changes in the redemption value of redeemable noncontrolling interests over the period from issuance to the earliest redemption date using the effective interest method. The accretion is recognized as an adjustment to retained earnings, or in the absence of retained earnings, additional paid-in capital. The balance of redeemable noncontrolling interests is measured at the greater of accreted redemption value at the end of each reporting period or the initial carrying value adjusted for the noncontrolling interests' contributions and share in income and losses.

During the third quarter of 2024, Nexstar recorded an adjustment to establish a $27 million carrying amount of noncontrolling interests to redeemable noncontrolling interests and reduced retained earnings by $20 million to accrete redeemable noncontrolling interests, of which $7 million was the impact of out-of-period accretion adjustment. The accretion is included in the calculation of earnings per share (see Note 15).

### Revenue Recognition

The Company recognizes revenue when control of a promised service is transferred to a customer in exchange for an amount that reflects the consideration the Company expects to be entitled to receive. Total revenue includes distribution, advertising and other. The Company's contracts with customers may include multiple performance obligations. For such arrangements, the Company allocates revenue to each performance obligation based on its relative standalone selling price, which is generally determined based on the price charged to customers. The Company also determines whether gross or net presentation is appropriate based on its relationship in the applicable transaction with its ultimate customer. Amounts paid by customers in advance are recorded as deferred revenue until the performance obligations are satisfied. Costs to obtain customer contracts (e.g., sales commissions) are expensed as incurred due to the short-term nature of such contracts.

*Distribution Revenues*—The Company receives compensation from MVPDs as well as vMVPDs, via our affiliation agreements with Big 4 networks, in return for the Company's consent to the retransmission of the signals of its television stations or the carriage of NewsNation's cable network. The arrangements are multi-year contracts and provide revenue based on a monthly amount the Company is entitled to receive per subscriber the MVPDs and vMVPDs have. These revenues are considered licenses of functional intellectual property and are recognized at the point in time the broadcast signal or cable network feed is delivered to the customers. The distributors report their subscriber numbers to the Company on a 30- to 60-day lag, which coincides with their payment of the fees due to the Company. Prior to receiving the report, the Company records revenue based on an estimated number of subscribers and the monthly amount the Company is entitled to receive per subscriber. Adjustments associated with the resolution of such estimates have, historically, been inconsequential. We also generate distribution revenues from fees paid by affiliates of The CW and from programmers who use our spectrum in selected local markets to air their content on our multicast streams, which are recognized as network programming and spectrum capacity, respectively, are delivered to customers.

*Advertising Revenues*—Advertising revenue primarily results from (i) the sale of commercial airtime to local, regional and national businesses, political candidates and other political advertisers by our stations and networks and (ii) digital advertising through the sale of advertising spots on our owned or third-party websites, and through mobile and over-the-top ("OTT") applications and other digital advertising solutions. For the sale of commercial airtime, the contracts are short-term in nature and the performance obligation is identified at the contract level as it represents a promise to deliver an agreed number of spots, an agreed price per spot and other specifications. Each performance obligation is satisfied over time as the advertiser receives and consumes benefits when its commercial is aired. For digital advertising, the contracts are short-term and the performance obligation is a promise to place an advertisement on our owned or third-party platforms over an agreed period of time or based on impressions. Advertising revenue is recognized for the amount the Company is entitled to receive, when the performance obligation is satisfied over time. Revenue from other digital businesses includes a consumer product reviews platform, which is recognized upon performance of services and applies the right to invoice practical expedient where the invoice amount corresponds directly with the value to its customers.

See Note 17 for disaggregated revenue information.

The Company does not disclose the value of unsatisfied performance obligations on its contracts with customers because they are either (i) contracts with an original expected term of one year or less, (ii) contracts for which the sales- or usage-based royalty exception was applied, or (iii) contracts for which revenue is recognized in proportion to the amount the Company has the right to invoice for services performed.

### Stock-Based Compensation

Nexstar grants time-based restricted stock units ("RSUs") and performance-based restricted stock units ("PSUs") which are described more fully in Note 13. The fair value of RSUs is based on the number of shares awarded and market price on the date of the award and is expensed over the vesting period, which is generally a one- to four-year service period. The fair value of PSUs with a market condition is determined using a Monte Carlo simulation model and is expensed over the required employee service period. Compensation expense for these PSUs is not adjusted for the actual number of shares issued based on the outcome of the market condition for completed performance periods. The fair value of PSUs with internal performance conditions is based on the market price of the shares on the date of grant and is expensed based on the probable outcome of internal performance metrics and subsequently adjusted to reflect the actual shares issued based on the outcome of the performance metrics for completed performance periods. There were no stock options granted during the periods covered in these financial statements and all outstanding awards have been fully exercised. Stock-based compensation is included in selling, general and administrative expense

in the accompanying Consolidated Statements of Operations. The excess or shortage of tax deductions over the compensation cost of stock-based payments is recognized as income tax benefit or income tax expense, respectively.

### Advertising Expense

Advertising costs, including costs to promote our brands, are expensed as incurred. During the years ended December 31, 2025, 2024 and 2023, the Company's advertising and promotion costs were $38 million, $48 million, and $71 million, respectively.

### Debt Financing Costs

Debt financing costs represent direct costs incurred to obtain long-term financing and are amortized to interest expense over the term of the related debt using the effective interest method. Previously capitalized debt financing costs are expensed and included in loss on extinguishment of debt if the Company determines that there has been a substantial modification of the related debt. Debt financing costs related to term loans and senior unsecured notes are combined with debt discounts and presented as a direct deduction from the carrying amount of debt. Debt financing costs related to revolving credit facilities are included in other noncurrent assets.

### Income Taxes

The Company accounts for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the carrying amounts and tax basis of assets and liabilities. A valuation allowance is applied against net deferred tax assets if, based on the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. Nexstar files a consolidated federal income tax return. Mission, White Knight and 54 Broadcasting, Inc. (a subsidiary of Vaughan and owner of station KNVA) file their own separate federal income tax returns. The CW and Vaughan are disregarded entities for tax purposes and do not incur tax within the consolidated financial statements.

The Company recognizes the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities. The determination is based on the technical merits of the position and presumes that each uncertain tax position will be examined by the relevant taxing authority that has full knowledge of all relevant information. The Company recognizes interest and penalties relating to income taxes within income tax expense.

### Comprehensive Income

The Company's comprehensive income consists of net income and unrecognized actuarial gains and losses on its pension and postretirement liabilities, net of income tax adjustments.

### Income Per Share

Net income attributable to Nexstar Media Group, Inc. less accretion of redeemable noncontrolling interests equals net income available to Nexstar's common stockholders. Basic income per share is computed by dividing the net income available to Nexstar's common stockholders by the weighted-average number of common shares outstanding during the period. Diluted income per share is computed using the weighted-average number of common shares and potentially dilutive common shares outstanding during the period. Potentially dilutive common shares are calculated using the treasury stock method. They consist of common shares that could be issued from the vesting of outstanding restricted stock units and, in the prior years, the exercise of outstanding stock options. See Note 15 for additional information.

### Segment Presentation

The Company assesses its operating segments in accordance with Accounting Standards Codification ("ASC") Topic 280, *"Segment Reporting."* Nexstar operates in one reportable broadcast segment. The other activities of the Company include operating segments that are nonreportable, the management of certain real estate assets and corporate function. See Notes 5 and 17 for additional segment information.

### Recent Accounting Pronouncements

### New Accounting Standards Adopted

In December 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2023-09, "Income Taxes (Topic 740): Improvements to Income Tax Disclosures" ("ASU 2023-09"). ASU 2023-09 applies to all entities that are subject to Topic 740, Income Taxes and is intended to enhance the transparency and decision usefulness of income tax disclosures. The new guidance requires consistent categorization and greater disaggregation of information in the rate reconciliation, as well as further disaggregation of income taxes paid. The Company adopted ASU 2023-09 for the year ended December 31, 2025, and applied the amendments retrospectively to all periods presented in the consolidated financial statements (see Note 14 for our updated income tax disclosures).

### New Accounting Standards Not Yet Adopted

In November 2024, the FASB issued ASU No. 2024-03, "Income Statement–Reporting Comprehensive Income–Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses" ("ASU 2024-03"). Additionally, in January 2025, the FASB issued ASU 2025-01 to clarify the effective date of ASU 2024-03. ASU 2024-03 requires a public entity to disclose additional information about specific expense categories in the notes to financial statements on an annual and interim basis. The amendments in ASU 2024-03 are effective for annual periods beginning after December 15, 2026, and interim periods beginning after December 15, 2027. Early adoption is permitted on either a prospective or retrospective basis. The Company is currently evaluating the potential impacts of ASU 2024-03 on its Consolidated Financial Statements and related disclosures.

In September 2025, the FASB issued ASU No. 2025-06, "Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40): Targeted Improvements to the Accounting for Internal-Use Software" ("ASU 2025-06"). ASU 2025-06 amends the existing standard to remove all references to prescriptive and sequential software development project stages and require that the entity capitalize software costs when both: management has authorized and committed to funding the software project; and it is probable that the project will be completed and the software will be used to perform the intended function (referred to as the "probable-to-complete" recognition threshold). ASU 2025-06 is effective for all annual periods beginning after December 15, 2027, and for interim periods within those annual reporting periods, with early adoption permitted. The guidance may be applied on a prospective basis, a modified basis, or a retrospective basis. The Company is currently evaluating the potential impacts of ASU 2025-06 on its Consolidated Financial Statements and related disclosures.

## Note 3:  Acquisition

### 2025 Acquisition

On January 31, 2025, Nexstar acquired certain assets of WBNX-TV, an independent full power television station serving the Cleveland, OH market, from Winston Broadcasting Network, Inc. for a $22 million cash purchase price. The acquired assets and assumed liabilities were recorded at fair value as of the closing date of the transaction and consisted primarily of $20 million related to the FCC license.

### 2023 Acquisitions

On July 20, 2023, Nexstar acquired certain assets of WSNN-LD, an MNTV affiliated low power television station serving the Tampa, Florida market, from Citadel Communications, LLC. On August 31, 2023, Nexstar acquired certain assets of KUSI-TV, an independent full power television station serving the San Diego, CA market, from McKinnon Broadcasting Company and Channel 51 of San Diego, Inc. The total purchase price of these acquisitions was $38 million, including working capital adjustments. The acquired assets and assumed liabilities were recorded at fair value as of the closing dates of the transactions and consisted primarily of $13 million in property and equipment and $19 million in FCC licenses.

## Note 4:  Property and Equipment

Property and equipment consisted of the following, as of December 31 ($ in millions):

| | Estimated useful life, in years | 2025 | | 2024 | |
|---|---|---|---|---|---|
| Buildings and improvements | 39 | $ | 464 | $ | 430 |
| Land | N/A | | 249 | | 249 |
| Leasehold improvements | term of lease | | 144 | | 140 |
| Studio and transmission equipment | 5-15 | | 1,135 | | 1,115 |
| Computer equipment | 3-5 | | 119 | | 154 |
| Furniture and fixtures | 7 | | 34 | | 33 |
| Vehicles | 5 | | 68 | | 67 |
| Construction in progress | N/A | | 39 | | 37 |
| | | | 2,252 | | 2,225 |
| Less: accumulated depreciation and amortization | | | (1,094) | | (1,018) |
| Property and equipment, net | | $ | 1,158 | $ | 1,207 |

F-18

For the years ended December 31, 2025, 2024 and 2023, depreciation expense of $168 million, $185 million and $176 million, respectively, was included in depreciation and amortization of intangible assets in the accompanying Consolidated Statements of Operations.

## Note 5:  Intangible Assets and Goodwill

The Company's goodwill by segment, indefinite-lived intangible assets and definite-lived intangible assets consisted of the following, as of December 31 (in millions):

| | Reportable Broadcast Segment | | | Other Segments | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| Goodwill | Gross | Accumulated Impairment | Net | Gross | Accumulated Impairment | Net | Gross | Accumulated Impairment | Net |
| Balances as of December 31, 2024 | $ 2,920 | $ (43) | $ 2,877 | $ 225 | $ (180) | $ 45 | $ 3,145 | $ (223) | $ 2,922 |
| Current year acquisition (Note 3) | 2 | - | 2 | - | - | - | 2 | - | 2 |
| Impairment loss | - | - | - | - | (14) | (14) | - | (14) | (14) |
| Balances as of December 31, 2025 | $ 2,922 | $ (43) | $ 2,879 | $ 225 | $ (194) | $ 31 | $ 3,147 | $ (237) | $ 2,910 |

| | FCC Licenses | | |
|---|---|---|---|
| Indefinite-lived Intangible Assets | Gross | Accumulated Impairment | Net |
| Balances as of December 31, 2024 | $ 2,977 | $ (48) | $ 2,929 |
| Current year acquisition (Note 3) | 20 | - | 20 |
| Balances as of December 31, 2025 | $ 2,997 | $ (48) | $ 2,949 |

| | Network Affiliation Agreements | | | Other Definite-Lived Intangible Assets | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| Definite-Lived Intangible Assets | Gross | Accumulated Amortization and Impairment | Net | Gross | Accumulated Amortization and Impairment | Net | Gross | Accumulated Amortization and Impairment | Net |
| Balances as of December 31, 2024 | $ 3,125 | $ (1,631) | $ 1,494 | $ 1,115 | $ (762) | $ 353 | $ 4,240 | $ (2,393) | $ 1,847 |
| Balances as of December 31, 2025 | $ 3,125 | $ (1,820) | $ 1,305 | $ 1,157 | $ (875) | $ 282 | $ 4,282 | $ (2,695) | $ 1,587 |

The estimated useful lives of network affiliation agreements and other definite-lived intangible assets are 15 years and one to 20 years, respectively. The decrease in definite-lived intangible assets was primarily due to amortization.

For the years ended December 31, 2025, 2024 and 2023, amortization expense of $302 million, $299 million and $311 million, respectively, was included in depreciation and amortization of intangible assets in the accompanying Consolidated Statements of Operations.

The following table presents the Company's estimate of amortization expense for each of the five succeeding fiscal years and thereafter for definite-lived intangible assets as of December 31, 2025 (in millions):

| | | |
|---|---|---|
| 2026 | $ | 283 |
| 2027 | | 267 |
| 2028 | | 242 |
| 2029 | | 222 |
| 2030 | | 178 |
| Thereafter | | 395 |
| | $ | 1,587 |

In the fourth quarter of 2025, using the qualitative impairment test, the Company performed its annual impairment assessment on goodwill attributable to its aggregated television stations reporting unit and cable reporting unit. Based on the results of such qualitative impairment tests, the Company concluded that it was more likely than not that the reporting units' fair values would sufficiently exceed the related carrying amounts.

With respect to a digital reporting unit, Nexstar recognized goodwill impairment of $14 million and $24 million during the fourth quarter of 2025 and 2024, respectively. During these quarters, we elected to perform quantitative impairment tests on this reporting unit due to operating performance and uncertain economic conditions. We estimated the fair value based on a valuation report prepared by a third-party valuation firm who used a combination of an income approach, which employs a discounted cash

flow model, and a market approach, which based the valuation on earnings multiples of comparable publicly traded digital media businesses and market net revenue multiples of comparable digital media transactions. As of December 31, 2025, the remaining goodwill of this reporting unit was $31 million. The likelihood of a material impairment is mitigated by the reduced book value of remaining goodwill.

During the year ended December 31, 2023, Nexstar recorded a goodwill impairment of $19 million (and $16 million impairment on definite-lived intangible assets) attributable to a separate digital reporting unit. This reporting unit has no remaining book value of goodwill and definite-lived intangible assets.

Our quantitative goodwill impairment tests are sensitive to changes in key assumptions used in our analysis. In our income approach models, if our projections of revenue growth rates and margins are not realized, if market factors outside of our control, such as increases in discount rates, occur, or if management's expectations or plans change, including changes to a reporting unit's long-term operating plans, the Company's goodwill and other key assets could be impaired in the future. With respect to net revenue and earnings multiples, the key uncertainties are determining the reporting unit's comparable public companies, comparable transactions and the selection of the market multiples.

The Company performed its annual impairment assessment on FCC licenses for each television station market using the qualitative impairment test. Based on the results of such qualitative impairment tests, the Company concluded that it was more likely than not that their fair values would sufficiently exceed the related carrying amounts.

The Company also evaluated its definite-lived intangible assets and other long-lived assets as to whether events or changes in circumstances indicate that such assets may be impaired. Based on our estimate of undiscounted future pre-tax cash flows expected to result from the use and eventual disposition of these assets, the Company determined that the carrying amounts are recoverable. No other events or circumstances were noted in 2025 that would indicate impairment.

## Note 6:  Investments

Investments in the Company's Consolidated Balance Sheets as of December 31 consisted of the following (in millions):

|  | **2025** | **2024** |
|---|---|---|
| Equity method investments | $ 390 | $ 873 |
| Other equity investments | 6 | 4 |
| Total investments | $ 396 | $ 877 |

### *Equity Method Investments — Investment in TV Food Network*

Nexstar's equity method investments primarily include its 31.3% ownership stake in TV Food Network which was acquired upon Nexstar's acquisition of Tribune Media Company ("Tribune") on September 19, 2019. Nexstar's partner in TV Food Network is Warner Bros. Discovery, Inc. ("WBD"), which owns a 68.7% interest in TV Food Network and operates the network on behalf of the partnership.

TV Food Network operates two 24-hour television networks, Food Network and Cooking Channel, offering quality television, video, internet and mobile entertainment and information focusing on food and entertaining.

The partnership agreement governing TV Food Network provides that the partnership shall, unless certain actions are taken by the partners, dissolve and commence winding up and liquidating TV Food Network upon the first to occur of certain enumerated liquidating events, one of which is a specified date of December 31, 2026. Nexstar intends to renew its partnership agreement with WBD for TV Food Network before expiration. In the event of a liquidation, Nexstar would be entitled to its proportionate share of distributions to partners, which the partnership agreement provides would occur as promptly as is consistent with obtaining fair market value for the assets of TV Food Network. The partnership agreement also provides that the partnership may be continued or reconstituted in certain circumstances.

Nexstar recognized the following related to its investment in TV Food Network during the years ended December 31, 2025, 2024 and 2023:

|  | **Years Ended December 31,** | | |
|---|---|---|---|
|  | **2025** | **2024** | **2023** |
| Cash distributions received | $ 137 | $ 154 | $ 270 |
| Recognized share in TV Food Network's net income | 102 | 144 | 177 |
| Recorded amortization of basis difference (expense) | (69) | (69) | (69) |
| Impairment loss | (381) | - | - |

During the fourth quarter of 2025, Nexstar identified indicators of OTTI related to its investment in TV Food Network, including continued softness in the U.S. linear advertising market for entertainment cable networks, declining MVPD subscribers and demand for entertainment cable networks by viewers and distributors, ongoing shifts in consumer preferences toward streaming and other digital platforms, and additional market data from recent spin-offs involving cable networks. Nexstar estimated the fair value of the investment using a valuation prepared by an independent third-party firm applying both income and market approaches. The income approach utilized a discounted cash flow model based on a five-year projection period, a 9.25% discount rate, and a terminal value incorporating a long-term cash flow growth rate of -3%. The market approach considered earnings multiples of comparable publicly traded businesses. Based on this analysis, Nexstar concluded that the fair value of its investment was below the carrying amount. As a result, a pre-tax, non-cash impairment charge of $381 million was recorded in "Impairment of an equity method investment" in the Consolidated Statements of Operations.

Fair value estimates related to Nexstar's investment in TV Food Network are sensitive to changes in the key assumptions used. Under the income approach, our lack of control over TV Food Network introduces significant uncertainty in the projected operating results. If projected revenue or cash flows are not achieved due to changes in TV Food Network's strategic or operational plans, if the projected long-term decline rate increases, or if external market forces such as increases in discount rates occur, the estimated fair value of our investment could decline further, potentially resulting in additional impairment charges. When applying market approaches, key uncertainties include the identification of appropriate comparable public companies, the lack of recent comparable market transactions, and the selection of market multiples.

As of December 31, 2025, Nexstar's investment in TV Food Network had a book value of $372 million, compared to $857 million as of December 31, 2024.

As of December 31, 2025, Nexstar's remaining share in the amortizable basis difference related to its investment in TV Food Network was $258 million, which will be amortized over a remaining estimated life of approximately 3.7 years, and Nexstar's share in basis difference attributable to the investee's goodwill was adjusted to $119 million to reflect the OTTI recognized in the fourth quarter of 2025. As of December 31, 2024, Nexstar's share in the amortizable basis difference and goodwill was $328 million and $500 million, respectively.

Summarized financial information for TV Food Network is as follows (in millions):

| Summarized financial information - TV Food Network | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2025** | | **2024** | | **2023** | |
| Net revenue | $ | 810 | $ | 1,017 | $ | 1,124 |
| Costs and expenses | | 491 | | 553 | | 571 |
| Income from operations | | 319 | | 464 | | 554 |
| Net income | | 325 | | 465 | | 565 |
| Net income attributable to Nexstar Media Group, Inc. | | 102 | | 144 | | 177 |

| | As of December 31 | | | |
|---|---|---|---|---|
| | **2025** | | **2024** | |
| Current assets | $ | 270 | $ | 365 |
| Noncurrent assets | | 426 | | 472 |
| Current liabilities | | 69 | | 96 |
| Noncurrent liabilities | | - | | - |

### Other Equity Investments

In February 2024, Nexstar received $40 million in cash proceeds, and recorded a gain on disposal of an investment for the same amount, in connection with Broadcast Music Inc.'s ("BMI") sale to New Mountain Capital.

**Note 7: Accrued Expenses**

Accrued expenses consisted of the following, as of December 31 (in millions):

| | 2025 | | 2024 |
|---|---|---|---|
| Compensation and related taxes | $ | 99 | $ | 91 |
| Interest payable | | 55 | | 56 |
| Network affiliation fees | | 77 | | 77 |
| Other | | 83 | | 90 |
| | $ | 314 | $ | 314 |

**Note 8: Debt**

Long-term debt consisted of the following, as of December 31 ($ in millions):

| | 2025 | | 2024 |
|---|---|---|---|
| Nexstar | | | |
| Revolving loans, due June 2030 | $ | 144 | $ | - |
| Term Loan A, due June 2030 | | 1,857 | | - |
| Term Loan A, due June 2027 | | - | | 2,121 |
| Term Loan B, due June 2032 | | 1,297 | | - |
| Term Loan B, due September 2026 | | - | | 1,358 |
| 5.625% Notes, due July 2027 | | 1,714 | | 1,714 |
| 4.75% Notes, due November 2028 | | 1,000 | | 1,000 |
| Mission | | | |
| Revolving loans, due June 2030 | | 62 | | - |
| Revolving loans, due June 2027 | | - | | 62 |
| Term Loan B, due June 2028 | | 287 | | 290 |
| Total outstanding principal | | 6,361 | | 6,545 |
| Less: unamortized financing costs and discount – Nexstar Term Loan A, due June 2030 | | (5) | | - |
| Less: unamortized financing costs and discount – Nexstar Term Loan A, due June 2027 | | - | | (4) |
| Less: unamortized financing costs and discount – Nexstar Term Loan B, due June 2032 | | (19) | | - |
| Less: unamortized financing costs and discount – Nexstar Term Loan B, due September 2026 | | - | | (14) |
| Add: unamortized premium, net of financing costs – Nexstar 5.625% Notes, due July 2027 | | 1 | | 2 |
| Less: unamortized financing costs and discount – Nexstar 4.75% Notes, due November 2028 | | (4) | | (5) |
| Less: unamortized financing costs and discount – Mission Term Loan B, due June 2028 | | (1) | | (1) |
| Total outstanding debt | | 6,333 | | 6,523 |
| Less: current portion | | (111) | | (124) |
| Long-term debt, net of current portion | $ | 6,222 | $ | 6,399 |

Nexstar's outstanding term loans and revolving loans are governed by Nexstar's credit agreement (as amended, the "Nexstar credit agreement"), and Mission's outstanding term loans and revolving loans are governed by Mission's credit agreement (as amended, the "Mission credit agreement"). Each of the amended credit agreements is also herein referred to as a "senior secured credit facility" (collectively, the "senior secured credit facilities"). Nexstar's senior unsecured notes are governed by the indentures.

***Senior Secured Credit Facilities***

***2025 Activities***

During the year ended December 31, 2025, the Company repaid scheduled principal maturities of $84 million.

On June 27, 2025, Nexstar and Mission, an independently owned VIE consolidated by Nexstar, amended their respective senior secured credit facilities. The amendments provided for the following:

• $750 million Nexstar revolving credit facility, due June 27, 2030 (of which $144 million was borrowed)

• $75 million Mission revolving credit facility, due June 27, 2030 (of which $62 million was borrowed)

• $1,905 million Nexstar Term Loan A, due June 27, 2030

• $1,300 million Nexstar Term Loan B, due June 27, 2032

The proceeds from the above new senior secured credit facilities, together with cash on hand, were used to repay the following outstanding loans on June 27, 2025:

- $62 million Mission revolving loan, due June 2027

- $2,091 million Nexstar Term Loan A, due June 2027

- $1,358 million Nexstar Term Loan B, due September 2026

Each of the Nexstar revolving credit facility, due June 2030, the Mission revolving credit facility, due June 2030, and the Nexstar Term Loan A, due June 2030, bear interest at the Secured Overnight Financing Rate ("SOFR") for the applicable interest period plus 1.50% per annum (subject to a pricing grid). The Nexstar Term Loan B, due June 2032, bears interest at SOFR for the applicable interest period plus 2.50% per annum.

In connection with the debt refinancing, the Company deferred $18 million in new lender fees and third-party costs associated with the issuance of new term loans (Term Loan A, due June 2030, and Term Loan B, due June 2032). Deferred financing costs under the previous term loans of $9 million were also carried over to the new term loans. These deferred costs are presented as a deduction of debt balance and are amortized over the related terms of debt using the effective interest method.

In connection with the debt refinancing, third-party debt issuance costs of $9 million that did not qualify for deferral were expensed and included in selling, general and administrative expenses in the accompanying Consolidated Statements of Operations for the year ended December 31, 2025.

Interest rates are selected at Nexstar's or Mission's option, as applicable, and the applicable margin is adjusted quarterly as defined in the applicable amended credit agreement. Interest is payable periodically based on the type of interest rate selected. As of December 31, the interest rates of the outstanding loans under the senior secured credit facilities were:

- 5.20% in 2025 for Nexstar's outstanding revolving loans, due June 2030 (based on an applicable margin of 1.50%)

- 5.20% and 5.88% in 2025 and 2024, respectively, for Nexstar's Term Loan A (based on an applicable margin of 1.50%)

- 6.20% and 6.88% in 2025 and 2024, respectively, for Nexstar's Term Loan B (based on an applicable margin of 2.50%)

- 5.20% and 5.88% in 2025 and 2024, respectively, for Mission's outstanding revolving loans (based on an applicable margin of 1.50%)

- 6.20% and 6.88% in 2025 and 2024, respectively, for Mission's Term Loan B (based on an applicable margin of 2.50%)

### 5.625% Notes, due July 2027

On July 3, 2019, Nexstar completed the sale and issuance of $1.120 billion 5.625% senior unsecured notes due 2027 (the "5.625% Notes, due July 2027") at par. On November 22, 2019, Nexstar completed the issuance and sale of $665 million aggregate principal amount of additional 5.625% Notes, due July 2027. These additional notes were issued at a price of 104.875%. The additional notes are treated as a single series with the 5.625% Notes, due July 2027 issued on July 3, 2019. The 5.625% Notes, due July 2027 were issued pursuant to an indenture dated July 3, 2019 (the "5.625% Indenture due 2027").

Interest on the 5.625% Notes, due July 2027 is payable semiannually in arrears on January 15 and July 15 of each year.

The 5.625% Notes, due July 2027 are guaranteed by Nexstar, Mission and certain of Nexstar's and Mission's existing and future restricted subsidiaries, subject to certain customary release provisions. The 5.625% Notes, due July 2027 are senior unsecured obligations of Nexstar and the guarantors, rank equal in right of payment with our and the guarantors' existing and future senior indebtedness, including Nexstar's 4.75% Notes, due November 2028, its term loans and its revolving credit facilities, but are effectively junior to our and the guarantors' secured debt, including the term loans and revolving credit facilities, to the extent of the value of the assets securing such debt.

At any time on or after July 15, 2022, Nexstar may redeem the 5.625% Notes, due July 2027, in whole or in part, at the redemption prices set forth in the 5.625% Indenture due 2027 plus accrued and unpaid interest to the redemption date. Upon the occurrence of a change of control (as defined in the 5.625% Indenture due 2027), each holder of the 5.625% Notes, due July 2027 may require Nexstar to repurchase all or a portion of the notes in cash at a price equal to 101.0% of the aggregate principal amount to be repurchased, plus accrued and unpaid interest, if any, thereon to the date of repurchase.

The 5.625% Notes, due July 2027 contain covenants that limit, among other things, Nexstar's ability to (1) incur additional debt, (2) pay dividends or make other distributions or repurchases or redeem its capital stock, (3) make certain investments, (4) create liens, (5) merge or consolidate with another person or transfer or sell assets, (6) enter into restrictions affecting the ability of

Nexstar's restricted subsidiaries to make distributions, loans or advances to it or other restricted subsidiaries, (7) prepay, redeem or repurchase certain indebtedness and (8) engage in transactions with affiliates.

The 5.625% Indenture due 2027 provides for customary events of default (subject in certain cases to customary grace and cure periods), which include nonpayment, breach of covenants, payment defaults or acceleration of other indebtedness, a failure to pay certain judgments and certain events of bankruptcy and insolvency. Generally, if an event of default occurs, the trustee or holders of at least 25% in principal amount of the then outstanding 5.625% Notes, due July 2027 may declare the principal of and accrued but unpaid interest, including additional interest, on all the 5.625% Notes, due July 2027 to be due and payable.

### 4.75% Notes, due November 2028

On September 25, 2020, Nexstar completed the sale and issuance of $1.0 billion 4.75% senior unsecured notes due 2028 ("4.75% Notes, due November 2028") at par. The 4.75% Notes, due November 2028 were issued under an indenture dated as of September 25, 2020 ("4.75% Notes, due November 2028 Indenture").

Interest on the 4.75% Notes, due November 2028 is payable semiannually in arrears on May 1 and November 1 of each year.

The 4.75% Notes, due November 2028 are guaranteed by Nexstar, Mission and certain of Nexstar's and Mission's existing and future restricted subsidiaries, subject to certain customary release provisions. The 4.75% Notes, due November 2028 are senior unsecured obligations of Nexstar and the guarantors, rank equal in right of payment with our and the guarantors' existing and future senior indebtedness, including Nexstar's 5.625% Notes, due July 2027, its term loans and its revolving credit facilities, but are effectively junior to our and the guarantors' secured debt, including the term loans and revolving credit facilities, to the extent of the value of the assets securing such debt.

At any time on or after November 1, 2023, Nexstar may redeem the 4.75% Notes, due November 2028, in whole or in part, at the redemption prices set forth in the 4.75% Notes, due November 2028 Indenture. Upon the occurrence of a change in control (as defined in the 4.75% Notes, due November 2028 Indenture), each holder of the 4.75% Notes, due November 2028 may require Nexstar to repurchase all or a portion of the notes in cash at a price equal to 101.0% of the aggregate principal amount to be repurchased, plus accrued and unpaid interest, if any, thereon to, but excluding, the date of repurchase.

The 4.75% Notes, due November 2028 Indenture contains covenants that limit, among other things, Nexstar's and the guarantors' ability to (1) incur additional debt, (2) pay dividends or make other distributions or repurchases or redeem its capital stock, (3) make certain investments, (4) transfer or sell assets, (5) create liens, (6) enter into restrictions affecting the ability of Nexstar's restricted subsidiaries to make distributions, loans or advances to it or other restricted subsidiaries, (7) guarantee certain indebtedness and (8) engage in transactions with affiliates.

The 4.75% Notes, due November 2028 Indenture provides for customary events of default (subject in certain cases to customary grace and cure periods), which include nonpayment, breach of covenants, payment defaults or acceleration of other indebtedness, a failure to pay certain judgments and certain events of bankruptcy and insolvency. Generally, if an event of default occurs and is continuing, the trustee or holders of at least 25% in principal amount of the then outstanding 4.75% Notes, due November 2028 may declare the principal of, premium, and accrued but unpaid interest, including additional interest, on all the 4.75% Notes, due November 2028 to be due and payable. Upon such a declaration, such principal, premium and accrued and unpaid interest will be due and payable immediately.

### Unused Commitments and Borrowing Availability

Nexstar and Mission had $586 million (net of outstanding standby letters of credit of $20 million) and $14 million, respectively, of unused revolving loan commitments under each of their senior secured credit facilities, all of which were available for borrowing, based on the covenant calculations as of December 31, 2025. The Company's ability to access funds under the senior secured credit facilities depends, in part, on its compliance with certain financial covenants. As of December 31, 2025, the Company was in compliance with its financial covenants.

### Collateralization and Guarantees of Debt

The Company's credit facilities described above are collateralized by a security interest in substantially all the combined assets, excluding FCC licenses, the other assets of consolidated VIEs unavailable to creditors of Nexstar (see Note 2) and the assets of The CW. Nexstar (excluding The CW) guarantees full payment of all obligations incurred under the Mission senior secured credit facility in the event of Mission's default. Mission is a guarantor of Nexstar's senior secured credit facility, Nexstar's 5.625% Notes, due July 2027 and Nexstar's 4.75% Notes, due November 2028.

In consideration of Nexstar's guarantee of the Mission senior secured credit facility, Mission has granted Nexstar purchase options to acquire the assets and assume the liabilities of each Mission station, subject to FCC consent. These option agreements, which expire on various dates between 2026 and 2034, are freely exercisable or assignable by Nexstar without consent or approval by Mission. The Company expects these option agreements to be renewed upon expiration.

### Debt Covenants

The Nexstar credit agreement (senior secured credit facility) contains a covenant which requires Nexstar to comply with a maximum consolidated first lien net leverage ratio of 4.25 to 1.00. Pursuant to the Nexstar credit agreement, this covenant ratio at Nexstar's election will increase to 4.75:1.00 with respect to the last day of the fiscal quarter during which a Material Transaction (as defined therein) shall have been consummated and the last day of each of the immediately following three consecutive fiscal quarters; provided that no more than two such elections will be made over the life of the facility. The financial covenant, which is formally calculated on a quarterly basis, is based on the combined results of the Company, excluding the operating results of The CW, which Nexstar designated as an unrestricted subsidiary under its credit agreements and indentures. The Mission credit agreement does not contain financial covenant ratio requirements but does provide for default in the event Nexstar does not comply with all covenants contained in the Nexstar credit agreement. As of December 31, 2025, the Company was in compliance with its financial covenants.

### Debt Maturities

The scheduled principal maturities of the Company's debt as of December 31, 2025 are summarized as follows (in millions):

| | | |
|---|---|---:|
| 2026 | $ | 111 |
| 2027 | | 1,825 |
| 2028 | | 1,390 |
| 2029 | | 108 |
| 2030 | | 1,695 |
| Thereafter | | 1,232 |
| | $ | 6,361 |

## Note 9:  Leases

### The Company as a Lessee

The Company has operating leases for office spaces, tower facilities, antenna sites, studios and other real estate properties and equipment. The operating leases have remaining lease terms of up to 89 years, some of which may include options to extend the leases from one year to 99 years. Lease contracts that the Company has executed but which have not yet commenced as of December 31, 2025 were not material.

Supplemental balance sheet information related to operating leases as of December 31 was as follows ($ in millions):

| | Balance Sheet Classification | 2025 | | 2024 | |
|---|---|---:|---|---:|---|
| **Operating leases** | | | | | |
| Operating lease right-of-use assets, net | Other noncurrent assets, net | $ | 265 | $ | 276 |
| Current operating lease liabilities | Operating lease liabilities | $ | 41 | $ | 37 |
| Noncurrent operating lease liabilities | Other noncurrent liabilities | $ | 242 | $ | 253 |
| | | | | | |
| Weighted Average Remaining Lease Term of Operating leases | | | 7.9 years | | 8 years |
| Weighted Average Discount Rate of Operating leases | | | 4.7% | | 4.9% |

Operating lease expenses for the year ended December 31, 2025 were $60 million, of which $27 million and $33 million were included in Direct operating and Selling, general and administrative expenses, respectively, excluding depreciation and amortization, in the accompanying Consolidated Statements of Operations.

Operating lease expenses for the year ended December 31, 2024 were $66 million, of which $29 million and $37 million were included in Direct operating and Selling, general and administrative expenses, respectively, excluding depreciation and amortization, in the accompanying Consolidated Statements of Operations.

Operating lease expenses for the year ended December 31, 2023 were $65 million, of which $28 million and $37 million were included in Direct operating and Selling, general and administrative expenses, respectively, excluding depreciation and amortization, in the accompanying Consolidated Statements of Operations.

Cash paid for operating leases included in the operating cash flows was $58 million, $63 million and $64 million for the years ended December 31, 2025, 2024 and 2023, respectively.

Future minimum lease payments under non-cancellable leases as of December 31, 2025 were as follows (in millions):

| | Operating Leases |
|---|---|
| 2026 | $ 53 |
| 2027 | 48 |
| 2028 | 45 |
| 2029 | 41 |
| 2030 | 38 |
| Thereafter | 120 |
| Total future minimum lease payments | 345 |
| Less: imputed interest | (62) |
| Total | $ 283 |

## Note 10:  Retirement and Postretirement Plans

### Defined Benefit Retirement Plans

Nexstar sponsors various funded, qualified non-contributory defined benefit pension plans covering certain current employees and former employees. As of December 31, 2025, the combined pension benefit obligations for these qualified retirement plans were $1.5 billion, and the combined plan assets were $1.4 billion, representing a funded status of approximately 92% and a combined underfunded position of $117 million. All plans are frozen in terms of pay and service, except for a plan with immaterial pension benefit obligations.

The remaining pension obligations of $37 million relate to non-contributory unfunded supplemental executive retirement and ERISA Excess plans. Nexstar's policy is to fund these benefits as claims and premiums become due.

Nexstar uses a December 31 measurement date for its pension benefit plans. The overfunded or underfunded status of these pension benefit plans is recognized as an asset or liability in the accompanying Consolidated Balance Sheets. The changes in the funded status are recorded in the year in which changes occur through comprehensive income (loss). The funded status of a plan represents the difference between the fair value of plan assets and the related plan projected benefit obligation.

As of and for the years ended December 31, the following table provides a reconciliation of the pension benefit obligations, plan assets and funded status, along with the related amounts that are recognized in the Consolidated Balance Sheets (in millions):

| | 2025 | | 2024 | |
|---|---|---|---|---|
| **Change in benefit obligations** | | | | |
| Benefit obligations at beginning of period | $ | 1,586 | $ | 1,708 |
| Service cost | | 1 | | 1 |
| Interest cost | | 78 | | 77 |
| Actuarial (gain) loss | | 46 | | (70) |
| ESOP transfer | | 3 | | 4 |
| Benefit payments | | (135) | | (134) |
| Benefit obligations at end of period | $ | 1,579 | $ | 1,586 |
| **Change in plan assets** | | | | |
| Fair value of plan assets at beginning of period | $ | 1,400 | $ | 1,496 |
| Actual return on plan assets | | 138 | | 29 |
| Employer contributions | | 19 | | 5 |
| ESOP transfer | | 3 | | 4 |
| Benefit payments | | (135) | | (134) |
| Fair value of plan assets at end of period | $ | 1,425 | $ | 1,400 |
| **Amounts recognized in Consolidated Balance Sheets** | | | | |
| Current liabilities | $ | (4) | $ | (4) |
| Noncurrent liabilities | | (150) | | (182) |
| Funded status | $ | (154) | $ | (186) |

Nexstar's pension benefit plans were underfunded as of December 31 with accumulated benefit obligations exceeding the fair value of plan assets. Information for the underfunded pension benefit plans is as follows (in millions):

| | 2025 | | 2024 | |
|---|---|---|---|---|
| Benefit obligations | $ | 1,579 | $ | 1,586 |
| Accumulated benefit obligations | | 1,579 | | 1,586 |
| Fair value of plan assets | | 1,425 | | 1,400 |

The pension plans' benefit obligations were determined using the following assumption:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Discount rate | 5.13% | 5.45% | 4.78% - 4.79% |

The decrease in the discount rates from December 31, 2024 to December 31, 2025 increased the projected benefit obligations of qualified defined benefit pension plans by approximately $40 million at December 31, 2025. In addition, pension obligation increased by approximately $4 million due to the updated census information.

The increase in the discount rates from December 31, 2023 to December 31, 2024 decreased the projected benefit obligations of qualified defined benefit pension plans by approximately $83 million at December 31, 2024. The decrease was partially offset by an approximately $13 million increase in pension obligation due to the updated census information and cash balance crediting rate assumption.

The following tables provide the components of net periodic benefit cost (credit) for the pension benefit plans for the years ended December 31 (in millions):

| | 2025 | | 2024 | | 2023 | |
|---|---|---|---|---|---|---|
| Service cost | $ | 1 | $ | 1 | $ | 1 |
| Interest cost | | 78 | | 77 | | 83 |
| Expected return on plan assets | | (103) | | (100) | | (112) |
| Amortization of net gain | | (6) | | (5) | | (8) |
| Net periodic benefit cost (credit) | $ | (30) | $ | (27) | $ | (36) |

Nexstar anticipates recording an aggregate net periodic benefit credit of $27 million for its pension benefits in 2026, as the expected return on plan assets exceeds estimated interest cost.

The net periodic costs for Nexstar's pension benefit plans were determined using the following assumptions:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Discount rate | 5.44% | 4.78% | 4.98% - 4.99% |
| Expected return on plan assets | 5.82% - 6.59% | 5.26% - 6.05% | 5.53% - 6.38% |
| Cash balance interest crediting rate | 4.60% - 4.65% | 4.00% - 4.25% | 3.50% - 3.75% |

The reasonableness of the expected return on the funded retirement plan assets was assessed with the assistance of an investment consultant, but all assumptions were reviewed by management. Their proprietary model simulates possible capital market scenarios based on the current economic environment and their capital market assumptions to come up with expected returns for the portfolio based on the current asset allocation.

As of December 31, the following table provides a summary of Nexstar's accumulated other comprehensive income (loss) related to pension benefit plans prior to any deferred tax effects (in millions):

| | 2025 | | 2024 | |
|---|---|---|---|---|
| Net actuarial loss | $ | (22) | $ | (5) |
| Prior service cost | | (2) | | (2) |
| Amounts in accumulated other comprehensive income | $ | (24) | $ | (7) |

The asset allocation for Nexstar's funded retirement plans at the end of 2025, and the asset allocation range for 2026, by asset category, are as follows:

|  | | Asset Allocation | Percentage of Plan Assets at Year End |
|---|---|---|---|
| Asset category: | | **2026** | **2025** |
| Equity securities | | 20% - 40% | 33% |
| Fixed income securities | | 60% - 80% | 62% |
| Opportunistic | | - | 5% |
| Total | | | 100% |

As the plan sponsor of the funded retirement plans, Nexstar's investment strategy is to achieve a rate of return on the plans' assets that, over the long term, will fund the plans' benefit payments and will provide for other required amounts in a manner that satisfies all fiduciary responsibilities. A determinant of the plans' returns is the asset allocation policy. The investment policies for plan assets provide ranges for the plans' long-term asset mix, as follows:

•For plan assets with a total fair value of $1.2 billion as of December 31, 2025, the investment policy ranges are 8%-28% U.S. equity, 0%-16% non-U.S. equity, 0%-13% emerging market equity, 0%-17% global equity, 0%-17% opportunistic sub-asset classes, 50%-70% fixed income and 0%-5% cash.

•For plan assets with a total fair value of $266 million as of December 31, 2025, the investment policy ranges are 0%-18% U.S. equity, 0%-12% non-U.S. equity, 0%-11% emerging market equity, 0%-15% global low volatility equity, 0%-14% opportunistic sub-asset classes, 70%-90% fixed income and 0%-10% cash.

Nexstar also reviews the plans' overall asset allocation to determine the proper balance of securities by market capitalization, value or growth, U.S., international or global or the addition of other asset classes.

The investment policies are reviewed frequently and administered by an investment consultant. Periodically, Nexstar evaluates each investment with the investment consultant to determine if the overall portfolio has performed satisfactorily when compared to the defined objectives, similarly invested portfolios and specific market indices.

Investments in Common Collective Trust Funds do not have any unfunded commitments and do not have any applicable liquidation periods or defined terms and periods to be held. The portfolios offer daily liquidity; however, they request 5 business days' notice for both withdrawals and redemptions. Strategies of the Common Collective Trust Funds by major category are as follows:

•Equity Common Collective Trusts are primarily invested in funds seeking investment results that correspond to the total return performance of their respective benchmarks in both the U.S. and international markets. Equity securities are invested broadly in U.S. and non-U.S. companies and are diversified across countries, currencies, market capitalizations and investment styles. These securities use the S&P 500 (U.S. large cap), Russell 2000 (U.S. small cap), Russell 2500 (U.S. mid cap) and MSCI All Country World Index ex-U.S. (non-U.S.) as their benchmarks.

•Fixed Income Common Collective Trusts are primarily invested in funds with an investment objective to provide investment returns through fixed-income and commingled investment vehicles that seek to outperform their respective benchmarks. Fixed income securities are invested in diversified portfolios that invest across the maturity spectrum and include primarily investment-grade securities with a minimum average quality rating of A and insurance annuity contracts. These securities use the Barclays Capital Aggregate (intermediate term bonds), Barclays Capital Long Corporate and Barclays Capital Long Government/Credit (long bonds) and U.S. Bond Indexes as their benchmarks.

•Real Estate and Real Asset Common Collective Trusts seek to achieve high current return and long-term capital growth by investing in equity securities of real estate investment trusts that seek to outperform their respective benchmarks.

Other investments include investments in real estate funds, emerging market debt, high yield bonds, commodity index funds, floating rate debt, and inflation-protected bonds. These investments use the National Council of Real Estate Investment Fiduciaries Property Index or the FTSE NAREIT All Equity REIT Index (real estate), JPM EMBI Global Core Index (emerging market debt), Barclays U.S. High Yield Ba/B 1% Issuer Capped Bond Index (high yield bonds), BBG Commodity Index (commodity index fund), Morningstar LSTA US Loan (floating rate debt) and BBG 1-10 TIPS (inflation-protected bond) as their benchmarks.

The following table sets forth, by asset category, the pension benefit plan assets as of December 31, 2025 and 2024, using the fair value hierarchy established under ASC Topic 820 as described in Note 16. The fair value hierarchy in the tables excludes certain investments which are valued using net asset value ("NAV") as a practical expedient (in millions):

|  | Pension Plan Assets as of December 31, 2025 | | | |
| --- | --- | --- | --- | --- |
|  | Level 1 | Level 2 | Level 3 | Total |
| Pension plan assets measured at fair value: | | | | |
| Registered investment companies | $ 217 | $ - | $ - | $ 217 |
| Common collective trusts | - | 11 | - | 11 |
| Pooled separate account | - | 6 | - | 6 |
| Total pension plan assets measured at fair value | $ 217 | $ 17 | $ - | 234 |
| Pension plan assets measured at NAV as a practical expedient | | | | 1,185 |
| Pension plan assets measured at contract value: | | | | |
| Insurance contracts | | | | 6 |
| Total pension plan assets | | | | $ 1,425 |

|  | Pension Plan Assets as of December 31, 2024 | | | |
| --- | --- | --- | --- | --- |
|  | Level 1 | Level 2 | Level 3 | Total |
| Pension plan assets measured at fair value: | | | | |
| Registered investment companies | $ 218 | $ - | $ - | $ 218 |
| Common collective trusts | - | 7 | - | 7 |
| Other | 2 | - | - | 2 |
| Pooled separate account | - | 6 | - | 6 |
| Total pension plan assets measured at fair value | $ 220 | $ 13 | $ - | 233 |
| Pension plan assets measured at NAV as a practical expedient | | | | 1,161 |
| Pension plan assets measured at contract value: | | | | |
| Insurance contracts | | | | 6 |
| Total pension plan assets | | | | $ 1,400 |

Registered investment companies are valued at exchange listed prices for exchange traded registered investment companies, which are classified in Level 1 of the fair value hierarchy.

Common/collective trusts are valued on the basis of the relative interest of each participating investor in the fair value of the underlying assets of each of the respective common/collective trusts. Common/collective trusts contain underlying assets valued based on pricing from observable market information in a non-active market and are classified in Level 2 of the fair value hierarchy.

Certain common/collective trusts, investment companies and real estate that are measured at fair value using the NAV per share practical expedient have not been categorized in the fair value hierarchy. The fair value amounts presented in the table above are intended to permit reconciliation of the fair value hierarchy to the total value of plan assets.

The pooled separate account ("PSA") represents an insurance contract under which plan assets are administered through pooled funds. The PSA portfolio includes investments in money market instruments, government and corporate bonds and notes. The PSA is valued daily based on the market value of the underlying net assets in the separate account. The majority of the underlying net assets have observable Level 1 and/or 2 quoted pricing inputs which are used to determine the unit value of the PSA, which is not publicly quoted and therefore classified as Level 2 of the fair value hierarchy.

The following table presents the amounts Nexstar expects to contribute to its pension benefit plans (in millions). These amounts include benefit payments made from plan assets, benefit payments made directly by Nexstar, and participants' required contributions. The estimates are actuarially determined and reflect Nexstar's current assumptions, including the impact of recent pension funding relief legislation. Actual contributions may differ materially from these estimates.

|  | Expected Payments |
| --- | --- |
| **Employer Contributions** | |
| 2026 to participant benefits | $ 34 |
| **Expected Benefit Payments** | |
| 2026 | $ 148 |
| 2027 | 145 |
| 2028 | 143 |
| 2029 | 140 |
| 2030 | 136 |
| 2031-2035 | 614 |

### Other Postretirement Benefit Plans

Nexstar maintains additional other postretirement benefit plans ("OPEB"), including retiree medical savings account programs that reimburse eligible retirees for certain medical expenses, as well as unfunded plans that provide specific health and life insurance benefits to certain retired employees. As of December 31, 2025 and 2024, the total benefit obligations associated with these plans were $16 million and $17 million, respectively. There were no significant transactions related to these plans during the years ended December 31, 2025, 2024 and 2023.

### Defined Contribution Plans

The Company has established retirement savings plans under Section 401(k) of the Internal Revenue Code (the "401(k) Plans"). The 401(k) Plans cover substantially all Company employees who meet the minimum age and service requirements and allow participants to defer a portion of their annual compensation on a pre-tax basis. Employer contributions to the 401(k) Plans may be made at the discretion of management of the Company. During the years ended December 31, 2025, 2024 and 2023, Nexstar contributed $19 million, $20 million and $18 million, respectively, to the 401(k) Plans.

## Note 11: Commitments and Contingencies

### Programming Commitments

The Company has contractual programming commitments for which no asset or liability has been recorded. Future minimum payments from these contracts, excluding intercompany transactions, are as follows as of December 31, 2025 (in millions):

| | | |
|---|---|---:|
| 2026 | $ | 899 |
| 2027 | | 318 |
| 2028 | | 167 |
| 2029 | | 160 |
| 2030 | | 139 |
| Thereafter | | 131 |
| | $ | 1,814 |

### Merger Agreement with TEGNA

On August 18, 2025, Nexstar entered into the Merger Agreement with TEGNA. The transaction is anticipated to close by the second half of 2026, subject to the satisfaction of certain customary conditions, including receipt of regulatory approvals. The agreement contains certain termination rights for both parties, including termination fees under certain circumstances. Nexstar also received committed financing from a group of commercial banks to fund the Merger with TEGNA and related transactions. See Note 1 for additional information on the termination fees and financing commitment.

### Guarantee of Mission Debt

Nexstar (excluding The CW) guarantees full payment of all obligations incurred under the Mission senior secured credit facility. In the event that Mission is unable to repay amounts due, Nexstar will be obligated to repay such amounts. The maximum potential amount of future payments that Nexstar would be required to make under this guarantee would be generally limited to the outstanding principal amounts. As of December 31, 2025, Mission had a maximum commitment of $362 million under the Mission credit agreement, of which $349 million principal balance of debt was outstanding.

### Indemnification Obligations

In connection with certain agreements that the Company enters into in the normal course of its business, including local service agreements, business acquisitions and borrowing arrangements, the Company enters into contractual arrangements under which the Company agrees to indemnify a third party to such arrangement from losses, claims and damages incurred by the indemnified party for certain events as defined within the particular contract. Such indemnification obligations may not be subject to maximum loss clauses, and the maximum potential amount of future payments the Company could be required to make under these indemnification arrangements may be unlimited. Historically, payments made related to these indemnifications have been insignificant, and the Company has not incurred significant costs to defend lawsuits or settle claims related to these indemnification agreements.

### *Collective Bargaining Agreements*

As of December 31, 2025, certain technical, production and news employees at 22 of the Company's stations are covered by collective bargaining agreements. The Company believes that employee relations are satisfactory and has not experienced any work stoppages at any of its stations. However, there can be no assurance that the collective bargaining agreements will be renewed in the future or that the Company will not experience a prolonged labor dispute, which could have a material adverse effect on its business, financial condition, or results of operations.

### *Litigation*

From time to time, the Company is involved in litigation that arises from the ordinary operations of business, such as contractual or employment disputes or other general actions. In the event of an adverse outcome of these proceedings, the Company believes the resulting liabilities would not have a material adverse effect on its financial condition or results of operations.

**Local TV Advertising Antitrust Litigation**—On March 16, 2018, a group of companies including Nexstar and Tribune (the "Defendants") received a Civil Investigative Demand from the Antitrust Division of the Department of Justice ("DOJ") regarding an investigation into the exchange of certain information related to the pacing of sales related to the same period in the prior year among broadcast stations in some local markets in alleged violation of federal antitrust law. Without admitting any wrongdoing, some Defendants, including Tribune, entered into a proposed consent decree (referred to herein as the "consent decree") with the DOJ on November 6, 2018. Without admitting any wrongdoing, Nexstar agreed to settle the matter with the DOJ on December 5, 2018. The consent decree was entered in final form by the U.S. District Court for the District of Columbia on May 22, 2019. The consent decree, which settles claims by the government of alleged violations of federal antitrust laws in connection with the alleged information sharing, does not include any financial penalty. Pursuant to the consent decree, Nexstar and Tribune agreed not to exchange certain non-public information with other stations operating in the same market except in certain cases, and to implement certain antitrust compliance measures and monitor and report on compliance with the consent decree.

Starting in July 2018, a series of plaintiffs filed putative class action lawsuits against the Defendants and others alleging that they coordinated their pricing of television advertising, thereby harming a proposed class of all buyers of television advertising time from one or more of the Defendants since at least January 1, 2014. The plaintiff in each lawsuit seeks injunctive relief and money damages caused by the alleged antitrust violations. On October 9, 2018, these cases were consolidated in a multi-district litigation in the District Court for the Northern District of Illinois captioned *In Re: Local TV Advertising Antitrust Litigation,* No. 1:18-cv-06785 ("MDL Litigation"). On January 23, 2019, the Court in the MDL Litigation appointed plaintiffs' lead and liaison counsel.

The MDL Litigation is ongoing. The Plaintiffs' Consolidated Complaint was filed on April 3, 2019; the Defendants filed a Motion to Dismiss on September 5, 2019. Before the Court ruled on that motion, the Plaintiffs filed their Second Amended Consolidated Complaint on September 9, 2019. This complaint added additional defendants and allegations. The Defendants filed a Motion to Dismiss and Strike on October 8, 2019. The Court denied that motion on November 6, 2020. On March 16, 2022, the Plaintiffs filed their Third Amended Complaint. The Third Amended Complaint adds two additional plaintiffs and an additional defendant but does not make material changes to the allegations.

The parties are in the discovery phase of litigation. On January 23, 2026, the Court entered a scheduling order setting trial on November 1, 2027. Nexstar and Tribune deny all allegations against them and will defend their advertising practices.

**Tribune Related Contingencies**

In connection with Nexstar's acquisition of Tribune on September 19, 2019, Nexstar assumed contingencies from certain legal proceedings, as follows:

**Chicago Cubs Transactions**—On August 21, 2009, Tribune and Chicago Entertainment Ventures, LLC (f/k/a Chicago Baseball Holdings, LLC) ("CEV LLC"), and its subsidiaries (collectively, "New Cubs LLC"), among other parties, entered into an agreement (the "Cubs Formation Agreement") governing the contribution of certain assets and liabilities related to the businesses of the Chicago Cubs Major League Baseball franchise then owned by Tribune and its subsidiaries to New Cubs LLC. The transactions contemplated by the Cubs Formation Agreement and the related agreements thereto (the "Chicago Cubs Transactions") closed on October 27, 2009. As a result of these transactions, Northside Entertainment Holdings LLC (f/k/a Ricketts Acquisition LLC) owned 95% and Tribune owned 5% of the membership interests in CEV LLC. The fair market value of the contributed assets exceeded the tax basis and did not result in an immediate taxable gain as the transaction was structured to comply with the partnership provisions of the Internal Revenue Code and related regulations.

On June 28, 2016, the Internal Revenue Service ("IRS") issued Tribune a Notice of Deficiency which presented the IRS's position that the gain with respect to the Chicago Cubs Transactions should have been included in Tribune's 2009 taxable income. Accordingly, the IRS proposed a $182 million tax and a $73 million gross valuation misstatement penalty. During the third quarter of 2016, Tribune filed a petition in U.S. Tax Court to contest the IRS's determination. After-tax interest on the aforementioned

proposed tax and penalty through December 31, 2025 would be approximately $271 million. In addition, if the IRS prevails in its position, under the tax rules for determining tax basis upon emergence from bankruptcy, the Company would be required to reduce its tax basis in certain assets. The reduction in tax basis would be required to reflect the reduction in the amount of the Company's guarantee of the New Cubs LLC debt which was included in the reported tax basis previously determined upon emergence from bankruptcy and subject to Tribune's 2014 and 2015 federal income tax audits (described below).

On September 19, 2019, Tribune became a wholly owned subsidiary of Nexstar following Nexstar's acquisition of Tribune. Nexstar disagrees with the IRS's position that the Chicago Cubs Transactions generated taxable gain in 2009, the proposed penalty and the IRS's calculation of the gain. If the IRS prevails in its position, the gain on the Chicago Cubs Transactions would be deemed to be taxable in 2009. Nexstar estimates that the federal and state income taxes would be approximately $225 million before interest and penalties. Any tax, interest and penalty due will be offset by tax payments made relating to this transaction subsequent to 2009. Tribune made approximately $154 million of tax payments prior to its merger with Nexstar.

A bench trial in the U.S. Tax Court took place between October 28, 2019 and November 8, 2019, and closing arguments took place on December 11, 2019. The Tax Court issued a separate opinion on January 6, 2020 holding that the IRS satisfied the procedural requirements for the imposition of the gross valuation misstatement penalty. The judge deferred any litigation of the penalty until a final determination was reached by the Tax Court or Court of Appeals.

On October 26, 2021, the Tax Court issued an opinion related to the Chicago Cubs Transactions, which held that Tribune's structure was, in substantial part, in compliance with partnership provisions of the Code and, as a result, did not trigger the entire 2009 taxable gain proposed by the IRS. On October 19, 2022, the Tax Court entered the decision that there is no tax deficiency or penalty due in the 2009 tax year. On January 13, 2023, the IRS filed a notice of appeal to the U.S. Court of Appeals for the Seventh Circuit. On February 3, 2023, the Company filed a notice of cross-appeal. On February 15, 2024, the case was argued before the U.S. Court of Appeals for the Seventh Circuit. The Company expects a ruling from the Court of Appeals in the first half of 2026.

As of December 31, 2025, Nexstar believes the tax impact of applying the Tax Court opinion to 2009 and its impact on subsequent tax years is not material to the Company's accounting for uncertain tax positions or to its Consolidated Financial Statements. Although management believes its estimates and judgments are reasonable, the timing and ultimate resolution are unpredictable and could materially change.

**Revenue Agent's Report on Tribune's 2014 to 2015 Federal Income Tax Audits**— Prior to Nexstar's acquisition of Tribune in September 2019, Tribune was undergoing federal income tax audits for taxable years 2014 and 2015. In the third quarter of 2020, the IRS completed its audits of Tribune and issued a Revenue Agent's Report which disallows the reporting of certain assets and liabilities related to Tribune's emergence from Chapter 11 bankruptcy on December 31, 2012. Nexstar disagrees with the IRS's proposed adjustments to the tax basis of certain assets and the related taxable income impact, and Nexstar is contesting the adjustments through the IRS administrative appeal procedures. If the IRS prevails in its position and after taking into account the impact of the Tax Court opinion, Nexstar would be required to reduce its tax basis in certain assets resulting in a $17 million increase in its federal and state taxes payable and a $69 million increase in deferred income tax liability as of December 31, 2025. In accordance with ASC Topic 740, the Company has reflected $11 million for certain contested issues in its liability for uncertain tax positions at December 31, 2025 and December 31, 2024.

### *Regulatory Matters*

On March 21, 2024, the FCC issued a Notice of Apparent Liability for Forfeiture ("NAL") to Nexstar and to Mission, a consolidated VIE, for alleged violations of the Communications Act of 1934, including the Telecommunications Act of 1996 (the "Communications Act") and FCC rules relating to Mission television station WPIX, New York, New York. The NAL alleges that Nexstar and Mission engaged in an unauthorized transfer of control of WPIX and that Nexstar violated the national television ownership limit by acquiring undisclosed attributable interests in the station. The NAL proposes forfeitures to Nexstar and Mission for the alleged violations and additionally requires that within 12 months of a forfeiture order or payment of the forfeitures, either (i) Mission divest WPIX to an "unrelated third party" or (ii) Mission sell WPIX to Nexstar, with Nexstar divesting a sufficient number of other stations to reduce its national reach below the FCC national ownership limit. Nexstar and Mission have filed responses vigorously disputing the NAL. Nexstar is unable to reasonably estimate the possible financial statement impact, if any, relating to the NAL.

## Note 12: Equity

The holders of common stock are entitled to one vote per share. The common stockholders are entitled to receive cash dividends, subject to the rights of holders of any series of preferred stock, on an equal per share basis. Nexstar's senior secured credit facility provides limits on the amount of dividends the Company may pay to stockholders during the term of Nexstar's credit agreement.

Nexstar's board of directors has authorized a stock repurchase program under which Nexstar may repurchase shares of its common stock from time to time in open market transactions, block trades or privately negotiated transactions, including through Rules 10b5-1 and 10b-18 plans. The program has no minimum number of shares that Nexstar is required to purchase, has no expiration date and may be modified, suspended or terminated at any time. As of December 31, 2025, $1.4 billion remained available for repurchases under the authorization.

**Note 13: Stock-Based Compensation**

### Stock-Based Compensation Expense

The Company recognized stock-based compensation expense of $78 million, $78 million and $60 million during the years ended December 31, 2025, 2024 and 2023, respectively, all attributable to RSUs and PSUs. As of December 31, 2025, there was $95 million of total unrecognized compensation cost related to RSUs and PSUs, which is expected to be recognized over a weighted-average period of 1.9 years.

### Stock-Based Compensation Plans

As of December 31, 2025, Nexstar's 2019 Long-Term Equity Incentive Plan, approved by Nexstar's majority stockholders on June 5, 2019 (the "2019 Plan"), provides for the granting of stock options, stock appreciation rights, RSUs and PSUs to directors, employees or consultants of Nexstar. The 2019 Plan authorizes the issuance of up to 3,100,000 shares of Nexstar's common stock. As of December 31, 2025, 664,860 shares remained available for future grants under the 2019 Plan.

### Stock Options

For the years ended December 31, 2024 and 2023, the aggregate intrinsic value of options exercised, on their respective exercise dates, was $28 million and $10 million, respectively. There were no stock options granted during the periods covered in these financial statements and all outstanding awards were exercised as of December 31, 2024.

### Time-Based Restricted Stock Units

The RSUs vest over a range of one to four years from the date of the award subject to the continued employment of the grantee as of each vesting date. Unvested RSUs are generally forfeited immediately upon the employee's termination for any reason other than change of control. The following table summarizes activity and information related to RSUs for the year ended December 31, 2025:

| | Unvested Shares | | Weighted-Average Grant-Date Fair Value Per Share |
|---|---|---|---|
| Unvested as of December 31, 2024 | 839,739 | $ | 149.48 |
| Awarded | 329,589 | $ | 162.87 |
| Vested | (339,934) | $ | 151.87 |
| Forfeited/cancelled | (81,724) | $ | 151.25 |
| Unvested as of December 31, 2025 | 747,670 | $ | 154.10 |

### Performance-Based Restricted Stock Units

The PSUs vest over a range of two to four years from the date of the award subject to the continued service of the grantee as of each vesting date and the achievement of specific performance metrics. For PSU awards with a market condition, the number of shares to be issued upon vesting is based on the total shareholder return of Nexstar's common stock measured against a defined peer group over a designated measurement period. Certain other PSU awards are based on the achievement of established internal operating goals. Unvested PSUs are generally forfeited immediately upon the employee's termination for any reason other than change of control or when the required metric was not achieved. The following table summarizes activity and information related to PSUs for the year ended December 31, 2025:

| | Unvested Shares | | Weighted-Average Grant-Date Fair Value Per Share |
|---|---|---|---|
| Unvested as of December 31, 2024 | 201,486 | $ | 188.40 |
| Awarded | 125,926 | $ | 221.01 |
| Vested | (124,785) | $ | 201.85 |
| Unvested as of December 31, 2025 | 202,627 | $ | 200.39 |

**Note 14:  Income Taxes**

The income tax expense (benefit) consisted of the following components for the years ended December 31 (in millions):

|  | 2025 | 2024 | 2023 |
|---|---|---|---|
| Current tax expense: | | | |
| Federal | $ 160 | $ 246 | $ 170 |
| State | 36 | 63 | 37 |
| | 196 | 309 | 207 |
| Deferred tax benefit: | | | |
| Federal | (98) | (28) | (60) |
| State | (31) | (5) | (16) |
| | (129) | (33) | (76) |
| Income tax expense | $ 67 | $ 276 | $ 131 |

The following is a reconciliation of the federal statutory income tax rate to income tax expense for the years ended December 31 (in millions):

|  | 2025 | | 2024 | | 2023 | |
|---|---|---|---|---|---|---|
| US federal statutory tax rate | $ 32 | 21.0% | $ 201 | 21.0% | $ 84 | 21.0% |
| State and local income taxes, net of federal income tax effect[1] | 7 | 4.7% | 43 | 4.5% | 18 | 4.5% |
| Changes in valuation allowances | 6 | 4.0% | 1 | 0.1% | 10 | 2.5% |
| Nontaxable or nondeductible items | | | | | | |
| Compensation | 11 | 7.3% | 12 | 1.3% | 8 | 2.0% |
| Meals and entertainment | 3 | 2.0% | 3 | 0.3% | 3 | 0.7% |
| Noncontrolling interest | 4 | 2.7% | 7 | 0.7% | 14 | 3.5% |
| Goodwill impairment | 3 | 2.0% | 5 | 0.5% | - | - |
| Others | 1 | 1.0% | 4 | 0.4% | (6) | (1.5%) |
| Income tax expense | $ 67 | 44.7% | $ 276 | 28.8% | $ 131 | 32.7% |

[1]State and local taxes income taxes in California, Louisiana, and Pennsylvania made up the majority (greater than 50 percent) of this category in 2025; California, Florida, Illinois, Indiana, New Jersey, New York, New York City, and Pennsylvania made up the majority in 2024; California, Illinois, Louisiana, New York, and Pennsylvania made up the majority in 2023.

The following is a summary of cash income taxes paid (net of refunds) for the years ended December 31 (in millions):

|  | 2025 | 2024 | 2023 |
|---|---|---|---|
| Income taxes paid, net of refunds: | | | |
| Federal | $ 176 | $ 205 | $ 144 |
| State and local | 32 | 49 | 25 |
| Income taxes paid, net of refunds | $ 208 | $ 254 | $ 169 |

F-34

The components of the net deferred tax asset (liability) were as follows, as of December 31 (in millions):

| | 2025 | 2024 |
|---|---|---|
| **Deferred tax assets:** | | |
| Net operating loss carryforwards | $ 33 | $ 34 |
| Compensation | 6 | 6 |
| Rent | 68 | 69 |
| Pension | 44 | 53 |
| Other | 46 | 44 |
| Total deferred tax assets | 197 | 206 |
| Valuation allowance for deferred tax assets | (57) | (52) |
| Total deferred tax assets | 140 | 154 |
| **Deferred tax liabilities:** | | |
| Property and equipment | (170) | (178) |
| Other intangible assets | (299) | (357) |
| Goodwill | (183) | (158) |
| FCC licenses | (692) | (678) |
| Rent | (64) | (68) |
| Investments | (42) | (160) |
| Other | (44) | (42) |
| Total deferred tax liabilities | (1,494) | (1,641) |
| Net deferred tax liabilities | $ (1,354) | $ (1,487) |

As of December 31, 2025, the Company's reserve for uncertain tax positions totaled approximately $26 million. For the years ended December 31, 2025, 2024 and 2023 there were $26 million, $27 million and $27 million of gross unrecognized tax benefits, respectively, that would reduce the effective tax rate if the underlying tax positions were sustained or settled favorably. The Company has not recorded any tax reserves related to the Chicago Cubs Transactions as further described in Note 11.

A reconciliation of the beginning and ending balances of the gross liability for uncertain tax positions is as follows (in millions):

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Uncertain tax position liability at the beginning of the year | $ 27 | $ 27 | $ 28 |
| Increases related to current year positions | - | 1 | - |
| Decreases related to settlements with taxing authorities | (1) | - | - |
| Decreases related to expiration of statute of limitations | - | (1) | (1) |
| Uncertain tax position liability at the end of the year | $ 26 | $ 27 | $ 27 |

The Company's liability for unrecognized tax benefits totaled $26 million and $27 million at December 31, 2025 and 2024, respectively. If all of the unrecognized tax benefits at those dates had been recognized, there would have been a favorable $26 million and $27 million impact on the Company's reported income tax expense in 2025 and 2024, respectively.

As allowed by ASC Topic 740, the Company recognizes accrued interest and penalties related to uncertain tax positions in income tax expense in the accompanying Consolidated Statements of Operations. The Company's accrued interest and penalties related to uncertain tax positions were $13 million, $12 million and $9 million for the years ended December 31, 2025, 2024 and 2023, respectively.

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than those which have been provided by the Company.

There can be no assurance that the outcomes from any tax examinations will not have a significant impact on the amount of such liabilities, which could have an impact on the operating results or financial position of the Company.

The Company files income tax returns in the U.S. federal jurisdiction and various state jurisdictions. The Tribune acquired entities are currently undergoing federal audits for tax periods including 2014–2015 and 2018–2019. Protective claims for refund have been filed for 2013, 2016 and 2017 to keep the periods open for specific issues relating to the potential Cubs resolution. Nexstar is subject to U.S. federal tax examinations for years after 2020. The Company currently has various state income tax returns in the process of examination or administrative appeal. Additionally, any net operating loss carry-forwards ("NOLs") that were generated in prior years and utilized in the current year or future years may also be subject to examination by the Internal Revenue Service. Generally, the Company is subject to state tax examination for years after 2018 and any NOLs that were generated in prior years and utilized in the current year or future years may also be subject to examination.

The Company has gross federal and state income tax NOL carryforwards of $124 million and $132 million, respectively, which are available to reduce future taxable income if utilized before their expiration. A valuation allowance has been recorded against $118 million of federal NOLs and $78 million of state NOLs attributable to one of the consolidated VIEs. Federal NOLs generated prior to 2018 will expire through 2037 if not utilized. Federal NOLs generated after 2017 carry forward indefinitely. State NOLs will expire through 2045 if not utilized. Section 382 of the Internal Revenue Code of 1986, as amended, generally imposes an annual limitation on the amount of NOLs that may be used to offset taxable income when a corporation has undergone significant changes in stock ownership. Ownership changes are evaluated as they occur and could limit the ability to use NOLs. As of December 31, 2025, the Company does not expect any NOLs to expire as a result of Section 382 limitations.

The ability to use NOLs is also dependent upon the Company's ability to generate taxable income. The NOLs could expire before the Company generates sufficient taxable income. To the extent the Company's use of NOLs is significantly limited, the Company's income could be subject to corporate income tax earlier than it would if it were able to use NOLs, which could have a negative effect on the Company's financial results and operations.

On July 4, 2025, H.R.1, also known as the One Big Beautiful Bill Act ("OBBBA") was signed into law, which includes significant changes to federal tax law and other regulatory provisions that are applicable to the Company in 2025. The provisions of the OBBA did not materially impact the annual effective rate in 2025, but did impact the split between current taxes payable and deferred taxes.

## Note 15: Income Per Share

Income per share (basic and diluted) available to common stockholders for the years ended December 31 are presented below ($ in millions, except per share amounts, and shares in thousands):

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Net income attributable to Nexstar Media Group, Inc. | $ 109 | $ 722 | $ 346 |
| Accretion of redeemable noncontrolling interests[1] | (17) | (20) | - |
| Net income available to common stockholders | $ 92 | $ 702 | $ 346 |
| | | | |
| Weighted average shares outstanding – basic | 30,349 | 32,311 | 35,317 |
| Dilutive effect of equity incentive plan instruments | 358 | 485 | 517 |
| Weighted average shares outstanding – diluted | 30,707 | 32,796 | 35,834 |
| | | | |
| Net income per share available to common stockholders – basic | $ 3.04 | $ 21.73 | $ 9.78 |
| Net income per share available to common stockholders – diluted | $ 3.00 | $ 21.41 | $ 9.64 |

[1]As discussed in Note 2, we adjusted our accounting for redeemable noncontrolling interests. The accretion for the year ended December 31, 2024 included an out-of-period adjustment of $7 million which reduced each of basic and diluted earnings per share by $0.20.

The Company had outstanding restricted stock units to acquire 38,000, 20,000 and 69,000 weighted average shares of common stock for the years ended December 31, 2025, 2024 and 2023, respectively, the effects of which are excluded from the calculation of dilutive income per share, as their inclusion would have been anti-dilutive for the periods presented.

## Note 16: Fair Value Measurements

The Company measures and records in its Consolidated Financial Statements certain assets and liabilities at fair value. ASC Topic 820, "Fair Value Measurement and Disclosures," establishes a fair value hierarchy for instruments measured at fair value that distinguishes between assumptions based on market data (observable inputs) and the Company's own assumptions (unobservable inputs). This hierarchy consists of the following three levels:

- Level 1 – Assets and liabilities whose values are based on unadjusted quoted prices for identical assets or liabilities in an active market.

- Level 2 – Assets and liabilities whose values are based on inputs other than those included in Level 1, including quoted market prices in markets that are not active; quoted prices of assets or liabilities with similar attributes in active markets; or valuation models whose inputs are observable or unobservable but corroborated by market data.

- Level 3 – Assets and liabilities whose values are based on valuation models or pricing techniques that utilize unobservable inputs that are significant to the overall fair value measurement.

The carrying values of cash and cash equivalents, accounts receivable, accounts payable and accrued expenses approximate fair value due to their short term nature.

The Company's long-lived assets, indefinite-lived intangible assets and goodwill, and investments accounted for using the equity method are not measured at fair value on a recurring basis but are subject to fair value adjustments in specific circumstances, such as when indicators of impairment are present. The resulting fair value measurements of these assets are considered Level 3 in the fair value hierarchy. Refer to Notes 5 and 6 for additional information.

The fair value hierarchy of assets associated with pension benefit plans are disclosed in Note 10. Certain plan assets measured using NAV as a practical expedient are excluded from the fair value hierarchy.

As of December 31, the estimated fair values and carrying amounts of the Company's long-term debt which are not measured at fair value on a recurring basis but for which fair value disclosures are required under ASC 820 were as follows ($ in millions):

| | 2025 | | 2024 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|---|---|---|---|---|
| Nexstar | | | | |
| Revolving loans due June 2030 | $ 144 | $ 139[1] | $ - | $ - |
| Term Loan A, due June 2030 | 1,852 | 1,820[2] | - | - |
| Term Loan A, due June 2027 | - | - | 2,117 | 2,093[3] |
| Term Loan B, due June 2032 | 1,278 | 1,302[2] | - | - |
| Term Loan B, due September 2026 | - | - | 1,344 | 1,362[3] |
| 5.625% Notes, due July 2027 | 1,715 | 1,712[2] | 1,716 | 1,667[2] |
| 4.75% Notes, due November 2028 | 996 | 990[2] | 995 | 930[2] |
| Mission | | | | |
| Revolving loans due June 2030 | 62 | 61[1] | - | - |
| Revolving loans due June 2027 | - | - | 62 | 61[3] |
| Term Loan B, due June 2028 | 286 | 288[2] | 289 | 290[3] |

[1] The fair value is based on the bid price provided by a third-party investment banking firm and is classified as Level 3 in the fair value hierarchy as the debt is not traded (unobservable in the market).

[2] The fair value is based on the bid price provided by a third-party investment banking firm and is classified as Level 2 in the fair value hierarchy as the bid price is quoted in a major market news service and the investment banking firm stands ready to trade (observable in the market).

[3] The fair value was estimated based on available borrowing rates for bank loans with similar terms and average maturities. The fair value measurement was considered Level 3, as significant inputs to the fair value calculation were unobservable in the market.

**Note 17: Segment Data**

The Company's reportable broadcast segment includes (i) television stations and related local websites that Nexstar owns, operates, programs or provides sales and other services to in various markets across the United States, (ii) NewsNation, a national cable news network, (iii) two owned and operated multicast networks and other multicast network services, and (iv) WGN-AM, a Chicago radio station. The other operating segments are nonreportable and include (i) The CW and (ii) digital businesses focused on the national marketplace. Intersegment transactions are eliminated in consolidation. The remaining activities of the Company are corporate functions and the management of certain real estate assets.

The Company's segment structure reflects the financial information and reports used by its Chief Operating Decision Maker ("CODM") to assess operating performance, allocate resources and make decisions regarding current operating and financial focus. The Company's CODM is the Chairman and Chief Executive Officer.

The CODM evaluates the performance of the Company's operating segments based on net revenue and segment profit (loss). Segment profit (loss) includes net revenue, programming and related expenses, selling, general and administrative expenses attributable to the segments, and amortization of broadcast rights. Segment profit (loss) excludes unallocated corporate revenue and expenses, depreciation of property and equipment and amortization of intangible assets, impairment charges, transaction and other one-time expenses, gain on disposal of assets and business divestitures and non-operating income statement items.

The following table sets forth a breakdown of selected financial information for our reportable Broadcast segment and a reconciliation of that segment's profit to income from operations (in millions):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2025 | 2024 | 2023 |
| **Reportable Broadcast Segment:** | | | |
| Net revenue | $ 4,657 | $ 5,134 | $ 4,611 |
| Programming and related expenses [1] | (2,200) | (2,182) | (2,086) |
| Selling, general and administrative expenses [1] | (734) | (775) | (771) |
| Amortization of broadcast rights [1] | (60) | (64) | (77) |
| Reportable Broadcast segment's profit | 1,663 | 2,113 | 1,677 |
| Other segments' loss, net | (87) | (130) | (253) |
| Corporate (unallocated) | (192) | (197) | (180) |
| Depreciation and amortization expense [2] | (471) | (484) | (488) |
| Goodwill and long-lived assets impairment | (14) | (24) | (35) |
| Transaction and other one-time expenses | (47) | - | - |
| Restructuring costs | - | (12) | (15) |
| Miscellaneous | (3) | 2 | 2 |
| Income from operations | $ 849 | $ 1,268 | $ 708 |

[1] The expenses included in the measure of our reportable Broadcast segment's profit are as follows:

• Programming and related expenses – primarily include fees incurred under network affiliation agreements and operating costs to produce and air local news.

• Selling, general and administrative expenses – primarily include (i) salaries, benefits and payroll taxes, commissions, professional fees, travel and software license fees incurred by sales teams and (ii) salaries, benefits and payroll taxes, group insurance and office rental costs incurred in managing the segment's business units.

• Amortization of broadcast rights – the amortization of license fees for acquired programs from national program syndicators and certain production companies.

[2] Includes depreciation of property and equipment and amortization of intangible assets. Excludes amortization of broadcast rights.

The following tables present the disaggregation of the Company's revenue by source (in millions).

| Year Ended December 31, 2025 | Reportable Broadcast Segment | Other Segments | Corporate (unallocated) | Eliminations[1] | Consolidated |
| --- | --- | --- | --- | --- | --- |
| Distribution | $ 2,863 | $ 118 | $ - | $ (57) | $ 2,924 |
| Advertising | 1,752 | 207 | - | - | 1,959 |
| Other | 42 | 21 | 10 | (7) | 66 |
| Total net revenue | $ 4,657 | $ 346 | $ 10 | $ (64) | $ 4,949 |

| Year Ended December 31, 2024 | Reportable Broadcast Segment | Other Segments | Corporate (unallocated) | Eliminations[1] | Consolidated |
| --- | --- | --- | --- | --- | --- |
| Distribution | $ 2,869 | $ 106 | $ - | $ (47) | $ 2,928 |
| Advertising | 2,223 | 192 | - | - | 2,415 |
| Other | 42 | 19 | 10 | (7) | 64 |
| Total net revenue | $ 5,134 | $ 317 | $ 10 | $ (54) | $ 5,407 |

F-38

| Year Ended December 31, 2023 | Reportable Broadcast Segment | | Other Segments | | Corporate (unallocated) | | Eliminations[1] | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Distribution | $ | 2,674 | $ | 73 | $ | 1 | $ | (21) | $ | 2,727 |
| Advertising | | 1,894 | | 227 | | - | | - | | 2,121 |
| Other | | 43 | | 39 | | 9 | | (6) | | 85 |
| Total net revenue | $ | 4,611 | $ | 339 | $ | 10 | $ | (27) | $ | 4,933 |

[1]The elimination of distribution revenue represents intersegment revenue generated by Other segments for services provided to the Broadcast segment.

Our primary sources of revenue include: (i) distribution, comprised primarily of retransmission revenue, carriage fees, affiliation fees and spectrum leasing revenue and (ii) advertising, comprised of non-political and political advertising.

Distribution revenue, our largest category of revenue, primarily results from compensation from cable, satellite and other MVPDs and vMVPDs in return for our consent to the retransmission of the signals of our television stations and the carriage of NewsNation, typically based on the number of subscribers the MVPDs and vMVPDs have. We also generate distribution revenues from affiliation fees paid by affiliates of The CW and from programmers who use our spectrum in selected local markets to air their content on our multicast streams. Distribution revenue is recognized at the point in time the broadcast signal or cable network feed is delivered to the distributors in the case of retransmission and carriage fee revenue or, in the case of affiliation fees and spectrum leasing revenue, as network programming and spectrum capacity are delivered to our affiliates and customers.

Advertising revenue primarily results from the sale to local, regional and national businesses, political candidates and other political advertisers of commercial airtime by our stations and networks and the sale of advertising on our owned or third-party websites, and through mobile and OTT applications and other digital advertising solutions. Advertising revenue is generally highest in the second and fourth quarters of each year, due in part to increases in consumer advertising in the spring and retail advertising in the period leading up to, and including, the holiday season. Advertising revenue is generally higher during even-numbered years when congressional and/or presidential elections occur and advertising is aired during the Olympic Games. Advertising revenue is recognized at the time the advertisement airs or is delivered on our websites or mobile or OTT applications or the advertising solution is delivered.

The Company primarily derives its revenues from advertising and from distribution of its stations' signals and its networks. During the years ended December 31, 2025, 2024 and 2023, revenues from two of the Company's customers from these sources exceeded 10% of the Company's consolidated net revenues. The first customer represented approximately 13%, 12% and 12% of the Company's consolidated net revenues in 2025, 2024 and 2023, respectively. The second customer represented 13%, 12% and 14% of the Company's consolidated net revenues in 2025, 2024 and 2023, respectively.

Assets by reportable segment are not reported because it is not used by the CODM to allocate resources or evaluate segment performance. For disclosure of goodwill by segment, see Note 5.

## Note 18: Valuation and Qualifying Accounts

Allowance for credit losses rollforward (in millions):

| | Balance at Beginning of Period | | Additions Charged to Costs and Expenses | | Deductions[1] | | Balance at End of Period |
|---|---|---|---|---|---|---|---|
| Year Ended December 31, 2025 | $ | 16 | $ | 9 | $ | (7) | 18 |
| Year Ended December 31, 2024 | | 20 | | 8 | | (12) | 16 |
| Year Ended December 31, 2023 | | 18 | | 12 | | (10) | 20 |

[1]Uncollectible accounts written off, net of recoveries.

## Note 19: Subsequent Events

On January 30, 2026, Nexstar's board of directors declared a quarterly cash dividend of $1.86 per share on its outstanding common stock. The dividend is payable on February 27, 2026 to stockholders of record on February 13, 2026.

**Exhibit 4.8**

**DESCRIPTION OF THE REGISTRANT'S SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934**

As of February 26, 2026, Nexstar Media Group, Inc. (the "Company," "Nexstar," "we," "us" and "our") had one class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended: the Common Stock (as defined below).

**DESCRIPTION OF CAPITAL STOCK**

*The following is a summary of the material terms of our capital stock that are contained in our Amended and Restated Certificate of Incorporation, as amended to date (the "Certificate of Incorporation") and Second Amended and Restated Bylaws, as amended to date (the "Bylaws"), and is qualified in its entirety by reference to these documents. You should refer to the Certificate of Incorporation and the Bylaws, both of which we have filed as exhibits to our Annual Report on Form 10-K of which this exhibit is a part. In addition, you should refer to the General Corporation Law of Delaware, as amended (the "DGCL"), which may also affect the terms of our capital stock. Terms used herein and not otherwise defined herein have the meanings set forth in the Certificate of Incorporation or the Bylaws, as applicable.*

**Authorized Shares of Capital Stock**

Under the Certificate of Incorporation, Nexstar is authorized to issue an aggregate of 100,200,000 shares of capital stock, divided into classes as follows:

- 100 million shares of common stock, par value $0.01 per share (the "common stock");
- 200,000 shares of preferred stock, par value $0.01 per share (the "preferred stock").

As of February 26, 2026, there were 30,327,997 shares of common stock outstanding, and there were no shares of preferred stock outstanding. Nexstar's common stock is traded on The Nasdaq Global Select Market under the symbol "NXST."

**Common Stock**

The holders of common stock possess all rights pertaining to the capital stock of Nexstar, subject to the preferences, qualifications, limitations, voting rights and restrictions with respect to any series of preferred stock that may be issued with any preference or priority over the common stock.

**Stockholder Voting**

Except as may be provided for in any amendment to the Certificate of Incorporation establishing a series of preferred stock, the holders of common stock will have the sole power to vote for the election of directors and for all other purposes. Each holder of common stock shall have one vote for each share held by such holder. Notwithstanding any other provision of the Certificate of Incorporation, holders of common stock shall not be entitled to vote on any amendment to the Certificate of Incorporation that relates solely to the terms of one or more outstanding series of preferred stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to the Certificate of Incorporation. Generally, all matters to be voted on by stockholders must be approved by a majority of the votes entitled to be cast by all shares of common stock present in person or represented by proxy, subject to any voting rights granted to holders of any preferred stock. Except as otherwise provided by law, and subject to any voting rights granted to holders of any outstanding preferred stock, amendments to Nexstar's Certificate of Incorporation generally must be approved by at least a majority of the voting power of all holders of common stock. However, amendments to certain provisions of Nexstar's Certificate of Incorporation must be approved by two-thirds of the votes entitled to be cast with respect to such amendments.

1

**Dividends and Other Distributions**

Holders of common stock will share in an equal amount per share in any dividend declared by the board of directors, subject to any preferential rights of any outstanding preferred stock. Dividends consisting of shares of common stock may be paid only as follows: (i) shares of common stock may be paid only to holders of common stock and (ii) shares shall be paid proportionally with respect to each outstanding share of common stock.

Upon the dissolution, liquidation or winding up of the Company, subject to the rights, if any, of the holders of any outstanding series of preferred stock, the holders of the common stock, as such, shall be entitled to receive the assets of the Company available for distribution to its stockholders ratably in proportion to the number of shares held by them.

**Preemptive Rights**

No holders of common stock have any preemptive rights with respect to the common stock or any other securities of the Company, or to any obligations convertible (directly or indirectly) into securities of the Company.

**Transfer Restrictions and Redemption**

If the Company has reason to believe that the Ownership, or proposed Ownership, of shares of capital stock of the Company by any stockholder, other Owner or Proposed Transferee could, either by itself or when taken together with the Ownership of any shares of capital stock of the Company by any other Person, result in any Violation, such stockholder, other Owner or Proposed Transferee, upon request of the Company, shall promptly furnish to the Company such information (including information with respect to citizenship, other Ownership interests and affiliations) as the Company may reasonably request to determine whether the Ownership of, or the exercise of any rights with respect to, shares of capital stock of the Company by such stockholder, other Owner or Proposed Transferee could result in any Violation.

If (a) any stockholder, other Owner or Proposed Transferee from whom information is requested should fail to respond to such request within the period of time (including any applicable extension thereof) determined by the board of directors, or (b) whether or not any stockholder, other Owner or Proposed Transferee timely responds to any request for information, the board of directors shall conclude that effecting, permitting or honoring any Transfer or the Ownership of any shares of capital stock of the Company, by any such stockholder, other Owner or Proposed Transferee, could result in any Violation, or that it is in the interest of the Company to prevent or cure any such Violation or any situation which could result in any such Violation, or mitigate the effects of any such Violation or any situation that could result in any such Violation, then the Company may, *inter alia*: (1) refuse to permit any Transfer of record of shares of capital stock of the Company that involves a Transfer of such shares to, or Ownership of such shares by, any Disqualified Person; (ii) refuse to honor any such Transfer of record effected or purported to have been effected, and in such case any such Transfer of record shall be deemed to have been void *ab initio;* (iii) suspend those rights of stock ownership the exercise of which could result in any Violation; (iv) redeem such shares, in accordance with the paragraph below and/or (v) take all such other action as the board of directors may deem necessary or advisable, including exercising any and all appropriate remedies, at law or in equity, in any court of competent jurisdiction, against any Disqualified Person.

Notwithstanding any other provision of the Certificate of Incorporation to the contrary, but subject to the provisions of any resolution or resolutions of the board of directors creating any series of preferred stock, outstanding shares of common stock or preferred stock shall always be subject to redemption by the Company, by action of the board of directors, if in the judgment of the board of directors such action should be taken with respect to any shares of capital stock of the Company of which any Disqualified Person is the stockholder, other Owner or Proposed Transferee. The terms and conditions of such redemption shall be as set forth in the Certificate of Incorporation.

**Takeover Defense**

Certain provisions of the Certificate of Incorporation, the Bylaws and the DGCL have anti-takeover effects and could delay, discourage, defer or prevent a tender offer or takeover attempt that a stockholder might consider to be in the stockholder's best interests, including attempts that might result in a premium over the market price for the shares held by stockholders, and may make removal of the incumbent management and directors more difficult.

*Authorized Shares.* The authorized but unissued shares of common stock and preferred stock will be available for future issuance without stockholder approval. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. The existence of authorized but unissued shares of common stock and preferred stock could render more difficult or discourage an attempt to obtain control of Nexstar by means of a proxy contest, tender offer, merger or otherwise.

The board of directors of Nexstar will have the sole authority to determine the terms of any one or more series of preferred stock, including voting rights, dividend rates, conversion and redemption rights, and liquidation preferences. As a result of the ability to fix voting rights for a series of preferred stock, the board of directors will have the power to the extent consistent with its legal duties to issue a series of preferred stock to persons friendly to management in order to attempt to block a tender offer, merger or other transaction by which a third-party seeks control of Nexstar, and thereby assist members of management to retain their positions.

*Special Meetings of Stockholders.* Under the Bylaws and subject to the rights of any series of preferred stock that may be issued by Nexstar, special meetings of stockholders may be called solely by the board of directors of Nexstar or by the chairperson of the board of directors.

*Action by Written Consent*. Under the Certificate of Incorporation and Bylaws, Nexstar stockholders may not take action by written consent.

*Advance Notice of Nominations and Proposed Business for Stockholder Meetings*. Under the Bylaws, only the board of directors or a stockholder of record entitled to vote at a meeting for the election of directors may nominate candidates for election to the board of directors of Nexstar at an annual meeting of stockholders or present business for consideration by the stockholders at an annual meeting.

The Bylaws require that a stockholder who desires to nominate a candidate for election to the board of directors at an annual meeting or present business at an annual meeting to provide notice to the Secretary of Nexstar in advance of the meeting. The notice must be in proper form and set forth various information related to the stockholder giving the notice and the applicable nomination or proposal. Notice of such stockholder nomination or proposal must be received by Nexstar not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is advanced by more than 30 days, or delayed by more than 90 days, from such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day prior to such annual meeting and not later than the later of the close of business on the 90th day prior to such annual meeting and the close of business on the 10th day following the day on which the public announcement of the date of such meeting is first made by Nexstar.

*Delaware Business Combination Statute*. Nexstar has elected to be subject to Section 203 of the DGCL, an anti-takeover law. In general, Section 203 prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the date the person became an interested stockholder, unless (with some exceptions) the "business combination" or the transaction in which the person became an interested stockholder is approved in a prescribed manner. Generally, a "business combination" includes a merger, asset or stock sale, or other transaction resulting in a financial benefit to the interested stockholder. Generally, an "interested stockholder" is a person who, together with affiliates and associates, owns (or within three years prior to the determination of interested stockholder status, did own) 15% or more of a corporation's voting stock. The existence of this provision could have an anti-takeover effect with respect to transactions not approved in advance by the board of directors, including discouraging attempts that might result in a premium over the market price for common stock.

**Other Matters**

*Limitation on Director's and Officer's Liability.* The Certificate of Incorporation provides that, to the fullest extent permitted by the DGCL, subject to certain exceptions, Nexstar will indemnify and advance expenses of any director or officer who is made or threatened to be made a party to any proceeding by reason of the fact that he or she is or was a director or officer of Nexstar or, while a director or officer of Nexstar, is or was serving at the request of Nexstar as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan. In addition, the Certificate of Incorporation provides that, to the fullest extent permitted by the DGCL, and except as otherwise provided in the Bylaws, no director or officer of Nexstar will be liable to Nexstar or its stockholders for monetary damages from a breach of fiduciary duty owed to Nexstar or its stockholders.

*Exclusive Forum.* The Certificate of Incorporation provides that, unless Nexstar, as authorized by its board of directors, consents in writing to the selection of alternative forum, (i) the Court of Chancery of the State of Delaware shall, to the fullest extent permitted by applicable law, be the sole and exclusive forum for: (a) any derivative action or proceeding brought on behalf of Nexstar; (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of Nexstar to Nexstar or Nexstar's stockholders; (c) any action asserting a claim against Nexstar arising pursuant to any provision of the DGCL or the Certificate of Incorporation or Bylaws; or (d) any action asserting a claim against Nexstar governed by the internal affairs doctrine, in each such case subject to said Court of Chancery having personal jurisdiction over the indispensible parties named as defendants therein, and (ii) the federal district courts of the United States shall be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended, against Nexstar or any director or officer of Nexstar.

*Transfer Agent.* The transfer agent for Nexstar is the American Stock Transfer & Trust Co., Corporate Trust Department, 6201 Fifteenth Ave., Brooklyn, New York 11219.

EX-21.1 3 nxst-ex21_1.htm EX-21.1

**EXHIBIT 21.1**

**Significant Subsidiaries of the Registrant**
**As of December 31, 2025**

| Name of Subsidiary | State of Incorporation |
|---|---|
| Nexstar Media Inc. | Delaware |
| Tribune Media Company | Delaware |
| Tribune Broadcasting Company II, LLC | Delaware |
| Tribune Real Estate Holdings, LLC | Delaware |
| The CW Network, LLC | Delaware |

EX-23.1 4 nxst-ex23_1.htm EX-23.1

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-206788, 333-215643, and 333-232632) of Nexstar Media Group, Inc. of our report dated February 26, 2026 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Dallas, Texas
February 26, 2026

EX-31.1 5 nxst-ex31_1.htm EX-31.1

**Exhibit 31.1**

**CERTIFICATION**

I, Perry A. Sook, certify that:

1. I have reviewed this Annual Report on Form 10-K of Nexstar Media Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 26, 2026

By:  /S/ PERRY A. SOOK

    Perry A. Sook
    Chairman and Chief Executive Officer

EX-31.2 6 nxst-ex31_2.htm EX-31.2

**Exhibit 31.2**

**CERTIFICATION**

I, Lee Ann Gliha, certify that:

1. I have reviewed this Annual Report on Form 10-K of Nexstar Media Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 26, 2026

By:  /s/ LEE ANN GLIHA

Lee Ann Gliha
Chief Financial Officer

**Exhibit 32.1**

### CERTIFICATION

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of Nexstar Media Group, Inc. (the "Company"), hereby certifies that the Company's Annual Report on Form 10-K for the year ended December 31, 2025 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 26, 2026

/S/ PERRY A. SOOK

Perry A. Sook
Chairman and Chief Executive Officer
(Principal Executive Officer)

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934 or otherwise subject to the liability of that section. The foregoing certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933 or the Securities Exchange Act of 1934.

EX-32.2 8 nxst-ex32_2.htm EX-32.2

**Exhibit 32.2**

**CERTIFICATION**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of Nexstar Media Group, Inc. (the "Company"), hereby certifies that the Company's Annual Report on Form 10-K for the year ended December 31, 2025 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 26, 2026

/S/ LEE ANN GLIHA
_____

Lee Ann Gliha
Chief Financial Officer
(Principal Financial and Accounting Officer)

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934 or otherwise subject to the liability of that section. The foregoing certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933 or the Securities Exchange Act of 1934.