Eliot A. Adelson (CA Bar No. 205284)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
Telephone: 415.268.7000
Facsimile: 415.268.7522
Email: EAdelson@mofo.com

Henry Huttinger (CA Bar No. 312843)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017-3543
Telephone: 213.892.5200
Facsimile: 213.892.5454
Email: HHuttinger@mofo.com

Alexander P. Okuliar (*pro hac vice*)
Bradley S. Lui (CA Bar No. 143088)
Alexa Rae DiCunzolo (*pro hac vice pending*)
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
Telephone: 202.887.1500
Facsimile: 202.912.2329
Email: AOkuliar@mofo.com
        BLui@mofo.com
        ADiCunzolo@mofo.com

Attorneys for Defendants Nexstar Media
Group, Inc. and TEGNA Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| State of California, et al., | Case No. 2:26-cv-00978-TLN-CKD |
| Plaintiffs, | **DEFENDANTS NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| Nexstar Media Group, Inc. and TEGNA Inc., | |
| Defendants. | Judges: Honorable Troy L. Nunley and Honorable Carolyn K. Delaney |
| | Action Filed: March 18, 2026 |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................................. 2

    A.    The Modern Media Landscape ................................................................................. 2

    B.    The Transaction ........................................................................................................ 4

III.  LEGAL STANDARD .......................................................................................................... 5

IV.   ARGUMENT ...................................................................................................................... 5

    A.    Plaintiffs Cannot Meet the High Standard for a TRO ............................................. 5

        1.    Plaintiffs Will Not Suffer Immediate and Irreparable Harm ......................... 6

        2.    Plaintiffs Are Unlikely to Succeed on the Merits ......................................... 8

            a.    The States Fail *Twombly*, Much Less Show Likelihood of Success ........................... 8

        3.    A TRO Would Harm the Public Interest ..................................................... 12

            a.    Create Conflicts of Law ............................................................................... 13

            b.    Deprive Public Benefits to the Community ................................................. 13

            c.    Undermine Congressional Intent ................................................................. 14

    B.    The Balance of the Equities Tips Strongly in Nexstar's Favor ............................. 15

    C.    Plaintiffs Unduly Delayed Seeking Relief ............................................................ 15

    D.    Plaintiffs Must Post a Bond .................................................................................. 16

V.    CONCLUSION ................................................................................................................. 17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advocacy Org. for Patients & Providers v. Merc Health Servs.*,
987 F. Supp. 967 (E.D. Mich. 1997).......................................................................................... 16

*Antoine L Garabet, M.D., Inc. v. Autonomous Techs.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) .................................................................................... 15

*Hawaii ex rel. Anzai v. Gannett Pac. Corp.*,
99 F. Supp. 2d 1241 (D. Haw. 1999) ........................................................................................ 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................................... 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................................... 8

*Bradt v. T-Mobile US, Inc.*,
No. 19-cv-07752, 2020 WL 1809716 (N.D. Cal. Feb. 28, 2020) ............................................. 9

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979).......................................................................................................................... 9

*Cal. v. Am. Stores Co.*,
872 F.2d 837 (9th Cir. 1989), rev'd on other grounds, 495 U.S. 271 (1990) ......................... 12

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988)............................................................................................... 5, 6, 8

*Dawson v. Asher*,
447 F. Supp. 3d 1047 (W.D. Wash. 2020).................................................................................. 6

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018)....................................................................................................... 9

*Disbar Corp. v. Newsom*,
508 F. Supp. 3d 747 (E.D. Cal. 2020)..................................................................................... 5, 6

*Eagle v. Star-Kist Foods, Inc.*,
812 F.2d 538 (9th Cir. 1987)........................................................................................................ 7

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)........................................................................................... 8, 10, 12

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000).................................................................................................................... 14

*Homeowners Against the Unfair Initiative v. California Bldg. Indus. Ass'n,*
    No. 06-CV-152, 2006 WL 5003362 (S.D. Cal. Jan. 27, 2006)................................................ 6

*Lucero v. Pennella,*
    No. 18-CV-01448, 2018 WL 5291980 (E.D. Cal. Oct. 23, 2018) ......................................... 15

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
    571 F. 3d 873 (9th Cir. 2009)................................................................................................. 6

*In re National Credit Management Group, L.L.C.,*
    21 F.Supp.2d 424 (1998)....................................................................................................... 16

*New York v. Deutsche Telekom AG,*
    439 F. Supp. 3d 179 (S.D.N.Y. 2020).................................................................................. 15

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.,*
    16 F.3d 1032 (9th Cir. 1994)................................................................................................ 16

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.,*
    778 F.3d 775 (9th Cir. 2015).......................................................................................... 10, 12

*Taleff v. Southwest Airlines Co.,*
    828 F. Supp. 2d 11198 (N.D. Cal. 2011) ............................................................................ 16

*Texas v. Google LLC,*
    764 F. Supp. 3d 500 (E.D. Tex. 2025) .................................................................................. 7

*United States v. Nexstar Media Grp., Inc.,*
    No. 1:19-cv-02295 (D.D.C. July 31, 2019) ........................................................................... 9

*United States v. Nexstar,*
    No. 19-cv-2295 (D.D.C. 2019) .............................................................................................. 9

*Uulu v. Warden,*
    No. 1:25-CV-01812-WBS-CKD, 2026 WL 412204 (E.D. Cal. Feb. 13, 2026)................... 5, 6

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004).......................................................................................................... 13, 14

*Washington v. Chimei Innolux Corp.,*
    659 F.3d 842 (9th Cir. 2011)................................................................................................. 7

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................................... 5, 13, 15

**Statutes**

15 U.S.C. § 26 ............................................................................................................................. 16

OPP. TO PLFS' MOTION FOR TRO

Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 ........................................................................................ 3, 14

Clayton Act Section 7, 15 U.S.C. § 18 ........................................................................ 8

Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a .................... 5

**Other Authorities**

47 C.F.R. § 76.65(a)............................................................................................... 12, 14

*Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, Memorandum Opinion and Order, MB Docket No. 25-331, DA 26-267 (F.C.C. Mar. 19, 2026) ............................................................................ *passim*

E.D. Cal. Local Rule 231 ...................................................................................... 15, 16

Fed. R. Civ. P. 65(c)................................................................................................... 16

S. Rep. No. 102-92 (1991), reprinted in 1992 U.S.C.C.A.N. 1133 ............................ 3, 14

## I.     INTRODUCTION

Nexstar and TEGNA announced this transaction in August 2025.[1]  The U.S. Department of Justice ("DOJ") and the Federal Communications Commission ("FCC") then spent several months reviewing it and considered many of the very issues and arguments being raised here. They cleared the deal.  The Plaintiff States ("States") worked directly with the DOJ in its review of the transaction yet raised no substantive concerns with Defendants until filing their Complaint.

Now the States ask this Court to upend—on an expedited basis without adequate review—the well-considered decisions of two expert agencies.  The FCC concluded the transaction serves the public interest by enabling expanded local news and information.  Okuliar Decl. Ex. A (FCC Order) ¶ 1.[2]  The States claim that in the future Nexstar could charge more to cable and satellite companies ("MVPDs" or "cable companies") for a license to retransmit local television signals. They also claim the cable companies could then pass those costs on to subscribers, who might be harmed if they do not switch away to the many internet-based alternatives available today.

The States seek an "extraordinary remedy" reserved for rare situations involving *imminent*, *irreparable* harm.  The States cannot support their sweeping request of the Court with their vague, speculative allegations of possible future financial injury.  *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249–51 (9th Cir. 2013).

No imminent, irreparable harm exists.  The States' main theory is that Nexstar will raise retransmission fees at some point in the future.  But, as the States acknowledge, any change in retransmission fees for expiring agreements is barred until after November 30, 2026 for parties that accept that extension.  *See* Okuliar Decl. Ex. A (FCC Order) ¶ 75.  That alone defeats any claim of imminence.  The FCC Order maintains the status quo, and many other agreements not covered directly by the FCC Order will not expire for years.

Their second claim of harm, that the transaction will hurt local journalism, fares no better. Again, among other reasons, the FCC Order commits Nexstar to *expand* local journalism and

---

[1] Press Release, *Nexstar Media Group, Inc. Enters into Definitive Agreement To Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction*, https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/.

[2] All exhibits herein are attached to the Declaration of Alexander Okuliar in Support of Defendants' Opposition to Plaintiffs' Motion for Protective Order ("Okuliar Decl.").

programming, just as it has done after prior deals. Okuliar Decl. Ex. A (FCC Order) ¶¶ 75, 82. The FCC has committed Nexstar to divest six stations, including in Colorado, Connecticut, and Virginia, to further allay such concerns. Okuliar Decl. Ex. A (FCC Order) ¶ 55. At a minimum, those three States should dismiss their claims to preserve judicial resources.

The States also cannot show a likelihood of success on the merits. Among other deficiencies, their Section 7 claim depends on an unsupported market definition resting on internally contradictory allegations, ignores competition in modern media markets, relies on out-of-date and out-of-place DOJ settlements, offers no grounding in caselaw, misconstrues how retransmission negotiations occur, and improperly assert harms outside any cognizable market.

Finally, the equities and public interest strongly favor denial. A temporary restraining order ("TRO") preventing integration would irreparably harm Nexstar and others, halt the benefits of expanded local programming for millions, disrupt a fully approved and closed deal, jeopardize Nexstar's business by creating confusion in the market, and impose ▮▮▮▮ in losses while creating a direct conflict with a lawful FCC Order.

The States cite to no court that has issued a TRO on a consummated deal where, as here, two expert federal agencies have approved it. The Court should deny this thirteenth-hour request.

## II.   FACTUAL BACKGROUND

### A.   The Modern Media Landscape

Local broadcasters operate in a media landscape that is unlike even a few years ago. Israel Decl. ¶ 10. They distribute content to viewers for free over the air within defined geographic regions, often as affiliates of major networks. Network-affiliated stations broadcast network content and their own content, including local news or lifestyle programming, which they produce at substantial cost.

Historically, the Big 4 television networks relied on local affiliates to reach viewers. As a way to protect the broadcast industry and consumers, in 1992, Congress reinforced that broadcasting model by requiring cable operators to obtain retransmission rights to carry certain broadcast station content (which they had previously carried without compensation to

broadcasters).[3]  The law was intended to fix the "distortion in the video marketplace which threaten[ed] the future of over-the-air broadcasting" under which "broadcasters in effect subsidize[d] the establishment of their chief competitors," MVPDs.[4]  It also set out "to provide protection for consumers against [cable companies'] monopoly rates and poor customer service."[5] The FCC in 2005 reported to Congress that the law was functioning as intended by preserving access to local broadcasting while allowing compensation to reflect marketplace negotiations. Okuliar Decl. Ex. B ¶ 33.

That model has since been disrupted.  Viewers now access programming across dozens of different subscription and ad-supported services, including Netflix, Disney+, YouTube, and Amazon Prime Video.  Live sports are likewise distributed across streaming services, league-owned direct-to-consumer (DTC) platforms, and virtual MVPDs (*e.g.,* Hulu Live and YouTube TV) ("vMVPDs").[6]  Israel Decl. ¶¶ 12–15.  Americans also obtain local news and information through numerous non-broadcast-TV options.[7]

At the same time, the Big 4 networks no longer depend exclusively on local broadcast affiliates.  Instead, they simulcast their most valuable programming—live sports, news, and primetime scripted content—on their own DTC platforms (*e.g.*, Paramount+, Peacock, Disney+, ESPN+, and Fox One) nationwide and *directly* to cable companies.  Israel Decl. at ¶¶ 13–14.  For example, in 2023, Charter secured the right to include Disney+ and ESPN+  as part of Charter's linear video package, and now offers Disney+ Hulu Bundle, ESPN Unlimited, HBO Max, Paramount+, Peacock Premium, AMC+, ViX , the Tennis Channel, and FOX One via its new Spectrum App Store.[8]

---

[3] *See* S. Rep. No. 102-92, at 35-36 (1991), reprinted in 1992 U.S.C.C.A.N. 1133, 1168–9 (quoting Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460).
[4] *Id.*
[5] *Id.* at 1134.
[6] Sara Lebow, *Live Sports Viewers Increasingly Embrace Digital*, EMARKETER (Oct. 28, 2024), https://www.emarketer.com/content/live-sports-viewers-increasingly-embrace-digital.
[7] Okuliar Decl. Ex. C, at 16.; Elisa Shearer, et al., *Sources of Local News,* PEW RESEARCH CENTER (May 7, 2024), https://www.pewresearch.org/journalism/2024/05/07/sources-of-local-news/.
[8] Press Release, *Charter, Introducing The Spectrum App Store, The Next Big Step in Seamless Entertainment* (Oct. 9, 2025), https://corporate.charter.com/newsroom/spectrum-introduces-the-spectrum-app-store; Okuliar Decl. Ex. D, at 14–16.  Indeed, while other forms of distribution have proliferated, well over 90% of the MVPD market is controlled by the ten largest providers.  *See* Okuliar Decl. Ex. E, at 25–26.  Many leading MVPDs are corporate giants that pool their cable assets with broadband operations,

**B.    The Transaction**

A key purpose of the Nexstar-TEGNA deal is to sustain and enhance the diversity of local voices and viewpoints in local communities.  The Transaction aims to "preserve[] high-quality local journalism and diversity of opinion" through enhancing Nexstar's "local presence."[9]

The FCC supports this deal as a way to protect and promote its "longstanding media goals of competition, localism, and diversity."  Okuliar Decl. Ex. A (FCC Order) ¶ 2.  The FCC's review of the deal began on December 1, 2025 and included commentary and submissions from 14 private parties.  *Id.* ¶ 10 & nn.19–22.  After completing its review of the deal and taking into account that commentary (including from DIRECTV, plaintiff in a related case), the FCC issued an Order clearing the deal with certain conditions.  *Id.* ¶ 7 ("[I]n light of Nexstar's commitments, there will be no material public interest harms arising from the transaction.").  The FCC found the following:

- **Tribune.**  Following Nexstar's 2019 acquisition of Tribune, Nexstar's stations increased local news coverage of 28,000 hours per year (more than 12.5%) and increased local lifestyle and political programming by 9,000 (more than 75%) and 800 hours per year (more than 40%), respectively.  *Id.* ¶ 68.

- **Commitments.**  The FCC secured commitments from Nexstar to "expand[] its investment in local news and programming, including increasing the amount of local news it provides in acquired markets," continue "offering those [MVPDs] with which it has an existing retransmission agreement an extension of its agreement at the existing rates for a certain period of time."  *Id.* ¶ 6.  Additionally, Nexstar commits to divesting six stations.  *Id.* ¶ 55.

Consistent with those commitments, Nexstar intends to invest more heavily in local programming and news coverage, expand advertising solutions, and compete more effectively against dominant technology and media platforms.  Biard Decl. ¶¶ 25–26.

---

television networks, and/or streaming services and have market capitalizations that far exceed those of Nexstar and TEGNA combined.  For example, Nexstar's and TEGNA's combined market of approximately $9.97 billion is dwarfed by each of Verizon ($214.7 billion), EchoStar ($32.02 billion), and DIRECTV parent Company TPG Inc. ($15.45 billion).  *See, e.g.*, TPG Inc. (TPG), YAHOO! FINANCE, https://finance.yahoo.com/quote/TPG/ (accessed Mar. 24, 2026).

[9] *Acquisition of TEGNA Inc. – August 2025*, Nexstar Media Group, Inc. (Aug. 2025), https://www.nexstar.tv/wp-content/uploads/2025/08/August-2025-TEGNA-Acquisition-Deck.pdf.

The DOJ also reviewed the transaction.  On September 30, 2025, Nexstar and TEGNA filed a pre-merger notification under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a (the "HSR Act").  The DOJ issued a Request for Additional Information ("Second Request") pursuant to 15 U.S.C. § 18a(e)(1)(A), triggering a mandatory waiting period for the parties and the production of millions of documents.  On March 19, 2026, after a seven-month investigation, the DOJ terminated the waiting period without any conditions.

During that investigation, the States separately contacted the parties to request waivers to work with DOJ, and obtain the same materials produced by the parties to the DOJ.  Okuliar Decl. ¶ 7.  Nexstar and TEGNA agreed.  *Id.* ¶¶ 8–10.  At no point did any of the States express *any* substantive concerns to the parties and, indeed, barely showed any interest in the deal at all.  The Transaction closed on March 19 after receiving all necessary regulatory approvals.

## III.    LEGAL STANDARD

"A TRO is an extraordinary remedy" intended "to preserve the status quo pending a fuller hearing."  *Disbar Corp. v. Newsom*, 508 F. Supp. 3d 747, 751 (E.D. Cal. 2020).  To prevail, the States must make a "clear showing" of: (1) a likelihood of success on the merits; (2) a likelihood that they will suffer immediate irreparable harm absent preliminary injunctive relief; (3) that the balance of equities tips in their favor; and (4) that preliminary injunctive relief is in the public interest.  *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The States must demonstrate—rather than simply allege—that irreparable harm is imminent.  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988).

## IV.    ARGUMENT

### A.    Plaintiffs Cannot Meet the High Standard for a TRO

Plaintiffs fail to establish a single element necessary for an injunction.  *See Winter*, 555 U.S. at 24; *Uulu v. Warden*, No. 25-CV-01812, 2026 WL 412204, at *2 (E.D. Cal. Feb. 13, 2026).  First, Plaintiffs' alleged harm is neither immediate nor irreparable because it is based on speculative changes in price that might occur, if at all, many months from now.  Second, Plaintiffs will not succeed on the merits because they do not adequately allege, and will fail to prove, that Nexstar could substantially harm competition in any relevant market.  Third, a TRO

would impair the public interest because it would prevent Nexstar from providing immediate benefits to consumers and undermine the national policy goals and statutory authority of the FCC. Fourth, the balance of the equities strongly favors Nexstar because, unlike the States' speculative injury, Nexstar will suffer immediate irreparable harm to its business and potential liability.

**1.    Plaintiffs Will Not Suffer Immediate and Irreparable Harm**

Plaintiffs cannot demonstrate required elements that their alleged injury is "irreparable" and "immediate."[10]  To show irreparable harm, the States must "demonstrate immediate threatened injury." *Caribbean Marine Servs.*, 844 F.2d at 675.  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.* at 674.[11] Plaintiffs allege three theories of harm, and none are sufficiently concrete or immediate to justify this "extraordinary remedy." *Id.* at 676 (finding abuse of discretion in enjoining relevant government program); *Disbar Corp.*, 508 F. Supp. 3d at 751.

The States' first theory of harm speculates that at some indeterminate point in the future, the transaction will "give Nexstar the power to charge MVPDs higher fees to retransmit its content." Compl. ¶¶ 6, 81; *see, e.g.* Mot. at 3.  Such "speculative injury" dependent on theoretical price outcomes in future negotiations is not enough to warrant a TRO.[12]  Nexstar's current retransmission rates to cable companies with expiring contracts will not change until at least December 1, 2026.  *See* Okuliar Decl. Ex. A (FCC Order) ¶ 75.  Moreover, MVPD contracts covering millions of subscribers were renegotiated in the last past year and will not expire for

[10] *Homeowners Against the Unfair Initiative v. Cal. Bldg. Indus. Ass'n*, No. 06-CV-152, 2006 WL 5003362, at *2 (S.D. Cal. Jan. 27, 2006) (quoting Fed. R. Civ. P. 65(b))*; see Caribbean Marine Servs.*, 844 F.2d at 674 ("At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm.").

[11] The States appear to seek a mandatory injunction, which "orders a responsible party to take action," and is "subject to a doubly demanding standard and requires the moving party to establish that the law and facts clearly favor his position, not simply that he is likely to succeed." *Uulu*, 2026 WL 412204, at *2 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F. 3d 873, 878-79 (9th Cir. 2009) and *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015)).  Such injunctions generally "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn*, 571 F. 3d at 879.  However construed, their Motion fails.

[12] *Caribbean Marine Servs.*, 844 F.2d at 674 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction"); *see also Right to Life of Cent. Cal. v. Bonta*, 562 F. Supp. 3d 947, 964 (E.D. Cal. 2021) (applying *Caribbean Marine Servs.* in the context of a TRO); *Dawson v. Asher*, 447 F. Supp. 3d 1047, 1051 (W.D. Wash. 2020) ("The possibility of harm is insufficient to warrant the extraordinary relief of a TRO.").

multiple years.  Biard Decl. ¶ 10.  In addition, Nexstar's agreements covering approximately 70% of its subscribers nationally do not even *begin* to expire until 2027.  *Id.* at ¶ 11.  Thus, the States' claim that "rates will rise on Dec 1, 2026" is simply false.  Compl. ¶ 34.

The FCC spent months reviewing these concerns and concluded that there was no "cognizable case" that the transaction would result in "higher prices or increased blackouts of programming."  Okuliar Decl. Ex. A (FCC Order) ¶ 71.  The States' conclusory harm allegations ignore this finding and are inconsistent with the economic realities of the industry.[13]  *See* Israel Decl. ¶ 12 ("Where broadcast stations (primarily accessed via retransmission on traditional MVPDs) once represented a unique channel to access the types of video content available from Big Four networks (such as the most popular scripted series, live sports, and so on), consumers can now select from a wide variety of delivery channels for the same television content, including vMVPDs, DTCs, FASTs, and other streaming services.  Industry participants colloquially describe subscriber migration from MVPDs to these alternative delivery channels as 'cord cutting.'").

For instance, the States ignore that: (1) Nexstar both needs and benefits from a steady subscriber base—it has no incentive to impose the blackouts of which the States complain, Biard Decl. ¶¶ 13–15; (2) "Nexstar does not set the rates that MVPDs charge to their customers," Okuliar Decl. Ex. A (FCC Order) ¶ 74; and (3) Nexstar stations remain available free over the air even if a cable company does not agree to a retransmission agreement.  *Id.* ¶ 71.

The States also speculate that higher retransmission fees will be "passed on to television consumers" but offer no facts to support that claim.[14]  Compl. ¶ 81.  Again, the FCC rejected this

[13] Many MVPDs offer products that exclude local stations, decline to carry stations except on uncompensated terms, and/or obtain network programming directly from networks, further refuting the States' claim of broadcaster control.  Biard Decl. ¶¶ 17–18.

[14] The States do not have standing to bring their claim.  The claimed injury to their citizens (and the citizens of non-parties) is derivative and entirely depends upon an assumed pass-through of costs that is not supported by any facts.  This is too attenuated to confer standing.  *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987).  Plaintiffs also fail to make the requisite showing to invoke *parens patriae* standing, which only "allows a sovereign to bring suit on behalf of its citizens when," among other factors, "the sovereign alleges injury to a sufficiently substantial segment of its population."  *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011).  The localized harms here do not approach the pervasive, economy-wide injury required for *parens patriae* standing.  *See Texas v. Google LLC*, 764 F. Supp. 3d 500, 524-525 (E.D. Tex. 2025) (*parens patriae* standing existed where alleged monopolization affected "millions of users across billions of impressions" and caused economy-wide harm that "adversely

very argument, finding that, "assuming arguendo Nexstar increases the fees it charges to MVPDs," there is no basis to conclude "that any such increases would reach consumers." Okuliar Decl. Ex. A (FCC Order) ¶ 74.[15]  The States cite no evidence to rebut the FCC's findings.

The States' ambiguous assertions that the transaction "threatens to degrade the quality and quantity of local news programming" also cannot justify a TRO.  Compl. ¶ 83.  That Nexstar would degrade its own product in such a competitive media environment makes no sense.  Those assertions also contradict this company's history of expanding news and local content and requires speculation that Nexstar would violate its commitments under the FCC Order.  Okuliar Decl. Ex. A (FCC Order) ¶ 85; Biard Decl. ¶ 26.  The Court should disregard them entirely.[16]

### 2.    Plaintiffs Are Unlikely to Succeed on the Merits

#### a.    The States Fail *Twombly*, Much Less Show Likelihood of Success

The States will not be able to show that the effect of the Transaction "may be substantially to lessen competition, or to tend to create a monopoly" in a properly defined relevant market.[17]  At this stage, they rely on vague and generalized conclusory allegations, but such formulaic pleadings are insufficient to support an antitrust claim.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554-55 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").  The States could not survive a motion to dismiss, much less substantiate their significantly higher burden under Rule 65(b).  *Caribbean Marine Servs.*, 844 F.2d at 675 (finding merely alleging imminent injury insufficient); *Aegis Software, Inc. v. 22nd Dist. Agric. Ass'n*, No. 15-CV-2956, 2016 WL 4680576 at *3 n.2 (S.D. Cal. Sept. 6, 2016) ("[T]he standard for a preliminary injunction requires the Court to determine whether Plaintiff is likely to succeed

and substantially affect[ed] the Plaintiff States' economies, as well as the general welfare in the Plaintiff States").

[15] Plaintiffs have not defined a relevant market in which such harm would occur, much less that such harm constitutes anticompetitive effects.  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992–93 (9th Cir. 2020) ("[C]ourts must focus on anticompetitive effects 'in the market where competition is [allegedly] being restrained.'").  Plaintiffs claim that the relevant product market is Licensing of Big 4 Television Retransmission Consent, so any supposed injuries occurring in some undefined market are insufficient to sustain Plaintiffs' burden.

[16] Moreover, Plaintiffs do not define any relevant market for "local news programming."  The numerous alternative sources of news, further undermine any such theory of harm.

[17] 15 U.S.C. § 18.

on the merits of its claim and not simply whether Plaintiff has stated a claim upon which relief could plausibly be granted.").

*First,* the States rely mainly on generic quotes from outdated DOJ settlement proceedings on different markets and/or MVPDs and try to pass those quotes off as relevant here.  But even several years ago, in connection with some of these same settlements, DOJ acknowledged that media markets were changing quickly and would likely require the agency to reevaluate its approach.[18]  More importantly, DOJ has already reviewed and passed on *this* deal, rendering States' reliance on the DOJ's prior statements irrelevant.[19]  *See* Israel Decl. ¶ 25 ("[R]eliance on historical approaches used by DOJ in its Nexstar/Tribune suit from 2019, and later its Gray/Quincy suit from 2021, are inapposite for evaluating the *current* competitive landscape in television.  DOJ's 2019 claims predate the introduction and proliferation of many of the streaming services—including Peacock, Disney+, Apple TV+, and HBO Max—that hundreds of millions of viewers turn to today.  When DOJ issued the complaint in the Nexstar/Tribune matter, *over 65% of households used an MVPD; 31% did so in 2025Q3*.").

*Second,* the States' incoherent and contradictory market definition allegations fall short. The States must properly define both a relevant product and geographic market.  *Cal. v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1132 (N.D. Cal. 2001); *see DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)). Even taking the States' allegations as true shows they will fail on both dimensions.  *Sutter Health,*

---

[18] DOJ Press Release, *Assistant Attorney General Makan Delrahim Delivers Remarks at the Antitrust Division's Public Workshop on Competition in Television and Digital Advertising* (May 2, 2019), https://www.justice.gov/archives/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-divisions-public.

[19] For instance, States allege "Big 4 stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly ranked primetime programs," Compl. ¶ 36, directly copying from DOJ's complaint against Nexstar's acquisition of Tribune in 2019.  Compl. ¶ 17, *United States v. Nexstar Media Grp., Inc.*, No. 19-cv-02295 (D.D.C. July 31, 2019) (same).  Supreme Court precedent counsels that "[w]here federal regulators have carefully scrutinized the challenged merger, imposed various restrictions on it, and 'stand ready to provide further consideration, supervision, and perhaps invalidation of asserted anticompetitive practices [,]" it is a "unique indicator that the challenged practice may have redeeming competitive virtues." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 13 (1979)).  This is especially true where the federal regulators are "intimately familiar with this technical subject matter, as well as the competitive realities involved," just as the DOJ and FCC are here.  *Id.*  Courts accordingly afford substantial weight to such agency determinations.  *See Bradt v. T-Mobile US, Inc.*, No. 19-cv-07752, 2020 WL 1809716, at *2 (N.D. Cal. Feb. 28, 2020).

OPP. TO PLFS' MOTION FOR TRO

130 F. Supp. 2d at 1132 (denying preliminary injunction where plaintiff failed to define a geographic market).

The States allege local and Designated Market Area ("DMA")-specific geographic markets and claim that increases in concentration in specific DMAs will lead to higher retransmission consent fees. They claim that a DMA based geographic market is justified because "Big 4 viewers in one DMA cannot switch to Big 4 programming in another DMA." Compl. ¶ 52. But whether viewers in one DMA can switch to programing in another DMA is irrelevant, as MVPDs, not viewers, are the buyers in States' alleged retransmission market. In any event, viewers can always access Nexstar stations for free over the air. Okuliar Decl. Ex. A (FCC Order) ¶ 71.

Moreover, other allegations directly contradict the States' geographic market definition. The States freely acknowledge that broadcasters and MVPDs negotiate licenses that cover all of the broadcaster's stations nationwide and arrive at a single per-subscriber rate for all similar stations. Compl. ¶¶ 32–33; Biard Decl. ¶ 5. The relevant geographic market is therefore *not* local. And, since the Complaint does not allege that the merger will have any appreciable effect on concentration in any more realistic geographic market, the States' claims fail.

The States also allege that the transaction will lead to a "Nationwide Portfolio Footprint Effect." Compl. ¶ 66. But the States do not support this claim with any facts. They do not explain, for example, how the alleged increases in concentration in the Sacramento-Stockton-Modesto, California DMA would allow Nexstar to increase its retransmission license fee *throughout the United States*. In any event, none of this is cognizable based upon the State's alleged *local* geographic markets. *Qualcomm Inc.*, 969 F.3d at 992 (9th Cir. 2020) (finding no antitrust harm to customers of the defendants' customers because outside the "area of effective competition") (cleaned up); *see, e.g., Bakay v. Apple, Inc.*, No. 24-5314, 2025 WL 3012822, at *2 (9th Cir. Oct. 28, 2025) (unpublished) (affirming dismissal where plaintiffs alleged injury in a market that was separate from relevant trade restraint); *St. Alphonsus Med. Ctr. Nampa Inc. v. St. Luke's Health Sys., Ltd.,* 78 F.3d 775, 786-87 (9th Cir. 2015) (rejecting effects where conclusion regarding ability to raise prices was not based on findings of market power in relevant market).

They also repeatedly contradict themselves on relevant product market. They allege that Nexstar and TEGNA compete in a product market for "Licensing of Big 4 Television Retransmission Consent," Compl. ¶ 35; Mot. at 11, but then assert that "MVPDs regard programming from each and every Big 4 station as essential for inclusion in the packages they offer subscribers." Compl. ¶ 36; Mot. at 5. If "each and every" Big 4 station is essential, those stations are "must-have" complements, not substitutes. Compl. ¶¶ 42–44. Broadcasters do not compete head-to-head for retransmission consent rights in part because programming licensed with one broadcaster cannot be substituted for another. Biard Decl. ¶ 3. A simple example illustrates the principle that dooms the States' theory:

> [I]f a CBS station carrying an NFL Sunday Afternoon game is not carried by an MVPD, that MVPD's subscribers cannot go to the respective ABC, FOX, or NBC station to watch that game. None of those other network affiliated stations have rights to broadcast that particular NFL Sunday Afternoon game. They are simply not substitutes for watching that NFL game. However, the same viewer could easily go to the NFL+ streaming product or Paramount+ to watch that particular Sunday Afternoon game (and many others), and might even have that game provided by their MVPD outside of the local CBS station.

*Id.* The States point to no evidence to support their contorted theory.

*Third,* the Complaint contains sparse and speculative allegations about anticompetitive effects, and the States' Motion does not cure these defects. To start, the States argue Nexstar will have greater bargaining leverage over MVPDs, without offering any allegations in support. Mot. at 16. This claim betrays a fundamental misunderstanding of Nexstar's incentives and industry dynamics. Israel Decl ¶ 52 ("[A]n analysis of bargaining leverage effects . . . depends on an analysis of churn in the event of a blackout. But due to the many MVPD alternatives that have become available to consumers in the last five years, much of this churn will be due to cord-cutting . . . [C]ord-cutting is detrimental not only to the MVPD, but also to the broadcaster. One cannot assume . . . that an increase in churn and cord-cutting in the event of a blackout will increase the bargaining power of the broadcaster. In fact, there is good reason to believe that the opposite may be true . . . [C]ord-cutting creates a negative externality among broadcasters that is internalized when broadcasters merge, creating downward pressure on retransmission rates."). Among other deficiencies, the States ignore the many programming alternatives to distributors.

OPP. TO PLFS' MOTION FOR TRO

Their suggestion that only certain local programming from select Big 4 stations is the only alternative is inconsistent with reality.  Biard Decl. ¶¶ 17–18.[20]

The States also claim that MVPD subscribers will be harmed, because, according to the States, if at some point Nexstar increased retransmission rates, cable companies may then raise prices to consumers.  Mot at 17.  This allegation is both unsupported and unrecognized in antitrust law.  The States offer no factual support that Nexstar will (or could) increase its rates or that any MVPDs would or could pass on such hypothetical retransmission rate increases to subscribers (who can and have turned away from cable to internet services by the tens of millions).  Retransmission negotiations are also subject to a statutory "good-faith" negotiation requirement enforceable through an FCC complaint process, s*ee* 47 U.S.C. § 325(b)(3)(C); 47 C.F.R. § 76.65, and any harms relating to after-acquired clauses that cable companies affirmatively agreed to are self-inflicted.  Even more, the Ninth Circuit has held that "actual or alleged harms to customers and consumers outside the relevant markets are ***beyond the scope of antitrust law***."  *Qualcomm*, 969 F.3d at 993.  Such thin allegations fail to meet the *Twombly/Iqbal* standard, much less the higher standard necessary for Plaintiffs' requested relief.

Even assuming Plaintiff could establish a *prima facie* case, Defendants could easily rebut any finding of anticompetitive effects.  A variety of factors can rebut a *prima facie* case, including that the merger is *on balance* procompetitive.[21]

### 3. A TRO Would Harm the Public Interest

Granting a TRO would create an unnecessary conflict between an administrative and judicial order, prevent the benefits of the deal to flow to millions of Americans, including those in States not party to this case, and undermine the stated public interests of the United States.  The States ignore the FCC's findings regarding the integration of these two broadcast businesses and promotion of journalism, much less refute them.  These concrete harms to the public interest

[20] Moreover, Plaintiffs cite no Section 7 case condemning a transaction merely because one sophisticated counterparty predicts that the merged firm may negotiate more aggressively in future contractual dealings. Mot. at 15; *Cf. St. Alphonsus*, 78 F.3d at 786–87 (finding that merged entity would be able to raise prices over insurers, given limited competition and internal documents highlighting ability to pressure payors).
[21] *See Cal. v. Am. Stores Co.*, 872 F.2d 837, 842–43 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990), reinstated in relevant part, 930 F.2d 776, 777 (9th Cir. 1991).

would be based on tenuous allegations raised by a handful of States.  This alone is reason enough for the Court to deny a TRO.  *Winter*, 555 U.S. at 23.

### a.    Create Conflicts of Law

Granting a TRO would create conflict with an FCC order, resulting in repercussions that counter the FCC's "regulatory structure designed to deter and remedy anticompetitive harm."[22] The FCC Order requires Nexstar to expand and increase its investment in local news.  Okuliar Decl. Ex. A (FCC Order) ¶ 85.  The FCC's regulatory framework is designed to ensure that broadcast ownership and operations serve the public interest, including promoting competition, localism, and diversity.  Okuliar Decl. Ex. A (FCC Order) ¶¶ 17–20.

### b.    Deprive Public Benefits to the Community

Granting a TRO will deprive the Nexstar's communities of the very benefits the FCC found to be in the public interest.  Nexstar will be able to invest in local programming and local coverage that benefits viewers, which will provide a substantial benefit to the public.  Okuliar Decl. Ex. A (FCC Order) ¶ 83.  Plaintiffs have it backwards when they claim that the transaction will degrade local news.  Nexstar has committed to increasing the amount and availability of local programming in the aggregate in the affected markets as part of the transaction.  Biard Decl. ¶ 25.[23]  The FCC has found the transaction would foster greater competition against national networks, large technology companies, and enhance the sophistication and scale of competing broadcast entities.  A hold-separate order would prevent Nexstar from delivering these benefits to viewers.  *Id.*  It would also irreparably harm the interests of the United States, as stated by the FCC in advancing this deal.  *See Trump v. CASA, Inc.,* 606 U.S. 831, 860 (2025) (finding entry of overbroad injunction would irreparably harm government).

---

[22] *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004).

[23] Even assuming *arguendo* that Nexstar will combine newsrooms in a DMA as the States hypothesize, they have no basis to assume that local news will be degraded.

> The consolidation of two news operations into one in the same DMA may allow the broadcaster to reach both stations' audience at lower cost.  These cost reductions would increase the marginal impact of every dollar invested into local news, as any increases in news programming or improvements in news quality will reach a broader audience (the combined audience of both stations).  With greater return on every dollar invested in news, the incentive to invest goes up. Put simply, the greater efficiency in news operation should be expected to both lower costs *and* increase quality and investment.

Israel Decl. ¶ 59.

OPP. TO PLFS' MOTION FOR TRO

Postponing integration will also delay Nexstar's accelerated plans to upgrade broadcast infrastructure and provide all TEGNA stations with access to ATSC 3.0, a new over-the-air broadcasting standard combining television with internet content, which offers superior audio and video quality, improved reception, and enables advanced emergency alerts.  *See* Okuliar Decl. Ex. A (FCC Order) ¶ 86.  Granting a hold-separate order would harm the public interest in these and other efforts.

c.    **Undermine Congressional Intent**

Further, the public interest favors adherence to Congressional intent.  The Supreme Court has instructed that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," and that where "there exists a regulatory structure designed to deter and remedy anticompetitive harm, the additional benefit to competition provided by antitrust enforcement will tend to be small."  *Trinko*, 540 U.S. at 411–12.  Here, Congress established precisely such a structure.  The Cable Television Consumer Protection and Competition Act of 1992 created the retransmission consent regime "to establish a marketplace for the disposition of the rights to retransmit broadcast signals" and to restore competitive balance to a market that had "tilted" too far in favor of cable operators.  S. Rep. No. 102-92, at 35–36 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 1133, 1168–69.  That regime is administered through FCC rulemaking, good-faith negotiation requirements under 47 C.F.R. § 76.65(a), and enforcement authority.

The Communications Act's antitrust saving clause does not change this analysis.  Although *Trinko* recognized that such a clause "bars a finding of implied immunity," the Court nonetheless held that where regulators have established "an effective steward of the antitrust function," courts should question "the additional benefit to competition provided by antitrust enforcement."  540 U.S. at 406–07, 412–14; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 862 (2000) ("Moreover, this Court has repeatedly declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law . . .").

The FCC did exactly that here and the Court should afford substantial weight to the FCC's

14                    OPP. TO PLFS' MOTION FOR TRO

determinations. *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 225 (S.D.N.Y. 2020) (federal review "contribut[es] substantially to rebutting" *prima facie* case where regulators are "intimately familiar with this technical subject matter" and "competitive realities involved").

### B.    The Balance of the Equities Tips Strongly in Nexstar's Favor

The balance of the equities favors Nexstar because the TRO would "impose a significant burden" on Nexstar. *Winter*, 555 U.S. at 27.  Nexstar will suffer irreparable operational, financial, and competitive harm if forced to hold TEGNA separate.  Biard Decl. ¶ 20.  A hold-separate order would prevent Nexstar from effectuating plans designed to result in cost savings and efficiencies, including systems integration, policy standardization, and retention of key employees. *Id.* ¶ 21.  A delay will also impede coordination on key business functions, such as advertising sales, pricing, inventory management, and contract negotiations. *Id.* ¶ 22.  Lost operational efficiencies alone have been valued at approximately ▮▮▮▮▮ and cannot be recaptured. *Id*.  A hold-separate requirement would also create uncertainty regarding the company's operations and strategic direction, impairing Nexstar's ability to preserve and grow key relationships and compete effectively. *Id.* ¶ 25.  That uncertainty also creates substantial risk of attrition among key personnel, especially high performers. *Id.* ¶ 27.  That uncertainty carries additional financial consequences—financing for the deal was based on operational and revenue synergies that, if delayed, could materially degrade Nexstar's standing in financial markets. *Id.* at ¶ 23.  Finally, a TRO would force Nexstar not to implement its commitments under the FCC Order, putting it at risk of violating the FCC Order.

### C.    Plaintiffs Unduly Delayed Seeking Relief

When a plaintiff "unduly delayed in seeking injunctive relief," the court "may conclude that the delay constitutes laches or contradicts the applicant's allegations of irreparable injury and may deny the motion solely on either ground." *See Lucero v. Pennella*, No. 18-CV-01448, 2018 WL 5291980, at *1 (E.D. Cal. Oct. 23, 2018) (denying TRO where plaintiff had "known for many months of the conduct about which he complains"); *see also* Local Rule 231(b).  Courts have denied relief where plaintiffs failed to exercise "proper diligence" and delayed in filing suit challenging a merger. *Antoine L Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp.

2d 1159, 1172–73 (C.D. Cal. 2000) (applying laches to bar relief).

In *Garabet*, the Court denied plaintiffs' request for divestiture because the plaintiffs were aware of the merger months before its consummation but took no "significant action," only to file suit the day of consummation.  *Id.* at 1173; *see, e.g.*, *Taleff v. Southwest Airlines Co.*, 828 F. Supp. 2d 1118, 1124 (N.D. Cal. 2011) ("[T]he Court finds that because Plaintiffs delayed in filing their suit until after Defendants' merger had already been consummated, the remedy of divestiture is now unavailable to Plaintiffs."); *Advocacy Org. for Patients & Providers v. Mercy Health Servs.*, 987 F. Supp. 967, 970 (E.D. Mich. 1997) (denying injunctive relief where plaintiffs had been aware of merger for several months before consummation).

Despite knowing about this merger since last summer and receiving voluminous materials from Defendants, the States expressed no concerns and little interest.  All the while, they were apparently working with DIRECTV to coordinate a strategy to support DIRECTV's opposition to the deal.  The States waited until 1:35 AM EDT on March 19, 2026 to file their Complaint and notify counsel, who they knew was based in Washington, D.C.  They should not get the benefit of their duplicitous strategy.  "[P]laintiffs are attempting to throw a monkey wrench into the merger at a very late stage in the game." *Advocacy Org.*, 987 F. Supp. at 970.  The Court should reject this last-minute effort to disrupt a merger announced eight months ago.

### D.     Plaintiffs Must Post a Bond

If the Court does not deny the States' Motion (which it should for the reasons stated), the States should be required to post a bond equivalent to the losses Nexstar will incur if it is wrongfully enjoined from integrating TEGNA.  *See* 15 U.S.C. § 26; Fed. R. Civ. P. 65(c); *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1037 (9th Cir. 1994) (Rule 65(c) protects against the risk of wrongful restraint).  States are not exempt from the bond requirement. *See, e.g., Hawaii ex rel. Anzai v. Gannett Pac. Corp.,* 99 F. Supp. 2d 1241, 1255 (D. Haw. 1999) (imposing bond on Hawaii); *In re Nat'l Credit Mgmt. Grp., L.L.C.*, 21 F. Supp. 2d 424, 465 (D.N.J. 1998) (imposing bond on State of New Jersey).

The States' failure to address the bond requirement (as Local Rule 231 requires) highlights the extent to which they ignore the harm to Nexstar should the Court accept their

tenuous theory.  In contrast to the speculative harm the States claim justifies their Motion, Nexstar will suffer irreparable harm in at least three ways: (1) the unnecessary expense of operating two separate companies nationwide (regardless of the extent of overlap in a particular DMA); (2) the cost of lost opportunities and revenue loss resulting from the uncertainty Plaintiffs' Complaint and TRO will cause among advertisers; and (3) substantial risk of attrition among key personnel.  The combined financial losses easily surpass whatever future harm could befall some unknown citizen or entity from the Transaction.  The Court should impose a security of at least $150 million if it grants the States' Motion.

### V.    CONCLUSION

The States' last-minute, unfounded, extraordinary request for relief should be denied in its entirety.

Dated: March 24, 2026

Respectfully submitted,

By: /s/ Alexander P. Okuliar
Alexander P. Okuliar (pro hac vice)
Eliot A. Adelson (CA Bar No. 205284)
Bradley S. Lui (CA Bar No. 143088)
Henry Huttinger (CA Bar No. 312843)
Alexa DiCunzolo (pro hac vice pending)

MORRISON & FOERSTER LLP
Attorneys for Defendants Nexstar
Media Group, Inc. and TEGNA Inc.

17                    OPP. TO PLFS' MOTION FOR TRO