

FILED

MAY 15 2026

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
**Sacramento Division**

| | |
|---|---|
| THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF ILLINOIS, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OREGON, AND THE COMMONWEALTH OF VIRGINIA ) ) ) ) ) ) ) ) ) | **Civil Case No.: 2:26-cv-00978-TLN-CKD** |

THE STATE OF CALIFORNIA, THE
STATE OF COLORADO, THE STATE OF
CONNECTICUT, THE STATE OF
ILLINOIS, THE STATE OF NEW
YORK, THE STATE OF NORTH
CAROLINA, THE STATE OF OREGON,
AND THE COMMONWEALTH OF
VIRGINIA           )
      **Plaintiffs,**     )
v.                 )
NEXSTAR MEDIA GROUP, INC. AND   )
TEGNA INC.,        )
      **Defendants.**     )
               )
Major Mike Webb,   )
      **Intervenor.**     )

**Civil Case No.: 2:26-cv-00978-TLN-CKD**

## MOTION TO INTERVENE

1. Proposed Intervenor, Major Mike Webb (legal name), also known as Michael D. Webb, seeking, *inter alia*, to enjoin Nexstar's proposed merger with TEGNA., pursuant to Fed. R. Civ. P. 65, hereby moves, pursuant to Fed. R. Civ. P. 24(a), to intervene as of right, or, in the alternative, for permissive intervention, in accordance with Fed. R. Civ. P. 24(b).

### Intervention

#### *Permissive Intervention*

2. "The mere fact that. . . [one] may not approve of publications. . . , or may not desire. . . to discuss. . . [another's] activities or publish. . . [another's] spoken words, does not give rise to an action cognizable under the law", and "[t]he *First Amendment* freedoms of speech and press are too precious to be eroded or undermined by the likes and dislikes of persons who invite attention and publicity by their own voluntary actions", *Falwell v. Penthouse Int'l, Ltd.*, 521 F. Supp. 1204 (W.D. Va. 1981).

3. "All persons", without express exception, "shall have the same right in every State and

- 1 -

Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by *white citizens*". 42 U.S.C. § 1981(a).

4.  Intervenor is "a citizen of the United States and a resident" "of mixed descent," albeit in reverse "proportion of seven eighths Caucasian and one eighth African blood", and "that. . . mixture of colored blood was not discernible in him"; however, "he was entitled to every recognition, right, privilege and immunity secured to the citizens of the United States of the white race by its *Constitution* and law". *Plessy v. Ferguson*, 163 U.S. 537 (1896).

5.  "Disparate treatment and disparate impact discrimination claims are separate and distinct." *Panda Express*, Case No: C 10-01370 SBA, *supra* (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003)).

6.  "Liability in a disparate-treatment case depends on whether the protected trait actually motivated the. . . [defendant's] decision", while "disparate-impact claims involve. . . practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Ibid.*

7.  And, in this matter, for all practical purposes, Intervenor, apparently "in error is a negro." *Patterson v. Commonwealth*, 139 Va. 589 (June 12, 1924).

8.  "On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).

9.  Far more than merely an unbridled right to be a cheerleader for the Government, but rather "[p]remised on mistrust of governmental power, the *First Amendment* stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. FEC*, Record No. 08-205, 558

U.S. 310 (2010) (citing *U.S. v. Playboy Entertainment Group, Inc.*, 529 U. S. 803 (2000)).

10. "Under our *Constitution*, [even] anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent", providing "*a shield from the tyranny* of the majority." *McIntyre v. Ohio Elections Comm'n (93-986)*, 514 U.S. 334 (1995) (emphasis added); *see generally* J. Mill, *On Liberty and Considerations on Representative Government* 1, 3-4 (R. McCallum ed. 1947).

11. "In [just] the realm of trademarks, the metaphorical marketplace of ideas becomes a tangible, powerful reality", especially where "that real marketplace exists as a matter of state law and our common-law tradition," and "[t]o permit viewpoint discrimination in this context is to permit Government censorship." *Matal v. Tam*, 582 U.S. 218 (2017).

12. "It is the purpose of the *First Amendment* to preserve an uninhibited marketplace of ideas in which truth", at issue here, "will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee.... It is the right of the public to receive ... ideas ... which is crucial here." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969).

13. "[T]he 'fairness doctrine' is itself enforced by the Government", and, while "that doctrine does not guarantee other speakers access to the microphone if they disagree with editorial opinion expressed by the station on public policy issues", "[n]o other voice need be heard", only "if the Government determines that the station's editorial [had] 'fairly" presented the substance of 'the' opposing view", *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, n. 11 (1984), not of evidence in the record here.

14. While, indeed, "editorials from an institution[,] which the public may hold in high regard may carry added weight in the marketplace of ideas", *Id.* (citing Brief for Appellees 15),

"[t]hat fact, however, magnifies the evil sought to be avoided, for the danger is that. . . views that are not actually shared by that institution will be parroted to curry favor with its benefactor." *Id.*

15. News reports that "Allen certainly defies all the stock stereotypes and negative typecasting of young African American males", and "[t]here's absolutely no crime, drug, gang, dysfunctional home, or education derelict tag that can be slapped on him"; "[h]e only made one reference to race in his alleged manifesto", and, albeit not even reported by News Nation, "[h]e alluded to himself as half Black and half white." Earl Ofari Hutchinson, "Cole Tomas Allen is a Black man who had everything going for him—so why?" *Eurweb*, April 27, 2026.

16. News reports that "Magistrate Judge Zia Faruqui told an attorney representing the Department of Corrections (DOC) that he was 'fascinated and disturbed' by Allen's treatment in jail", and "Allen was placed on suicide watch when he was first imprisoned." Peter D'Abrosca, "Judge apologizes to alleged would-be Trump assassin, drags Jan. 6 suspects into rant over jail complaints," *supra.*

17. News reports that "Allen [had] exchanged gunfire with the agents before falling to the ground and being apprehended", and had been "found with a 12-gauge pump-action shotgun, a .28-caliber semiautomatic handgun and three knives in his possession". Rob Taub, "Timeline: How Cole Allen allegedly got steps away from Trump," *News Nation*, April 27, 2026.

18. "Nexstar Media Group owns more than 200 stations in 116 U.S. markets", and "[i]t simultaneously operates the NewsNation cable channel." BNM Staff, "Nexstar Media Group to Use NewsNation as Local Network News Source," *Barrett Media*, April 13, 2026.

19. "The news comes amid Nexstar's bid to acquire TEGNA in a $3.5 billion deal", and, "[a]fter

being granted approval for the move last month by the FCC, a coalition of state attorneys general has sued to block the move." *Id.*

20. After approval of the merger, in a surprising decision, "Nexstar Media Group, the largest owner of local television stations in the United States, ha[d] launched a major initiative to reshape national news content on its affiliated broadcasts." Luke Bouma, "Nexstar is Ending National News From Sources Like NBC on Local News Casts on ABC, CBS, FOX, & NBC Stations As It Replacing It With National NewsNation Content," *Cord Cutter News*, April 11, 2026.

21. "The company, which operates more than 200 stations serving 116 markets and reaching roughly 220 million people, is [now] directing those outlets to stop incorporating segments produced by major national networks including ABC, NBC, and CBS. Instead, the stations will draw from material supplied by NewsNation, the cable news channel owned by Nexstar itself, according to Reuters and Bloomberg", and "[t]his comes as there has been growing concern about the slow death of local news." *Id.*

22. "A report from Bloomberg shares that Nexstar has ended the agreements it previously had with NBC for nationally reported segments", and "Nexstar Media Group CEO Perry Sook previously told company employees that he believes NewsNation will ultimately become the 'exclusive wire service and national news partner' for all of its local news operations." BNM Staff, "Nexstar Media Group to Use NewsNation as Local Network News Source," *Barrett Media, supra.*

23. News reports that just one "Secret Service officer was shot but was wearing a bullet-resistant vest and survived, officials say", and "Allen was injured during the attack but was not shot." Erik Tucker, Michael Kunzelman & Alanna Durkin Richer, "Allen was injured during the

attack but was not shot," *Associated Press*, April 27, 2026.

24. News reports that "Allen was apprehended just feet away from the stairs and elevators leading down to the ballroom, where Trump, the first lady and other officials were seated", and "Allen was 'totally subdued' by Secret Service, and police confirm he'd been taken to a local hospital." Rob Taub, "Timeline: How Cole Allen allegedly got steps away from Trump," *supra*.

25. However, news reports that "Allen's photos quickly went viral – as he was seen shirtless, being held down to the ground by law enforcement officials", and "many also ended up asking why Allen was shirtless in the first place", leading "to some speculation, and in some cases bogus claims like this clothes being taken 'maliciously' were also bandied about." Shuvrajit Das Biswas, "Why was Cole Tomas Allen shirtless?[1]" *Hindustan Times*, April 27, 2026.

26. News reports that "Elon Musk's longtime fixation on a white racial majority is intensifying", and "[t]he richest man in the world posted about how the white race was under threat, made allusions to race science or promoted anti-immigrant conspiracy content on 26 out of 31 days in January, according to the Guardian's analysis of his social media output." Nick Robins-Early, "Elon Musk posted about race almost every day in January," *The Independent*, February 12, 2026.

27. "Journalist Eric Lichtblau says President Trump's incendiary rhetoric has stoked a 'new age of hate.'" Dave Davies, "'American Reich' author details a national surge in bigotry and white supremacy," *NPR*, January 7, 2026.

---

[1]"WHCD shooter's photos raise questions amid claims of Instagram being deleted". Shuvrajit Das Biswas, "Why was Cole Tomas Allen shirtless?" *supra*.

**28.** More concerningly, news reports that "[a]nother shared the photos and remarked 'President Trump shared photos on Truth Social showing a shirtless suspect—identified as 31-year-old Cole Tomas Allen from Torrance, California—detained face-down on a patterned carpet after law enforcement responded'", and "[t]hey added[,] 'The incident has sparked discussions about security protocols at high-profile events.'" Shuvrajit Das Biswas, "Why was Cole Tomas Allen shirtless?" *supra.*[2]

**29.** News reports that "more than 2,000 journalists and guests were told to take cover", when "Allen tripped and fell to the ground, and officers immediately jumped on him, stripping him of his weapons and shirt to ensure he didn't have explosives on him, law enforcement sources told CBS News." Jennifer Jacobs, *et al.*, "Gunshot at correspondents' dinner may have struck cellphone in pocket of officer's bulletproof vest, sources say," *CBS News*, April 28, 2026.

**30.** However, a popular science journal had carried a story, not even reported by News Nation, just two days later, but not reported in the press, noting how, "[w]hen federal agents came to the home of David Morens. . . with an arrest warrant", not for an attempt to take the life of the President, but "for allegedly concealing federal records related to the debate about the origin of the COVID-19 pandemic, they [had] behaved as if the 78-year-old retired scientist was a violent criminal." Jon Cohen, *Guns and bulletproof vests: How federal agents arrested Fauci aide,* 392 Science 6798, April 27, 2026.

**31.** "If two or more persons conspire to kill. . . any individual designated in subsection (a) of this section and one or more of such persons do any act to effect the object of the conspiracy, each shall be punished (1) by imprisonment for any term of years or for life, or (2) by death

---

[2] "Yet another noted 'He was taken down fast — shirtless, cuffed, and face-down on the hotel carpet after shots were fired.'" *Id.*

or imprisonment for any term of years or for life, if death results to such individual." 18 U.S.C. § 1751(d).

32. "Whoever assaults any person designated in subsection (a)(1) shall be fined under this title, or imprisoned not more than ten years, or both." 18 U.S.C. § 1751(e).

33. Yet, Morens, a former aide to "former director, Anthony Fauci, was having his morning coffee at his Chester, Maryland, home when he heard loud pounding on the door"; "[h]e [had] opened it to find a half-dozen federal agents carrying guns and wearing tactical gear, including bulletproof vests, according to two sources who spoke with him but asked not to be identified", while yet "[a]nother team of officers stood in the distance and observed, as did neighbors." Jon Cohen, *Guns and bulletproof vests: How federal agents arrested Fauci aide, supra.*

34. "Morens is accused of violations including trying to circumvent the *Freedom of Information Act* by using personal email rather than his government account in efforts to help Peter Daszak, former head of the EcoHealth Alliance, a now-defunct nonprofit research organization." *Id.*

35. "Allen is charged by complaint with one count of attempt to assassinate the President of the United States, transportation of a firearm & ammunition in interstate commerce with intent to commit a felony, and discharge of a firearm during a crime of violence." Press Release, "Suspect in White House Correspondents' Dinner Shooting Charged with Attempt to Assassinate the President," *DoJ*, April 27, 2026.

36. "David M. Morens, 78, of Chester, Maryland, is charged with conspiracy against the United States; destruction, alteration, or falsification of records in federal investigations; concealment, removal, or mutilation of records; and aiding and abetting." Press Release,

"Former Senior NIAID Official Indicted for Concealing Federal Records During COVID-19 Pandemic," *DoJ*, April 28, 2026.

37. "'These allegations represent a profound abuse of trust at a time when the American people needed it most — during the height of a global pandemic,' said Acting Attorney General Todd Blanche." *Id.*

38. "'As alleged in the indictment, Dr. Morens and his co-conspirators deliberately concealed information and falsified records in an effort to suppress alternative theories regarding the origins of COVID-19'", and "Government officials have a solemn duty to provide honest, well-grounded facts and advice in service of the public interest — not to advance their own personal or ideological agendas.'" *Id.*

39. "'Circumventing records protocols with the intention of avoiding transparency is something that will not be tolerated by this FBI,' said FBI Director Kash Patel." *Id.*

40. "'Not only did Morens allegedly engage in the illegal obfuscation of his communications, but he received kickbacks for doing so'"; "'If you have engaged in activity conspiring against the United States, we will not stop until you face justice.'" *Id.*

41. "'When public officials deliberately circumvent the law to hide their communications from the public, they undermine the public's trust and the integrity of our institutions'"; "'This was especially true during the COVID-19 pandemic when transparency was needed most,' said U.S. Attorney Kelly O. Hayes for the District of Maryland." *Id.*

42. "'Our office will continue to hold accountable those who seek to evade their legal obligations for their own gain'"; "'Public officials who disregard their legal obligations undermine the transparency that keeps our federal programs strong'"; "The deliberate mishandling and concealment of records in a federal investigation is not just a breach of duty,

it is a betrayal of public trust,' said Special Agent in Charge Marcus L. Sykes, U.S. Department of Health and Human Services Office of Inspector General (HHS-OIG)."

43. While, reportedly, "'HHS-OIG remains committed to working with our law enforcement partners to ensure that anyone who seeks to evade the law is held fully accountable'", *Id.*, "'This smells to me like political theater, and is absolutely overkill,' says Daszak, a recipient of some of Morens's personal emails who was barred from future National Institutes of Health funding in 2024 after the government found he had violated federal grant rules." *Id.*

44. However, unlike Allen, "half Black and half white", Earl Ofari Hutchinson, "Cole Tomas Allen is a Black man who had everything going for him—so why?" *supra*,  in this instance, in suburbia, "[t]he agents did not harm Morens, but took off his pants and shirt, handcuffed him, and drove him 65 kilometers to the U.S. District Court in Greenbelt, Maryland, where he was fingerprinted, photographed, and jailed. He was released on his own recognizance later in the day, but was asked to return to Greenbelt and surrender his passport, which he did." Jon Cohen, *Guns and bulletproof vests: How federal agents arrested Fauci aide, supra.*

45. "The Department of Health and Human Services, which oversees NIAID, and FBI both have field agents who make arrests in federal cases like this"; however, "[o]nly FBI replied to Science's questions." *Id.*

46. "'The claims about aggressive tactics are inaccurate,' it stated in an email", and ";The FBI respectfully follows policy and procedures for the safety of everyone involved in the operation.'" *Id.*

47. "Morens's lawyer declined to comment on the indictment, which centers on emails between his client and other scientists"; however, "Solomon Wisenberg, a former federal prosecutor who now defends people accused of white-collar crimes—which would include the handling

of federal government records—says Morens's defense could be that the indictment is politically motivated." Jon Cohen, "Fauci aide indicted over federal records violations related to COVID-19," *Science*, April 28, 2026, *updated* April 29, 2026.

48. "Wisenberg, noting that the case was filed in Maryland, says Morens would likely find a sympathetic jury in the Democrat-leaning state if it went to trial. Even if convicted, he says it's highly unlikely Morens would face a stiff sentence." *Id.*

49. ''Unless we're talking about national security or true espionage, the idea that a 78-year-old is going to do serious time is very far-fetched,' Wisenberg says." *Id.*

### *Mandatory Intervention*

50. "On timely motion, the court must" , in ministerial obligation, "permit anyone to intervene who: (1) is given *an unconditional right* to intervene by *a federal statute*; or (2) claims an *interest relating to the property or transaction* that is the subject of the action, and is *so situated* that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, Fed. R. Civ. P. 24(a) (emphasis added).

### Sherman Act

51. Claims of conversion, in unjust enrichment, amount to far more than merely a "wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Economopoulos v. Kolaitis*, 259 Va. 806 (Va. 2000) (citing *Credit Corp. v. Kaplan*, 198 Va. 67 (1956)[3].

52. In *Perk v. Vector Resources Group, Ltd.*, 253 Va. 310 (Va. 1997), the plaintiff, a creator of software, and other intellectual property items, had claimed that he had suffered the "lost the value of his efforts in creating the converted items, the fair market value of the items, and

---

[3] "An action for conversion can be maintained only by the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted." *Id.* (citing *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299 (1994)).

- 11 -

future profits", and that Reviewing Court rebutted the claim that he had failed, therefor, to state a cause of action, noting the error of the Trial Court.

53. "Conversion includes any distinct act of dominion wrongfully exerted over property that is in denial of, or inconsistent with, the owner's rights." *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294 (Va. 1998) (citing *Hairston Motor Co. v. Newsome*, 253 Va. 129 (1997); *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67 (1956)).

54. "Generally, the measure of damages for the conversion of commercial paper is *prima facie* the face value". *Id.* (citing Va. Code § 8.3A-420(b); *American Nat'l Bank of Portsmouth v. Ames*, 169 Va. 711 (1938)).As noted above, without express exception, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

55. Simply stated, "[a] civil conspiracy is defined as [merely] an agreement between two or more people to participate in an unlawful act or a lawful act in an unlawful manner," and "[t]he conspirators 'must share the general conspiratorial objective, but they need not know all the details of the plan . . . or possess the same motives." *Hobson*, 737 F.2d at 1.

56. "Any person who. . . purchas[es] or sell[s] a security while in possession of material, *nonpublic information* shall be liable. . . to any person who, contemporaneously with the purchase or sale of securities. . . has purchased. . . or sold. . . securities of the same class", 15 U.S.C. § 78t-1(a) (emphasis added); however, "[n]o action may be brought under this section more than 5 years after *the date of the last transaction* that is the subject of the violation." 15

U.S.C. § 78t-1(b)(4) (emphasis added).

57. For purposes of standing, Article III Courts have defined an injury-in-fact as "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)).

58. "The proximate-cause inquiry is not easy to define, and over the years it has taken various forms; but courts have a great deal of experience applying it, and there is a wealth of precedent for them to draw upon in doing so." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996); *Pacific Operators Offshore, LLP v. Valladolid*, 132 S.Ct. 680 (2012) (Scalia, J., concurring in part and concurring in judgment)).

59. "Proximate-cause analysis is controlled by the nature of the statutory cause of action", and "[t]he question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.*

60. "Put differently, the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct", and "[t]hat is ordinarily the case if the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'" *Id.* (citing *Holmes v. Sec. Invest. Protect. Corp.*, 503 U.S. 258 (March 24, 1992); *see, e.g., Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010)).

61. "In a sense, of course, all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising; but since the *Lanham Act* authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute." *Id.* (citing *Harold H.*

*Huggins Realty, Inc. v. FNC, Inc.,* 634 F.3d 787 (5th Cir. 2011)).

62. "That is consistent with our recognition that under common-law principles, a plaintiff can be directly injured by a misrepresentation even where 'a third party, and not the plaintiff, ... relied on' it." *Id.* (citing *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639 (2008)).

63. "Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor", and "[s]uch punishment shall be in addition to any civil relief recoverable under § 18.2-500." Va. Code § 18.2-499(A).

64. In the present matter, "the averred fact of knowledge of the peril stated was absolutely essential", all heard, or should have "heard three or four short, shrill whistles, one right after the other", just as all knew or should have known that "the blasts" are not made without reason. *St. Louis & S. F. R. Co. v. Model Laundry,* 42 Okla. 501 (June 20, 1918).

65. "In this case, the defendants were, at least, on constructive notice regarding the condition. . . , as an owner/occupier is generally on constructive notice of what a reasonable inspection would reveal." *Hagadorn v. Prudential Ins. Co.,* 267 Ga. App. 143 (Ga. Ct. App. 2004).

66. "Any person who attempts to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection A of this section shall [also] be guilty of a violation of this section and subject to the same penalties set out in subsection A." Va. Code § 18.2-499(B).

67. "Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, 'damages' shall include loss of profits." Va. Code § 18.2-500(A).

68. "Whenever a person shall duly file a civil action in the circuit court of any county or city against any person alleging violations of the provisions of § 18.2-499 and praying that such party defendant be restrained and enjoined from continuing the acts complained of, such court shall have jurisdiction to hear and determine the issues involved, to issue injunctions *pendente lite* and permanent injunctions and to decree damages and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel." Va. Code § 18.2-500(B).

69. "Under Virginia law, the elements of a common law civil conspiracy are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff through an overt action done pursuant to the agreement", *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619 (W.D. Va. 2015) (citing *William v. AES Corp.*, 28 F.Supp.3d 553 (E.D.Va.2014)), and "[t]here must also be an underlying tort committed." *Id.* (citing *William,* 28 F.Supp.3d, at 553).

Unlawful Purpose or Act in Tortious Interference

70. "[I]f a contract is terminable at will or involves only a contract or business expectancy, 'a plaintiff, in order to present a *prima facie* case of tortious interference, must allege and prove not only an intentional interference ..., but also that the defendant employed "improper methods," *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 754 S.E.2d 313, (2014), wholly eliminating the language regarding probability of pecuniary enrichment.

71. Under the revised and abbreviated test, "the existence of a valid contractual relationship or

- 15 -

business expectancy," *Id.*, as well as the "knowledge of the relationship or expectancy on the part of the interferor," *Id.*, are assumed to prove the fact of the matter of an interference, while the "intentional interference inducing or causing a breach or termination of the relationship or expectancy," *Id.*, is essentially the restated test.

72. The business expectancy was first applied to an entity without a pecuniary expectancy in *United Kosher Butchers Ass'n v. Associated Synagogues of Greater Boston, Inc.*, 349 Mass. 595, 211 N.E.2d 332 (Sup. Jud. Ct., 1965), recognizing the property, *vis* contractual, right in the expectancy and warranting the differing statutes of limitations for tortious interference with a contract, or two years, juxtaposed to a business expectancy, for which, in the Commonwealth, the statute of limitations tolls at five years. *Dunlap*, 287 Va., at 207, 754 S.E.2d, at 313.

73. Similarly, political organizations have been included as potential parties under the federal racketeering statute, *see Lopez v. Pastrick*, No. 205-CV-452, 2007 WL 1042140, at *1–6 (N.D. Ind. Apr. 4, 2007).

Conspiracies to Violate Rights

74. "Any national. . . injured. . . by reason of an act of international terrorism. . . may sue therefor. . . and shall recover threefold the damages. . . and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).

75. The State Department Secretary "is authorized to designate an organization as a foreign terrorist organization", 8 U.S.C. § 1189(a)(1), and, since December 12, 2004, *ISIS (formerly al-Qa'ida in Iraq)*, known to operate in Central Africa (Congo), Mozambique, Greater Sahara, West Africa, Philippines, *Bangladesh*, Libya, Khorasan Province and Sinai Province, has been a Foreign Terrorist Organizations (FTO)." Editors, "Foreign Terrorist Organizations," *State Department*, December 1, 2025 (emphasis added).

- 16 -

76. Under this provision, a person may bring a civil action "for an injury arising from an act of international terrorism committed, planned, or authorized by an organization", "as of the date on which such act of international terrorism was committed, planned, or authorized, liability", which "may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. §2332(d)(2).

77. Moreover, "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the *due course of justice* in any State or Territory, *with intent to deny to any citizen the equal protection of the laws*, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws. . . whereby *another is injured* in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, *the party so injured or deprived may have an action* for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(2).

78. State Action "'challenged on equal protection grounds is evaluated under 'strict scrutiny' if it interferes with a 'fundamental right' or discriminates against a 'suspect class'", *Gray v. Commonwealth*, 274 Va. 290 (2007) (quoting *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988).

79. Moreover, where "strict scrutiny applies, . . . [a defendant] faces a daunting gauntlet, as 'it is the rare' law that 'survives' this kind of review", *Id.* (quoting *Burson v. Freeman*, 504 U.S. 191 (1992)).

80. "To survive, the. . . [regulations] must be 'narrowly tailored' to advance a 'compelling state

interest.'" *Id.* (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989).

81. "The highest standard, strict scrutiny, applies where '[w]here certain 'fundamental rights" are involved, and requires that legislation or actions 'limiting these rights may be justified only by a 'compelling state interest,' ' requiring legislation and action 'must be narrowly drawn to express only the legitimate state interests at stake.'" *Hawkins v. Grese*, 68 Va. App. 462 (Va. Ct. App. 2018) (quoting *Roe v. Wade*, 410 U.S. 113 (1973)).

82. "To hold otherwise, as the Court does, is irrational and antithetical to the very nature of the SSI program and the equal protection of citizens guaranteed by the *Constitution*." *U.S. v. Vaello Madero,* 596 U.S. 159 (2022) (Sotomayor, J. dissenting).

83. Yet, many government officials had expected that "full approval could have an impact on vaccine mandates – several schools and business ha[d] suggested they would consider mandating Covid-19 vaccines once they are approved." Jamie Gumbrecht, "FDA grants priority review to Pfizer/BioNTech Covid-19 vaccine; agency official says approval decision expected within two months," *CNN*, July 16, 2021.

84. "On January 23, 2020, facing growing pressure from a restive working class, Chinese authorities initiated the first Zero-COVID elimination policy in the world, with 13 million people in Wuhan beginning the first mass lockdown in human history." WSWS Editorial Board, "5 years of the COVID-19 pandemic: The response of the World Socialist Web Site," *WSWS*, March 24, 2025.

85. However, while some had expressed the thought that the approval for private label marketing might "also help sway skeptics hesitant to get the vaccines now", Jamie Gumbrecht, "FDA grants priority review to Pfizer/BioNTech Covid-19 vaccine; agency official says approval decision expected within two months," *supra*, in a mere 40-page report, published by the

organization that had declared the pandemic emergency, it was early reported that "COVID-19 transmission in children appears to be limited compared with influenza, while the clinical picture differs from SARS", and that, with just one month of limited lockdowns, "China [wa]s already, and rightfully, working to bolster its economy, reopen its schools and return to a more normal semblance of its society, even as it works to contain the remaining chains of COVID-19 transmission", a report that had strongly recommended "[a]ppropriately, a science-based, risk[-]informed and phased approach", to enable "a clear recognition and readiness of the need to immediately react to any new COVID-19 cases or clusters as key elements of the containment strategy are lifted." *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, February 16-24, 2020.

86. Most significantly, "**[a]ymptomatic infection** ha[d] been reported, but the majority of the relatively rare cases who [we]re asymptomatic on the date of identification/report went on to develop disease", and "[t]he proportion of truly asymptomatic infections is unclear but appears to be relatively rare and does not appear to be a major driver of transmission." *Id.* (emphasis in original).

87. However, quote contrary to what most may believe, the clinically accepted consensus is that while symptoms require some form of diagnostic method or test to elicit from patient, like taking a temperature with a thermometer, to a clinical degree of significance, exhalation events, like coughing or sneezing, are, in fact, asymptomatic presentations or indications of potential infection, Adam Feldman (Reviewed by Deborah Witherspoon), "Why do signs and symptoms matter?" *Medical News Today*, February 22, 2018. "Pathology (from the Greek word *pathología*, meaning the study of suffering) refers to the specialty of medical science concerned with the cause, development, structural/ functional changes, and natural history

associated from a normal phenotype (observable characteristics due to genome and environment), evident via patient complaints (symptoms), and/or the measurements of a careful observer (signs)", while "[t]he cause of the disease is referred to as its etiology (from the Greek word meaning the study of cause)." William K. Funkhouser, Jr., Pathology: The Clinical Description of Human Disease, pp. 217–229, October 6, 2017.

88. More significantly, for tactical and strategic military analysts, federal regulators had recovered viable virus samples "on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the *Diamond Princess* but before disinfection procedures had been conducted (Takuya Yamagishi, National Institute of Infectious Diseases, personal communication, 2020)." Leah F. Moriarty, *et al.*, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships —Worldwide, February– March 2020, supra* (citing CDC COVID-19 Response Team, *Severe outcomes among patients with coronavirus disease 2019 (COVID-19)—United States, February 12–March 16, 2020*, 69 MMWR 12, pp. 343-346, March 27, 2020, *Epub.*, March 18, 2020. However, while in at least one study, the "median time *from illness onset to collection* of the tested specimens was 12 days", Alainna J. Jamal, *et al.*, *Sensitivity of Nasopharyngeal Swabs and Saliva for the Detection of Severe Acute Respiratory Syndrome Coronavirus 2*, 72 Clin. Infect. Dis. 6, pp. 1064-1066, March 15, 2021, in studies regarding nasopharyngeal swabs it has been found "that asymptomatic carriers can shed viable virus until 7 days after the initial positive PCR test, with [only] one outlier shedding until day 15", Takayuti Murata, *et al.*, *Shedding of Viable Virus in Asymptomatic SARS-CoV-2 Carriers*, 6 mSphere 3, e00019-21, May 19, 2021.

89. Hence, clinical researchers could not recover the same from a nasopharyngeal swab where

conditions for a virus are optimal over laying exposed on a surface, and cutting the viable lifespan outside the host by half. This finding, taken with the regimen applied in Koch's Postulates, which contemplates some degraded capabilities upon acquisition of a host, *see generally* Julia A. Segre, *What does it take to satisfy Koch's postulates two centuries later? Microbial genomics and Propionibacteria acnes*, 133 J Invest Dermatol. 9 , pp 2141-2142 (September 2013), suggests that whatever had shed the recovered virus had neither been natural nor human.

90. And this would suggest further that the infections had come about through some mechanism like a smoke munition, especially noting that the "kill zone" found in the Guangzhou restaurant study, Jianyun Lu, *et al.*, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020, supra*, find a perfect overlay matchup with the effective range of a standard smoke grenade deploying just riot agent, or 30 meters. TM 43-0001-29, *Technical Manual: Army Ammunition Data Sheets for Grenades*, June 1994 (Obsolete)[4]

91. "If two or more persons in any State or Territory conspire. . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in

---

[4]"The ignited smoke composition disperses to produce a white smoke cloud within 2 to 6 seconds after firing at approximately 98 feet (30 m) from the launching device." *Id.*

his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

92. "Every person who, *having knowledge that any of the wrongs conspired to be done*, and mentioned in section 1985 of this title, are about to be committed, and *having power to prevent or aid in preventing the commission of the same*, neglects or refuses so to do, if such wrongful act be committed, *shall be liable to the party injured*, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action". 42 U.S.C. § 1986.

93. Generally, "[t]he offender", as here, "must only have or create an understanding. . . that he can influence matters in connection with an official duty", and "[w]hether he is capable of actually effecting such an act is irrelevant." *U.S. v. Manzo*, 851 F.Supp.2d 797 (D.N.J. 2012) (citing *State v. Ferro*, 128 N.J.Super. 353 (App.Div.1974)).

94. Moreover, "if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased"; however, "no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued." 42 U.S.C. § 1986.

95. "[I]n cases where the acts of the defendant or the enterprise were inherently unlawful, such as

murder. . . , the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering acts was short", *Eisert v. Town of Hempstead*, 918 F. Supp. 601 (E.D.N.Y. 1996).

96. "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control", *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (quoting 18 U.S.C. § 2339B(h)), and "a terrorist is 'any one who attempts to further his views by a system of coercive intimidation.'" *U.S. v. Christianson*, 586 F.3d 532 (7th Cir. 2009) (quoting XVII *Oxford English Dictionary* 821 (2d ed. 1989); *Webster's Third New International Dictionary* 2361 (1981)).

97. Where "the object crimes alleged. . . were part of a broader conspiracy 'intended to promote' enumerated crimes of terrorism", it has been held that "[t]he terrorism enhancement applies no matter which object crimes were assumed in the guilty verdict, so there is no need to determine beyond a reasonable doubt that. . .[a defendant or defendants] conspired to commit any one of the named object crimes in particular." *U.S. v. Graham*, 275 F.3d 490 (6th Cir. 2001).

98. Yet, according to press accounts, before the merger agreement, "[t]he White House [had] announced that Vice President Kamala Harris [had] tested positive for Covid-19 on both a rapid and PCR test", and "[t]his [had] unfolded just before Harris was scheduled to meet with President Biden." Vice President Kamala Harris tests positive for Covid," *NBC News*, April 26, 2022.

99. "Whoever kills (1) any individual who is the President of the United States. . . shall be

punished as provided by sections 1111 and 1112 of this title", 18 U.S.C. § 1751(a), and "[w]hoever attempts to kill. . . shall be punished by imprisonment for any term of years or for life." 18 U.S.C. § 1751(c).

100.    According to press accounts, "marking the third time in. . . two years the president ha[d] tested positive for the virus", and "[t]he White House. . . said Biden was 'experiencing mild symptoms' and would return to Delaware to self-isolate and 'carry out all of his duties fully during that time'."; "[h]e received his first dose of Paxlovid, an antiviral therapy produced by Pfizer." Miranda Nazzaro, "How many times has President Biden tested positive for COVID-19?" *The Hill*, July 17, 2024.

101.    Federal law enforcement define "international terror" as "[v]iolent, criminal acts committed by individuals and/or groups who are inspired by, or associated with, designated foreign terrorist organizations or nations (state-sponsored)", and define "domestic terrorism" as "[v]iolent, criminal acts committed by individuals and/or groups to further ideological goals stemming from domestic influences, such as those of a political, religious, social, racial, or environmental nature." Staff, "What We Investigate," *FBI*, https://www.fbi.gov/investigate/terrorism (accessed May 5, 2022).

102.    While in some jurisdictions, a party may be found to have just engaged in "aiding and abetting a breach of fiduciary duty", *Alpert v. Riley*, 2009 WL 1226767 (S.D. Tex. April 30, 2009), in the Commonwealth of Virginia, "[a]iding and abetting is a criminal concept and not a civil concept", *A.G. Van Metre Const., Inc. v. NVKettler L.P.*, No. 13174 , In Chancery, 1992 WL 884467 (Va. Cir. Ct. January 29, 1992).

103.    Nonetheless a "Court recites the facts 'in the light most favorable to the government and draw[s] all reasonable inferences in its favor.'" *U.S. v. Zodhiates*, 235 F.Supp.3d 439 (2017)

(quoting *U.S. v. Guadagna*, 183 F.3d 122 (2d Cir. 1999).

104.    Moreover, "when the Government proves an element of a crime circumstantially—as it must almost always do when it proves a defendant's intent—the Government 'need not 'exclude every reasonable hypothesis other than that of guilt.'"" *Id.* (quoting *Ibid.* (quoting *Holland v. U.S.*, 348 U.S. 121 (1954)).

105.    Furthermore, "when the Government offers circumstantial evidence of intent from which a reasonable jury could find the defendant guilty beyond a reasonable doubt—as the Government did in this case—Rule 29 does not permit the Court to set aside the jury's view of that evidence." *Id.*

106.    In some jurisdictions, a defendant may also be charged as "a principal in the second degree or as an accessory before the fact", *U.S. v. Local 560, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 581 F. Supp. 279 (D.N.J. 1984), aff'd, 780 F.2d 267 (3d Cir. 1985), and, in the Commonwealth of Virginia, he may be charged as accessory to murder, a violation of Va. Code § 18.2-32, chargeable to accessories under Va. Code § 18.2-19.

107.    On similar facts, one tribunal considering crimes against humanity had concluded that "[t]he excuse given by the Accused in his evidence (Session 81, Vol. IV, p. xxxx5), that all he did was to pass on a message which he received from Cracow, is not plausible," concluding that "undoubtedly he knew the value of the tale about 'administration of tonics,' to which he put his signature." *Eichmann*, 36 I.L.R. at 5.

108.    Even a soldier "must use common sense", *Callaway*, 519 F.2d at 184, and "[t]he acts of a subordinate done in compliance with an unlawful order given him by his superior are excused and impose no criminal liability upon him unless the superior's order is one which a

man of ordinary sense and understanding would, under the circumstances, know to be

unlawful, or if the order in question is actually known to the accused to be unlawful." *Calley*,

22 U.S.C.M.A. at 534.

**<u>Excusable Neglect</u>**

109.    "Generally, 'excusable neglect' does not require counsel to have been faultless, and

'inadvertence, mistake, or carelessness' can fall within the rule." *Cohen*, 819 F.3d at 476

(citing *Pioneer Inv. Servs. Co.*, 507 U.S. at 380; 4B Charles A. Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1165 (4th ed. 2015)).

110.    However, still, "counsel typically must have 'some reasonable basis' for not meeting a

filing deadline", *Id.* (citing Wright & Miller, *supra*, § 1165, and "[t]o determine whether the

district court permissibly exercised its discretion to find counsel's neglect inexcusable, we

consider four factors set forth by the Supreme Court in Pioneer: (1) the risk of prejudice to

the other side; (2) the length of the delay and the potential impact on judicial proceedings; (3)

the reason for the delay and whether it was within counsel's reasonable control; and (4)

whether counsel acted in good faith." *Id.* (citing *Pioneer Inv. Servs. Co.*, 507 U.S. at 380;

*Yesudian ex rel. U.S. v. Howard Univ.*, 270 F.3d 969 (D.C.Cir.2001) (applying the four

*Pioneer* factors).

111.    At the end of last month, "California Attorney General Rob Bonta. . . [,] as part of a now

bipartisan coalition of 13 attorneys general, filed an amended complaint against Nexstar

Media Group, Inc. (Nexstar) and Tegna Inc. (Tegna) in the ongoing challenge of the

broadcast giants' merger", and, a month prior, "Attorney General Bonta [had] led a coalition

in challenging the Nexstar/Tegna merger, and shortly after, the U.S. District Court for the

Eastern District of California granted a preliminary injunction halting the merger while

litigation in this case proceeds." Press Release, "Attorney General Bonta Welcomes New

- 26 -

States and Files Amended Complaint in Nexstar/Tegna Challenge, Lawsuit Now Bipartisan," *OAG-CA*, April 30, 2026.

112.    "TEGNA Inc. (NYSE: TGNA) had made an announcement to its shareholders, concerning a vote "to adopt the *Agreement and Plan of Merger*, dated as of August 18, 2025 (the '*Merger Agreement*'), pursuant to which TEGNA will be acquired by Nexstar Media Group, Inc. ('Nexstar')." Press Release, "Nextstar Media Group, Inc. Enters Definitive Agreement to Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction," *TEGNA*, August 19, 2025.

113.    "On December 1, 2025, the Federal Communications Commission (Commission) [had] accepted for filing applications proposing to transfer all outstanding equity interests in TEGNA Inc. (TEGNA), the ultimate parent of the licensees of 64 full power television stations, one AM radio station, one FM radio station, and other related FCC licenses, to Nexstar Media Inc. (Nexstar, and, together with TEGNA, the Applicants), a wholly owned subsidiary of Nexstar Media Group, Inc., in a cash merger transaction (Transaction)", DA 25-1000, *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc. and Permit-But-Disclose Ex Parte Status for Proceeding*, MB Docket No. 25-331, December 1, 2025) ("Pub. Not. DA 25-1000"); however, while Intervenor had taken the opportunity availed under 16 CFR 3.14(a), in a statutorily conferred right, Plaintiffs did not at that time attempt to participate or intervene in that matter, before "eight state attorneys general, including Virginia's Jay Jones," Staff & Wire, "Nexstar finalizes acquisition of Tegna; WAVY to be sold," *Daily Press*, March 19, 2026, "the son of former Norfolk Circuit Court judge Jerrauld Jones and Norfolk Juvenile and Domestic Relations District Court judge Lyn M. Simmons". Editors, "Jay Jones," *Wikipedia*, accessed

February 17, 2026, had "sued to stop the deal, arguing it would give Nexstar too much control of local TV stations", Staff & Wire, "Nexstar finalizes acquisition of Tegna; WAVY to be sold," *supra*.

114.    Most recently, in addition to other current actions in state and federal courts, and scheduled for a hearing on motions to dismiss, docketed for May 22, 2026, *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568-LMB-WBP, p. 4 (E.D.Va. April 28, 2026), in which State Defendants had asserted a claim, mindful of Fed. R. Civ. P. 11, that "Webb fails to plead sufficient facts to establish standing". Koski & O'Bannon Demurrer, *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568-LMB-WBP, p. 5 (E.D.Va. April 10, 2026); Jones Demurrer, *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568-LMB-WBP, p. 2 (E.D.Va. April 10, 2026), Intervenor had been pitted, in the federal court in the City of Alexandria, against, Virginia's first Black Attorney General," Lowell Feld, "VA Redistricting Amendment 'YES' Campaign, VA NAACP, AG Jay Jones, *etc.* Denounce 'MAGA-Linked' Group's 'Offensive' Mailers' Using 'Racist Imagery' & 'Invoking Jim Crow'," *Blue Virginia*, March 9, 2026, among the Plaintiffs in this action, and raising claims under the *Voting Rights Act of 1965*, U.S.C. § 10101 *et seq.*, including a claim that a recent ballot measure had infringed upon his "right to 'solicit petitions to qualify for the November ballot[,] as an independent candidate", Koski & O'Bannon Demurrer, *Webb v. Zuckerberg*, pp. 5-6 (E.D.Va. April 10, 2026) (citing Dkt. No. 20, at ¶ 127).

115.    At that time, however, Jones and the other State Defendants had denied a reasonable inference arising from the fact that, "'[t]he proposal would keep a southern portion of Arlington in the 8th Congressional District, which currently encompasses all of the county and is represented by Rep. Don Beyer (D)', and '[t]his would extend as far south as York

- 28 -

County in the Tidewater region'", Amd. Compl., p. 12, ¶ 32 (quoting Scott McCaffrey & Emily Leayman, "Proposed congressional maps in Virginia would split Arlington in two," *ARL Now*, February 6, 2026), "a distance of almost 200 miles, and up to a three-hour drive." *Id.*

116.    An "election does nothing to protect minority views but rather places the. . . [minority] who hold such views at the mercy of the majority", *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499 (E.D. Va. 2016).

117.    Yet, "we do not count heads before enforcing the *First Amendment.*" *McCreary Cnty. Kentucky v. ACLU of Kentucky*, 545 U.S. 844 (2005) (O'Connor, J., concurring).

118.    Not dissimilar from "vague and mostly unintelligible discussions", *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568-LMB-WBP, p. 4 (E.D.Va. April 28, 2026), which had been presented to federal court by Intervenor, albeit not reported in the press, just before the final days of the election, "Alex Keena, associate professor of political science at Virginia Commonwealth University, [who] supports the idea of mixed-member electoral systems", has expressed concerns that, under the proposed redistricting, "[n]o district would have a Black majority or plurality," and "one could argue the map amounts to a racial gerrymander even though it was drawn by Democrats and includes Black leadership in both legislative chambers". Elle Cota, Redistricting might not be solution Virginia voters really need, educators say," *Newsbreak*, April 17, 2020. "[H]e does not suggest the changes were intentional". *Id.*

119.    Not dissimilar from "vague and mostly unintelligible discussions", *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568-LMB-WBP, p. 4 (April 28, 2026), which had been presented to federal court by Intervenor, albeit not reported in the press, "University of Richmond Law

Professor Henry Chambers said the *Voting Rights Act* was meant to guarantee that anyone could vote regardless of their race." Tyler Englander, "A look at how the Voting Rights Act changed Virginia," *WRIC*, May 4, 2026. "Chambers said", *Id.* voicing claims not dissimilar from "vague and mostly unintelligible discussions", *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568-LMB-WBP, p. 4 (E.D.Va. April 28, 2026), presented by Intervenor, that the *Voting Rights Act* [had] led the Virginia General Assembly to get rid of multi-member districts that were meant to suppress the power of the minority vote, and led to the creation of Virginia's first majority-minority congressional district in the 1990s." Tyler Englander, "A look at how the Voting Rights Act changed Virginia," *supra*.

120.    Now, safely beyond the controversial election, and after the decision in *Callais*, that, now, "'Folks could argue, hey, we're actually representing people of color through this district,' Chambers said." *Id.*

121.    While not before the redistricting measure, now this Black law professors claims that "intentionally suppressing the minority vote is still illegal, however, that's not the entire story." *Id.*

122.    "'The Supreme Court has arguably suggested that as long as you have some partisan reason to also suppress the minority vote, we're gonna say that it's partisan suppression, and if it's partisan suppression, then we go under *Rucho*, which says well you can engage in partisan gerrymandering as much as you want,' Chambers told 8News." *Id.*

123.    However, most recently, the nation's highest court has weighed in upon the vexing question of redistricting, and, indeed, "[r]edistricting constitutes a traditional domain of state legislative authority." *Alexander* v. *South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024).

124. Still, another Black elected official, "Virginia Rep. Jennifer McClellan [now] called the ruling a 'devastating blow'", emphasizing that "'[w]hile the 6-3 decision in *Louisiana v. Callais* upholds the constitutionality of Section 2, the conservative majority of the Supreme Court leaves it powerless to address racial discrimination in our electoral system and opens the door for a new wave of unbridled racial gerrymandering'". Cameron Thompson, "Supreme Court ruling weakens Voting Rights Act amid Virginia redistricting fight," *Newsbreak*, May 1, 2026.

125. "McClellan wrote, 'Today's ruling *makes it nearly impossible to ensure minority voters have a fair opportunity* to elect the candidate of their choice and threatens Black representation across the country." *Id.*

126. While the elected Member of Congress has told the press, "'These ongoing attacks pull us farther away from the ideals upon which our nation was founded and undermine generations of progress to achieve fair participation and representation in a government by, of and for the people'", *Id.*, as noted in Webb's allegations, "Under the constitutional amendment and HB 29, four Democratic-held congressional districts would shift to become more Republican, based on the 2025 gubernatorial election results", including Bobby Scott's District 3, in the Hampton/Norfolk area, Jennifer McClellan's District 4, in Richmond, James Walkinshaw's District 11, including most of Fairfax County and Fairfax City, and Don Beyer's District 8, *Id.*, the "enclave of left-leaning affluence a few miles from the U.S. Capitol," where in 2016, "8th District Democrats could have selected a new, more progressive course from their ballot choices, which included two openly gay candidates and two blacks"; however, "[i]nstead, they nominated a white man who just turned 64, a veteran of politics whose car dealerships are ubiquitous in Northern Virginia and who touts himself

as a progressive, even though he was known as a pragmatist when he was the state's lieutenant governor." Paul Schwartman, "After his political resurrection, candidate Beyer adopts high-minded approach," *Washington Post*, June 28, 2014.

127.    Nonetheless, the Supreme Court had observed that "[t]he *Constitution* imposes some important restrictions on the States' exercise of this power, but they are otherwise free to draw districts as they please", as long as they "use traditional districting factors such as 'compactness, contiguity,' 'maintaining the integrity of political subdivisions, preserving the core of existing districts,' and protecting incumbents." *Callais*, 608 U.S., at ___ (citing *Bush v. Vera*, 517 U.S. 952 (1996) (plurality opinion); *Miller* v. *Johnson*, 515 U.S. 900 (1995).

128.    "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights", Fed. R. Civ. P. 24(b)(3), and no person or entity has a right to break the law.

129.    "The Court must consider three factors to determine whether an application to intervene is timely: (1) the stage of the proceedings; (2) the reason for any delay in moving to intervene; and (3) whether the parties would be prejudiced." *EEOC v. ABM Indus. Inc.*, 249 F.R.D. 588 (E.D.Cal. March 5, 2008) (citing *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825 (9th Cir.1996)).

130.    Furthermore, "[a] motion to intervene must be served on the parties as provided in Rule 5" and "[t]he motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).

131.    "[I]n cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder. . . , the courts generally have concluded that the requisite threat of continuity

was adequately established by the nature of the activity, even though the period spanned by the racketeering acts was short", *Eisert v. Town of Hempstead*, 918 F. Supp. 601 (E.D.N.Y. 1996), and "[n]o citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts", and "[t]he imminence of such a prosecution, even though alleged to be unauthorized, and, hence, unlawful, is not, alone, ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid", *Beal v. Missouri Pacific Railroad Corp.*, 312 U.S. 45 (1941).

132.    *A priori*, "[i]t is emphatically the duty of the Judicial Department to say what the law is." *Marbury v. Madison*, 5 Cranch at 137 (1803).

133.    Hence, no reasonable trier of fact, nor even Meta and Zuckerberg can "dispute that COVID-19," often described as "a highly contagious and deadly virus, falls within this definition." *U.S. v. Perez*, Crim. Act. No.: 5:20-CR-283-DAE-1, 2021 WL 4621695 (W.D. Tex. June 9, 2021) (unpublished).

134.    [T]he purpose of the law is 'to put the plaintiff in as good a position as he would have been in had the defendant kept his contract.'" *Hawkins v. McGee*, 84 N.H. 114 (1929) (citation omitted).

135.    Accordingly, "[t]he measure of recovery 'is based upon *what the defendant should have given* the plaintiff, not what the plaintiff has given the defendant or otherwise expended.'" *Id.* (citation omitted).

136.    "'The only losses that can be said fairly to come within the terms of a contract are such as the *parties must have had in mind when the contract was made*, or such as they either knew or ought to have known would probably result from a failure to comply with its terms.'" *Id.* (citation omitted).

137.    "'As a general rule, the measure of the vendee's damages is the difference between the value of the goods as they would have been if the warranty as to quality had been true, and the actual value at the time of the sale, including gains prevented and losses sustained, and such other damages as could be reasonably anticipated by the parties as likely to be caused by the vendor's failure to keep his agreement, and could not by reasonable care on the part of the vendee have been avoided.'" *Id.* (citation omitted).

## Conclusion

138.    "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to the community", *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440 (4th Cir. 2004).

139.    However, "[i]n order to be treated as speech involving a matter of public concern, the interested community need not be especially large nor the relevant concern of 'paramount importance or national scope.'" *Snyder v. Phelps*, 580 F.3d 206 (4th Cir. 2009) (quoting *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997).

140.    Particularly, "the *First Amendment* protects [only] statements 'relating to matters of public concern *which [do] not contain a provably false factual connotation*'", *McCullough v. Gannett Co.*, Civ. Act. No. 1:2022cv01099, 2023 WL 3075940 (E.D.Va. April 25, 2023) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990)), and, hence, only "'rhetorical speech' that uses 'loose, figurative, or hyperbolic language' is entitled to *First Amendment* protection and therefore is not actionable." *Id.* (quoting *Snyder*, 580 F.3d at 206).

141.    "The ultimate purpose of the judicial process is to determine the truth", *Caldor, Inc. v. Bowden*, 330 Md. 632 (1993), and "[a] lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth", *Com. v. Manigo*, 2010 WL 468084 (Va.Cir.Ct.

2010); accordingly, "[w]e who are seeking truth and not victory, whether right or wrong, have no reason to turn our eyes from any source of light which presents itself, and least of all from a source so high and so respectable as the decision of the supreme court of the United States." *U.S. v. Burr*, 25 F. Cas. 55 (C.C.D. Va. 1807).

142.  "Criminal liability is normally based upon the concurrence of two factors, 'an evil-meaning mind [and] an evil-doing hand. . . .'", *U.S. v. Bailey*, 444 U.S. 394 (1980) (quoting *Morissette v. U.S.*, 342 U.S. 246 (1952), and "'[i]t is emphatically the province and duty of the judicial department to say what the law is'". *U.S. v. Nixon*, 418 U.S. 683 (1973) (citing *Marbury v. Madison*, 1 Cranch 137 (1803)).

143.  Moreover, "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office", *Monitor Patriot Co.*, 401 U.S. at 265.

144.  "The highest standard, strict scrutiny, applies where '[w]here certain 'fundamental rights' ' are involved, and requires that legislation or actions 'limiting these rights may be justified only by a 'compelling state interest,' ' requiring legislation and action 'must be narrowly drawn to express only the legitimate state interests at stake.'" *Hawkins v. Grese*, 68 Va. App. 462 (Va. Ct. App. 2018) (quoting *Roe v. Wade*, 410 U.S. 113 (1973)).

145.  Moreover, "[s]uch fundamental rights include not only those listed in the *Bill of Rights* but additional implied rights protected by the *Fourteenth Amendment."* *Id.*

146.  Generally, in Article III Courts, pursuant to 28 U.S. Code § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the *Constitution*, laws, or treaties of the United States", and Intervenor presents a federal question, arising under the *Equal Protection Clause* of the *Fourteenth Amendment*, with connection to the *First*

*Amendment*, arising from regulations of content-based free speech, which must be content neutral and are subjected to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

147.    Further, it is clear that "'[a] statute challenged on equal protection grounds is evaluated under 'strict scrutiny' if it interferes with a 'fundamental right' or discriminates against a 'suspect class.'" *Gray v. Commonwealth*, 274 Va. 290 (2007) (quoting *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988).

148.    "If a law does too much, or does too little, to advance the government's objectives, it will fail." *Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010) (citing *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214 (1989)).

149.    Where "strict scrutiny applies, . . . [a defendant] faces a daunting gauntlet, as 'it is the rare' law that 'survives' this kind of review", *Id.* (quoting *Burson v. Freeman*, 504 U.S. 191 (1992)), and, "[t]o survive, the. . . [regulations] must be 'narrowly tailored' to advance a 'compelling state interest.'" *Id.* (quoting *Eu*, 489 U.S. at 214).

150.    "[F]reedom in the long run does not come from this kind of license to each sect to fix its own limits, but comes of hard-headed fixing of those limits by neutral authority with an eye to the widest freedom to proselyte compatible with the freedom of those subjects to proselying (*sic*) pressures." *Hall v. Commonwealth*, 188 Va. 72 (1948).

151.    Hence, beyond a reasonable doubt, Defendants, with full acquiescence of Plaintiffs, had "engage[d] in. . . conduct with intent to convey false or misleading information under circumstances. . . where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter. . .10." 18 U.S.C. § 1038(a)(1).

152.    "All we say to America is to be true to what you said on paper." Martin Luther King, Jr., *I've Been to the Mountaintop*, April 3, 1968.

WHEREFORE, for the reasons stated above, the Court should grant this motion for to

intervene, in addition to granting to Intervenor such other equitable remedies as deemed

appropriate.

Respectfully submitted,

· Major Mike Webb, *Pro Se*
3445 Washington Boulevard
Apartment # 306
Arlington, Virginia  22201
Phone: (856) 220-2354
Email: GiveFaithATry@gmail.com
Dated: May 13, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of May, 2026, that I will mail this **Motion to Intervene**, by hand delivery and/or email to the following parties, named in suit.

Kathleen A. Kirby, Esq.
Wiley Rein LLP
Counsel for Nexstar, Inc.
2050 M Street, NW
Washington, District of Columbia 20036
Telephone: (202) 719-3360
Email: kkirby@wiley.law

Jocelyn G. Jezierny , Esq.
Counsel for TEGNA, Inc.
Covington & Burling LLP
850 10th Street, NW
Washington, District of Columbia 20001 ·
Telephone: (202) 662-5316
Email: jjezierny@cov.com

Laura Antonini, Paula Blizzard, Paul Chander, Elizabeth Cheever, Emily Curran, Jennifer Hane, Komal K. Patel, Connie P. Sung & Brian Wang, Esqs.
*Office of the Attorney General of California*
455 Golden Gate Ave., Suite 11000
San Francisco, California 94102-7014
Telephone: (415) 510-3765
Email: Paula.Blizzard@doj.ca.gov;
Laura.Antonini@doj.ca.gov

Shaoul Sussman, Nico Gurian, Victoria M. O. Field & Paul M. Goodrich, Esqs.
*Simonsen Sussman LLP*
307 W. 38th St., 16th Floor
New York, New York 10018
Telephone: (646) 693-3929
Email: shaoul@simonsensussman.com;
nico.gurian@simonsensussman.com;
victoria.field@simonsensussman.com;
paul.goodrich@simonsensussman.com

Catherine S. Simonsen & Thomas G. Mattes, Esqs.
*Simonsen Sussman LLP*
418 Bamboo Ln., Suite C-18
Los Angeles, California 90012
Telephone: (917) 747-5196/(202) 384-3130
Email: catherine@simonsensussman.com;
thomas.mattes@simonsensussman.com'
nicolas@simonsensussman.com;
victoria.sims@simonsensussman.com

Bryn A. Williams, Jonathan B. Sallet, Robin Alexander & Amy Bowles, Esqs.
*Office of the Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: (720)508-6000
Email: Bryn.Williams@coag.gov;
Jon.Sallet@coag.gov;
Robin.Alexander@coag.gov;
Amy.Bowles@coag.gov

Julián A. Quiñones Reyes, Esq.
*Office of the Attorney General of Connecticut*
165 Capitol Avenue
Hartford, Connecticut 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov

Paul J. Harper, Elizabeth L. Maxeiner, John R. Milligan & Daniel R. Betancourt, Esqs.
*Office of the Attorney General of Illinois*
115 S. LaSalle St. Chicago, IL 60603
Telephone: (312) 814-1004
E-Mail: paul.harper@ilag.gov

Scott L. Barnhart, Jesse Moore & Jacob Patterson, Esqs.
*Office of the Attorney General of Indiana*
Indiana Government Center South
302 W. Washington Street, 5th Floor

John Harris, Esq.
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: 785-296-2215

Indianapolis, Indiana 46204
Phone: (317) 232-4956
Email: Jesse.Moore@atg.in.gov

Anthony W. Mariano & Jennifer E. Greaney,
Esqs.
*Office of the Massachusetts Attorney General*
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (781) 835-7990
Email: Anthony.Mariano@mass.gov

Francisco Benzoni & Brian Rabinovitz,
Esqs.
*Office of the Attorney General of North
Carolina*
114 W. Edenton Street
Raleigh, North Carolina 27603
Telephone: (919) 716-6000
Email: fbenzoni@ncdoj.gov;
brabinovitz@ncdoj.gov

Tracy W. Wertz, Joseph S. Betsko & Jennifer
A. Thomson, Esqs.
*Pennsylvania Office of the Attorney General*
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
Email: twertz@attorneygeneral.gov;
jbetsko@attorneygeneral.gov;
jthomson@attorneygeneral.gov
Telephone: (717) 787-4530

Tyler T. Henry, Esq.
*Office of the Attorney General of Virginia*
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Email: THenry@oag.state.va.us;
Attorneygeneral@oag.state.va.us

Email: John.Harris@ag.ks.gov

Elinor R. Hoffmann, Christopher D'Angelo,
Amy McFarlane & Morgan Feder, Esqs.
*Office of the Attorney General*
28 Liberty Street
New York, New York 10005
Telephone: | (212) 416-8269/(212) 416-
6124/(212) 416-6195/(212) 416-8288
Email: Elinor.Hoffmann@ag.ny.gov;
Christopher.D'Angelo@ag.ny.gov;
Amy.McFarlane@ag.ny.gov;
Morgan.Feder@ag.ny.gov

Timothy D. Smith & Ian Van Loh, Esqs.
*Oregon Department of Justice*
100 SW Market Street
Portland, Oregon 97201
Telephone: (503) 798-3297/(971) 239-
7457/(503) 428.9482
Email: tim.smith@doj.oregon.gov;
ian.vanloh@doj.oregon.gov;
alex.delorenzo@doj.oregon.gov

Sarah L. J. Aceves, Esq.
*Office of the Attorney General of Vermont*
109 State Street
Montpelier, Vermont 05676
Email: sarah.aceves@vermont.gov
Telephone : (802) 828-3170

Respectfully submitted,

Major Mike Webb
3445 Washington Boulevard, Apartment 306
Arlington, Virginia 22201
Phone: (856) 220-1354
Email: GiveFaithATry@gmail.com
Date: May 13, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
**Sacramento Division**

| | |
|---|---|
| THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF ILLINOIS, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OREGON, AND THE COMMONWEALTH OF VIRGINIA <br> **Plaintiffs,** <br> v. <br> NEXSTAR MEDIA GROUP, INC. AND TEGNA INC., <br> **Defendants.** <br><br> Major Mike Webb, <br> **Intervenor.** | **Civil Case No.: 2:26-cv-00978-TLN-CKD** |

## <u>MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE</u>

### <u>Political Campaign</u>

1.  "Non-minorities remain more likely than Hispanics, Native Americans, and African Americans to graduate from high school, and are nearly three times more likely to have a bachelor's degree than Hispanics and Native Americans", *DNC. v. Reagan*, 329 F. Supp. 3d 824 (D. Ariz. 2018).

2.  While, indeed, 42% of Arlington residents, age 25 and older, hold at least a graduate degree, "billed as the most educated city in the U.S., in a Forbes analysis, thanks to 76% of adults 25 and older holding a bachelor's degree", Cuneyt Dil, "Arlington is the most educated city in the country, study finds," *Axios*, October 26, 2023, "[d]ue to their lower levels of literacy and education, minority voters are more likely to be unaware of [even] certain technical rules, such as the requirement that early ballots be received by the county recorder", *Democratic Nat'l Comm. v. Reagan* 329 F. Supp. 3d 824 (D. Ariz. 2018).

-1-

3. And "[p]eople of color make up 41% of the Arlington population." Staff, "Diversity & Inclusivity," *Arlington*, https://www.arlingtoneconomicdevelopment.com/Life-in-Arlington/Diversity-Inclusivity (accessed September 10, 2025), and "[i]n this enclave of left-leaning affluence a few miles from the U.S. Capitol," Paul Schwartzman, "After his political resurrection, candidate Beyer adopts high-minded approach," *Washington Post*, June 28, 2014, it should be surprising that there is no sense of community outrage even after "Forbes [had] noted a racial gap in bachelor's degrees, with 10.5% of non-white residents holding degrees." Cuneyt Dil, "Arlington is the most educated city in the country, study finds," *supra*.

4. "'Virginia is the absolute lowest-scoring state in terms of proficiency cut score than any other state in the country,'" Tyler Englander, "Projections show more than 50% of VA students could fail SOLs because of new cut scores," *WRIC*, September 26, 2025, and Intervenor resides "[i]n a district where 48 percent of residents are minorities". Megan Flynn, "Don Beyer's first primary challenger asks him to 'pass the torch'," *Washington Post*, April 24, 2022.

5. "With the FCC [had been] expected to grant its game-changing merger with Nexstar Media Group by granting waivers that would allow it to own more than two full-power stations in a market — just as it did with Circle City's purchase of WRTV-TV in Indianapolis from The E.W. Scripps Co. — the only TV station ownership group headquartered in the National Capital Region has stated its rule-busting deal is on track for completion 'by the second half of 2026.'" Adam Jacobson, "TEGNA Expects Nexstar Merger Closing By July," *RBR*, March 2, 2026.

6. After approval of the merger, in a surprising decision, "Nexstar Media Group, the largest

owner of local television stations in the United States, ha[d] launched a major initiative to reshape national news content on its affiliated broadcasts." Luke Bouma, "Nexstar is Ending National News From Sources Like NBC on Local News Casts on ABC, CBS, FOX, & NBC Stations As It Replacing It With National NewsNation Content," *Cord Cutter News*, April 11, 2026.

7. "Political speech is 'indispensable to decisionmaking in a democracy," *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 778 (1978), and "[t]he executive power shall be vested in a President of the United States of America", *U.S. Const.*, Article 2, Sec. 1, and "[t]he President shall be commander in chief of the Army and Navy of the United States, and of the militia of the several states, when called into the actual service of the United States". *U.S. Const.*, Article 2, Sec. 2.

8. In accordance with 10 U.S.C. § 14308, and in recognition of his "qualities" of "patriotism[,] valor[,] fidelity and "abilities", as well as "demonstrated potential for increased responsibility", effective on December 9, 2009, Intervenor had been "promoted in the United States Army Reserve to the grade rank" of major upon order of the President, who had "reposed special trust and confidence" in him serving in the branch of military intelligence. AHRC-PRO Orders B-12-907826, December 10, 2009.

9. "I will guard everything within the limits of my post and quit my post only when properly relieved." General Order No. 1.

10. "I will obey my special orders and perform all of my duties in a military manner." General Order No. 2.

11. "I will report violations of my special orders, emergencies, and anything not covered in my instructions to the commander of the relief." General Order No. 3.

12. Hence, in what may be construed as a personal directive, with the broadest discretion, from the Commander in Chief to a commissioned officer in the Retired Reserve, the former President, expressing his sincerely held belief that "our best days still lie ahead", had written a letter, while describing Webb as a person possessed with "passion", he had encouraged Relator "to remain an active participant in helping to write the next chapter of the American story", and had requested my personal "courage and dedication at this critical time". Joseph R. Biden, *Letter to Petitioner*, September 15, 2022.

13. "DOD acknowledges that the President has not executed a wavier under [§ 1107a(a)(1)]," and, in 2021, it had been held that "DOD cannot mandate vaccines that only have an *EUA*." *Doe #1–#14 v. Austin*, 572 F. Supp. 3d 1224 (N.D. Fla. 2021).

14. However, it would not be until two years later that "Secretary Austin [had] rescinded the Aug. 24, 2021 memorandum mandating that members of the Armed Forces under DoD authority be vaccinated against COVID-19, and the memorandum of Nov. 30, 2021, pertaining to the vaccination of National Guard and Reserve personnel"; "[t]his rescission requirement was established by the *James M. Inhofe National Defense Authorization Act for Fiscal Year 2023*." Press Release, "DOD Rescinds COVID-19 Vaccination Mandate," DoD, January 10, 2023.

15. "WAVY-TV 10 is the #1 news station in the Norfolk, VA market and produces 11 hours of local content every weekday." Editors, "Station Profile: Wavy 10," *Nexstar*, accessed March 23, 2026.

16. "WAVY remains one of the strongest NBC affiliates in America, regularly ranking in the top 10 for *The Today Show*, *NBC Prime* and the *NFL on NBC*", *Id.*; however, with respect to Plaintiffs and Defendants, "[t]hey very seldom", if ever, "got around to mentioning the fact";

- 4 -

""[t]hey didn't get around to that." Martin Luther King, Jr., *I've Been to the Mountaintop*, April 3, 1968.

17. Before the approval of the Pfizer product, "DOD press secretary John Kirby told reporters Monday that 73% of active-duty troops have at least one dose and more than 60% are now fully vaccinated." Luis Martinez & Matt Seyler, "Pentagon to require COVID vaccines for all service members," *ABC News*, August 9, 2021.

18. "The US and Israel tracked Iranian Supreme Leader Ayatollah Ali Khamenei for months and then struck when he presented them a rate opening — a massive meeting of the Islamic Republic's security officials at his Tehran compound." Nicholas McEntyre & Ariel Zilber, "The US and Israel tracked Khamenei for months — and then he gave them a massive opportunity to take him out," *The New York Post*, March 1, 2026.

19. A concern expressed by no member of Congress, vested with the power "To declare War", *U.S. Const.*, art. I, cl. 11, and wholly unreported even in the press, "[n]o person employed by or acting on behalf of the United States Government shall engage in or conspire to engage in assassination." E.O. 12,333, *United States Intelligence Activities*, Sect. 2.11, December 4, 1981, *as amended* by E.O. 13,284 (2003), E.O. 13,355 (2004) & E.O. 13,470 (2008)).

20. Moreover, "[n]o element of the Intelligence Community shall participate in or request any person to undertake activities forbidden by this Order." *Id.*, Sect. 2.12.

21. "No covert action may be conducted which is intended to influence United States political processes, public opinion, policies, or media." *Id.*, Sect. 2.13, *supra*.

22. Similarly, unaddressed by Plaintiffs and Defendants, "[n]o element of the Intelligence Community shall sponsor, contract for, or conduct research on human subjects except in accordance with guidelines issued by the Department of Health and Human Services", and

"[t]he subject's informed consent shall be documented as required by those guidelines." E.O. 12,333, *United States Intelligence Activities*, Sect. 2.10, *supra*.

23. Moreover, as an entity, created under law, "[t]he agencies within the Intelligence Community shall, *in accordance with applicable United States law. . .* conduct intelligence activities" strictly limited to that which is deemed "necessary for the *conduct of foreign relations* and the *protection of the national security*" to include "*hostile activities* directed against the United States *by foreign powers, organizations, persons, and their agents*". E.O. 12,333, *U.S. Intelligence Activities*, Sect. 1.4, December 4, 1981 (emphasis added).

24. Accordingly, "[c]ollection of such information is a priority objective and will be pursued in a vigorous, innovative and responsible manner that is *consistent with the Constitution and applicable law* and respectful of the principles upon which the United States was founded." *Id.*, Sect. 2.1, *supra* (emphasis added).

25. "'National security' means [only] the national defense or foreign relations of the United States." E.O. 12,958, *Classified National Security Information*, Sect. 1.1(a), April 17, 1995 (emphasis added).

26. "Intelligence Community elements within executive departments *shall [only] serve the information and intelligence needs of their respective heads of departments* and also shall operate as part of an integrated Intelligence Community, as provided in law or this order". E.O. 12,333, *U.S. Intelligence Activities*, Sect. 1.7, *supra* (emphasis added).

27. Furthermore, "[e]lements of the Intelligence Community shall use the least intrusive collection techniques feasible within the United States or directed against United States persons abroad", *Id.*, Sect. 2.4, *supra*; regulations "that substantially burden a person's exercise of. . . [rights] are only permissible if they are the least restrictive means of furthering

a compelling governmental interest." *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151 (10th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

28. However, "[b]y email of March 23, 2021, OMB [had] acknowledged receipt of. . . [a] request and assigned it tracking number 21-220". Walsh Decl., p. 2, ¶ 3 (D.D.C. August 29, 2024), and, of notable record, just months after receipt of OMB *FOIA* No. 21-220, and one month after the deadline for response had tolled, this national security agency "ha[d] 'coalesced around two likely scenarios' but ha[d] not reached a definitive conclusion on this question", Briefing Room, "Statement by President Joe Biden on the Investigation into the Origins of COVID-19," *The White House*, May 26, 2021.

29. Yet, Joint Expeditionary Base, Little Creek-Fort Story, Naval Station Norfolk, Norfolk Naval Shipyard (Portsmouth), "Naval Weapons Station Yorktown and Norfolk Naval Shipyard (Virginia Beach) are a part of the U.S. Navy presence in the Tidewater, in addition to Joint Base Langley-Eustis – Fort Eustis (Newport News), USCG Training Center Yorktown, *Id.*, and the Joint Staff College. Bradley Williams, "Operation Graduation: Joint Advanced Warfighting School Commencement," *JFSC*, June 12, 2023.

30. "Coronavirus disease 2019 (COVID-19) presents a unique challenge to United States Navy hospital ships", and an early study had been conducted "to determine the prevalence of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) infection among US Navy personnel deployed on the *USNS COMFORT*", based in Norfolk, Virginia, "to augment the inpatient health care capacity in New York City." Tahaniyat Lalani, *et al.*, *SARS-CoV-2 Infections and Serologic Responses Among Military Personnel Deployed on the USNS COMFORT to New York City During the COVID-19 Pandemic*, 8 Open Forum Infect. Dis. 2,

pp. ofaa654 (January 23, 2021).

31. According to recent news, "WAVY's future was involved in the final movement", and "Nexstar Media Group, the owner of WAVY-TV, said it has closed its deal to acquire rival Tegna's TV stations, including WVEC, despite opposition from eight state attorneys general who filed a lawsuit to block the merger." Staff & Wire Reporters, "Nexstar finalizes acquisition of Tegna; WAVY to be sold," *Virginia Pilot*, March 26, 2026.

32. Moreover, described as unparalleled in their trust for the press, and as "more likely to feel connected to their main source of news", perceiving "news media's watchdog role is seen as more of a necessary check among black adults than among whites", "less concerned about made-up news than other national issues" and "prefer getting their news from TV", despite an acknowledged low representation of other African Americans in network news. Sarah Atske, "7 facts about black Americans and the news media," Pew Research Center, August 7, 2019, one racial demographic had viewed as much at twice as much television as any other American, Amy Watson, "Media consumption among ethnic groups in the U.S. "Statistics & Facts," Statista, November 28, 2019[1], and in a public health crisis year, "Black/African-American consumers spen[t] an average of 3.55 hours per day watching TV, while Asian and Hispanic average around 1.75 and 2.45 hours per day respectively." *Id.* And, with a population of 321,105, the City of Norfolk is 39.6% Black, 10.1% Hispanic/Latino and 9.0% multiracial, Staff, "QuickFacts: Norfolk City, Virginia," *Census.Gov*, July 1, 2024, constituting a "minority opportunity" congressional district. *See generally* Justin Brown (Battleground), "Majority-Minority Districts in the 117th Congress," *Substack*, January 7, 2023.

---

[1] "Black/African-American consumers spend an average of 3.55 hours per day watching TV, while Asian and Hispanic average around 1.75 and 2.45 hours per day respectively." *Id.*

33. With a population of 96,482, the City of Portsmouth is 50.6% Black, a Black majority, while only 5.4% are Latino/Hispanic, and 9.4% are multiracial, Staff, "QuickFacts: Portsmouth, Virginia," *Census.Gov*, July 1, 2024, while with a population of 137,596, the City of Hampton is 49.3% Black, 6.9% Latino/Hispanic and 9.2% multiracial. Staff, "QuickFacts: Hampton City, Virginia," *Census.Gov*, July 1, 2024. With a population of 96,482, the City of Portsmouth is 50.6% Black, a Black majority, while only 5.4% are Latino/Hispanic, and 9.4% are multiracial, Staff, "QuickFacts: Portsmouth, Virginia," *Census.Gov*, July 1, 2024, while with a population of 137,596, the City of Hampton is 49.3% Black, 6.9% Latino/Hispanic and 9.2% multiracial. Staff, "QuickFacts: Hampton City, Virginia," *Census.Gov*, July 1, 2024.

34. "The primary question 'is whether a reasonably well-trained" management officer for the merging parties "would have known", *Welsh v. Williams*, Civ. No. 5:22-CV-183-BQ, 2023 WL 11990749 (N.D.Tex. June 30, 2023), that almost a year before the FDA approval for private label marketing, "more than 38,000 people ha[d] indicated a willingness to volunteer by signing up with vaccine advocacy group 1Day Sooner", William Booth & Carolyn Y. Johnson, "Britain to infect healthy volunteers with coronavirus in vaccine challenge trials," *Washington Post*, October 20, 2020.

35. As a matter of science, it is an empirically established fact that no highly contagious disease, a rather rare occurrence in nature, René Gottschalk, *Management of highly contagious, life-threatening infectious diseases in Germany*, 58 Bundesgesundheitsblatt Gesundheitsforschung Gesundheitsschutz 7, pp. 657-61 (July 2015), has an infectious dose higher than just 15 particles, Jean Maguire van Seventer & Natasha S. Hochberg, *Principles of Infectious Diseases: Transmission, Diagnosis, Prevention, and Control*, 6 Intern'l Encyc.

Pub. H. 2nd Ed.

**36.** Moreover, in this study, based upon unidentified criteria, only 36 had been selected for the human challenge study, not published until late March 2022, of which only 50% had been reported to exhibit expressions of illness between two and four days of being intranasally inoculated with only 10 particles, or infectious dose, of the original COVID-19 variant, Ben Killingsley, *et al.*, *Safety, tolerability and viral kinetics during SARS-CoV-2 human challenge in young adults*, 28 Nat. Med., pp. 1031–1041 (May 2022), *Epub.*, March 31, 2022, making COVID-19 a highly contagious only to those persons, representing 0.05% of those who had volunteered for the study. *See* William Booth & Carolyn Y. Johnson, "Britain to infect healthy volunteers with coronavirus in vaccine challenge trials," *supra.*

**37.** Clinically, the novel virus even at that point had been validated as "a highly transmissible virus.'" Major Garrett, "'The Takeout': I tested positive for COVID, so I interviewed Dr. Fauci," *CBS News*, May 27, 2022[2], or a "highly contagious disease", as claimed, Transcript, "Ralph Northam Virginia COVID-19 Press Conference Transcript April 27," *Rev*, April 27, 2020; *see also* Joel Achenbach, "Three months into the pandemic, here's how likely the coronavirus is to infect people," *Washington Post*, March 28, 2020[3], nor even presenting the potential to have "'you know, escaped'", Audrey McNamara, "Former CDC chief says 'most likely' cause of coronavirus is that it 'escaped' from a lab," *CBS News*, March 27, 2021.

**38.** Yet, before the approval of the first "vaccines", which had only been developed as "medical countermeasures against COVID–19", 85 Fed. Reg. 52, March 17, 2020, it was known by

---

[2] "'And it is very likely that if you were not vaccinated and double-boosted, then you would have had a much more severe outcome than you have right now. And you and I, I think — *very unlikely*, Major, we'd be speaking to each other right now.'" *Id.* (emphasis added).

[3] "In the early days in China, before the government imposed extreme travel restrictions in Wuhan and nearby areas, and before everyone realized exactly how bad the epidemic might be, the $R^0$ was 2.38, according to a study published in the journal Science", and they claimed "[t]hat is a highly contagious disease." *Id.*

federal regulators that the primary means of transmission was *via* aerosols, which can persist in the air for hours, and that the specific amount of "SARS-CoV-2 needed to transmit infection ha[d] not [yet] been established", Staff, "Scientific Brief: SARS-CoV-2 Transmission," *CDC*, May 7, 2021.

39. This is credible evidence that, for unknown and unarticulated reasons, not even federal public health regulators had yet performed the "How Many Licks Does It Take to Get to the Center of a Tootsie Roll Pop Test, a methodology known to science, since, at least the works of Robert Koch on the causation methods attributed to anthrax in 1870, to determine infectious dose, Julia A. Segre, *What does it take to satisfy Koch's postulates two centuries later? Microbial genomics and Propionibacteria acnes*, 133 J Invest Dermatol. 9, pp 2141-2142 (September 2013), all the more available today with the advances of medical science and technology, which today may safely utilize E6 Vero cells to perform this readily available methodology for assessing transmission risk, *see* John A. Lednicky, *Isolation of SARS-CoV-2 from the air in a car driven by a COVID patient with mild illness*, MedR$_x$IV, January 15, 2020

40. Under the rule stated in *Thompson v. Bacon*, 245 Va. 107,425 S.E.2d 512 (1993), "[a] party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Id.* (citing *Winn v. Aleda Constr. Co.*, 227 Va. 304 (1984)).

41. Moreover, in civil remedy, "[w]hoever engages in any conduct with intent to convey [such] false or misleading information. . . is liable in a civil action to any party *incurring expenses incident to any emergency* or investigative response to that conduct, for those expenses", 18

U.S.C. § 1038(b), and any "person ordered to make reimbursement under this subsection shall be jointly and severally liable for such expenses with each other person, if any, *who is ordered to make reimbursement* under this subsection for the same expenses." 18 U.S.C. § 1038(c) (emphasis added).

42. Even a "gag order", as arguably at issue, now raised on appeal, "may only be entered for the benefit of the defendant," in a criminal proceeding, and upon a clear showing "that: (i) without a prior restraint, publicity would 'impair the defendant's right to a fair trial' by irrevocably tainting the jury pool,", "(ii) 'measures short of an order restraining all publication [will not] insure[ ] the defendant a fair trial,'" "and (iii) it is likely that an injunction will effectively secure a fair trial for the defendant," *Voter Reference Foundation, LLC v. Balderas*, 616 F.Supp.3d 1132 (D.N.M. 2022) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976)).

43. A reasonable trier of fact would be compelled, on the record, to "think the data speaks for themselves'", Dartunorro Clark, "Fauci calls Amy Coney Barrett ceremony in Rose Garden 'superspreader event'," *NBC News*, October 9, 2020; "they cannot have it both ways." *Connecticut v. Teal*, 457 U.S. 440 (1982).

44. Intervenor has "floated around the periphery of the Northern Virginia political scene for nearly the past decade", Scott Broadbeck, "Morning Notes: Candidate Adds Military Rank to His Name," *ARL Now*, June 10, 2021.

45. "In 2017, he received 18% of the vote in a three-way School Board race that included Monique O'Grady (70%) and Alison Dough (10%)", "[i]n 2021, he garnered 19% of the vote in the School Board race against Kadera", and "[i]n 2023, running as an independent for House of Delegates, he received 17% of the vote against Del. Alfonso Lopez (D-3)". Scott

McCaffery, "School Board candidates tackle budget and impact of Trump administration," *ARL Now*, September 4, 2021.

46. When Monique "Moe" Bryant had secured the endorsement of the Arlington Democrats in May, the "only independent Major Webb (formerly known as Mike Webb) ha[d] filed the required paperwork to get on the School Board ballot, county elections director Gretchen Reinemeyer told ARLnow." Scott McCaffery, "Bryant wins 69% in Democratic School Board caucus, advances to general election," *ARL Now*, May 12, 2025.

47. Not until most recently had the local press even reported about a candidate, described as "not a serious option", Scott McCaffery, "Sun Gazette endorsement: Mary Kadera for Arlington School Board," *Arlington Sun Gazette/Inside NOVA*, September 23, 2021, in a congressional district where it has been observed that "[b]ookies probably wouldn't even lay odds on the chance of Republicans picking up the 8th Congressional District seat, it seems so out of reach." Scott McCaffery, "GOP challengers to Beyer hope to gain traction," *Arlington Sun Gazette/Inside NOVA*, January 29, 2016, had "acknowledged he was in the race mostly to provide a forum for his views, largely focused on the response to the Covid pandemic." Scott McCaffery, "School Board candidates tackle budget and impact of Trump administration," *ARL Now*, September 4, 2025.

48. Those, having "assumed an 'influential role in ordering society'", *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (quoting *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967) (Warren, C.J., concurring in result), "[f]or the most part those who attain this status [of public figure] have assumed roles of especial prominence in the affairs of society", and "[s]ome occupy positions of such persuasive power and influence that they are deemed public figures for all purposes"; however, far "[m]ore commonly, those classed as public

- 13 -

figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved", and "they invite attention and comment." *Id.*

49. "[I]t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office", *Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971).

50. And "[t]he loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury", *Doe v. Tangipahoa Par. Sch. Bd.*, 631 F. Supp. 2d 823 (E.D. La. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347 (1976)).

51. Under the *Noerr-Pennington* doctrine, "[a] party who petitions the government for redress generally is immune from. . . liability", *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965), and "[t]his immunity extends to persons who petition all types of government entities — legislatures, administrative agencies, and courts." *Id.* (citing *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)[4]).

52. "[W]hat is at stake here is loss of an opportunity to express . . . one's dissatisfaction with the laws and policies." *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977).

53. "Generally, "the *First Amendment* means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *U.S. v. Perez*, Criminal Action No.: 5:20-CR-283-DAE-1, 2021 WL 4621695 (W.D. Tex. Signed June 9, 2021) (unpublished) (citing *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564 (2002) (internal quotation marks omitted)).

---

[4] "The right of access to the courts is indeed but one aspect of the right of petition." *Id.*

54. "In addition, 'content–based regulations [on speech] are presumptively invalid.'" *Id.* (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)).

55. "However, content-based restrictions on speech may be permissible when 'confined to the few 'historic and traditional categories [of expression] long familiar to the bar.''" *Id.* (quoting *U.S. v. Alvarez*, 567 U.S. 709 (2012) (quoting *U.S. v. Stevens*, 559 U.S. 460 (2010)).

56. "The relevant category for purposes of this statute is speech presenting some grave and imminent threat the government has the power to prevent." *Id.*

57. Moreover, *Reid v. MSPB*, 508 F.3d 674 (Fed. Cir. 2007) articulates a timing/knowledge test to determine whether conduct is retaliatory, and, under this rule, the complainant need only demonstrate that "the deciding official knew of the [protected activity]. . . and that the adverse action was initiated within a reasonable time of [the same]".

58. Under the timing/knowledge test, a complainant "need not demonstrate the existence of a retaliatory motive. . . to establish that [the protected activity]. . . was a contributing factor". *Kewley v. HHS*, 153 F.3d 1357 (Fed. Cir. 1998) (quoting *Marano v. DoJ*, 2 F.3d 1137(Fed. Cir. 1993)).

59. Hence, "[o]nce the knowledge/timing test has been met, an administrative judge must find that the appellant has shown that. . . [the protected activity] was a contributing factor. . . , even if, after a complete analysis of all of the evidence, a reasonable factfinder could not conclude that the appellant's [protected activity]. . . was a contributing factor". *Schnell v. Department of the Army*, 114 M.S.P.R. 83 (2010).

## Competitors in the Marketplace of Ideas

60. Even if "an analog-era rule that no longer aligns with how Americans consume media", Jennifer Maas, "National Association of Broadcasters Calls for FCC to Abolish National TV

Ownership Rule Amid Nexstar-Tegna Deal," *Variety*, August 23, 2025, still, "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them". 15 U.S.C. § 13(a).

61. "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act", and "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

62. "A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e).

63. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal", and "[e]very person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony". 15 U.S.C. § 1.

64. Without express exception, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

65. Certainly noticed, even if referred to in hushed tones, like, in the Judaic tradition, "Yahweh,"

his name, unlike even any other Republican, or even Independent, in hallowed reverence is not mentioned, progressive blogs, associated with the political parties of Plaintiffs, have boldly proclaimed:

> "Now and again, analysts will refer to the determined and wildly successful Arlington Democrats in battle-hardened military terms. Onslaught, commando, and scorched earth come to mind. Those are usually employed in relation to the fall campaign when yet another Republican, an "independent" who is really a Republican, or a real independent (often a pesky candidate who finds a way onto the ballot almost every year) is about to be drubbed in an election in the small but intensely political county just across the Potomac from the nation's capital." Cragg Hines, "Arlington Dems Pour It On, Boost "Regular" Dem Mary Kadera to Big Victory in School Board Caucus Over 'Insurgent Candidate'," *Blue Virginia*, May 26, 2021.

66. Yet, according to Google Analytics, exceeding a thousand unique visitors on a 30-day rolling basis, during Webb's last campaign for school board, with no political party endorsement, his political website was performing better than 94% of similar sights dedicated to "Politics & Government", "Worldwide", and performing 95% better in drawing visitors from a Boolean query on the Google platform.

67. "Brand name awareness tells you how well your audience recognizes and remembers your brand", and "[b]uilding strong brand name awareness helps you stand out in a crowded market." Editors, "Brand Name Awareness: Best Strategies to Boost Recognition," *Slate Team*, February 13, 2025.

68. "Brand recognition is a concept used in advertising and marketing to describe consumers' ability to recognize a brand through visual or auditory cues such as logos, packaging, colors, slogans, or jingles", and "[c]ompanies often conduct market research to assess the effectiveness of their brand recognition strategies." Will Kenton (reviewed by Charles Potter and fact-checked by Peter Rathburn), "What Is Brand Recognition? Why It's Important and Benefits," *Investopedia*, September 16, 2024.

69. "Strong brand recognition can result in higher sales and profit margins, even if competing

-17-

brands are of equal quality." *Id.*

70. Before the merger, "FCC rules [had] set a limit of 39% for the percentage of households one broadcast company is allowed to reach in the United States, as well as limits to the number of stations a company can own in a single market", and "FCC also allows for something called the ultra-high-frequency (UHF) discount, which lets stations that broadcast with historically less reliable UHF systems count only 50% of their audience." Lukas I. Alpert, "Nexstar-Tegna deal puts Trump move to eliminate broadcast ownership rules to the test," *Morningstar*, August 19, 2025.

71. "That means, in theory, a company operating only UHF stations could own channels that reach 78% of U.S. households", while, "[c]urrently, Nexstar says it reaches 70% of U.S. households, if the UHF discount is removed, through the roughly 200 stations it owns in 116 markets." *Id.*

72. "The company says that number will jump to 80% if it is allowed to acquire Tegna's 64 stations", and, "[t]ogether, the new company would operate 265 stations in 44 states. Nexstar also operates the CW Network and NewsNation." *Id.*

73. "With the FCC expected to grant its game-changing merger with Nexstar Media Group by granting waivers that would allow it to own more than two full-power stations in a market — just as it did with Circle City's purchase of WRTV-TV in Indianapolis from The E.W. Scripps Co. — the only TV station ownership group headquartered in the National Capital Region has stated its rule-busting deal is on track for completion 'by the second half of 2026.'" Adam Jacobson, "TEGNA Expects Nexstar Merger Closing By July," *RBR*, March 2, 2026.

74. "Nexstar CEO Perry Sook told Wall Street analysts that the company's executives

- 18 -

'appreciate the support' of President Trump of the pending $6.2 billion merger with Tegna." Dade Hayes, "Nexstar CEO Salutes Donald Trump For Backing Tegna Merger, Says Mega-Deal Is On Track To Close By June," *Deadline*, February 26, 2026.

75. "The megadeal would create by far the largest owner of local TV stations, with reach to 80% of U.S. households", and, "[e]arlier this month, Trump backed the transaction in a post on Truth Social, arguing the deal would create 'more competition against THE ENEMY, the Fake News National TV Networks.'" *Id.*

76. Generally, a court cannot deny that a "person is entitled to redress", *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (Rehnquist J., dissenting with O'Connor and Thomas joining).

77. However, here, arguably, on the present facts, "[t]here is another consideration growing out of this part of the case which necessarily rises in judgment". *U.S. v. The Amistad*, 40 U.S. 518 (1841).

78. Generally, an illegitimate motive is sufficient to even pierce the veil of a claim of prosecutorial discretion, *U.S. v. Regan*, 221 F. Supp. 2d 661 (E.D. Va. 2002) (citing *Oyler v. Boles*, 368 U.S. 448 (1962)). *See also U.S. v. Hastings*, 126 F.3d 310 (4th Cir.1997).

79. In criminal law, the task of the court is "to determine whether the record contains enough evidence for the triers of the facts to find beyond a reasonable doubt each element of the offenses involved. *U.S. v. Calley*, 22 U.S.C.M.A. 534 (1973) (citing *U.S. v. Papenheim*, 19 U.S.C.M.A. 203 (1970); *U.S. v Wilson*, 13 U.S.C.M.A. 670 (1963)).

80. In a theory of *respondeat superior*, ""the extent to which the tort of the employee is incident to his employment'" is insufficient, and "the employment brought tortfeasor and victim

together in time and place is not enough." *Z.V. v. Cty. of Riverside*, Record No. G050922 (Cal.Ct.App. June 17, 2015) (quoting *Lu v. Powell*, 621 F.3d 944 (9th Cir.2010)).

81. Rather, 1) "the incident leading to injury must be an 'outgrowth' of the employment", *Id.* (citing *Carr v. Wm. C. Crowell Co.*, 28 Cal.2d 652 (1946), ], 657); 2) " the risk of tortious injury must be "'inherent in the working environment"'", *Id.* (quoting *Ibid.*) "or "'typical of or broadly incidental to the enterprise [the employer] has undertaken"'", *Id.* (quoting ( *Hinman v. Westinghouse Elec. Co.*, 2 Cal.3d 956 ((1970)., 960.Co.[, supra,] 2 Cal.3d [at p.] 960) (citing *Lisa M. v. Henry Mayo Newhall Mem. Hosp.*, 12 Cal.4th 291 (1995).

82. "Motives common to most corporate officers, including the desire for the corporation to appear profitable, to keep stock prices high to increase officer compensation, or even to enhance their own prestige do not suffice for scienter." *Id.* (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47 (2d Cir. 1995); *Russo v. Bruce*, 777 F. Supp. 2d 505 (S.D.N.Y. 2011).

83. "Where plaintiffs do not allege that defendants had a motive to defraud the public, they must instead plead facts that support 'a stronger inference of recklessness'", *Id.* (citing *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), and, "[t]o qualify as reckless, defendants' conduct must have been 'highly unreasonable' and 'an extreme departure from the standards of ordinary care.'" *Id.* (quoting *Novak*, 216 F.3d, at 300) (citation omitted)).

84. "Plaintiffs can establish recklessness by adequately alleging that 'defendants knew facts or had access to non-public information contradicting their public statements' and therefore 'knew or should have known they were misrepresenting material facts.'" *Id.* (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) (citation omitted)).

85. "Plaintiffs can sometimes successfully plead recklessness by alleging 'facts demonstrating that defendants failed to review or check information that they had a duty to monitor.'" *Id.*

(quoting *Novak*, 216 F.3d, at 300)).

86. "An alleged 'refusal to see the obvious, or to investigate the doubtful,' however, must be 'egregious' to be actionable." *Id.* (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) (citation omitted)).

87. During the COVID-19 pandemic, beyond a reasonable doubt, news broadcasting companies had "engage[d] in. . . conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed". 18 U.S.C. § 1038(a)(1).

88. "During times of excess, fundamentals take a backseat", and "valuations nowadays are driven by a 'huge, recursive 'tail wagging the dog' nature,' meaning they are based on expectations of the future rather than present reality." Rakesh Sharma, Why Tesla (TSLA) Skyrocketed During the Pandemic," *Investopedia*, December 02, 2021.

89. "Not all downtrodden stocks are guaranteed to rise from the ashes, but there's no denying that with the assistance of some constructive commentary from the pros, Chewy is rebounding"; however, "the go-go days for this stock were during the COVID-19 pandemic, when pet adoption and online shopping surged", and, "[s]ince then, Chewy ground lower and lower." Todd Shriber, "The Market Knocked Chewy Down. Could Investing $5,000 Now Make You Richer?" *Fool*, April 22, 2026.

90. Some winners prevailed in fluctuating markets and "Amazon [had] remain[ed] one of the few companies to benefit from the coronavirus pandemic, with surging online sales helping it to report record profits in July." Annie Palmer, "Tech: How Amazon managed the coronavirus crisis and came out stronger," *CNBC*, September 29, 2020.

91. "The stock market peaked in February 2020 before the outbreak of the Covid-19 pandemic", which had "ended up having a significant impact on the world economy, leading to

- 21 -

unprecedented volatility and uncertainty that lingers to this day." Nilay Mehrotra, "The Aftermath And Impact Of Covid-19 On Stock Markets," *Forbes*, February 10, 2023.

92. "[I]t is undeniable that the Covid-19 pandemic ha[d] had a significant impact on the stock market", and "[o]ne of the ways in which the Covid-19 pandemic ha[d] impacted the stock market is through dramatic fluctuations in stock prices." *Id.*

93. "The real issue is whether Pfizer can successfully navigate what Wall Street calls 'patent cliffs'", and "[a] patent cliff occurs when a drug company loses exclusivity on a blockbuster treatment, allowing generic competitors to flood the market with cheaper versions and rapidly erode revenue", exactly "what "Pfizer is facing now, as several of its blockbuster drugs -- including Eliquis, Ibrance, Xtandi, and Xeljanz -- are expected to lose exclusivity between 2026 and 2030." Jeff Siegel, "Is Pfizer a Buy, Sell, or Hold in 2026?" *The Motley Fool*, May 12, 2026.

94. "They [had] generated roughly $56.7 billion for Pfizer in 2022", and "[t]he company itself expects patent expirations alone to reduce 2026 revenue by roughly $1.5 billion", and, simultaneously, "sales of COVID products continue to decline sharply"; "[b]y 2025, that figure had fallen to about $6.7 billion, and management expects around $5 billion in COVID revenue for 2026" *Id.*

95. However, "despite all of this, Pfizer is still expecting to bring in between $59.5 billion and $62.5 billion in revenue during 2026." *Id.*

96. "In fact, 'the COVID-19 had a noticeable impact on the market that the price of the market increased after each wave of this virus reached its highest number of cases which resulted in high volatility', and, as a result, 'after October 24, 2020, the price of Tesla, Apple, and Google significantly increased.'" Navid Mottaghi & Sara Farhangdoost, *Stock Price*

- 22 -

*Forecasting in Presence of Covid-19 Pandemic and Evaluating Performances of Machine Learning Models for Time-Series Forecasting*, arXiv:2105.02785v1 [q-fin.ST], May 4, 2021.

97. "Researchers had reported that "the statistical analysis of the stock prices was split into two major times one before the spread of COVID-19 and the second one after the time to understand the effect of this virus', and, '[f]rom January 2020 to April 2021, after this virus started to spread, that the Mean and SD of price are substantially higher than before January 2020.'" *Id.*

98. "It is [only] 'purposeful unconstitutional [government] suppression of speech [which] constitutes irreparable harm for preliminary injunction purposes'", and, while "the assertion of *First Amendment* rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits", to succeed "the plaintiffs must show 'a chilling effect on free expression". Accordingly, it is the "direct penalization, as opposed to incidental inhibition, of *First Amendment* rights [which] constitutes irreparable injury." *Time Warner Cable of New York City v. City of New York*, 943 F.Supp. 1357 (S.D.N.Y. 1996).

99. With respect to the *Cable Act*, "one goal of the law was to 'provide the widest possible diversity of information services and sources to the public, consistent with the *First Amendment's* goal of a robust marketplace of ideas'", *Id.* (quoting. H.R.Rep. No. 98–934 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655), and "[p]ublic access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet", and "[t]hey provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas"; "PEG channels also contribute to an informed citizenry by bringing

- 23 -

local schools into the home, and by showing the public local government at work." *Id.*

## Selective Prosecution

### *Reasonable Suspicion and Probable Cause*

100.    "[A]n 'investigative detention' must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest." *Commonwealth v. Goldsborough*, 31 A.3d 299 (Pa.Super. 2011), *appeal denied*, 616 Pa. 651 (2012).

101.    "An 'investigative detention' is interchangeably labeled as a 'stop and frisk' or a 'Terry stop.'" *Commonwealth v. Brame*, 239 A.3d 1119 (Pa.Super. 2020), *appeal denied*, 666 Pa. 240, 251 A.3d 771 (2021).

102.    "An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates. . . [constitutional] protections". *Commonwealth v. Jones,* 874 A.2d 108 (Pa.Super. 2005) (internal citations omitted).

103.    "To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot", and "[r]easonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate." *Id.*

104.    "Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity." *Id.*

105.    "Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate." *Id.*

- 24 -

106.   Hence, "the question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity." *Commonwealth v. Cottman*, 764 A.2d 595 (Pa.Super. 2000) (quoting *Commonwealth v. Beasley*, 761 A.2d 621 (Pa.Super. 2000), *appeal denied*, 565 Pa. 662 (2001)).

107.   "In making this determination, we must give due weight…to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience." *Commonwealth v. Young*, 904 A.2d 947 (Pa.Super. 2006), *appeal denied*, 591 Pa. 664 (2006) (internal citations and quotation marks omitted).

108.   "Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct"; "[r]ather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Id.*

109.   However, "an arrest or custodial detention must be supported by probable cause to believe the person is engaged in criminal activity." *Commonwealth v. Livingstone*, 644 Pa. 27, n.1 (2017).

110.   As to a finding of probable cause, "'in justifying the particular intrusion[,] the police officer must be able to point to *specific and articulable facts* which . . . reasonably warrant that intrusion'", *South Dakota v. Opperman*, 428 U.S. 364 (1976) (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)),  as reasonably appears to be the case at bar, and "[s]uch a requirement of 'specificity in the information upon which police action is predicated is the central teaching of this Court's *Fourth Amendment* jurisprudence'". *Id.* (quoting *Ibid.* n. 18).

111.    "To properly convict, the government must prove every element of each offense charged beyond a reasonable doubt". *U.S. v. Kimble*, 719 F.2d 1253 (5th Cir. 1983).

112.    "[T]he *Due Process Clause* protects the accused *against conviction* except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged", *In re Winship*, 397 U.S. 358 (1970), which is distinct from obtaining an indictment. Moreover, while, indeed, absolute immunity applies to 'the presentation of evidence ... before a grand jury after a decision to seek an indictment is made'). "only after an indictment has been returned in the case of a felony conviction, "separate offenses by the specification of distinct elements. . . must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict " *Jones v. U.S.*, 526 U.S. 227 (1999).

113.    Beyond a reasonable doubt, neither Plaintiffs nor Defendants have even suggested that deaths or even the response to the COVID-19 pandemic has established even a reasonable suspicion.

### *Black Lives Matter*

114.    "Arguments not raised in a party's brief are deemed waived", *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, n.6 (S.D.N.Y. 2020), and "failure to adequately brief an argument constitutes waiver of that argument." (); *Levine v. Lawrence*, Civ. Act. No. 03-cv-01694 (DRH), 2005 WL 1412143 (E.D.N.Y. June 15, 2005)).

115.    Clearly, "the institution of criminal charges, as well as their order and timing, are matters of prosecutorial discretion", *In re Horan*, 271 Va. 258 (2006) (citing *Bradshaw v. Commonwealth*, 228 Va. 484 (1984); *Commonwealth v. Sangha*, 107 Va. Cir. 408A (2021)); however, this context was limited to those matters where "[a] prosecutor has the discretion to decide under which of several applicable statutes the charges shall be instituted." *Id.* (citing *Hensley v. City of Norfolk*, 216 Va. 369 (1975)).

116.    "*Nolle prosequi* shall be entered only in the discretion of the court, upon motion of the Commonwealth with good cause therefor shown", Va. Code § 19.2-265.3.

117.    However, "[t]he question of good cause. . . is reviewed upon an abuse of discretion standard", *Henderson v. Commonwealth*, 59 Va. App. 641 722 S.E.2d 275 (2012), *aff'd*, 285 Va. 318, 736 S.E.2d 901 (2013), and "[t]he underlying determinations of good cause ... involve a case-by-case exercise of the trial court's discretion." *Allen v. Commonwealth*, 58 Va.App. 618, 712 S.E.2d 748 (2011) (citing cases).

118.    "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Grattan v. Commonwealth*, 278 Va. 602 (2009) (quoting *Thomas v. Commonwealth*, 44 Va.App. 741, 607 S.E.2d 738 (2005)).

119.    "[T]he State must possess articulable facts and officer inferences to form suspicion", *Kansas v. Glover*, 140 S. Ct. 1183 (2020), and "[t]o establish probable cause, a search warrant application must provide sufficient information to support a reasonable belief that evidence of a crime may be found in a certain place." *People v. Huginnie*, 2024 N.Y. Slip Op. 1726, (N.Y. App. Div. 2024) (quoting *People v Coleman*, 176 A.D.3d 851, 851 [internal quotation marks omitted]).

120.    "Because Code § 15.2-1627(B) is the 'more specific' statute in that it specifically addresses the classes of crimes which the Commonwealth Attorney is to required to prosecute and which he has discretion to prosecute, it prevails over" other provisions. *Sangha*, 107 Va. Cir. at 408A.

121.    Clearly, "[i]n 1979, the General Assembly codified th[e] tradition in Code § 19.2-265.3", and, now, "[u]nder this statute, a trial court has the discretion to refuse a *nolle prosequi* [only] if the prosecutor fails to show 'good cause'", *Duggins v. Commonwealth*, 59 Va. App. 785

- 27 -

(2012) (citing Va. Code § 19.2-265.3); however, no such statement has been entered, nor mandated by any court.

122.    "[T]he purpose of the 'good cause' requirement is to give a defendant an opportunity to object to the Commonwealth's Attorney's dropping of a case to ensure that the defendant is not subject to 'mischief' by the Commonwealth Attorney", and, "[w]hen the Commonwealth Attorney elects not to prosecute pursuant to Code § 15.2-1627(B), a defendant could certainly object to the court that the election not to prosecute was due to such 'mischief' by the Commonwealth Attorney and the court, in dismissing the case, could do so with prejudice to cure the 'mischief.'" *Sangha*, 107 Va. Cir. at 408A.

123.    "Acts in excess of judicial authority constitute[] misconduct, particularly where a judge *deliberately disregards the requirements of fairness and due process.*" *Cannon v. Comm'n on Judic. Qualif.*, 14 Cal. 3d 678 (1975).

124.    "The attorney for the Commonwealth. . . shall be a part of the department of law enforcement of the county or city in which he is elected or appointed, and shall", in ministerial obligation, "have the duties and powers imposed upon him by general law". Va. Code § 15.2-1627(B).

125.    "To render a mandamus a proper remedy, the officer to whom it is directed must be one to whom, on legal principles, such writ must be directed, and the person applying for it must be without any other specific remedy", and "[i]t is emphatically the duty of the Judicial Department to say what the law is." *Marbury*, 5 U.S. (2 Cranch) at 137.

126.    "Sovereign immunity does not bar. . . a declaratory judgment action or injunction that seeks to prohibit state parties from acting", *Elansari v. Commonwealth*, 663 M.D. 2020 (Pa. Cmmw. Ct. Sep. 16, 2024) (citing *Finn v. Rendell*, 990 A.2d 100 (Pa. Cmwlth. 2010)), and,

"[f]urthermore, a mandamus action 'will lie to compel a state officer or agency to perform a ministerial or mandatory duty.'" *Id.*

127.    Where a requirement is mandatory, not merely directory, a distinction with a legally significant effect, *Carilion Clinic*, 296 Va. at 319 (quoting *Sch. Bd. v. Caudill Rowlett Scott, Inc.*, 237 Va. 550 (1989)), "'mandamus is always granted to compel the performance of some duty which has not been done'", and "'[i]t is not granted to undo an act already done.'" *Bd. of Supv'rs of Amherst Cty v. Combs*, 160 Va. 487 (1933) (quoting 18 R.C.L., page 114) (quoting *Harrison v. Barksdale*, 127 Va. 180 (1920)) (emphasis added).

128.    Mandamus, is "said to be *limited to the sole inquiry of whether the particular writ asked for should, or should not, be granted*", and "[n]or is the extraordinary writ of mandamus ever granted to enforce a right when there is any other adequate legal remedy available to the applicant", *Combs*, 160 Va. at 487 (citing *High's Ex. Leg. Rem.*, section 10; 2 *Spelling on Ex. Relief*, section 1374) (emphasis added); "[t]he issue whether a legal duty in tort exists is a pure question of law." *Kellermann v. McDonough*, 278 Va. 478 (2009).

129.    "Where there is no jurisdiction, there can be no discretion, for discretion is incident to jurisdiction." *Bradley v. Fisher*, 13 Wall. 335 (1872) (citing *Piper v. Pearson*, 2 Gray 120).

130.    While "a plaintiff guilty of ordinary negligence in not earlier discovering a cause of action may not avoid the bar of the statute of limitations merely because a fraud or fraudulent concealment is involved", and "[a] mere failure to disclose pertinent information. . . is not sufficient to toll the statute of limitations unless there *has been some affirmative act of concealment*", "[f]raudulent concealment *requires something of an affirmative nature designed to prevent discovery of a cause of action.*" *Drake v. McNair*, 993 A.2d 607, 2010 D.C. App. LEXIS 215 (D.C.App. April 29, 2010) (emphasis added).

- 29 -

131.    Under the Federal Rules, "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed"; however, "*when denying that a condition precedent has occurred* or been performed, *a party must do so with particularity.*" Fed. R. Civ. P. 9(c) (emphasis added).

132.    "[N]egligence involved in the crime must have been criminal negligence, and it must have been 'reckless or wanton and of such a character as to show disregard of the safety of others under circumstances likely to cause injury or death.'" *Darnell v. Commonwealth*, 6 Va. App. 485 (Va. Ct. App. 1988).

133.    "Knowledge means an awareness or understanding of a fact or circumstance", *Painter v. Amin*, No. F079239, 13-14 (Cal. Ct. App. May. 17, 2021) (citing Black's Law Dict. (8th ed. 2004) p. 888), while "[i]mputed knowledge is defined as '[k]nowledge attributed [by law] to a given person, esp. because of the person's legal responsibility for another's conduct <the principal's imputed knowledge of its agent's dealings.'" *Id.* (quoting *Ibid.*).

134.    "A party who alleges that acts are done in bad faith, or for a dishonest or fraudulent purpose, takes the burden of proving such bad faith", *Id.* (citing *Ibid.*), and "[i]t is not assessed by the reasonableness of the belief." *Id.* (citing *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558 (Tex. 1984)).

135.    "Bad faith is not simply bad judgment or negligence"; rather "[b]ad faith implies a conscious wrongdoing due to a dishonest purpose or moral obliquity." *Id.* (citing *Rogers v. Ricane Enterps., Inc.*, 930 S.W.2d 157 (Tex.App.-Amarillo 1996, *writ denied*)).

136.    Moreover, "[b]ad faith is not negligence in that it requires a state of mind that affirmatively acts with furtive design or ill will", *Id.* (citing *Ibid.*), and "[b]ad faith may be inferred from unheeded suspicious circumstances of a substantial character, although the

- 30 -

evidence adduced is insufficient of itself to support a finding that the taker had actual knowledge of the defect of the instrument", *Id.* (citing *Fenner v. Am. Sur. Co.*, 156 S.W.2d 279 (Tex.Civ.App. Waco 1941, *writ ref'd w.o.m.*)).

137.    "To constitute criminal negligence essential to a conviction of involuntary manslaughter, an accused's conduct 'must be of such reckless, wanton or flagrant nature as to indicate a callous disregard for human life and of the probable consequences of the act.'" *Davis v. Commonwealth*, 230 Va. 201 (1985) (citing *Lewis v. Commonwealth*, 211 Va. 684 (1971)).

138.    "A plaintiff can establish the process was tainted where: (1) the officer obviously failed to present accurate evidence 'to support the probable cause required for the issuance of a warrant'—*i.e.*, a *Malley* violation; or (2) 'officers ... deliberately or recklessly [ha] provide[d] false, material information for use in an affidavit or ... ma[de] knowing and intentional omissions that [had] result[ed] in a warrant being issued without probable cause"—known as a *Franks* violation." *Welsh v. Williams*, Civ. No. 5:22-CV-183-BQ, *supra* (quoting *Mayfield v. Currie*, 976 F.3d 482 (5th Cir. 2020) (internal quotation marks and alterations omitted) (quoting *Melton v. Phillips*, 875 F.3d 256 (5th Cir. 2017) (*en banc*)).

<u>Kill One and Scare a Thousand</u>

139.    "[A] group cannot obtain constitutional immunity from prosecution by violating a statute more frequently than any other group." *U.S. v. Weslin*, 156 F.3d 292 (2d Cir. 1998) (*per curiam*) (citation omitted).

140.    Merely "raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants". *U.S. v. Bass*, 536 U.S. 862 (2002) (*per curiam*) (emphasis omitted)).

141.    One researcher, Dr. Lisa A. Cooper, described as "an internist who directs The Johns Hopkins Center for Health Equity", had "found that doctors have poorer communication with

Black patients than white ones", and "[d]octors tended to dominate visits with Black patients by talking, rather than listening and connecting with patients, she found.". Michael A. Fletcher, "Black Americans see a health-care system infected by racism, new poll shows," *National Geographic*, October 16, 2020.

142. Yet, "[w]ith white patients, the conversation more often flowed two ways", and "[t]he result is that Black patients often are reluctant to share whatever ails them and, more often than white patients, leave doctor's visits feeling unheard." *Id.*

143. "Black Americans are more religious than the American public as a whole, and roughly 60 percent of Black churchgoers attend a majority Black church, according to a 2020 study by the Pew Research Center." Liam Stack, "'A Safe Space': Black Pastors Promote Vaccinations from the Pulpit," *The New York Times*, October 9, 2021.

144. "A group of the nation's leading Black clergy led by Rev. Al Sharpton and Rev. Calvin O. Butts, III kicked off its nationwide Choose Healthy Life (CHL) initiative yesterday to address health disparities in the Black community through the Black Church by hosting its first COVID-19 testing event at historic Abyssinian Baptist Church in Harlem, N.Y."., with a mission to "provide services including COVID-19 testing, vaccine awareness and preventative health education through 50 churches across five cities in a historic partnership with United Way of New York City, Quest Diagnostics and America's leading public health experts." Choose Healthy Life, "Group of Nation's Most Renowned Black Clergy Led by Rev. Sharpton and Rev. Butts Launch Nationwide Testing Campaign to Fight COVID-19 in the Black Community," *PR Newswire*, January 26, 2021.

145. At a star-studded event, "[l]ocal dignitaries stood nearby, including Hazel N. Dukes, president of the N.A.A.C.P. New York State Conference, and gave speeches about the

importance of vaccination." Liam Stack, "'A Safe Space': Black Pastors Promote Vaccinations from the Pulpit," *supra.*

146.    Yet, returning to the debunked Tuskegee theme, even "Pastor Butts said vaccine advocacy had to overcome the legacy of those conspiracies, including the Tuskegee syphilis study, during which government researchers withheld syphilis treatment from hundreds of Black men for 40 years so they could observe the course of the disease", and "[w]hen talking to community members, Pastor Butts said he [had] emphasize[d] the role of Black doctors in the development of the vaccines and in pro-vaccine public health campaigns, including Dr. Kizzmekia Corbett at the National Institutes of Health, Dr. Marcella Nunez-Smith at the Yale School of Medicine, and the National Medical Association, a professional society of Black doctors." *Id. But see Webb v. Alfred Street*, Civil Action No. 1:2023cv00096 (E.D.Va. 2023), *aff'd* No. 23-1397 (4th Cir. 2023).

147.    "Some crimes may by their very nature include a future threat, such as in a *protection racket.*" *Reich v. Lopez*, 858 F.3d 55 (2d Cir. May 26, 2017) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)) (emphasis added).

148.    One Virginia religious faith leader had "preached in church about the virus in March [2020], before he became sick, encouraging people not to be afraid", and, of report, "[o]n March 22, five days after Virginia Gov. Ralph Northam (D) had urged people to 'avoid non-essential gatherings of more than 10 people,' Glenn [had] told his congregation that 'I firmly believe that God is larger than this dreaded virus,' according to a video played April 6 by Richmond station WTVR"; however, "[o]n March 23, Northam ordered nonessential businesses closed and banned all gatherings of more than 10 people." Michelle Boorstein, "Prominent Virginia pastor who said 'God is larger than this dreaded virus' dies of covid-19,"

- 33 -

*Washington Post*, April 13, 2020.

149. Just three years later, in 2023, "[a]s the horses were loaded into the starting gate, Tedi Dietrich whispered a prayer", "'Lord, let the horses get all the way around safe,'" while "watching the *race*. . . on a giant screen erected amid the party in Churchill Downs' courtyard." Claire Galofaro & Gary B. Graves, "In the shadow of 7 horse deaths, party goes on at the Derby," *AP*, May 6, 2023 (emphasis added).

150. "News had just broken that a sixth horse had died in the days and hours leading into the Derby", and "[a] seventh horse died later in the day." *Id.*

151. Just three years before, "[a] prominent Richmond-area evangelical pastor died on the eve of Easter after contracting the novel coronavirus", Michelle Boorstein, "Prominent Virginia pastor who said 'God is larger than this dreaded virus' dies of covid-19," *supra*.

152. At that time, "[t]he Church of God in Christ, the country's biggest African American Pentecostal denomination, ha[d] taken a deep and painful leadership hit with reports of at least a dozen to up to 30 bishops and prominent clergy dying of covid-19, the disease caused by the novel coronavirus." Michelle Boorstein, "Covid-19 has killed multiple bishops and pastors within the nation's largest black Pentecostal denomination," *Washington Post*, April 19, 2020.

153. Mindful that "no person shall be put upon trial for any felony, unless an indictment or presentment shall have first been found or made by a grand jury in a court of competent jurisdiction", Va. Code § 19.2-217, "[t]he attorney for the Commonwealth. . . shall be a part of the department of law enforcement of the county or city in which he is elected or appointed, and shall have the duties and powers imposed upon him by general law, including the duty of prosecuting all warrants, indictments or informations charging a felony" .Va.

- 34 -

Code § 15.2-1627(B).

154.    However, with at least "'a discriminatory effect'", if not "'motivated by a discriminatory purpose.'" *U.S. v. Williams*, 701 F.Supp.3d 257 (2023) (quoting *U.S. v. Armstrong*, 517 U.S. 456 (1996)) (citations omitted). *Accord U.S. v. Alameh*, 341 F.3d 167 (2d Cir. 2003).

155.    Virginia prosecutors have claimed that "'sovereign immunity is 'alive and well' in Virginia'", Renewed Motion for Entry of Demurrer and Entry of a Prefiling Injunction, *Webb v. Porter*, Case No., CL22002367 (Alexandria Cir. August 23, 2023) (quoting *Messina v. Burden*, 228 Va. 301 (1984)).

156.    "The 2023 Kentucky Derby was marred by the death of 12 horses at Churchill Downs in the days before and after the race, leading to an investigation searching for answers behind the widespread deaths", Edward Sutelan, Kentucky Derby horse death investigation, explained: Why horses were dying at Churchill Downs during 2023 race week," *Sporting News*, May 3, 2024.

157.    However, a petition for writ of mandamus, *see Webb v. Davenport*, Case No. CL22W03079-00 (Chesterfield Cir. 2022), *dismissed*, Record No. 230277, (Va. 2023), to compel a grand jury investigation into the death of " apillar of the region's faith community," "Bishop Gerald Glenn, 66, founder and leader since 1995 of the New Deliverance Evangelistic Church in Chesterfield," who had been "the first black chaplain of that community's police department and was a police officer before becoming a pastor," Michelle Boorstein, "Prominent Virginia pastor who said 'God is larger than this dreaded virus' dies of covid-19," *supra*, had been deemed sufficiently frivolous and vexatious to warrant a pre-filing injunction, upon a claim by one prosecutor, specifically alluding to a hypothetical in which the Alexandria Mayor had committed cold-blooded murder and heinous acts of terror,

- 35 -

had boldly averred that, "[e]ven accepting, *arguendo*, that probably cause exists. . . no court can order the Commonwealth Attorney to charge anyone", no court can order the Commonwealth Attorney to charge anyone", and "[t]he decision to charge is a discretionary duty that lies entirely within the province of the public prosecutor", Renewed Motion for Entry of Demurrer, *Webb v. Porter*, Case Number CL22002367 (Alexandria Cir. August 23, 2023).

158.    Yet, "[t]he term 'moral turpitude' refers to behavior 'that shocks the public conscience as being inherently base, vile, or depraved'," *Uribe v. Sessions,* 855 F.3d 622 (4th Cir. 2017) (citations omitted), and "conduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," rebutting even a claim in defense of sovereign immunity. *Cty. of Sacramento v. Lewis,* 523 U.S. 833 (1998).

159.    "The distinguishing mark of a 'manifestly unlawful order' should fly like a black flag above the given order, as a warning reading 'Prohibited!'" *Attorney General of Israel v. Eichmann*, 36 I.L.R. 5 (Supreme Court of Israel, 1961) (quoting *Chief Military Prosecutor v. Melinki, et al.* (13 Pesakim Mehoziim, p. 90)), and "[i]t is to be pointed out here that even the jurists of the Third Reich did not dare to put on paper that obedience to orders is above all". *Id.*

160.    Even a soldier "must use common sense", *Calley v. Callaway,* 519 F.2d 184 (5th Cir. 1975), and "[t]he acts of a subordinate done in compliance with an unlawful order given him by his superior are excused and impose no criminal liability upon him unless the superior's order is one which a man of ordinary sense and understanding would, under the circumstances, know to be unlawful, or if the order in question is actually known to the

accused to be unlawful." *Calley*, 22 U.S.C.M.A., at 534.

The "Black Death"

161.   While federal regulators had "stopped reporting data on Covid cases in May 2023", "[s]ince the beginning of the pandemic", in the City of Norfolk, with "a toral of 549 reported deaths", "1 in 443 residents", had accrued, Editors, "Tracking Coronavirus in Norfolk, Va.: Latest Map and Case Count," *The New York Times*, March 23, 2023, approximately equivalent to the "553 reported deaths", "1 in 417" that had been accumulated in Richmond, Editors, "Tracking Coronavirus in Richmond, Va.: Latest Map and Case Count," *The New York Times*, March 23, 2023, one third of the nation's capital, where "[t]hrough October 2022, there were 1,400 deaths attributed to COVID-19". Editors, "How did COVID-19 affect people in Washington, DC?" *USA Facts*, accessed February 17, 2026.

162.   "Moguldom Nation, aggregating reporting from state media sources, said black Virginians in Richmond were contracting and dying from the coronavirus at a higher rate than other races", and, in 2020, "[t]he online site reported that everyone who had died was black." Donnelle Eller, "Fact check: Black people make up disproportionate share of COVID-19 deaths in Richmond, Virginia," *USA Today*, May 5, 2020. By August 2020, it was known that, in Richmond, "more than 80% of coronavirus cases [we]re Black or Latino, and Latinos ha[d] nearly three times the number of cases than white Richmonders despite being only 7% of the city's population', while 'Black Richmonders [had] account[ed] for more than 60% of the city's deaths". Sabrina Moreno, "Almost 6 months in, Black and Latino residents are still 80% of Richmond's COVID cases. . .", *supra*.

163.   "Males and the Hispanic, American Indian and Alaska Native (AIAN) populations experienced a disproportionately large number of deaths from 2019 to 2020, the year that includes the start of the COVID-19 pandemic." Shannon Sabo and Sandra Johnson, "Males

- 37 -

and the Hispanic, American Indian and Alaska Native Populations Experienced Disproportionate Increases in Deaths During Pandemic," *Census*, June 22, 2023.

164. "As of June 14, 2023, around 66 percent of all COVID-19 deaths in the United States ha[d] been among non-Hispanic whites, although non-Hispanic whites account for 60 percent of the total U.S. population"; "[o]n the other hand, non-Hispanic Asians ha[d] accounted for just three percent of all deaths due to COVID-19 even though this group makes up almost six percent of the entire U.S. population." A. Minhas, "Distribution of COVID-19 (coronavirus disease) deaths in the United States as of June 14, 2023, by race and ethnicity," *Statista*, November 9, 2025.

165. "Using COVID-19 case data from the Centers for Disease Control and Prevention," to "calculate[] crude and indirect age-adjusted COVID-19 mortality rates for the non-Hispanic White and non-Hispanic Black populations in each of 353 counties for the period February 2, 2020, through January 30, 2021", and "[u]sing linear regression analysis," researchers had "examined the relationship between several county-level measures of structural racism and the observed differences in racial disparities in COVID-19 mortality across counties", and "[n]inety-three percent of the counties in . . . [that] study experienced higher death rates among the Black compared to the White population, with an average ratio of Black to White death rates of 1.9 and a 17.5-fold difference between the disparity in the lowest and highest counties." Michael Siegel, *et al.*, *Actual Racial/Ethnic Disparities in COVID-19 Mortality for the Non-Hispanic Black Compared to Non-Hispanic White Population in 353 US Counties and Their Association with Structural Racism*, 9 J. Racial Ethn. Health Disparities 5, pp. 1697-1725 (August 2021).

166. According to these researchers, "[t]hree traditional measures of structural racism were

significantly related to the magnitude of the Black-White racial disparity in COVID-19 mortality rates across counties", *Id.*; however, in science, "[c]orrelation implies association, but not causation", and, "[c]onversely, causation implies association, but not correlation", Naomi Altman & Martin Krzywinski, *Points of Significance: Association, correlation and causation*, 12 Nat. Meth., pp. 899-900, September 29, 2015.

167.   It "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned", Fed. R. Evid. 201(b)(2), in conditions precedent, "[b]efore an *EUA* may be issued, the Secretary of HHS must declare that circumstances exist justifying the authorization based on one of four determinations", and he is granted only one authority unto himself, *i.e.*, where "a determination by the Secretary" is made "that there is a public health emergency, or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a *CBRN agent or agents*, or a disease or condition that may be attributable to such agent or agents." 85 Fed. Reg. 26, February 7, 2020.

168.   "If Congress had wanted to authorize" any other conditions, "in any way, it would have said so." *Fischer v. U.S.*, 603 U.S. 480 (2024).

169.   It is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned", Va. S. Ct. R. 2:201(b), that "[t]he term CBRN stands for 'chemical, biological, radiological and nuclear', and relates to specific hazards that may be encountered during an incident", and "[t]he term CBRN is *generally reserved for the deliberate release of a hazardous material* such as in a terrorist attack, whereas the term Hazmat is used for accidental release or exposure to toxic industrial material." Antony Calder & Steven Bland, *Chemical, biological, radiological and nuclear considerations in a major*

*incident*, 33 Surg. (Oxf.) 9, pp. 442–448, August 6, 2015 (emphasis added).

170.    Generally, legislative authorities are "presumed to have known. . . the definition and interpretation already attributed to the term[s]". *Branch v. Commonwealth*, 14 Va. App. 836 (Va. Ct. App. 1992).

171.    Hence, they cannot "dispute that COVID-19," often described as "a highly contagious and deadly virus, falls within this definition." *U.S. v. Perez*, Crim. Act. No.: 5:20-CR-283-DAE-1, 2021 WL 4621695 (W.D. Tex. June 9, 2021) (unpublished).

<u>Matter of Color</u>

172.    Most recently, a Court had elected a right to remain silent with respect to a similar pre-filing injunction, imposed by local election officials against Intervenor, in the Circuit Court for the City of Richmond, *Webb v. Washington Post*, Case No. CL24002622-00 (Richmond Cir. October 10, 2025), where Intervenor has a similar action related to "a CBRN agent or agents", Fed. Reg. 26, February 7, 2020, responsible for "553 reported deaths", in the City of Richmond, Editors, "Tracking Coronavirus in Richmond, Va.: Latest Map and Case Count," *The New York Times*, March 23, 2023; *but see Webb v. Virginia League of Planned Parenthood*, one third of death toll in the nation's capital, where "[t]hrough October 2022, there were 1,400 deaths attributed to COVID-19". Editors, "How did COVID-19 affect people in Washington, DC?" *USA Facts*, accessed February 17, 2026, and approximately the equivalent of what today is known as the My Lai (Pinkville) Massacre, where there had been a "mass killing of as many as 500 unarmed villagers by U.S. soldiers in the hamlet of My Lai on March 16, 1968, and, "[b]y 11:00 am as many as 500 Vietnamese civilians had been killed." Michael Ray, "My Lai Massacre," *Britannica*, February 6, 2026, a reference to which one recent Article III Court had described as "mostly unintelligible discussions[,] regarding a range of unrelated topics", *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568-LMB-WBP, p.

- 40 -

3 (E.D.Va. April 28, 2026), and, yet effectively banning access to courts for a candidate who might warrant injunctive relief in those municipalities. *Id.*, at p.4.

173.    Nationally, not as matter of opinion, but rather as fact, by the first anniversary of the pandemic declaration, at which time, according to the President, "the total deaths in America... [reached] 527,726", "more deaths than in World War One, World War Two, the Vietnam War, and 9/11 combined" Briefing Room, "Remarks by President Biden on the Anniversary of the COVID-19 Shutdown," *The White House*, March 11, 2021, it was known that America had "lost at least 73,462 Black lives to COVID-19", and that "Black people [had] account[ed] for 15% of COVID-19 deaths where race [wa]s known." The Atlantic COVID Tracking Project (Boston University), "The COVID Racial Data Tracker", *COVID Tracking*, March 7, 2021.

### *Expert Testimony*

174.    In emerging markets, it had been the "DoD policy under reference (b) that: 1. The AFMIC is hereby established as a field production activity of the DIA administratively integrated with the DIA organization", and that the AFMIC should "be jointly staffed by personnel assigned or detailed from each of the Military Departments, as agreed between the Director, DIA and Secretaries of the Military Departments." DoDI 6420.1, *Armed Forces Medical Intelligence Center (AFMIC)*, September 30, 1996.

175.    Intervenor had served as a former biological warfare planner, having served as the Executive Officer/*Aide de Camp* and as the most junior commissioned officer to have ever served as the Operations Officer for all U.S. Army strategic counterintelligence, playing a key staff role in standing up the Armed Forces Medical Intelligence Center (AFMIC), *see generally* DODD 6420.1, *Armed Forces Medical Intelligence Center (AFMIC)*, September 30, 1996 , the precursor to the National Medical Intelligence Center (NMIC), *see generally*

- 41 -

DODI 6420.01, *National Center for Medical Intelligence (NCMI)*, March 20, 2009, incorporating Change 3, effective September 8, 2020, which was the subject of the ABC News report. Josh Margolin & James Gordon Meek, "Intelligence report warned of coronavirus crisis as early as November: Sources 'Analysts concluded it could be a cataclysmic event,' a source said," *ABC News*, April 8, 2020. *See also* Fed.R.Evid. 702.

176. Intervenor is, statistically just another "negro of African descent; his ancestors were of pure African blood, and were brought into this country and sold as negro slaves", *Dred Scott v. Sandford*, 60 U.S. 393 (1856).

177. "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

178. However, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

179. "Red teaming is an essential capability in preparing and assessing the Department of Defense's (DoD) ability to execute their mission", and, a "red team is a group of people

(military, civilian, contractor) who emulate an adversary's tactics, techniques, and procedures against a targeted mission or capability (Manual, 2013)."John Schwab & Sally Vandeven, *Global Information Assurance Certification Paper*, GIAC/Sans Institute (2017).

180.    "The Department of Defense Manual 8570.01M defines a red team as '[a]n independent and focused threat based effort…based on formal; time bounded tasking to expose and exploit information operations vulnerabilities of friendly forces as a means to improve readiness' (Officer A. S., 2015)." *Id.*

181.    "The key point of the definition is that red team activity is focused and threat-based with a formal bounded tasking in a contested. . . environment." *Id.*

182.    As an Assistant S2, (AS2), Intervenor had "[a]ssist[ed] the S2 in all security matters", to include routine matters, such as "conduct[ing] security inspections", John M. Manfre & Stephen R. Sipe, DA Form 67-9-1, *Officer Evaluation Report*, November 2, 1999.

183.    "Responsible for the Oversight and Group management of all Red Teams", as just a lieutenant, identified as "[a] leader for the 21st Century Army," Bryon S. Line & Michael A. Simmons, DA Form 67-9, *Officer Evaluation Form, supra,* expressly commended for his coordination and execution of real-world counterintelligence support to the Advanced Warfighter Experiment (AWE)/Task Force XXI (TF XXI), Michael A. Simmons, DA Form 638, *Recommendation for Award*, April 15, 1997, Intervenor had supported "over two dozen major CI surveys, [and] Vulnerability [A]ssessments", as well as managing an "Army level[,] year[-]long threat simulation in support of the Advanced Warfighter Experiment, in addition to "orchestrating the first ever recurring support by Air Force Information Warfare elements for Group's RED TEAM and major vulnerability assessments." Brian S. Line & Michael A. Simmons, DA Form 67-9, *Officer Evaluation Form, supra.*

**184.**   In the military, by regulation, a basic level, common soldier skill is to be proficient enough to "[r]eact to each situation [only] by following leader's directives or performing appropriate actions", and to "[b]e prepared to adjust your mission-oriented protective posture (MOPP) level in case of a nuclear, biological, or chemical (NBC) attack." STP21-1-SMCT, *Soldier's Manual of Common Tasks Skill Level 1*, October 10, 1990 (obsolete).

**185.**   "MOPP analysis is a process conducted by small unit leaders, battalion level and below, that determine the level of protection to be used by their soldiers", *Id.*, and, not in directive from higher echelons, but, with boots on ground and eyes on the objective, *"[a]t the small unit level*, this MOPP analysis constitutes that unit's chemical vulnerability assessment." FM 34, *NBC Protection*, May 29, 1992 (obsolete) (emphasis added).

**Actual Vindictiveness**

**186.**   Intervenor, certainly "no stranger to the legal system", Federal Defendants' Demurrer, *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568, p. 3 (E.D.Va. April 10, 2026), has most recently been described as "a serial litigator", *Webb v. Zuckerberg*, Civ. Act. No. 1:26-cv-00568, p. 2 (E.D.Va. April 28, 2026).

**187.**   However, "[u]nder the plain error standard, the appellant must demonstrate that: '(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *U.S. v. Romano*, 487 Fed.Appx. 607 (2d Cir. 2012) (quoting *U.S. v. Marcus*, 130 S.Ct. 2159 (2010) (internal quotation marks omitted)).

**188.**   "Error is plain if it is so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." *U.S. v. Brown*, 352 F.3d

- 44 -

654 (2d Cir.2003) (internal quotation marks omitted).

189.    "There are two essential elements of a claim of actual vindictiveness: 'the defendant must show that (1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) the defendant would not have been prosecuted except for the animus.'" *Id.* (quoting *U.S. v. Sanders*, 211 F.3d 711 (2d Cir.2000) (internal quotation marks and alteration omitted)).

190.    "To obtain discovery, a defendant 'must provide some evidence tending to show the existence" of these elements. *Id.* (quoting *Ibid.*) (internal quotation marks omitted)).

191.    "Buckshot is a shotgun cartridge loaded with multiple large, spherical pellets, designed to deliver a high-impact, distributed strike", and, "[u]nlike a single rifle or handgun bullet, a buckshot shell releases a cluster of projectiles simultaneously"; "[t]he resulting damage to the human body is characterized by a unique combination of multiple distinct wound tracks and massive localized trauma, determined primarily by the distance between the shotgun muzzle and the target." Editors, "What Does Buckshot Do to a Person?" *Biology Insights*, December 7, 2025.

192.    Just mere "[l]ead exposure causes neurotoxicity, reproductive system dysfunction, renal failure, and blood and endocrine system disorders in human and experimental animals." Osman Celbis, *et al.*, *Investigation of Lead Mobilization from the Buckshot Residues to the Critical Organs.* 143 Biol. Trace Elem. Res., pp. 688–694, December 10, 2010.

193.    In recent news, "[d]uring *Meet the Press. . .*, Attorney General Todd Blanche said that authorities believe 'the suspect traveled by train from Los Angeles to Chicago, and then Chicago to Washington, D.C., where", "reportedly a trained engineer who once interned for

NASA, and later worked in developing video games and as a teacher in California before moving into a series of temporary jobs", had "'checked into the hotel where the correspondents' dinner was at in the last day or two.'" Katy Forrester, "'SHOOTER' IN COURT Cole Allen pleads not guilty after 'opening fire at White House Correspondents Dinner in Trump assassination attempt'," *The Sun (UK)*, May 11, 2026.

194.    "The US Attorney for the District of Columbia, Jeanine Ferris Pirro, has accused Allen of being armed 'to the teeth' in a chilling bid to assassinate Trump during the packed annual gala", and "[p]rosecutors claim Allen – the son of a church leader – was heavily armed with a shotgun, handgun, and knives when he charges a security checkpoint one floor above the main ballroom." *Id.*

195.    "Allen, from Torrance, California, was allegedly lying in wait at the black-tie event", and he "is accused of firing a Mossberg Maverick 88 12-gauge pump-action shotgun and striking a Secret Service officer once in the chest"; "[t]he agent, who was saved by their body armor, reportedly returned fire five times before Allen fell to the ground, where he was restrained by law enforcement and taken into custody", while "Allen suffered a minor knee injury but was not shot." *Id.*

196.    "Authorities also allege Allen was carrying a Rock Island Armory 1911 .38 caliber pistol along with dozens of rounds of unspent shotgun and handgun ammunition, as well as several knives and daggers, multiple sheaths and holsters, and tools including needle-nose pliers and wire cutters." *Id.*

197.    However, "[f]orensic ballistics represents a crucial domain in the analysis of criminal events involving firearms, particularly in cases of bodily injury or homicide caused by multiple-projectile ammunition", and "[b]allistics, understood as the science that studies the

behavior, flight, and effects of projectiles, is typically divided into several branches: internal ballistics (processes occurring within the firearm up to the projectile's exit), external ballistics (projectile behavior in flight), terminal ballistics (penetration into targets), and wound ballistics (effects on biological tissues)". Eleonora Micaela Ertola, *et al.*, *Shot or buckshot? The evidentiary value of ballistic and forensic medical expertise in a case of homicide and personal injury*, 81 Leg. Med., pp. 102794 (March 2026) (citing P. Saukko & B. Knight, *Knight's Forensic Pathology, 4th ed.*, CRC Press, London (2015); J.M. DiMaio Vincent, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques, 3rd ed.*, CRC Press (2021)).

198.    "The anatomic effect of bullet traversing the body and creating a permanent cavity will be similar in the thigh or the head, but the functional effect may be negligible in the former and almost certainly fatal in the latter." Jowan G. Penn-Barwell1, Kate V. Brown & C. Anton Fries, *High velocity gunshot injuries to the extremities: management on and off the battlefield*, 8 Curr. Rev. Musculoskelet. Med., pp. 312–317 (2015).

199.    "In the head and torso, there are organs and structures in which almost any anatomic disruption will result in death, *e.g.*, the CNS, heart, and great vessels, whereas structures in the extremities are typically more tolerant of gunshot injuries." *Id.*

200.    "The differences between wounds due to conventional shotgun (shot) injuries and those inflicted by buckshot are inadequately appreciated by most clinicians", W.E. DeMuth, Jr., G.G. Nicholas & B.L. Munger, *Buckshot wounds*, 18 J. Trauma. 1, p. 53-7 (January1978).

201.    However, in the press accounts, there is no reference to the type of ammunition the "friendly federal assassin", had been carrying, Moohita Karu Garg, "'Friendly Federal Assassin' Allen was carrying THESE weapons when he tried to assassinate Trump at

WHCD," *WIONEWS*, April 28, 2026; however, whilele "no legal definition is provided to differentiate between birdshot (small pellets) and buckshot (large pellets)", Eleonora Micaela Ertola, *et al.*, *Shot or buckshot? The evidentiary value of ballistic and forensic medical expertise in a case of homicide and personal injury*, *supra* (citing J.M. DiMaio Vincent, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques, 3rd ed., supra*), "[t]his distinction, while not juridically codified, is of fundamental importance in forensic and technical contexts, as it directly influences wound potential, projectile dispersion, and the reconstruction of shooting distance." *Id.*

202.    "Smoothbore shotgun cartridges can be loaded with a variety of projectiles, including small-caliber pellets (birdshot) or larger-diameter buckshot, each producing different wound characteristics", *Id.* (citing P. Saukko & B. Knight, *Knight's Forensic Pathology, 4th ed.,supra*; J.M. DiMaio Vincent, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques, 3rd ed., supra*), and, particularly, "[a]t close range, buckshot causes multiple and devastating injuries, with limited dispersion and significant tissue penetration, often accompanied by pseudo tattooing due to filler or residue particles". *Id.* (citing [2,3]).

203.    "At close range," with a "*maximum effective range* for reliably incapacitating a target. . . generally considered to be around 25-40 yards", "a 12-gauge shotgun firing buckshot is absolutely considered a 'man-stopper'", because "[t]he combination of multiple projectiles, high energy transfer, and potential for devastating tissue damage makes it a highly effective weapon for quickly incapacitating an attacker"; however, merely "[c]lothing can offer some resistance to buckshot penetration, especially at longer ranges", and lethality depends upon multiple factors, Laura Young, "How lethal is 12 gauge buckshot?" *IERE*, November 19, 2025, including, in this instance, the unpublished type of ammunition used by the assailant.

204.    According to Article III Courts, nonetheless, Intervenor, "[u]nder any definition, qualifies as a highly vexatious litigant", *Webb v. Executive Office of the President (EOP)*, Civ. Act. No. 1:23-cv-00816 (D.D.C. March 31, 2026), and "[t]his case, like many of the plaintiff's recently filed cases, recycles arguments and allegations related to the COVID-19 pandemic". *Webb v. Executive Office of the President (EOP)*, Civ. Act. No. 1:23-cv-00816, p. 3 (D.D.C March 31, 2025).

205.    However, "when opposing parties tell two different stories," as here, "one of which is blatantly contradicted by the record, so that *no reasonable jury* could believe it, a court *should not adopt that version* of the facts", at least "for purposes of ruling on a motion for summary judgment", *Scott v. Harris*, 550 U.S. 372 (2007) (emphasis added), and the matter "generally end[s] there." *U.S. v. Balde*, 943 F.3d 73 (2d Cir. 2019).

206.    "Whether a fact is material depends on the relevant substantive law", *Davis v. Bryson*, Civ. Act. No.: 5:17-cv-00060 (W.D. Va. Apr. 25, 2018) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)).

207.    As a basic proposition, "'if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.'" *Jacobson*, 197 U.S. at 11 (quoting *Mugler v. Kansas*, 123 U.S. 623 (1887); *Minnesota v. Barber*, 136 U.S. 313 (1890); *Atkin v. Kansas*, 191 U. S. 207 (1902)).

208.    Furthermore, "[w]hen the Supreme Court has invalidated a statute because of an illegitimate purpose, '[i]n each case, the government's action was held unconstitutional only because openly available data supported a commonsense conclusion that a religious objective

- 49 -

permeated the government's action." *Croft v. Perry*, 604 F. Supp. 2d 932 (N.D. Tex. 2009), *aff'd* 624 F.3d 157 (5th Cir. 2010) (quoting *McCreary County v. ACLU*, 545 U.S. 844 (2005)).

209.    Moreover, at least for environmental advocates, as expressed in *M.C. Mehta v. Union of India, A.I.R.* 1987 S.C. 1086 (1984):

> "We would therefore hold that where an enterprise is engaged in a hazardous or inherently dangerous activity and harm results to anyone on account of an accident in the operation of such hazardous or inherently dangerous activity resulting, for example, in escape of toxic gas the enterprise is strictly and absolutely liable to compensate all those who are affected by the accident and such liability is not subject to any of the exceptions which operate vis-à-vis the tortious principle of strict liability under the rule in *Rylands v. Fletcher*, 1868 3 HL 330."

210.    "Where the question is one of public right, and the object of the mandamus is to procure the enforcement of a public duty, the people are regarded as the real party, and the relator at whose instigation the proceedings are instituted, need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and as such, interested in the execution of the laws." High, *Extr. Rem.*, sec. 431. *See also Ferry v. Williams*, 41 N.J.L. 332 (Sup. Ct. 1879).

211.    "[M]andamus is most frequently applied. . . in order to prevent a defect or failure of justice", *Cowan v. Fulton,* 64 Va. (23 Gratt.) 579 (1873), and "[c]riminal negligence, in turn, is defined as 'an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby.'" *Johnson v. State*, 292 Ga. 856 (Ga. 2013) (quoting O.C.G.A. § 16–2–1(b)).

212.    "All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General", 28 U.S.C. § 509, and, "[e]xcept as otherwise provided by law, each United States attorney, within his district, shall", *inter alia*, "prosecute for all offenses against the United States". 28 U.S.C. §

547(1).

213.    Nonetheless, "[t]he statute of limitations on Dr. Anthony Fauci's criminal referral for lying to Congress about gain-of-function research" his expiring, "but Sen. Rand Paul, R-Ky., is vowing to keep up the pressure on 'the COVID coverup' with a Senate hearing". Erick Mack, "Rand Paul vows to keep pressure on Fauci as statute of limitations on criminal referral expires Monday," *Fox News*, May 11, 2026.

214.    Nonetheless, "Court[s] must consider three factors to determine whether an application to intervene is timely: (1) the stage of the proceedings; (2) the reason for any delay in moving to intervene; and (3) whether the parties would be prejudiced." *EEOC v. ABM Indus. Inc.*, 249 F.R.D. 588 (E.D.Cal. March 5, 2008) (citing *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825 (9th Cir.1996)).

215.    Most recently in the news, "[t]he Department of Justice has indicted a former senior adviser to Dr. Anthony Fauci for allegedly destroying and concealing records from investigations into the origins of the COVID-19 pandemic", and "David Morens, 78, has been charged with one count of conspiracy against the United States; two counts of destruction, alteration, or falsification of records in federal investigations; and two counts of concealment, removal, or mutilation of records." Josh Christenson, "Anthony Fauci adviser indicted by DOJ on charges of concealing COVID records," *New York Post*, April 28, 2026.

216.    "Information in the indictment indicates the co-conspirators are Dr. Peter Daszak, the president of Manhattan-based non-profit EcoHealth Alliance, and Dr. Gerald Keusch, an associate director of Boston University's National Emerging Infectious Disease Laboratory Institute and National Institutes of Health (NIH) grantee." *Id.*

217.    Painting a gloomy forecast, "Dr. Richard Ebright, a molecular biologist at Rutgers

University, [had] added[,] 'Unless one or more flips and provides evidence against Fauci and others in exchange for immunity, all three should be, and likely will be, convicted,'" while noting that "Keusch approved the first EcoHealth grant awarded to the now-infamous Wuhan Institute of Virology in 2002." *Id.*

218.    Prior to the Rose Garden event, "[t]he Secret Service ha[d] refused to disclose how many of its employees ha[d] tested positive or have had to quarantine, citing privacy and security", and some had remarked about the "difference between" what was perceived as "facing outside threats they have trained for — a gun, a bomb or a biohazard — and being put at additional risk because of behavior they characterized as reckless at times", "after White House press secretary Kayleigh McEnany [had] tested positive", finding agents protecting the President actually saying "it felt like he and some of his colleagues had been spared only by a measure of good luck", while "Trump campaign spokesman Hogan Gidley dismissed media concern about the agents' safety as 'absolutely stupid and foolish.'" Jill Colvin, *et al.*, "White House staff, Secret Service eye virus with fear, anger," *AP*, October 6, 2020.

219.    "Trump had aides there recording videos and taking photographs of him", while "the mood within the White House remain[ed] somber, with staff fearful they may have been exposed to the virus", confronting what had been incongruously described by the press as "a new reality — a worksite that once seemed like a bubble of safety is anything but — they also have been engaged in finger-pointing over conflicting reports released about the president's health as well as a lack of information provided internally." *Id.*

220.    While "[m]any. . . learned about positive tests from media reports", with a perception portrayed in the press that "several were [still] exposed, without their knowledge, to people the White House already knew could be contagious", the message from the press, and many

political leaders was that "[e]ven when Trump was at the hospital, his staff was not immune to risk." *Id.*

221.    Nonetheless, "not testifying as an expert," it could be construed as "rationally based on the witness's perception", "helpful to clearly understanding the witness's testimony or to determining a fact in issue" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702", Fed. R. Evid. 701, that "[t]he purpose of the United States Army Chemical, Biological, Radiological, Nuclear School (USACBRNS) Training Guidance is to codify the operations plan to enable the success of the USACBRNS", and "USACBRNS supports efforts to 'Deliver Army 2030' through the execution of our core functional responsibilities aligned with all applicable Army Regulations and Directives." Editors, "Chemical Corps Focus", *DOW* (Fiscal Year 2025).

222.    "The Core Functions of the CBRN Regiment is to assess CBRN threats and hazards to gain real time understanding, protect against CBRN incidents to achieve inherent survivability, and mitigate the consequences of CBRN hazards to negate hazard effects", and "[t]he Core Capabilities of the CBRN Regiment are to advise Commanders regarding CBRN defense and counter weapons of mass destruction (CWMD) missions, CBRN assessment, reconnaissance and surveillance, and contamination mitigation." *Id.*

223.    Not the Medical Service Corps, but rather "[t]he USACBRNS trains Joint and International service members; develops leaders; supports training in units, develops Multi-Service and Army doctrine; builds the future CBRN force; and is the Joint combat developer for the Joint Chemical, Biological, Radiological, and Nuclear Defense program." *Id.*

224.    At the discovery stage, "[i]f a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it", and "[a]

denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest." Fed. R. Civ. P. 36(a)(4).

225.    "The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." *Id.*

226.    Similarly, at the demurrer stage, "[a] party waives any defense listed in Rule 12(b)(2)–(5) by: (A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or (B) failing to either: (i) make it by motion under this rule; or (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course."

227.    Simply stated, where a party "does not challenge the. . . determination. . . [a]ny challenge to those. . . determinations has been waived." *Silva v. Garland*, 27 F.4th 95, n. 7 (2022). *See also Bekele v. Lyft, Inc.*, 918 F.3d 181 (1st Cir. 2019).

228.    Yet, when "[m]ore than 200 people attended the. . . event at the White House Rose Garden where President Donald Trump announced his nomination of Amy Coney Barrett to the U.S. Supreme Court", it was reported monolithically that "[t]he festive function – which drew high-profile public officials, religious leaders and other dignitaries – has since been called a likely coronavirus 'superspreader' after nearly a dozen people in attendance later tested positive for COVID-19." Staff, "Here's everyone at the White House Rose Garden SCOTUS event now called a likely 'superspreader.' Help us ID them all," *USA Today*, October 7, 2020, *updated* January 28, 2021.

229.    Unreported by any news publisher or broadcaster, Intervenor had been presenting the

- 54 -

story that aligned with the controlling laws, commencing the first, and longest surviving, challenge against the lockdowns, *Webb v. Northam*, Case No. CL2001624 (Alexandria Cir. 2020), *aff'd* Record No. 210536 (Va. 2022), *cert. denied* Record No. 21-8142 (U.S. 2021), the first, and longest surviving, challenge against the nonmedical grade facial coverings, *see Webb v. Northam*, Civil Action No. 3:20-cv-00497 (E.D. Va. 2020), *aff'd* Record No. 20-1968 (4th Cir. 2021), *cert. denied* Record No. 21-6170 (U.S. 2021), and, later, the first and longest surviving challenges against the "medical countermeasures against COVID–19", 85 Fed. Reg. 52, *supra. See Webb v. Fauci*, Civ. Act. No. 3:2021cv00432 (E.D.Va. 2020), *aff'd, Record No. 21-2394 (4th Cir. 2022), cert denied*, Record No. 21-8242, 143 S.Ct. 79 (2022); *Webb v. OMB*, Civ. Act. No. 3:2022cv00418 (E.D.Va. 2022), *aff'd*, Record No. 22-1698 (4th Cir. 2023); *Webb v. Fauci*, Record No. 21-6868; 142 S.Ct. 1352 (2022); *Webb v. Meta Platforms, Inc.*, Civ. Act. No. 1:23-cv-00816 (D.C. 2023), *dismissed*, Record No. 24-5036 (D.C.C. 2024); *Webb v. EOP*, Record No. 25-5127 (D.C. Cir. 2025).

230.    Even today, according to official government sources, while "[a] four-count Indictment was issued in U.S. District Court today charging Cole Tomas Allen, 31, with Attempt to Assassinate the President of the United States, Donald J. Trump, in connection with the April 25 shooting during the White House Correspondents' Association Dinner at the Washington Hilton," Press Release, "Indictment Charges Cole Tomas Allen with Attempt to Assassinate the President and Assault on a Federal Officer with a Deadly Weapon," *DoJ*, May 5, 2026, "[a] former National Institute of Allergy and Infectious Diseases (NIAID) employee is facing indictment for his role in a scheme to evade *Freedom of Information Act (FOIA)* requests in connection with COVID-19 research grants", and "David M. Morens, 78, of Chester, Maryland, is charged with conspiracy against the United States; destruction, alteration, or

falsification of records in federal investigations; concealment, removal, or mutilation of records; and aiding and abetting." Office of the Inspector General (OIG), "Former Senior NIAID Official Indicted for Concealing Federal Records During COVID-19 Pandemic," *HHS*, April 28, 2026.

231.    However, "[t]he standard for proving a selective-prosecution claim is 'a demanding one'", *Williams*, 701 F.Supp.3d, at 257 (quoting *Armstrong*, 517 U.S., at 456), and "'[u]nder Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'"" *Id.* (quoting *U.S. v. Texas*, 599 U.S. 670 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)).

232.    "The Government 'retains 'broad discretion' as to whom to prosecute'", *Id.* (quoting *Wayte v. U.S.*, 470 U.S. 598 (1985) (quoting *U.S. v. Goodwin*, 457 U.S. 368, n.11 (1982)), and, "[a]s a result, 'the presumption of regularity supports' ... prosecutorial decisions and, '*in the absence of clear evidence* to the contrary, courts presume that [prosecutors] have properly discharged their official duties.'" *Armstrong*, 517 U.S., at 456 (alteration adopted) (quoting *U.S. v. Chem. Found., Inc.*, 272 U.S. 1 (1926)). *See also U.S. v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

233.    "To establish a selective-prosecution claim, a defendant must present 'clear evidence' that the decision to prosecute not only (1) 'had a discriminatory effect' but also (2) 'was motivated by a discriminatory purpose.'" *Id.* (quoting *Armstrong*, 517 U.S., at 456 (citations omitted). *Accord Alameh*, 341 F.3d, at 167.

234.    "For the first element, a defendant must establish that 'others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the

charge against the defendant' and that the defendant has been 'singled out.'" *Id.* (quoting *U.S. v. Fares*, 978 F.2d 52 (2d Cir. 1992) (alteration adopted) (quoting *U.S. v. Moon*, 718 F.2d 1210 (2d Cir. 1983)).

235.    "For the second element, a defendant must establish that the Government's 'selection of the defendant for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.'" *Id.* (quoting *Ibid.* (alteration adopted) (quoting *Moon*, 718 F.2d, at 1210).

236.    "In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion.'" *Armstrong*, 517 U.S., at 456 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357 (1978)).

237.    "To prove discriminatory effect," a complainant "must show that individuals who are 'similarly situated' and hold a different viewpoint have gone unprosecuted." *Id.* (quoting *Fares*, 978 F.2d, at 52 (quoting *Moon*, 718 F.2d, at 1210).

238.    "This requires showing that individuals outside the protected class committed roughly the same crime in roughly the same circumstances but were not prosecuted." *U.S. v. Parnas*, No. 19-cr-00725 (JPO), 2021 WL 2981567 (S.D.N.Y. July 14, 2021).

239.    "[V]indictive prosecution requires 'a finding of 'actual' vindictiveness' or 'a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action.'" *Williams*, 701 F.Supp.3d, at 257 (quoting *U.S. v. Johnson*, 171 F.3d 139 (2d Cir. 1999) (*per curiam*).

240. Clearly, Intervenor, here, has "identified 'facts indicating that similarly situated individuals have not been prosecuted or that the government otherwise has operated in bad faith,'" *Id.* (quoting *U.S. v. Montague*, 67 F.4th 520 (2d Cir. 2023).

241. Generally, in Article III Courts, pursuant to 28 U.S. Code § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the *Constitution*, laws, or treaties of the United States", and Intervenor presents a federal question, arising under the *Equal Protection Clause* of the *Fourteenth Amendment*, with connection to the *First Amendment*, arising from regulations of content-based free speech, which must be content neutral and are subjected to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

242. Further, it is clear that "'[a] statute challenged on equal protection grounds is evaluated under 'strict scrutiny' if it interferes with a 'fundamental right' or discriminates against a 'suspect class.'" *Gray v. Commonwealth*, 274 Va. 290 (2007) (quoting *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988).

### Conclusion

243. "If a law does too much, or does too little, to advance the government's objectives, it will fail." *Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010) (citing *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214 (1989)).

244. Where "strict scrutiny applies, . . . [a defendant] faces a daunting gauntlet, as 'it is the rare' law that 'survives' this kind of review", *Id.* (quoting *Burson v. Freeman*, 504 U.S. 191 (1992)), and, "[t]o survive, the. . . [regulations] must be 'narrowly tailored' to advance a 'compelling state interest.'" *Id.* (quoting *Eu*, 489 U.S. at 214).

245. "[F]reedom in the long run does not come from this kind of license to each sect to fix its own limits, but comes of hard-headed fixing of those limits by neutral authority with an eye to the widest freedom to proselyte compatible with the freedom of those subjects to

proselying (*sic*) pressures." *Hall v. Commonwealth*, 188 Va. 72 (1948).

246.    Hence, beyond a reasonable doubt, Defendants, with full acquiescence of Plaintiffs, had "engage[d] in. . . conduct with intent to convey false or misleading information under circumstances. . . where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter. . .10." 18 U.S.C. § 1038(a)(1).

247.    "All we say to America is to be true to what you said on paper." Martin Luther King, Jr., *I've Been to the Mountaintop*, April 3, 1968.

WHEREFORE, for the reasons stated above, the Court should grant this motion for to intervene, in addition to granting to Intervenor such other equitable remedies as deemed appropriate.

Respectfully submitted,

· Major Mike Webb, *Pro Se*
3445 Washington Boulevard
Apartment # 306
Arlington, Virginia  22201
Phone: (856) 220-2354
Email: GiveFaithATry@gmail.com
Dated: May 13, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of May, 2026, that I will mail this **Memorandum of Points & Authorities in Support of Motion to Intervene,** by hand delivery and/or email to the following parties, named in suit.

Kathleen A. Kirby, Esq.
Wiley Rein LLP
Counsel for Nexstar, Inc.
2050 M Street, NW
Washington, District of Columbia 20036
Telephone: (202) 719-3360
Email: kkirby@wiley.law

Jocelyn G. Jezierny , Esq.
Counsel for TEGNA, Inc.
Covington & Burling LLP
850 10th Street, NW
Washington, District of Columbia 20001 ·
Telephone: (202) 662-5316
Email: jjezierny@cov.com

Laura Antonini, Paula Blizzard, Paul Chander, Elizabeth Cheever, Emily Curran, Jennifer Hane, Komal K. Patel, Connie P. Sung & Brian Wang, Esqs.
*Office of the Attorney General of California*
455 Golden Gate Ave., Suite 11000
San Francisco, California 94102-7014
Telephone: (415) 510-3765
Email: Paula.Blizzard@doj.ca.gov;
Laura.Antonini@doj.ca.gov

Shaoul Sussman, Nico Gurian, Victoria M. O. Field & Paul M. Goodrich, Esqs.
*Simonsen Sussman LLP*
307 W. 38th St., 16th Floor
New York, New York 10018
Telephone: (646) 693-3929
Email: shaoul@simonsensussman.com;
nico.gurian@simonsensussman.com;
victoria.field@simonsensussman.com;
paul.goodrich@simonsensussman.com

Catherine S. Simonsen & Thomas G. Mattes, Esqs.
*Simonsen Sussman LLP*
418 Bamboo Ln., Suite C-18
Los Angeles, California 90012
Telephone: (917) 747-5196/(202) 384-3130
Email: catherine@simonsensussman.com;
thomas.mattes@simonsensussman.com'
nicolas@simonsensussman.com;
victoria.sims@simonsensussman.com

Bryn A. Williams, Jonathan B. Sallet, Robin Alexander & Amy Bowles, Esqs.
*Office of the Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: (720)508-6000
Email: Bryn.Williams@coag.gov;
Jon.Sallet@coag.gov;
Robin.Alexander@coag.gov;
Amy.Bowles@coag.gov

Julián A. Quiñones Reyes, Esq.
*Office of the Attorney General of Connecticut*
165 Capitol Avenue
Hartford, Connecticut 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov

Paul J. Harper, Elizabeth L. Maxeiner, John R. Milligan & Daniel R. Betancourt, Esqs.
*Office of the Attorney General of Illinois*
115 S. LaSalle St. Chicago, IL 60603
Telephone: (312) 814-1004
E-Mail: paul.harper@ilag.gov

Scott L. Barnhart, Jesse Moore & Jacob Patterson, Esqs.
*Office of the Attorney General of Indiana*
Indiana Government Center South

John Harris, Esq.
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612

**- 60 -**

302 W. Washington Street, 5th Floor
Indianapolis, Indiana 46204
Phone: (317) 232-4956
Email: Jesse.Moore@atg.in.gov

Anthony W. Mariano & Jennifer E. Greaney,
Esqs.
*Office of the Massachusetts Attorney General*
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (781) 835-7990
Email: Anthony.Mariano@mass.gov

Francisco Benzoni  &  Brian Rabinovitz,
Esqs.
*Office of the Attorney General of North
Carolina*
114 W. Edenton Street
Raleigh, North Carolina 27603
Telephone: (919) 716-6000
Email: fbenzoni@ncdoj.gov;
brabinovitz@ncdoj.gov

Tracy W. Wertz, Joseph S. Betsko & Jennifer
A. Thomson, Esqs.
*Pennsylvania Office of the Attorney General*
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania  17120
Email: twertz@attorneygeneral.gov;
jbetsko@attorneygeneral.gov;
jthomson@attorneygeneral.gov
Telephone: (717) 787-4530

Tyler T. Henry, Esq.
*Office of the Attorney General of Virginia*
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Email: THenry@oag.state.va.us;
Attorneygeneral@oag.state.va.us

Telephone: 785-296-2215
Email: John.Harris@ag.ks.gov

Elinor R. Hoffmann, Christopher D'Angelo,
Amy McFarlane & Morgan Feder, Esqs.
*Office of the Attorney General*
28 Liberty Street
New York, New York 10005
Telephone: | (212) 416-8269/(212) 416-
6124/(212) 416-6195/(212) 416-8288
Email: Elinor.Hoffmann@ag.ny.gov;
Christopher.D'Angelo@ag.ny.gov;
Amy.McFarlane@ag.ny.gov;
Morgan.Feder@ag.ny.gov

Timothy D. Smith & Ian Van Loh, Esqs.
*Oregon Department of Justice*
100 SW Market Street
Portland, Oregon  97201
Telephone: (503) 798-3297/(971) 239-
7457/(503) 428.9482
Email: tim.smith@doj.oregon.gov;
ian.vanloh@doj.oregon.gov;
alex.delorenzo@doj.oregon.gov

Sarah L. J. Aceves, Esq.
*Office of the Attorney General of Vermont*
109 State Street
Montpelier, Vermont 05676
Email: sarah.aceves@vermont.gov
Telephone : (802) 828-3170

Respectfully submitted,

Major Mike Webb
3445 Washington Boulevard, Apartment 306
Arlington, Virginia 22201
Phone: (856) 220-1354
Email: GiveFaithATry@gmail.com
Date: May 13, 2026